

FILED
*April 20, 2015*
Third Court of Appeals
Jeffrey D. Kyle
Clerk

ACCEPTED
03-14-00725-CV
4956355
THIRD COURT OF APPEALS
AUSTIN, TEXAS
4/20/2015 3:17:27 PM
JEFFREY D. KYLE
CLERK

No. 03-14-00725-CV

## IN THE THIRD COURT OF APPEALS
## AUSTIN, TEXAS

### IN RE GEORGE GREEN AND GARLAND GREEN
*RELATOR*

PETITION FOR MANDAMUS FROM CAUSE NO. 18314
33RD JUDICIAL DISTRICT COURT OF LLANO COUNTY, TEXAS
HON. ALLAN GARRETT, PRESIDING

**BRIEF**
OF PORT OF CALL HOMEOWNERS ASSOCIATION, RANDOLPH HARIG,
PHILLIP JACOBS, JOHN ROSS BUCHHOLTZ, RICHARD PAT MCELROY,
*REAL PARTIES IN INTEREST*

Brantley Ross Pringle, Jr.
State Bar No. 16330001
rpringle@2w-g.com
Heidi A. Coughlin
State Bar 24059615
hcoughlin@w-g.com
Mike Thompson, Jr.
State Bar No. 19898200
mthompson@w-g.com
Wright & Greenhill, P.C.
221 W. 6th Street, Suite 1800
Austin, Texas 78701
512/476-4600
512/476-5382 (Fax)
*Attorneys for Real Parties In
Interest*

# IDENTITY OF PARTIES AND COUNSEL

To comply with the Texas Rules of Appellate Procedure, the following is a complete list of all parties to the trial court's order at issue, as well as the names and addresses of all trial and appellate counsel.

**Relator:**

George Green
Garlan Green, deceased

**Counsel for Relator:**

David Junkin
P.O. Box 2910
Wimberley, Texas 78676
david@junkinlawoffice.com

**Real Parties In Interest:**

Port of Call Homeowners Association
Randolph Harig
Phillip Jacobs
John Ross Buchholtz
Richard Pat McElroy

**Counsel for Defendants/Real Parties In Interest:**

Brantley Ross Pringle, Jr.
rpringle@w-g.com
Heidi A. Coughlin
hcoughlin@w-g.com
Mike Thompson, Jr.
mthompson@w-g.com
Wright & Greenhill, P.C.
221 W. 6th Street, Suite 1800
Austin, Texas 78701

**Respondent:**

Honorable Allan Garrett
Judge 33rd Judicial District Court
Of Llano County, Texas

Executed the orders of which
Relators complain

**Other Parties:**

Nancy Carothers

L. Hayes Fuller, III
Naman Howell Smith & Lee,
P.L.L.C.
400 Austin Avenue, Suite 800
P. O. Box 1470
Waco, TX   75703-1470
hfuller@namanhowell.com

# TABLE OF CONTENTS

Index of Authorities ........................................................................ v - vi

Statement of the Case ...................................................................... 2

Counter-Issues Presented................................................................ 3

**Counter-Issue One: The Court of Appeals does not have jurisdiction to consider the discovery matters at issue in this case and the mandamus should be dismissed because Relator has an adequate legal remedy.**

**Reply Point One: Assuming arguendo, that this court has jurisdiction of this matter, Mandamus still fails, because Green has the right to inspect documents provided under the order and the trial court did not abuse its discretion in maintaining its docket and court procedures. [Responsive to all Relator's issues]**

Background........................................................................................ 4 - 5

Summary of the Argument ............................................................... 6

Argument and Authorities ............................................................... 7 - 18

Conclusion and Prayer..................................................................... 19

Certificate of Service ....................................................................... 22

Appendix ............................................................................................ 23-24

# INDEX OF AUTHORITIES

**Case Law**                                                                             **Page(s)**

*Burton v. Cravey,*
    759 S.W.2d 160 (Tex.App.—Houston [1st Dist] 1988, *no writ*) ............ 18,23

*Cleveland v. Williams,*
    29 Tex. 204, 213 (1867) ................................................................. 11,23

*Cole v. McWillie,*
    ___ S.W.3d___, 2015 WL 535562 (Tex.App.—Eastland 2015, *no pet* ... 11,23

*Crawford v. Morris,*
    228 S.W.2d 364, 366 (Tex.Civ.App.—Eastland 1950,
    *writ ref'd n.r.e.*) ........................................................................... 11,23

*Downer v. Aquamarine Operators, Inc.,*
    701 S.W.2d 238 (Tex. 1985) *cert. denied,* 476 U.S. 1159 (1986) ......... 9,23

*Ezeoke v. Tracy,*
    349 S.W.3d 679 (Tex. App.—Houston [14th Dist.] 2011, *no pet.*)......... 16,23

*Gaughn v. National Cutting Horse Association,*
    351 S.W. 3d 408 (Tex.App.—Ft. Worth 2011, *pet. for review denied* .. 16,23

*Gilmer v. Veatch,*
    121 S.W. 545 (1909) ...................................................................... 11,23

*Huie v. DeShazo,*
    922 S.W.2d 920 (Tex. 1996) ........................................................... 16,23

*In re Bay Area Citizens Against Lawsuit Abuse,*
    982 S.W. 2d 371, 381-82 (Tex. 1998) ............................................... 15,23

*In re Campbell,*
    106 S.W.3d 788 (Tex.App.—Texarkana 2003) ..................................... 7,23

*Johnson v. Fourth Court of Appeals,*
    700 S.W.2d 916 (Tex. 1985) .............................................................. 9,23

*Lehmann v. Har-Con Corp.,*
    39 S.W.3d 191, 200 (Tex. 2001) ....................................................8,10,23

*Nehring v. McMurrain,*
    45 S.W. 1032 (Tex. Civ. App. 1898) .................................................. 11,23

*Scott & White Memorial Hosp. v. Schexnider,*
    940 S.W.2d 594 (Tex. 1996) ............................................................ 10,24

*Velez v. DeLara,*
    905 S.W.2d 43 (Tex.App.—San Antonio 1995, *no writ* ........................ 8,24

*Walker v. Packer,*
    827 S.W.2d 833 (Tex. 1992) .............................................................. 8,24

*Watson v. The Homeowners Association of Heritage Ranch, Inc.,*
    346 S.W.3d 258 (Tex.App.—Dallas 2011, *no writ*)............................ 12,24

*Wood v. James R. Moriarty, P.C.,*
        940 S.W.2d 359 (Tex.App.—Dallas, 1997, *no pet*) ............................... 7,24

**Rules**

Tex. Bus. Org Code §252.010 (Vernon 2012).................................................. 18,24
Tex. Bus. Org. Code §22.351 (Vernon 2012)..................................................13,14,18,24
Tex. Bus. Org. Code §1396-2.23A(Vernon 2009) ........................................... 15,24
Tex. Prop. Code §82.114 (Vernon 2014) .......................................................13,14,17,24
Tex. R. App. Pro. 42.3 (Vernon 2003) ........................................................... 7,24
Tex. R. Civ. Pro. 190.5 (Vernon Supp. 2014) ................................................ 15,24
Tex. R. Civ. Pro. 191.1 (Vernon 2004) ......................................................... 15,24
Tex. R. Civ. Pro. 191.3(c) (Vernon 2004) ...................................................... 16,24
Tex. R. Civ. Pro. 191.3(e) (Vernon 2004) ...................................................... 16,24
Tex. R. Civ. Pro. 192.4 (Vernon 2004) ........................................................... 15,24
Tex. R. Civ. Pro. 192.6 (Vernon 2004) ........................................................... 15,24
Tex. R. Civ. Pro. 192.6(a) (Vernon 2004) ....................................................... 16,24
Tex. R. Civ. Pro. 192.6(b)(4) (Vernon 2004) .................................................. 16,24
Tex. R. Civ. Pro. 215.3 (Vernon 2004) ........................................................... 15,24
Tex. R. Civ. Pro. 301 (Vernon 2008) .............................................................. 10,24
Tex. R. Civ. Pro. 329b (Vernon 2008) ............................................................ 10,24

**Other**
www.Washingtonpost.com "John Roberts, Umpire"
        6/28/2012, Chris Cillizza (visited 2/27) ...................................... 10,24

No. 03-14-00725-CV

---

IN THE THIRD COURT OF APPEALS
AUSTIN, TEXAS

---

IN RE GEORGE GREEN AND GARLAND GREEN
*RELATOR*

---

PETITION FOR MANDAMUS FROM CAUSE NO. 18314
33RD JUDICIAL DISTRICT COURT OF LLANO COUNTY, TEXAS
HON. ALLAN GARRETT, PRESIDING

---

**BRIEF**
OF PORT OF CALL HOMEOWNERS ASSOCIATION, RANDOLPH HARIG,
PHILLIP JACOBS, JOHN ROSS BUCHHOLTZ, RICHARD PAT MCELROY,
*REAL PARTIES IN INTEREST*

---

TO THE HONORABLE THIRD COURT OF APPEALS:

COME NOW Real Parties In Interest Port of Call Homeowners Association,

Randolph Harig, Phillip Jacobs, John Ross Buchholtz, and Richard Pat McElroy

(hereinafter "POC") and file this their Brief and would show the following:

## STATEMENT OF THE CASE

POC generally agrees with George Green and Garlan Green's (hereinafter "Green") statements of the case as reported in the original brief and subsequent Court of Appeals pleadings in general. The primary disagreement between the parties now centers on whether or not the Court of Appeals has jurisdiction to consider the discovery order at issue and whether or not the trial court abused its discretion with its discovery rulings.

## COUNTER-ISSUES PRESENTED

**Counter-Issue One:** The Court of Appeals does not have jurisdiction to consider the discovery matters at issue in this case and the mandamus should be dismissed because Relator has an adequate legal remedy.

**Reply Point One:** Assuming arguendo, that this court has jurisdiction of this matter, Mandamus still fails, because Green has the right to inspect documents provided under the order and the trial court did not abuse its discretion in maintaining its docket and court procedures. [Responsive to all Relator's issues]

# BACKGROUND

In his Original Petition, Green complains that POC breached fiduciary duties and breached contracts. (CR p. 8-14)[1] During the pendency of the litigation, POC filed a motion seeking protection from Green's discovery actions on August 8, 2014. (CR p. 114-130) One basis of the Motion was that Green was making duplicative requests for information to harass POC. (RR Vol. II, p. 5-15) A hearing was held on August 14, 2014, and after that, an order for protection was granted. (CR p. 131-132) George Green was at that hearing and discussed discovery issues with Respondent. (RR Vol. II, p. 28)

Subsequently, Green continued conduct POC believed violated the order of protection. (CR p. 153-156) In response, POC filed a Motion to Enforce the Order of August 14, 2014. (CR p. 153-156) A hearing was held on that motion on October 14, 2014. (CR p. 175; RR Vol. III, p. 3) The Judge granted the Motion to Enforce the Protective Order and entered an order on October 21, 2014. (CR p. 175) The record of the hearing on that Motion again details what Respondent expected of the parties. (RR Vol. II, p. 12-19) That is the order that was the subject of the original appeal. That order has been vacated. (Supp. CR p. 4)

---

[1] For this brief, the Clerk's Record is referenced as CR p. ___ or Supp. CR p. ___ for the Supplemental Clerk's Record. The Reporter's Record is referenced as RR Vol. ___ p. ___; or Supp. RR p. __ for references to the Supplemental Reporter's Record for the hearing January 30, 2015.

On January 30, 2015, a hearing was held in the District Court and as noted, the Respondent vacated the order of October 21, 2014. (Supp. CR p. 4; Supp. RR p. 4-30) On that date, the trial court again discussed the discovery issues at length with the parties, working with them to try to fashion a further compromise in order to meet the concerns of both parties. (Supp. RR Vol. I, p. 4-31) As the record from that hearing makes clear, neither Respondent nor Real Parties In Interest were seeking to prevent Green from attending meetings of the Homeowners Association ("HOA"), voting in HOA elections or speaking at those meetings. (Supp. RR Vol. I, p. 6, 11, 15, 23) Indeed, Green had attended meetings of the Homeowners Association after the October 21, 2014 order. (Supp. RR Vol. I, p. 6) Rather, Respondent wanted to provide Relator the information allowable under the Bylaws and Codes, while preventing what he had found to be the harassing conduct of constant demands for information and documents directly to POC. (*Id*)

## SUMMARY OF THE ARGUMENT

In the present action, the Court of Appeals is without jurisdiction to grant mandamus for two reasons. First, the trial court vacated the earlier order Green sought to appeal. Second, the January 30, 2015 order concerns a discovery matter, there is no final judgment and there is an adequate remedy at law.

Moreover, assuming arguendo that this Court has jurisdiction, the Trial Court did not abuse its discretion in any action of which the Relator has complained, or seeks to complain. Respondent has authority to manage his docket and the discovery process for cases the parties have conferred jurisdiction upon it by filing a lawsuit. Moreover, the codes providing for information and document requests require such requests be pursued reasonably and for a proper purpose. The Respondent very clearly followed those principles in fashioning these orders.

# I.  ARGUMENT AND AUTHORITIES

**A.**  **The Court of Appeals does not have jurisdiction to consider the discovery matters at issue in this case and the mandamus should be dismissed because Relator has an adequate legal remedy.**

> **1.**  **The Court Should Reconsider its April 3, 2015 Order and Find the Issue Moot Because the Order Complained of was Vacated.**

Originally, Relator claimed to be seeking interlocutory review of an injunction.  However, properly understood, the order for which Green seeks relief is a discovery sanction. *Wood v. James R. Moriarty, P.C.,* 940 S.W.2d 359 (Tex. App—Dallas, 1997, *no pet*).  On January 30, 2015, a hearing was held in the District Court and the District Court vacated the order of October 21, 2014, the order that was the subject of the pending interlocutory appeal. (Supp. CR p. 4)

POC has argued and here re-urges its argument that this court has the authority to dismiss this appeal because the discovery order complained of has been vacated. *In re Campbell*, 106 S.W.3d 788 (Tex. App.—Texarkana 2003)(trial court order vacating earlier contempt order moots appeal because order no longer exists).  For this reason, POC re-urges its argument that the Court of Appeals is without jurisdiction and the case should be dismissed.  *Tex. R. App. Pro.* 42.3 (Vernon 2003).

> **2.**  **The mandamus should be denied because this is a discovery matter, there is no final appealable judgment and Relators have an adequate remedy at law for the review of the Order.**

This case involves questions about the discovery process undertaken by the parties and the court umpiring those actions in this civil case. There is no final judgment. *Lehmann v. Har-Con Corp.,* 39 S.W.3d 191, 200 (Tex. 2001). Rather, Green sought to proceed under the extraordinary remedy that is an interlocutory appeal. (CR p. 182-183) Subsequently, this Court allowed Green's appeal to proceed as a mandamus action.

Consistent with the idea of judicial economy allowing review of trial court rulings under the discretionary standard of review, Green has a remedy at law for the review of these discovery orders and that is available after judgment. *Walker v. Packer*, 827 S.W2d 833, 842 (Tex. 1992). The discussion between the parties and Respondent, about the Respondent's interest for discovery in this case, weighing costs to the court and parties clearly illustrates why discovery matters are not ordinarily appealable during the pendency of the case. (Supp. RR Vol. I, p. 10-24) Discovery sanctions are rarely the proper subject for mandamus review. *Velez v. Delara*, 905 S.W.2d 43 (Tex.App.—San Antonio 1995, *no writ*). Even if the Court of Appeals had jurisdiction, the Respondent did not abuse his discretion with his ruling in this case. And, if he did, the ruling is subject to review after judgment.

**B.** **Reply Point One: Assuming arguendo, that this court has jurisdiction of this matter, Mandamus still fails, because Green has the right to inspect documents provided under the order and the trial court did not abuse its discretion in maintaining its docket and court procedures. [Responsive to all Relator's issues]**

**1. Standard of Review**

As Relator rightly concedes, a trial court has a broad range of discretion in maintaining its docket and controlling discovery procedures with parties before the court. The proper standard of review for this matter is whether or not the trial judge abused his discretion. *Johnson v. Fourth Court of Appeals*, 700 S.W.2d 916, 917 (Tex. 1985). In order to establish that the trial judge abused his discretion, the reviewing court must consider he acted without reference to any guiding rules and principles, such that the act was arbitrary and unreasonable. *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238 (Tex. 1985) *cert. denied*, 476 U.S. 1159 (1986).

**2.     The court did not violate its discretionary authority to umpire discovery matters before the court.**

When standing for confirmation to the Supreme Court, Justice John Roberts aptly described the proper role of the judge as the umpire of the judicial system, not playing the game, but seeking to insure the parties operate fairly and in bounds. www.Washingtonpost.com 6/28/2012, Chris Cillizza (visited 2/27). As the parties here agree, that understanding is at the heart of the standard of review in this case. The standard guides the Court of Appeals' review. Applying that standard, it is clear the district judge did not abuse his discretion here.

Regardless of how the order at issue may be styled, it is not a final order as it did not dispose of all parties and/or claims. *Lehmann v. Har-Con*, 39 S.W.3d 191, 200 (Tex. 2001). Therefore, it is not a final judgment. *Tex. R. Civ. Pro.* 301. A trial court retains jurisdiction over its docket, including the power to modify, amend, or change interlocutory rulings and orders until it loses its plenary power. *Tex. R. Civ. Pro.* 329b, *Scott & White Memorial Hosp., v. Schexnider*, 940 S.W.2d 594, 596 (Tex. 1996). Accordingly, the trial court had authority to change this interlocutory order in the way it did regardless of what it is called.

**3. Green is not entitled to mandamus relief from Judge Garrett's January 30, 2015 discovery order because the Judge's decision was not arbitrary, it was reasonable, and does not violate Green's rights as a property owner derived from statute, bylaws or other legal authority.**

**a. George Green is not a property owner and therefore has no rights to inspect records under the statute, bylaws or other legal authority.**

George Green brought this lawsuit by and through a Power of Attorney he had from his father, Garlan Green, a property owner at Port of Call. (CR p. 8) Relator argued earlier that outside of the discovery context of the Texas Rules of Civil Procedure, he is entitled to information under the Property Code, the Texas Business Organizations Code and the Bylaws of the Association as a property owner. (RR Vol. II, p 51 - 53) On or about January 17, 2015, Garlan Green passed away. Green's counsel has since filed a Suggestion of Death notifying the Court of this development. The powers of the agent cease on the death of his principal. *Cole v. McWillie*, ___ S.W.3d ___, 2015 WL 535562 (Tex.App.—Eastland 2015, *no pet.*) ("...the law is clear, that an agent's authority to bind his principal terminates upon the principal's death." citing *Cleveland v. Williams*, 29 Tex. 204, 213 (1867), *Crawford v. Morris*, 228 S.W.2d 364, 366 (Tex.Civ.App.—Eastland 1950, *writ ref'd n.r.e.*)). Upon his passing, the Power of Attorney from Garlan Green to his son George Green was revoked. *Gilmer v. Veatch,* 121 S.W. 545 Tex. Civ. App. 1909, *no writ*), *Nehring v. McMurrain*, 45 S.W. 1032 (Tex. Civ.

App. 1898, *no writ*). Green's counsel has acknowledged that Garland Green's death complicates standing. (Supp. RR p. 12-13)

George Green is not a property owner. (Supp. RR p. 12-13) Nor is there any evidence that he is acting as a proper agent for a property owner because the property owner Garlan Green has passed away. Therefore, George Green has no rights to review or inspect documents under the Homeowner Association Bylaws, the Texas Property Code or the Texas Business Organizations Code. Absent such standing, he has no right to request or inspect documents in any event.

> **b.** **Respondent balanced Green's right to inspect documents, as a property owner, with Green's previous unreasonable, harassing document requests. The January 30, 2015 Order provides Green with all the documents he is entitled to inspect under statutes and bylaws and protects the POC from constant harassing requests.**

In the filings they have made with the court, the Relator has also mischaracterized the court's order of January 30, 2015. The fact is, the order entered by the court on January 30, 2015 expressly allows for the production of records from POC to Green through counsel.[2] (Supp. CR p. 5) This is a proper ruling. *See Watson v The Homeowners Association of Heritage Ranch, Inc.*, 346 S.W.3d 258 (Tex.App.—Dallas 2011, *no petition*) (protective order regarding information request under statute not abuse of discretion). Indeed, POC is obligated to provide documents every 60 days without any further request. (Supp.

_____

[2] So did the earlier orders of August 14, 2014 and October 21, 2014.

-12-

CR p. 5) This is a procedure that is more liberal than the provisions of the Property Code, or the Business Organization Code themselves. *See: Tex. Prop. Code* §82.114 and *Tex. Bus. Org. Code* §22.351. (and/or their predecessors) Further, no one has argued that POC has not followed and met its obligations under these orders made by Respondent. The January 30, 2015 order provides a reasonable procedure for POC to provide all statutorily required documents and other discovery.

The apparent question before the court in this Mandamus proceeding is whether the Relator abused his discretion to control extra-judicial discovery requests incident to a lawsuit. *See* Court of Appeals Order of April 3, 2015 p. 2. The Court has asked POC to address the power of the court to control document and information requests existing beyond the ordinary discovery vehicles described in the Texas Rules of Civil Procedure. Initially, the Court of Appeals should recognize that the Respondent did not abuse his discretion in finding Green had not exercised his rights for a proper purpose, but rather had been using them to harass the Association.

At the commencement of this lawsuit, Green sent POC significant discovery, including extensive requests for production of documents. (RR Vol. II, p. 51) These requests included information a property owner is entitled to inspect by statute, as well as additional information. (*Id.*) The Texas Property Code, Texas

Business Organization Code, and the Port of Call Homeowners Association Bylaws themselves only require that documents requested be produced for inspection, and possibly copying. *Tex. Prop. Code* §82.114; *Tex. Bus. Org. Code* §22.351. However, Relator also requested the documents in his Requests for Production and his attorney has taken the position that inspection is not sufficient but rather the documents needed to be "produced." (RR Vol. II, p. 51) POC counsel has produced to Green all non-privileged documents in their actual and constructive possession relating to the Home Owners Association, these documents dated back to 1998 and totaled over 16,000 pages. (RR Vol. II, p. 19)

Ultimately POC sought relief from Green's constant demands in the form of a protective order. (CR p. 114) The Respondent determined that the constant demand to the POC for more documents, additional documents and to re-review documents previously produced, was harassing. (RR Vol. II, p. 29, 53; RR Vol. II, p. 13-19; Supp. RR p. 8-30) Subsequently, POC filed a Motion to Enforce the order believing Green had violated the earlier ruling. (CR p. 153) After a series of hearings, the Order of January 30, 2015 was entered. (Supp. CR Vol. I, p. 5) It requires "Defendants [POC] supplement document responsive to Plaintiff's [Green] previous discovery requests made by Plaintiff every sixty (60) days ... Such supplementation shall occur without prompting or request by Plaintiff, and *shall include any Port of Call Homeowners Association-related documents that*

*members may lawfully request due to their status as HOA members."* (Supp. CR Vol. I, p. 5) (*Emphasis added*)

Clearly, the court can sanction parties under the discovery rules of the Texas Rules of Civil Procedure, when parties are abusing discovery. *See generally: Tex. R. Civ. Pro. 190.5 (Vernon Supp. 2014), Tex. R. Civ. Pro. 191.1 (Vernon 2004), Tex. R. Civ. Pro. 192.4 (Vernon 2004), Tex. R. Civ. Pro. 192.6 (Vernon 2004), and Tex. R. Civ. Pro. 215.3 (Vernon 2004).* Indeed, the court can undertake such action *sua sponte. See Tex. R. Civ. Pro. 191.3(e) (Vernon 2004).* Further, the court can modify a discovery period developed under the Texas Rules of Civil Procedure at anytime, and it **must** do so when justice requires it. *Tex. R. Civ. Pro. 190.5.* (*Emphasis added*) Those rules further describe that discovery may be limited by the court, and should be limited by the court if it determines, on motion or its own initiative, that discovery requests are duplicative or otherwise harmful. *Tex. R. Civ. Pro. 192.4.*

Properly understood, this power of the court to umpire the parties' discovery efforts must extend to extra judicial discovery processes in other statutory frameworks, like the Texas Property Code and the Texas Business Organizations Code. Courts have recognized this. *See e.g.*, *In re Bay Area Citizens Against Lawsuit Abuse*, 982 S.W.2d 371, 381-82 (Tex. 1998) (names of financial contributors not subject to blanket disclosures under *Tex. Bus. Org. Code* §1396-

2.23A), *Huie v. DeShazo*, 922 S.W.2d 920, 923-23 (Tex. 1996) (information requests under statute do not override attorney-client privilege). Indeed, even the structure of the Texas Rules of Civil Procedure themselves support this understanding, because the power of the court to sanction, limit or otherwise modify discovery requests found in *Tex. R. Civ. Pro.* 192.6(a) and 192.6(b)(4) is not limited to "these rules" (i.e., the discovery processes of the Rules of Civil Procedure). The drafters of those rules could have limited that provision to the discovery in the Rules of Civil Procedure had they wanted to. They did not. Thus, that power is not circumscribed. *See: Gaughn v. National Cutting Horse Association*, 351 S.W. 3d 408 (Tex.App.—Ft. Worth 2011, *pet. for review denied*).

In addition, *Tex. R. Civ. Pro.* 191.3(c) provides that the signature of a party to a "discovery request" implies that the request, among other things, is not harassing. If a court determines otherwise it may impose a sanction on the person who made the certification by signature. *Tex. R. Civ. Pro.* 191.3(e). Again, that judicial power is not limited to "these rules" and the discovery vehicles described in the Rules of Civil Procedure. Therefore, the judicial discretion built into the system via the Texas Rules of Civil Procedure can be applied to discovery matters beyond those rules. *See: Gaughn v. National Cutting Horse Association*, 351 S.W.3d 408 (Tex.App.—Ft. Worth 2011, *pet. for review denied*). In addition, a court has inherent authority in some situations to impose sanctions. *See: Ezeoke v.*

*Tracy*, 349 S.W.3d 679, 685 (Tex. App.—Houston [14th Dist.] 2011, *no pet.*). That power extends to sanctions if a party violates a court order, like here. Respondent earlier determined that Green had violated his discovery order of August 14, 2014 and continued harassing POC. (CR p. 175; Supp. RR Vol. I, p. 8; RR Vol. II, p. 12-19)

It is not crystal clear all of the statutory schemes the Relator believes provide him the right of immediate inspection of records from his father's Homeowners Association. In the hearing of August 14, 2014, Relator's counsel urged Texas Business and Organizations Code §252.010 and §22.351. (RR Vol. II, p. 40 - 45) Furthermore, the Texas Property Code §82.114 is referenced in the Bylaws and thus also of likely application. (RR Vol. II, p. 40) Moreover, §81.209 of the Texas Property Code may too apply. Each of these is discussed below.

The Texas Property Code §82.114(b) requires an association keep "all financial and other records of the association…*reasonably* available…for examination by a *unit owner* and the *owner's agents*." *Tex. Prop. Code* §82.114 (*Vernon's 2014*). (*Emphasis added*) The same reasonableness provision is incorporated into the Port of Call Homeowner's Association Bylaws by reference. (RR Vol. II, p. 40) Section 81.209[3] of the Property Code has been interpreted to mean a homeowner may inspect records unless the request is for an improper

---

[3] §81.209 applies to those regimes created before January 1, 1994. POC was created in 1980, it is possible it has application to this case.

purpose.  *Burton v. Cravey*, 759 S.W.2d 160 (Tex.App.—Houston [1ˢᵗ Dist] 1988, *no writ*).

The Texas Business Organizations Code states that a member of a corporation is entitled to review specific documents at any "reasonable time and for a *proper purpose*."  *Tex. Bus. Org. Code* §22.351 (*Vernon's 2012*) (*Emphasis added*)  Moreover, §252.010 requires that an unincorporated non-profit association ". . . shall make the books and records available on request to members of the association for inspection and copying."  *Tex. Bus. Org. Code* §252.010 (*Vernon 2012*).[4]  The statutes do not require production "on demand."  (RR Vol. II, p. 27)

Considering all of these sections together, it is certainly not an abuse of discretion for a court to determine that the documents the statues require to be inspected or produced shall be produced in a form that is regularly used in the course of business every 60 days.  That is what the Respondent did in this case.  That should not be taken as disregarding all standards or rules, but is rather a prudent use of his discretionary authority.

Since the Respondent ruled that POC had to *produce* all documents Green would be entitled to *inspect* as a homeowner, POC is actually required to exceed their obligations to Green under the referenced statutes or bylaws.  In an effort to curb what Respondent identified as Green's previous harassing behavior, the Court

---

[4] While POC was created in 1980, it was not incorporated until later.  (RR Vol. I, p. 41-42)  Thus both sections might apply.

also ruled that Green's request for documents covered by the order or previously produced will be viewed as a discovery abuse and subject to sanctions. (Supp. CR p. 5) The Judge explicitly excluded requests for documents from Green's attorney. (*Id*)

The January 30, 2015 Order does not deprive Green of any right to access of records, in fact, it gives him greater access to records than he is entitled to under statutes and bylaws. Further the January 30, 2015 Order is an attempt to protect POC from Green's harassing and abusive requests. Accordingly, there is no abuse of discretion in making the order Respondent made and the Petition for Mandamus should be denied.

## CONCLUSION AND PRAYER

POC prays that the Court dismiss the Petition for Mandamus because it is without jurisdiction to consider it. In the alternative, POC prays that the Court deny the Relator's issues because there is no error in the rendition of the order below. Pleading as a further alternative, POC prays that the Court sustain their counterpoint as an alternative ground for affirming the order of the trial court. POC prays for such other relief both at law or equity to which it may be justly entitled.

Respectfully submitted,

WRIGHT & GREENHILL, P.C.
221 West 6th Street, Suite 1800
Austin, Texas 78701
512/476-4600
512/476-5382
rpringle@w-g.com
hcoughlin@w-g.com
mthompson@w-g.com

/s/ Brantley Ross Pringle, Jr.
By:_____
Brantley Ross Pringle, Jr.
State Bar No. 16330001
Heidi A. Coughlin
State Bar No. 24059615
Mike Thompson, Jr.
State Bar No. 19898200

ATTORNEYS FOR REAL PARTIES
IN INTEREST

## CERTIFICATE OF COMPLIANCE

Pursuant to Tex. R. App. Pro. 9.4, the undersigned certifies this brief complies with the type-volume limitations of Tex. R. App. Pro. 9.4(i)(2)(3).

1. EXCLUSIVE OF THE EXEMPTED PORTIONS IN TEX. R. APP. PRO. 9.4(i)(1), THE BRIEF CONTAINS (select one):

 A. 3524 words, OR

 B. _____ lines of text in monospaced typeface.

2. THE BRIEF HAS BEEN PREPARED (select one):

 A. in proportionally spaced typeface using:

 X   Software Name and Version:  Microsoft Word:  Mac 2011 in Times New Roman 14, OR

 B. in monospaced (nonproportionally spaced) typeface using:

 Typeface name and number of characters per inch.


 *Mike Thompson*
 Mike Thompson, Jr.

## NOTICE OF ELECTRONIC FILING

The undersigned counsel certifies that on the 20th day of April, 2015, he has electronically filed the foregoing document with the 3rd Court of Appeals using the court's electronic filing system.

## CERTIFICATE OF SERVICE

I hereby certify that on the 20th day of April, 2015, a true and correct copy of the foregoing Brief has been mailed, by certified mail, return receipt requested, to the following:

David Junkin
LAW OFFICE OF DAVID JUNKIN
P. O. Box 2910
Wimberley, Texas 78676

L. Hayes Fuller, III
NAMAN HOWELL SMITH & LEE, P.L.L.C
400 Austin Avenue, Suite 800
P. O. Box 1470
Waco, Texas 75703-1470

　　　　　　　　　　　　　　/s/ Mike Thompson, Jr.
　　　　　　　　　　　　　　Mike Thompson, Jr.

No. 03-14-00725-CV

IN THE THIRD COURT OF APPEALS
AUSTIN, TEXAS

IN RE GEORGE GREEN AND GARLAND GREEN
*RELATORS*

PETITION FOR MANDAMUS FROM CAUSE NO. 18314
33RD JUDICIAL DISTRICT COURT OF LLANO COUNTY, TEXAS
HON. ALLAN GARRETT, PRESIDING

## APPENDIX OF CASES AND RULES

**Exhibit #**                                    **Document**

1.   *Burton v. Cravey*, 759 S.W.2d 160 (Tex.App.—Houston [1st Dist] 1988, *no writ*)
2.   *Cleveland v. Williams*, 29 Tex. 204, 213 (1867)
3.   *Cole v. McWillie*, __ S.W.3d __, 2015 WL 535562 (Tex.App.—Eastland 2015, *no pet.*
4.   *Crawford v. Morris*, 228 S.W.2d 364, 366 (Tex.Civ.App.—Eastland 1950, *writ ref'd n.r.e.*)
5.   *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238 (Tex. 1985) *cert. denied*, 476 U.S. 1159 (1986)
6.   *Ezeoke v. Tracy*, 349 S.W.3d 679, 685 (Tex. App.—Houston [14th Dist.] 2011, *no pet.*)
7.   *Gaughn v. National Cutting Horse Association*, 351 S.W. 3d 408 (Tex.App.—Ft. Worth 2011, *pet. for review denied*
8.   *Gilmer v. Veatch*, 121 S.W. 545 (1909)
9.   *Huie v. DeShazo*, 922 S.W.2d 920, 923-23 (Tex. 1996)
10.  *In re Bay Area Citizens Against Lawsuit Abuse*, 982 S.W. 2d 371, 381-82 (Tex. 1998)
11.  *In re Campbell*, 106 S.W.3d 788 (Tex.App.—Texarkana 2003)
12.  *Johnson v. Fourth Court of Appeals*, 700 S.W.2d 916 (Tex. 1985)
13.  *Lehmann v. Har-Con Corp.*, 39 S.W.3d 191, 200 (Tex. 2001)
14.  *Nehring v. McMurrain*, 45 S.W. 1032 (Tex. Civ. App. 1898)

15. *Scott & White Memorial Hosp. v. Schexnider*, 940 S.W.2d 594 (Tex. 1996)
16. *Velez v. DeLara*, 905 S.W.2d 43 (Tex.App.—San Antonio 1995, *no writ*
17. *Walker v. Packer*, 827 S.W.2d 833 (Tex. 1992)
18. *Watson v. The Homeowners Association of Heritage Ranch, Inc.*, 346 S.W.3d 258 (Tex.App.—Dallas 2011, no writ)
19. *Wood v. James R. Moriarty, P.C.*, 940 S.W.2d 359 (Tex.App.—Dallas, 1997, *no pet*)
20. Tex. Bus. Org Code §252.010 (Vernon 2012)
21. Tex. Bus. Org. Code §22.351 (Vernon 2012)
22. Tex. Bus. Org. Code §1396-2.23A  (Vernon 2009)
23. Tex. Prop. Code §82.114 (Vernon 2014)
24. Tex. R. App. Pro. 42.3 (Vernon 2003)
25. Tex. R. Civ. Pro. 190.5 (Vernon Supp. 2014)
26. Tex. R. Civ. Pro. 191.1 (Vernon 2004)
27. Tex. R. Civ. Pro. 191.3(c) (Vernon 2004)
28. Tex. R. Civ. Pro. 191.3(e) (Vernon 2004)
29. Tex. R. Civ. Pro. 192.4 (Vernon 2004)
30. Tex. R. Civ. Pro. 192.6 (Vernon 2004)
31. Tex. R. Civ. Pro. 192.6(a) (Vernon 2004)
32. Tex. R. Civ. Pro. 192.6(b)(4) (Vernon 2004)
33. Tex. R. Civ. Pro. 215.3 (Vernon 2004)
34. Tex. R. Civ. Pro. 301 (Vernon 2008)
35. Tex. R. Civ. Pro. 329b (Vernon 2008)

**Other**
36. [www.Washingtonpost.com](http://www.Washingtonpost.com) "John Roberts, Umpire" 6/28/2012, Chris Cillizza (visited 2/27)

759 S.W.2d 160
Court of Appeals of Texas,
Houston (1st Dist.).

Lou W. BURTON and Galleria
Diplomat Association, Inc., Appellants,
v.
Jeffrey M. CRAVEY, et al., Appellees.

No. 01–88–00270–CV.  |  Aug. 18,
1988.  |  Rehearing Denied Sept. 8, 1988.

Condominium association appealed an order of the 269th District Court of Harris County, David West, J., which granted condominium owners a writ of mandamus to inspect the association's books and records. The Court of Appeals, Duggan, J., held that: (1) writ of mandamus was proper method by which to enforce owners' statutory inspection rights, and (2) absent proof by association of improper purpose for inspecting records, owners were entitled to inspect all pertinent records including those of association's attorney.

Affirmed.

West Headnotes (3)

**[1]**    **Mandamus**
 Custody of and access to corporate records and books

Writ of mandamus was proper method to enforce condominium owners' statutory rights to view condominium's records; owners were not required to establish a cause of action against the condominium or a probable right and probable injury. V.T.C.A., Property Code § 81.209; Vernon's Ann.Texas Civ.St. art. 1396–2.23.

2 Cases that cite this headnote

**[2]**    **Common Interest Communities**
 Association records

Absent proof by condominium association that inspection of records was for improper purpose, condominium owners were entitled to inspect "all books and records" of condominium including records and files of attorney for association. Vernon's Ann.Texas Civ.St. art. 1396–2.23.

3 Cases that cite this headnote

**[3]**    **Common Interest Communities**
 Association records

In the event that condominium association's attorney's records, sought by condominium owners, were subject to attorney-client privilege, court would weigh association's interest in nondisclosure of communications against inspection rights of condominium owners. V.T.C.A., Property Code § 81.209; Vernon's Ann.Texas Civ.St. art. 1396–2.23.

3 Cases that cite this headnote

**Attorneys and Law Firms**

**\*160** Wade B. Reese, Houston, for appellants.

Lou W. Burton, Houston, pro se.

John K. Grubb, Houston, for appellees.

Before SAM BASS, DUGGAN and LEVY, JJ.

**OPINION**

DUGGAN, Justice.

This appeal involves the right to inspect records and books of a condominium association. Appellees, a group of dissident owners, filed a petition for writs of mandamus and injunction because of the appellant Galleria Diplomat Association's board of directors' refusal to allow the inspection of records. In a corrected order dated March 2, 1988, the trial court granted the writ of **\*161** mandamus, ordering the Association to maintain its books and records at its offices and make these records available for inspection and copying. The trial court also enjoined appellants from interfering with appellees' right to inspect these books and records. The

court further ordered the delay of the annual election by the Association's members.

All of the points of error attack the ordered production of records in the possession of appellant Burton, the attorney for the appellant Association. The trial court entered a finding of fact that the Association's Board of Directors hired Burton "to handle numerous matters for the Association and that records of Lou W. Burton relating to Association matters are part of the books and records of the Galleria Diplomat Townhomes Homeowner's Association, Inc. a/k/a the Galleria Diplomat Association, Inc." This finding of fact is not challenged by point of error and is therefore binding on appeal. *Wade v. Anderson,* 602 S.W.2d 347, 349 (Tex.Civ.App.—Beaumont 1980, writ ref'd n.r.e.). The court ordered the production of "all of Lou W. Burton's records and files in any way related to his representation" of the Association.

In their first of three points of error, appellants contend that the trial court erred in ordering the production of Burton's records because the application and proof fail to establish a cause of action or a probable right and a probable injury.

 [1]    Appellants mischaracterize the nature of the trial court proceedings. For example, they argue that appellees have other adequate remedies under Tex.R.Civ.P. 167, 168 and 737 to pursue inspection. This assertion ignores the fact that a writ of mandamus is the proper remedy to enforce the right of inspection. *See* 20 R. Hamilton, *Texas Business Organizations* § 801 (1973). Appellees did not have to establish an independent cause of action; they merely had to establish their statutory right to inspect.

Tex.Prop.Code Ann. § 81.209 (Vernon 1984) provides the following for condominium records:

(a) The administrator or board of administration of a condominium regime or a person appointed by the bylaws of the regime shall keep a detailed written account of the receipts and expenditures related to the building and its administration that specifies the expenses incurred by the regime.

(b) *The accounts and supporting vouchers of a condominium regime shall be made available to the apartment owners for examination on working days at convenient, established, and publicly announced hours.*

(c) The books and records of a condominium regime must comply with good accounting procedures and must be

audited at least once each year by an auditor who is not associated with the condominium regime.

(Emphasis added.)

The Texas Non–Profit Corporation Act, Tex.Rev.Civ.Stat.Ann. art. 1396–2.23 (Vernon 1980), additionally provides:

A. Each corporation shall keep correct and complete books and records of account and shall keep minutes of the proceedings of its members, board of directors, and committees having any authority of the board of directors and shall keep at its registered office or principal office in this State a record of the names and addresses of its members entitled to vote.

B. *All books and records of a corporation may be inspected by any member,* or his agent or attorney, *for any proper purpose at any reasonable time.*

(Emphasis added.)

In their application for writ of mandamus, appellees were attempting to enforce their statutory rights as condominium apartment owners to inspect the "accounts and supporting vouchers of a condominium regime" under Property Code § 81.209, and as corporation members to inspect "all books and records" of a non-profit corporation under article 1396–2.23. The trial court did not err in ordering the production of Burton's records.

Appellants' first point of error is overruled.

 **\*162**  Appellants contend in their second point of error that the trial court erred in ordering production of the records and files of the attorney for the condominium association because the order is overly broad, unduly burdensome, and requires the production of irrelevant information.

Appellees sought the production of records that they were statutorily entitled to inspect. Appellants' complaints about the order appear to be an attempt to engraft discovery notions upon the appellees' statutory right of inspection, which is independent of any right of discovery in litigation. *See San Antonio Models, Inc. v. Peeples,* 686 S.W.2d 666 (Tex.App.—San Antonio 1985, orig. proceeding). The right to inspect under article 1396–2.23 encompasses "all books and records." The trial court found that Burton's files and records relating to the Association were the "books and

records" of the Association. This finding is not challenged on appeal. This right of condominium owners to inspect the books and records, like the comparable right to inspect granted shareholders in corporations, is limited by the requirement that the inspection be for any "proper purpose." *See* R. Hamilton, *Texas Business Organizations* § 804 (1973); *see also* Annotation, *What Corporate Documents Are Subject to Shareholder's Right to Inspection* 88 A.L.R.3d 663 (1978).

 **[2]** Once the trial court found that Burton's files and records relating to the Association were part of the books and records of the Association, appellees were entitled to inspect them for any "proper purpose." Appellants, however, do not contend that the intended inspection is for an improper purpose. There was testimony by appellees that they were concerned about the "substantial" and "inordinate" fees paid to Burton by the Association. Although the parties have presented no cases squarely on point, it would appear that it was the appellant Association's burden of proof to establish the absence of proper purpose. *Uvalde Rock Asphalt Co. v. Loughridge,* 425 S.W.2d 818 (Tex.1968); *Moore v. Rock Creek Oil Corp.,* 59 S.W.2d 815 (Tex.Comm'n App.1933, holding approved); *see also,* 5A Fletcher, *Cyclopedia of the Law of Private Corporations* § 2253.1 (1987). The trial court, however, sustained appellees' objections to appellants' attempted inquiries about ulterior or vindictive motives for the inspection of records. Appellants do not complain about the exclusion of this testimony.

Appellants' second point of error is overruled.

Appellants contend in their third point of error that the trial court erred in granting the production order because it requires the inspection of privileged documents.

Again, we note that appellants are attempting to engraft notions borrowed from Texas discovery practice onto a statutory right to inspect. Article 1396–2.23 contains no limitations on the member's right to inspect as long as the books and records are those of the non-profit corporation and the inspection is for "any proper purpose." The trial court found that Burton's records and files relating to the Association were part of the Association's books and records, and appellants have not contended that the intended inspection is for an improper purpose. The only limitation under article 1396–2.23 is "proper purpose." Appellants have failed to prove that the purpose of the inspection was improper.

 **[3]** Moreover, if the attorney-client privilege did apply, we would hold that the trial court did not abuse its discretion in ordering the inspection of Burton's records. The attorney-client privilege is not absolute; appellants' interest in the nondisclosure of communications protected by the privilege would have to be balanced against the inspection rights of the members of the non-profit corporation. *See In re LTV Securities Litigation,* 89 F.R.D. 595, 609–611 (N.D.Tex.1981). Under the facts of this case, the trial court did not abuse its discretion in ordering the inspection of Burton's records.

Appellants' third point of error is overruled.

The judgment is affirmed.

---

**End of Document** © 2015 Thomson Reuters. No claim to original U.S. Government Works.

29 Tex. 204
Supreme Court of Texas.

LARKIN G. CLEVELAND

v.

JOHN H. WILLIAMS, ADM'R.

January, 1867.

**\*204**  The court below charged the jury as follows: "If you find from the evidence that the corn in question, that is, the hundred bushels of corn, was in a bulk with other corn, and had not been measured out and separated from the bulk, so that the same could be identified previous to the death of Hall, then the sale was incomplete, and you will find for the plaintiff the value of the corn as proved." This was error.

By the common law, if a seller make a proposition, and the buyer accept, and the goods are in the possession of the seller, and nothing remains to be done to identify them, or in any way prepare them for delivery, the sale is complete, and the property in the goods passes at once. The buyer acquires not a mere *jus ad rem,* but an absolute *jus in re,* and he may demand delivery at once on tender of the price, and sue for the goods as his own, if delivery be refused.

The 17th section of the statute of frauds and perjuries (Charles II), which requires that delivery by the vendor and acceptance by the vendee of part of the goods sold, or something given in earnest or part payment to bind the bargain, or that some note or memorandum of the bargain, in writing, to be signed by the parties, etc., in order to give validity to the contract,  **\*205** has never been re-enacted in Texas, and it has not become a part of our common law. Pas. Dig. art. 978, note 418.

No sale is complete, so as to vest in the vendee an immediate right of property, so long as anything remains to be done between the buyer and seller in relation to the goods. The goods sold must be separated and identified by marks and numbers, so as to be completely distinguished from all other goods, or from the bulk or mass with which they happen to be mixed.

The goods sold must be ascertained, designated, and separated from the stock or quantity with which they are mixed, before the property can pass.

Until this be done, it is merely a sale without a subject-matter *in esse,* which cannot take effect *in presenti.*

Where the vendor sold the corn in his crib before his death, and appointed an agent to measure and deliver it, which the agent did after the death of the principal, but before it was known to the parties, the title did not pass, and the administrator of the deceased had the right to recover the corn.

The only exception is the case where the power or authority is coupled with an interest in the thing actually vested in the agent. The reason of this exception is entirely compatible with the general ground on which the rule is founded: it is, that the agent, having the legal title to the property in himself, is capable of transferring it in his own name, notwithstanding the death of his principal; and the death of his principal, therefore, has no operation upon his acts.

This was not so by the civil law, but, by the common law, the death of the principal is an instantaneous and absolute revocation of the authority of the agent, unless the power be coupled with an interest.

APPEAL from Polk. The case was tried before Hon. SAMUEL A. WILSON, one of the district judges.

The petitioner, who sues as the administrator of the estate of Thomas B. Hall, deceased, alleges that said Hall died in September, 1860; that on the day of his death he was possessed, as of his own property, of one hundred bushels of corn, worth $1.50 per bushel; that after the death of said Hall the defendant took the said corn, without authority, and converted the same to his own use, and, therefore, lays damages at $500.

The defendant plead, 1st, general demurrer; 2d, general denial; and, 3d, specially, that in the life-time of the said Hall the respondent loaned to him $200, for which Hall gave to him his promissory note; that afterwards said Hall sold to him one hundred bushels of corn, at $1 per **\*206** bushel, in part payment of said note, which respondent duly credited thereon; that said corn, so bought and paid for before the death of said Hall, is the same for which he is sued; that the balance of said note he now holds as a valid and subsisting claim against said estate, unpaid, etc.

The evidence is in substance as follows: John S. Cleveland states that in the fall of 1860 Thomas B. Hall told him that he had sold to Larkin G. Cleveland one hundred bushels of corn

in payment of a debt he owed to said Larkin G. Cleveland, and that said Hall told him (witness) to retain that amount of corn out of a large bulk of corn then in his (Hall's) crib, and that C. B. Hall would measure it. A few weeks after this Thomas B. Hall died, away from home, on his way to Galveston. After the death of Thomas B. Hall (which was then unknown), C. B. Hall measured and delivered the corn to Larkin G. Cleveland, measuring it from a large bulk of corn then in Hall's crib.

C. B. Hall, brother of deceased, testified to the same facts. By agreement of counsel, it was admitted, as if proved, that Larkin G. Cleveland held a note on Thomas B. Hall for $200, and that it was credited with one hundred bushels of corn, at $1 per bushel, amount received as measured by C. B. Hall.

The charge complained of is as follows: "3d. If you find from the evidence that the corn in question, that is, the one hundred bushels, was in a bulk with other corn, and had not been measured out and separated from the bulk, so that the same could be identified previous to the death of Hall, then the sale was incomplete, and you will find for the plaintiff the value of the corn as proved."

There were a verdict and judgment for plaintiff, from which the defendant appealed, and assigned for error the mistake in the charge.

West Headnotes (3)

[1] **Frauds, Statute of**
    👈 Statutory Provisions
    The seventeenth section of the statute of frauds and perjuries (29 Car.II, c. 3) has never been re-enacted in this state, and has not become a part of our common law.

    1 Cases that cite this headnote

[2] **Principal and Agent**
    👈 Acts Done in Ignorance of Principal's Death
    An agent appointed to complete a sale of property of his principal, in which the agent himself has no interest, cannot act after the principal's death, whether or not he has received notice thereof.

8 Cases that cite this headnote

[3] **Sales**
    👈 Part of Specific Stock or Mass
    Where a certain number of bushels of corn are sold from a quantity in bulk in the vendor's crib, the sale is not completed until the amount sold is separated and measured.

    30 Cases that cite this headnote

**Attorneys and Law Firms**

*C. L. Cleveland,* for appellant. The measuring of the corn was merely a formal act, which could be well executed **\*207** after the death of Hall, by the party nominated for that purpose. It is admitted, as a general proposition, that the death of the principal operates a revocation of an agency. But where an authority is coupled with an interest, or where it is given for a valuable consideration, or as security, it is otherwise. Story, Agency, § 477. The reason of the exception is entirely compatible with the general ground on which the rule is founded. It is, that the agent, having the legal title to the property vested in himself, is capable of transferring it in his own name, notwithstanding the death of the principal, and the death of the principal has no operation on his act. The power given by the principal, under such circumstances, is rather an assent or agreement that the agent may transfer the property vested in him, free from any equities of the principal, than strictly a power to transfer. Story, Agency, § 489. Nice distinctions are drawn in the law books as to what is necessary "to complete" a sale, especially so where the question of lien for price is involved, or the right of a subsequent purchaser, or of fraud as against creditors. But in this case no such questions arise.

As between the parties, the right of property passed. 1 Par. Con. § 5, bot. page 465; and Noy, Max. 88. The corn was bought and paid for; it only remained to be measured. This was to be done, not by the vendor, nor the vendee, but by a third party, acting for both, in his own name. What remained to be done was to be performed by John S. Cleveland and C. B. Hall. The former was "to retain" the corn; the latter to measure it; trusts cognate with the sale, springing out of the contract of sale, reposed in them, upon consideration paid attaching at once to the property and in them, to be executed

for the benefit of L. G. Cleveland, which they could and did execute in their own names; and that is the true test of the lawfulness of the act. Had the same power been given to the purchaser by the vendor "to retain" and measure, under like **\*208** circumstances, the death of the vendor clearly would not revoke that power, because it would be coupled with an interest. Does the rule change when the power is conferred on a third party to do the same thing? If so, its flexibility is marvelous. Hunt v. Rousmanier's Adm'r, 8 Wheat. 201; and Knapp v. Alford, 10 Page, 205. Further, the measuring and delivery were before the death of T. B. Hall was known. The act was in good faith, and might well rest on that ground, if it were simply the execution of a naked power. Cassidy v. McKenzie, 4 Watts & S. 282. But what shall be said of the equities of the case? Cleveland's debt, to the amount of the credit given thereon, is extinguished. Shall the estate of Hall get the benefit of the judgment besides, or shall Cleveland be driven to some sort of doubtful remedy to get back the price paid? Such circuity is not necessary to adjust the equities arising, and is abhorrent to a sound interpretation of the principles pervading the authorities.

The attention and inquiry of the jury were limited alone to the fact, that the measuring of the corn occurred after the death of T. B. Hall. The assumption that the contract of sale was incomplete, or that, if incomplete, it could not be completed after Hall's death, by measuring and delivery, is not well founded, and for that error the cause should be reversed.

No brief for the appellee has been furnished to the reporter.

**Opinion**

COKE, J.

The only questions presented by the assignments of error, necessary to be considered, arise on the third clause in the charge of the court to the jury, which reads as follows:

"If you find, from the evidence, that the corn in question, that is, the hundred bushels of corn, was in a bulk with other corn, and had not been measured out and sepated **\*209** from the bulk, so that the same could be identified, previous to the death of Hall, then the sale was incomplete, and you will find for the plaintiff the value of the corn as proved."

Considering this instruction with reference to the facts of this case, it involves two propositions: first, that in order to complete the sale of the corn, and pass the title to Cleveland, it was necessary that it should have been separated from other corn and measured, so as to be identified, and capable of specific delivery to and possession by the vendee; and, second, that if not so completed in the lifetime of Hall, the act of his agent, C. B. Hall, in separating, measuring, and delivering the corn after the death of his principal, was unauthorized and void, and conferred no right upon Cleveland to the corn delivered. We are of opinion that the charge on both propositions is correct.

By the common law, if the seller make a proposition and the buyer accept, and the goods are in the possession of the seller, and nothing remains to be done to identify them, or in any way prepare them for delivery, the sale is complete, and the property in the goods passes at once. The buyer acquires not a mere *jus ad rem,* but an absolute *jus in re,* and he may demand delivery at once on tender of the price, and sue for the goods as his own if delivery be refused. 2 Kent, Com. 492; 2 Par. Con. 320; 1 Par. Con. 441; Story, Sales, § 300.

An innovation upon the principles of the common law on this subject was made in England by the 17th section of the statute of frauds and perjuries of Charles II, which has been substantially re-enacted in nearly all the states of the Union except Texas. This section requires delivery by the vendor, and acceptance by the vendee of part of the goods sold, or something given in earnest or part payment to bind the bargain, or that some note or memorandum in writing of the bargain be signed, etc., etc., in order to give validity to the contract, so that an action for its enforcement may **\*210** be maintained. This section of the statute of Charles has never been enacted or of force in this state, and the common law, unaffected by its provisions, furnishes the rule by which the validity of contracts of sale of chattels must be tried here. Delivery as between the parties is not essential to the completeness of a sale of a chattel, unless made so by the terms of the bargain. Story, Sales, § 300; 2 Kent, Com. 39, 492; 1 Par. Con. 441. But it is essential that nothing shall remain to be done (by the vendor) to the thing sold to put it into a condition for sale, or to identify it, or to discriminate it from other things. If anything remains to be done by the vendor which is material or important before the vendee can identify or possess the thing sold, or before it becomes deliverable, the sale is executory and incomplete, and the property in it does not pass absolutely to the vendee. Judge Story, in his work on Sales, says: "No sale is complete, so as to vest in the vendee an immediate right of property, so long as anything remains to be done between the buyer and the seller in relation to the goods. The goods sold must be separated and identified by marks and numbers, so as to

be completely distinguished from all other goods, or from the bulk or mass with which they happen to be mixed." Story, Sales, § 296.

Chancellor Kent, in his Commentaries, vol. 2, p. 496, says: "If anything remains to be done, as between the seller and buyer, before the goods are to be delivered, a present right of property does not attach in the buyer. This is a well-established principle in the doctrine of sales. But where everything is done by the seller, as to a parcel of the quantity sold, to put the goods in a deliverable state, the property, and consequently the risk, passes to the buyer; and, as to so much as requires further acts to be done on the part of the seller, the property and the risk remain with the seller. The goods sold must be ascertained, designated, and separated from the stock or quantity with which they are mixed, before the property can pass."

**\*211** The same doctrine is asserted with equal emphasis by Mr. Parsons in his work on Contracts, vol. 1, p. 441, and in Brown on Sales, p. 44. While these general principles are recognized and affirmed by an almost unbroken concurrence of the authorities, there is much apparent conflict in their practical application in the adjudicated cases. We understand the reason underlying these principles to be the fundamental one, that until the property, which is the subject of the sale, is designated and defined, it is, as it were, a sale without a subject-matter *in esse,* which cannot take effect *in presenti,* for the want of that necessary ingredient in a sale to act on, and is, therefore, necessarily executory and incomplete. The purchaser, in such a sale, cannot maintain an action to recover specific property, if delivery be refused, because he has no right in any specific part of the bulk, an undefined portion of which he has contracted for. In such an action he must describe and identify, with reasonable certainty, according to its character, the property he sues for, and this he cannot do, because his rights are indefinite, and cannot be attached to or located in any designated part of the mass. He has not that *jus in re* which alone entitles him to recover, and without which his purchase is incomplete. 6 East, 614. This reason does not exist where the subject-matter of the sale is designated and defined, as where the whole bulk is sold. It is true, it may have to be weighed, counted, or measured; but if this is to be done to enable the parties to make a settlement, and not for the purpose of completing the sale, the right passes to and vests in the purchaser. It is certainly correct, as laid down in the books, that when anything remains to be done by the seller, such as counting, weighing, or measuring, the title does not pass, when either of these operations is necessary

in order to separate the goods from a larger mass, of which they form a part; but when the entire mass is sold and must be measured, simply with a view to the ascertainment of its price, **\*212** for the purpose of a settlement, the better opinion, on principle and authority, is, that the title passes. By keeping the distinction between a specific and an indefinite commodity in view, it is believed that most of the cases upon this subject can be explained, and their apparent conflict reconciled. Macomber v. Parker, 13 Pick. 182; Cunningham v. Ashbrook, 20 Mo. 560; Scott v. Wills, 6 Watts & S. 368; Riddle v. Varnum, 20 Pick. 283, 284; Crofoot v. Bennett, 2 Comst. 260.

This distinction is forcibly put by Mr. Justice Strong, delivering the opinion of a majority of the supreme court of New York, in Crofoot v. Bennett, in which he says: "But if the goods sold are clearly identified, then, although it may be necessary to number, weigh, or measure them, in order to ascertain what would be the price of the whole at a rate agreed upon between the parties, the title will pass. If a flock of sheep be sold at so much the head, and it is agreed that they shall be counted after the sale, in order to determine the entire price of the whole, the sale is valid and complete. But if a given number out of the whole are sold, no title is acquired by the purchaser until they are separated, and their identity thus ascertained and determined. The distinction in all these cases does not depend so much upon what is to be done, as upon the object which is to be effected by it. If that be specification, the property is not changed; if it be merely to ascertain the total value at designated rates, the change of title is effected."

The same doctrine is distinctly maintained by the supreme court of Massachusetts, in Macomber v. Parker and in Riddle v. Varnum, and by the supreme court of Missouri, in Cunningham v. Ashbrook, and is believed to be well sustained by a great majority of all the adjudicated cases. An application of these principles to this branch of the charge of the court fully vindicates its correctness with reference to the facts of this case.

**\*213** Passing to the consideration of the remaining proposition involved in the charge of the court under discussion, we are of opinion that the setting apart and designation by measurement of the corn from the bulk of which it was a part, by C. B. Hall, the agent, after the death of his principal, cannot aid the rights of the appellant, for the reason that the death of the principal operated a revocation, or, it might more properly be said, a destruction of the power of the agent.

This is an ancient and well-settled doctrine of the common law, and it seems that the fact of the agent having acted in good faith, in ignorance of the death of his principal, is not sufficient to take a case out of the operation of this general rule, where the power is a naked one, not coupled with an interest.

"The only admitted exception," says Judge Story, in his work on Agency, "that properly constitutes an exception to this general rule, is the case where the power or authority is coupled with an interest in the thing, actually vested in the agent. The reason of this exception is entirely compatible with the general ground on which the rule is founded. It is, that the agent, having the legal title to the property in himself, is capable of transferring it in his own name, notwithstanding the death of his principal, and the death of his principal therefore has no operation upon his act." Story, Agency, § 489.

It is said by Chancellor Kent, vol. 2 of his Commentaries, p. 646, that "By the civil law, and the law of those countries which have adopted the civil law, the acts of an agent, done, *bona fide,* after the death of his principal and before notice of his death, are valid and binding on his representatives. But this equitable principle does not prevail in the English law, and the death of the principal is an instantaneous and absolute revocation of the authority of the agent, unless the power be coupled with an interest."

There are some authorities which go far toward maintaining **\*214** that the common and civil law on this subject may be harmonized. So it is understood to have been held in Pennsylvania, in Cassidy v. McKenzie, 4 Watts & S. 282. In this case a payment made to an agent, after the death of the principal, was held binding on the representatives of the latter. Judge Story, in his work on Agency, inclines to the opinion, that the difference between the civil and the common law is more apparent than real, and that where the act must be done in the name of the principal, the same objection would obtain to it after the death of the principal in the foreign law as it does in our law, and that the difference between our law and the former seems to rest, not so much upon a difference of principle, as upon the difference in the modes of executing the authority.

He nevertheless admits the force and binding authority of the common law principle, while he confesses the greater liberality and equity of that which obtains in the civil law. Story, Agency, §§ 495 to 498.

The rule of our law, as to the time when the revocation of an authority by the act of the principal takes effect, is equally clear, comprehensive, and just. As to the agent himself, it takes effect from the time when the revocation is made known to him; and as to third persons when it is made known to them, and not before. And this the principal may do by making the revocation as notorious as the fact of agency was. Until it is thus made known, the principal is bound by the acts of his agent, done within the scope of his authority, upon the familiar principle, that where one of two innocent persons must suffer, he shall suffer who, by his confidence, or silence, or conduct, has misled the other. 1 Par. Con. 60; 11 N. H. 397; Story, Agency, § 470. This is in striking contrast with the other principle, which holds, where the revocation is implied from the death of the principal, that every act of the agent, though done in good faith, in pursuance of his authority, without notice of his principal's **\*215** death, is unauthorized and invalid. Harsh and unjust as must be the operation of this principle in many cases, it is too well settled by the authorities, English and American, to be departed from.

The leading argument upon which it is sustained in the books is, that the agent can do only what his principal may do, and must act in his principal's name, and that as a dead man can do no act, so a valid act cannot be done in a dead man's name. Hunt v. Rousmanier's Administrator, 8 Wheat. 174; Story, Agency, § 488. Accordingly, in apparent consonance with that course of reasoning, some respectable authorities seem strongly inclined to maintain the doctrine that, when the agency can be, and ordinarily is, properly executed in the name of the agent, without reference to the principal, the acts of the former, done after the death of the latter, without notice of the death, are valid and binding; though it must be admitted, that the cases relied on as illustrating this doctrine are usually either in fact powers coupled with an interest, or are governed by like analogies. Story, Agency, §§ 33, 34, 496, 497; Davis v. Lane, 10 N. H. 413; 1 Par. Con. 62; Dick v. Page, 17 Mo. 234; Russ. Fac. and Brok. 360; Chit. Com. & Mer. 223.

In Robertson v. Paul, 16 Tex. 472, it was held by this court, that a power to sell, contained in a mortgage or deed of trust, although not revoked, on general principles, by the death of the grantor, being a power coupled with an interest, is inconsistent with our statute respecting the settlement of estates of deceased persons, and, therefore, cannot be executed after the death of the grantor. In this case, we have

not deemed it necessary to consider the provisions of our statute in connection with the question, or to determine what influence, if any, it might have had if the power had been such a one as survived the death of the grantor, it being clear, on general principles, that the authority of the agent was of a character that was, *ipso* **\*216** *facto,* extinguished by the death of his principal. C. B. Hall, the agent, had no title or interest, legal or equitable, in the subject-matter of his agency. It is not pretended that he had possession of the corn that was in the crib and on the plantation of his principal, and the only authority he is shown to have had over it was, to set apart and measure the number of bushels contracted to the appellant. His was a naked power. Having executed it after it had been revoked by the death of his principal, the representatives of the latter are not bound by his unauthorized act. The jury were properly instructed, and their verdict is fully supported by the testimony.

There is no error in the judgment, and it is

Affirmed.

**Parallel Citations**

1867 WL 4513 (Tex.), 94 Am.Dec. 274

---

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

2015 WL 535562
Only the Westlaw citation is currently available.

NOTICE: THIS OPINION HAS NOT BEEN
RELEASED FOR PUBLICATION IN THE
PERMANENT LAW REPORTS. UNTIL RELEASED,
IT IS SUBJECT TO REVISION OR WITHDRAWAL.

OPINION
Court of Appeals of Texas,
Eastland.

Stephen C. Cole and Robert Strack, Appellants
v.
Michael McWillie, Wanda Juanita
Phillips, and Delvonne Burke, Appellees

No. 11–12–00265–CV     |
Opinion filed January 15, 2015

**Synopsis**

**Background:** Holder of proceeds from a $^{35}/_{640}$ nonparticipating royalty interest in a tract of land filed interpleader action to determine the owners of the interest. Grantees of the interest, pursuant to a deed executed by the original property owner's attorney-in-fact, filed cross-claim for a declaration that the deed was valid, and original property owner's heirs and their assignees counterclaimed for a declaration that the deed was void due to the owner's incapacity when the deed was executed. The 238th Judicial District Court, Midland County, awarded partial summary judgment to heirs and assignees, finding the deed to be void, and then entered judgment after a bench trial resolving additional matters. Grantees appealed.

**[Holding:]** On denial of rehearing, the Court of Appeals, Jim R. Wright, C.J., held that deed was voidable, rather than void, and thus any action to disavow the deed was subject to four-year statute of limitations.

Reversed and remanded.

West Headnotes (18)

**[1]** **Contracts**
 Effect of invalidity

Because a voidable contract continues in effect until active steps are taken to disaffirm the contract and because a void contract is wholly ineffective from the outset, the distinction is significant.

Cases that cite this headnote

**[2]** **Contracts**
 Physical or mental condition of party

The right to disaffirm a contract survives the death of the incompetent person and descends to her heirs or her personal representative.

Cases that cite this headnote

**[3]** **Limitation of Actions**
Rescission or cancellation

The right to disaffirm a contract is subject to a four-year statute of limitations. Tex. Civ. Prac. & Rem. Code Ann. § 16.051.

Cases that cite this headnote

**[4]** **Contracts**
Physical or mental condition of party

A contract executed by a person who lacks mental capacity is voidable, not void.

Cases that cite this headnote

**[5]** **Deeds**
Effect of invalidity

**Limitation of Actions**
Rescission or cancellation

Deed executed by property owner's attorney-in-fact after owner became mentally incompetent was voidable, rather than void, and thus any action to disavow the deed was subject to four-year statute of limitations, even though the power of attorney, which was executed before

owner became incompetent, was not a durable power of attorney; statute authorizing durable powers of attorney did not make all other powers terminate upon the principal's incapacity, and declaring such a deed to be void would deprive a principal or her heirs of the ability to affirm an advantageous contract, and would allow a claimant to seek to invalidate a deed many years after its execution. Tex. Prob. Code Ann. § 36A(1980); Tex. Civ. Prac. & Rem. Code Ann. § 16.051.

Cases that cite this headnote

**[6]     Principal and Agent**
  Nature of the relation in general

Agency is a consensual relationship between two parties where one, the agent, acts on behalf of the other, the principal, subject to the principal's control.

Cases that cite this headnote

**[7]     Principal and Agent**
  Nature of the relation in general

**Principal and Agent**
  Appointment of Agent

For an agency relationship to exist, there must be both a meeting of the minds between the parties and some act constituting the appointment of an agent.

Cases that cite this headnote

**[8]     Principal and Agent**
  Letters or Powers of Attorney Under Seal

The appointment of an attorney-in-fact creates an agency relationship.

Cases that cite this headnote

**[9]     Principal and Agent**
  Nature of the relation in general

**Principal and Agent**
  Deeds

An important principle of agency law is that one who authorizes another to act for him acts as if

he himself had personally acted; to this extent, both the principal and the agent are only one person, and thus, a deed executed by an agent for and with that authority from his principal is as if executed by the principal himself.

Cases that cite this headnote

**[10]    Deeds**
  Effect of invalidity

**Principal and Agent**
  Construction of letters or powers of attorney

**Principal and Agent**
  Deeds

An attorney-in-fact who was appointed in a power of attorney that did not contain the language making it a durable power of attorney and who executes a deed on behalf of an incompetent principal, even when the principal was competent at the time he appointed the attorney-in-fact to act on his behalf, creates an effective and valid deed that is voidable at the election of the principal or the principal's estate. Tex. Prob. Code Ann. § 36A(1980).

Cases that cite this headnote

**[11]    Principal and Agent**
  Death of Principal

An agent's authority to bind his principal terminates upon the principal's death.

Cases that cite this headnote

**[12]    Contracts**
  Physical or mental condition of party

**Contracts**
  Effect of invalidity

**Infants**
  Capacity to contract in general

**Infants**
  Avoidance and disaffirmance

When a contract is executed on behalf of an incapacitated person, whether by infancy or by mental incompetence, the party in danger of unfair disadvantage in the transaction is

the "incapacitated party," while the party who transacts with the incapacitated party suffers no potential detriment in the bargaining process; the protections offered by the law should therefore benefit the incapacitated party by allowing him to disavow the contract upon his return to sufficient capacity.

Cases that cite this headnote

**[13]  Contracts**
   Estoppel and Ratification
**Contracts**
   Effect of invalidity

The benefit of being able to disavow a contract made on behalf of an incapacitated principal extends to the heirs of a deceased principal or the guardian of a permanently incapacitated principal; in such a case, the benefited party can secure the advantage of a good bargain by ratifying the contract or he can relieve himself of a bad bargain by electing to disavow the agreement.

Cases that cite this headnote

**[14]  Contracts**
   Physical or mental condition of party

To hold an agreement made on behalf of an incapacitated principal void as a matter of law would deprive the disadvantaged party of the benefit of an advantageous contract.

Cases that cite this headnote

**[15]  Limitation of Actions**
   Rescission or cancellation

Property owner's heirs and their assignee waived, for purposes of appeal, their argument that statute allowing assertion of a time-barred counterclaim or cross-claim precluded application of the four-year statute of limitations for actions to disavow a voidable contract to their counterclaim seeking to disavow a deed executed by owner's attorney-in-fact after owner had become mentally incompetent, where heirs and assignee did not raise the statute in the trial court, arguing only that the deed was void, rather

than voidable. Tex. Civ. Prac. & Rem. Code Ann. §§ 16.051, 16.069; Tex. R. Civ. P. 94.

Cases that cite this headnote

**[16]  Limitation of Actions**
   Necessity
**Limitation of Actions**
   Replication or reply and subsequent pleadings

A party seeking to avail itself of a rule in avoidance of a statute of limitations must affirmatively plead its theory of avoidance in its original petition or a supplemental petition. Tex. R. Civ. P. 94.

Cases that cite this headnote

**[17]  Judgment**
   Motion or Other Application

A party seeking summary judgment must include in its motion the specific grounds on which relief is requested. Tex. R. Civ. P. 166a(c).

Cases that cite this headnote

**[18]  Appeal and Error**
   Grounds for Sustaining Decision Not Considered

An appellate court may not affirm a summary judgment on grounds not expressly set out in the motion for summary judgment. Tex. R. Civ. P. 166a(c).

Cases that cite this headnote

**On Appeal from the 238th Judicial District Court, Midland County, Texas, Trial Court Cause No. CV47686**

**Attorneys and Law Firms**

M. McDonnold Jr., Steven C. Kiser, for Stephen C. Cole and Robert Strack.

H. Clay Moore, Jill C. Pennington, for Michael McWillie, Wanda Juanita Phillips, and Delvonne Burke.

Panel consists of: Wright, C.J., Willson, J., and Bailey, J.

**OPINION**

JIM R. WRIGHT, CHIEF JUSTICE

 **\*1**  This court's former opinion and judgment dated August 29, 2014, are withdrawn. This court's opinion and judgment dated January 15, 2015, are substituted therefor. The motion for rehearing filed by Stephen C. Cole and Robert Strack is denied, and the motion for rehearing filed by Michael McWillie, Wanda Juanita Phillips, and Delvonne Burke is also denied.

The dispositive issue in this case is whether a deed is void or voidable when it is executed by an attorney-in-fact who is acting on behalf of one who was competent at the time of the execution of the power of attorney, but who was incompetent at the time of the execution of the deed. The trial court determined that such a conveyance was void as a matter of law. We reverse and remand.

This case concerns the ownership of an undivided 35/640 nonparticipating royalty interest (the NPRI) in a tract of land located in Andrews and Martin Counties. The summary judgment evidence shows that Rosa Van Huss was the owner and common source of title to the NPRI. The NPRI is subject to and covered by an oil and gas lease in which the lessor reserved a one-fifth (1/5) royalty.

Van Huss executed a power of attorney in favor of her daughter, Wanda Juanita Phillips, on April 1, 1980. The parties agree that Van Huss was competent at the time she executed the power of attorney. The power of attorney was not durable as provided for in Section 36A of the Texas Probate Code. Section 36A was in effect at the time of the execution of the power of attorney. Although Van Huss was never adjudicated to be incompetent, the parties do not dispute that she became mentally incompetent in June 1982 and remained so until her death in 1986.

In 1985, Phillips executed a quitclaim deed with respect to the NPRI. She executed the conveyance in her capacity as Van Huss's attorney-in-fact. In that conveyance, Phillips conveyed all of Van Huss's interest in the NPRI to Stephen C. Cole and Robert Strack.

Van Huss died on June 11, 1986, leaving a Last Will and Testament. The will was admitted to probate as a Muniment of Title. In the will, Van Huss provided that her estate was to be distributed one-half to Phillips, one-fourth to Delvonne Burke (Van Huss's granddaughter), and one-fourth to Sherry Jackson a/k/a Schiara Reindollar (Van Huss's granddaughter). Therefore, Phillips, Burke, and Reindollar acquired all of Van Huss's interest in the NPRI upon her death. They subsequently executed a number of assignments of the interest to Phillips's son, Michael McWillie.

Henry Resources, L.L.C. held certain proceeds related to the NPRI. Because it was uncertain as to the ownership of the proceeds, Henry Resources filed an interpleader action in 2010. In an agreed partial order, the trial court ordered that the proceeds held by Henry Resources were to be deposited into the registry of the court. Henry Resources complied with the order, and the trial court dismissed it from the lawsuit.

Phillips, Burke, and McWillie (Appellees) later filed a motion for partial summary judgment in which they sought a declaration from the trial court that the deed executed by Phillips in her capacity as Van Huss's attorney-in-fact was void as a matter of law. Cole and Strack responded that the deed was voidable, not void, and that the statute of limitations had expired on any suit to avoid the deed. After a hearing, the trial court granted the motion for partial summary judgment and concluded that the deed was void; the trial court determined that, because Van Huss was incompetent when Phillips executed the deed, Phillips lacked the authority to transact business on behalf of Van Huss at that time.

 **\*2**  At a bench trial, the parties entered into stipulations of fact relating to the chain of title and other matters. After the trial, the trial court entered its final judgment. In that judgment, the trial court incorporated the previous order granting partial summary judgment, rendered judgment that the deed was void and that title was held by Appellees, awarded the proceeds of production to Appellees, denied the requests for attorneys' fees, and denied all relief requested by Cole and Strack. This appeal followed.

We review de novo an order granting summary judgment. *Travelers Ins. Co. v. Joachim,* 315 S.W.3d 860, 862 (Tex.2010). When reviewing a summary judgment, we take as true all evidence favorable to the nonmovant, and we indulge every reasonable inference and resolve any doubts in the nonmovant's favor. *Provident Life & Accident Ins. Co. v. Knott,* 128 S.W.3d 211, 215 (Tex.2003). The party moving

for summary judgment has the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. TEX. R. CIV. P. 166a(c); *Haase v. Glazner,* 62 S.W.3d 795, 797 (Tex.2001).

 **[1]** **[2]** **[3]** The parties agree that the ultimate issue in this case is whether the deed was void as a matter of law, or simply voidable. Because a voidable contract continues in effect until active steps are taken to disaffirm the contract and because a void contract is wholly ineffective from the outset, the distinction is significant. *Mo. Pac. Ry. Co. v. Brazil,* 72 Tex. 233, 10 S.W. 403, 406 (1888); *Country Cupboard, Inc. v. Texstar Corp.,* 570 S.W.2d 70, 74 (Tex.Civ.App.– Dallas 1978, writ ref'd n.r.e.). The right to disaffirm a contract survives the death of the incompetent person and descends to her heirs or her personal representative. *SeeBennett v. Romos,* 151 Tex. 511, 252 S.W.2d 442, 448–49 (1952); *Fuller v. Middleton,* 453 S.W.2d 372, 375 (Tex.Civ.App.– Fort Worth 1970, writ ref'd n.r.e.). Additionally, the right to disaffirm is subject to a four-year statute of limitations. TEX. CIV. PRAC. & REM.s Code Ann. § 16.051 (WEST 2008); *SEE ALSO FORD V. EXXON MOBIL CHEM. CO.,* 235 S.W.3D 615, 618 (TEX.2007); *SLAUGHTER V. QUALLS,* 139 TEX. 340, 162 S.W.2D 671, 674 (1942). IN THIS CASE, COLE AND STRACK CLAIM THAT, IF THIS COURT HOLDS THAT THE DEED WAS VOIDABLE, RATHER THAN VOID, THE STATUTE OF LIMITATIONS ON APPELLEES' RIGHT TO DISAFFIRM THE DEED HAS EXPIRED.

 **[4]** It is settled law in Texas that a contract executed by a person who lacks mental capacity is voidable, not void. *Williams v. Sapieha,* 94 Tex. 430, 61 S.W. 115, 116 (1901); *Neill v. Pure Oil Co.,* 101 S.W.2d 402, 404 (Tex.Civ.App.– Dallas 1937, writ ref'd); *see alsoIn re Morgan Stanley & Co.,* 293 S.W.3d 182, 193 (Tex.2009) (Hecht, J., dissenting) ("The rule in Texas and most other jurisdictions is that the contract [of a party who lacked mental capacity] exists and can be ratified or avoided."). In *Williams,* a landowner executed a power of attorney by which he authorized his attorney-in- fact to sell land and to execute a deed on the landowner's behalf. The landowner lacked the mental capacity to manage his affairs at the time that he executed the power of attorney. *Id.* Thereafter, the attorney-in-fact executed a deed to the property on the incompetent landowner's behalf. The validity of that deed became the subject of a subsequent lawsuit. *Id.* The *Williams* court likened the deed of an insane person to that of an infant. It held that the power of attorney executed by the incompetent landowner, as well as the deed executed

by the incompetent landowner's attorney-in-fact pursuant to that power of attorney, was not void but, rather, was voidable. *Id.* The court reasoned, "We can see no difference in principle between the act of making a deed which passes the title and making an instrument which authorizes another person to do the same thing." *Id.*

 **\*3** **[5]** Cole and Strack, in turn, rely on *Williams* to argue that, when a principal becomes incompetent after having executed a valid power of attorney, any subsequent action of the attorney-in-fact on the principal's behalf is voidable as well. Cole and Strack suggest that the subsequent action amounts to action taken by the incompetent principal. Therefore, they argue that *Williams* is controlling in this case and that the deed executed by Phillips as attorney-in-fact for Van Huss is not void but, instead, is voidable.

Appellees frame their response under principles of agency law. They argue that the actions of a purported agent who lacks authority to bind the principal are void as to the principal. According to Appellees, an agent has no authority to bind his principal upon the principal's incapacity unless he has been authorized to do so pursuant to former Section 36A of the Probate Code or its progeny. [1] Thus, their argument goes, when a principal becomes incompetent and his power of attorney lacks the specific language from Section 36A that is required to establish a durable power of attorney, any subsequent action by the agent on the principal's behalf is void as a matter of law.

 **[6]** **[7]** Agency is a consensual relationship between two parties where one, the agent, acts on behalf of the other, the principal, subject to the principal's control. *Bhalli v. Methodist Hosp.,* 896 S.W.2d 207, 210 (Tex.App.–Houston [1st Dist.] 1995, writ denied); *Lone Star Partners v. NationsBank Corp.,* 893 S.W.2d 593 (Tex.App.–Texarkana 1994, writ denied); *Herschbach v. City of Corpus Christi,* 883 S.W.2d 720 (Tex.App.–Corpus Christi 1994, writ denied). For an agency relationship to exist, there must be both a meeting of the minds between the parties and some act constituting the appointment of an agent. *Lone Star Partners,* 893 S.W.2d at 600.

 **[8]** The appointment of an attorney-in-fact creates an agency relationship. *Dernick Res., Inc. v. Wilstein,* 312 S.W.3d 864, 877 (Tex.App.–Houston [1st Dist.] 2009, no pet.); *Smith v. Lanier,* 998 S.W.2d 324, 334 (Tex.App.–Austin 1999, pet. denied). Under the common law, the agency authority created in a power of attorney existed only when the principal was

capable of acting on his or her own behalf and terminated upon the death or incapacity of the principal. *Comerica Bank–Texas v. Tex. Commerce Bank Nat'l Ass'n,* 2 S.W.3d 723, 725 (Tex.App.–Texarkana 1999, pet. denied) (citing *Harrington v. Bailey,* 351 S.W.2d 946, 948 (Tex.Civ.App.–Waco 1961, no writ)).

In 1971, the legislature enacted Section 36A of the Probate Code, establishing durable powers of attorney. At the time Van Huss executed the power of attorney, Section 36A provided in relevant part:

> When a principal designates another his attorney in fact or agent by power of attorney in writing and the writing contains the words "this power of attorney shall not terminate on disability of the principal" or similar words showing the intent of the principal that the power shall not terminate on his disability, then the powers of the attorney in fact or agent shall be exercisable by him on behalf of the principal notwithstanding later disability or incompetence of the principal.

**\*4** This was the first codification of a law that gave a principal the ability to provide specifically that a power of attorney would not terminate upon the disability of the principal. *SeeComerica Bank–Texas,* 2 S.W.3d at 726.

However, we disagree with Appellees' assertion that a power of attorney automatically terminates upon the disability of the principal in the absence of a durable power of attorney executed in accordance with Section 36A. To the contrary, we interpret Section 36A to merely provide a method for a principal to enable his attorney-in-fact to continue to act on the principal's behalf subsequent to the incapacity of the principal, regardless of whether that incapacity is temporary or permanent. We do not interpret Section 36A to establish that, in the absence of the durable-power-of-attorney language, any deed executed by an attorney-in-fact subsequent to the principal's incapacitation is rendered void as a matter of law. *SeeCampbell v. U.S.,* 657 F.2d 1174, 1177–78 (Ct.Cl.1981) (interpreting former TEX. PROB.CODE § 36A as providing a method for a principal to enable a durable power of attorney rather than providing that, without such language, the power immediately terminates upon the incapacity of the principal).

In the cases relied upon by Appellees, the courts address an agent's authority to act on behalf of an incapacitated principal, but those courts did not address the specific issue in this case and stopped short of holding that a deed

executed by an attorney-in-fact on behalf of an incompetent principal is void as a matter of law. *SeeComerica Bank–Texas,* 2 S.W.3d at 725–26 (addressing validity of power of attorney that contained Section 36A language); *Jensen v. Kisro,* 547 S.W.2d 65, 66–67 (Tex.Civ.App.–Houston [1st Dist.] 1977, no writ) (addressing effect of temporary incapacity on agency relationship); *Harrington v. Bailey,* 351 S.W.2d 946, 948 (Tex.Civ.App.–Waco 1961, no writ) (addressing effect of gift by agent following legal declaration of principal's incapacitation); *Scroggins v. Meredith,* 131 S.W.2d 195, 195 (Tex.Civ.App.–Beaumont 1939, no writ) (deed—executed by attorney-in-fact after power of attorney had been revoked by marriage—considered void); *Wall v. Lubbock,* 52 Tex.Civ.App. 405, 118 S.W. 886, 888 (Austin 1908, writ ref'd) (deed—executed by agent after principal's death—considered void).

We believe that *Williams* is controlling in this case. As we stated above, *Williams* provides the settled rule that a deed executed by a person who lacks the capacity to do so is voidable as a matter of law, not void. *SeeWilliams,* 61 S.W. at 116.

**[9]** **[10]** An important principle of agency law is that one who authorizes another to act for him acts as if he himself had personally acted. "To this extent, both the principal and the agent are only one person; thus, a [deed] executed by an agent for and with that authority from his principal is as if executed by the principal himself." *Lucas v. Whiteley,* 550 S.W.2d 767, 769 (Tex.Civ.App.–Amarillo 1977, writ ref'd n.r.e.) (citing *Julian Petroleum Corp. v. Egger,* 15 S.W.2d 36, 39 (Tex.Civ.App.–Fort Worth 1928, writ ref'd)). Given this relationship between an agent and principal, we believe that the proper approach in this case is to import the principal's lack of capacity to the agent who acts on the principal's behalf. Thus, an attorney-in-fact who was appointed in a power of attorney that did not contain the language of Section 36A and who executes a deed on behalf of an incompetent principal, even when the principal was competent at the time he appointed the attorney-in-fact to act on his behalf, creates an effective and valid deed that is voidable at the election of the principal or the principal's estate.

**\*5** **[11]** **[12]** **[13]** **[14]** Appellees' argument likens a principal's incapacity to a principal's death; the law is clear that an agent's authority to bind his principal terminates upon the principal's death. *SeeCleveland v. Williams,* 29 Tex. 204, 213 (1867); *Crawford v. Morris,* 228 S.W.2d 364, 366 (Tex.Civ.App.–Eastland 1950, writ ref'd n.r.e.). But this

approach is contrary to the approach in *Williams,* where the Texas Supreme Court analogized the incapacity of a principal to the incapacity of a minor. *See* *Williams,* 61 S.W. at 116–17. When a contract is executed on behalf of an incapacitated person—whether by infancy or by mental incompetence—the party in danger of unfair disadvantage in the transaction is, in fact, the incapacitated party. The party who transacts with the incapacitated party suffers no potential detriment in the bargaining process. The protections offered by our laws should benefit the incapacitated party by allowing him to disavow the contract upon his return to sufficient capacity. This benefit extends to the heirs of a deceased principal or the guardian of a permanently incapacitated principal. In such a case, the benefitted party can secure the advantage of a good bargain by ratifying the contract or he can relieve himself of a bad bargain by electing to disavow the agreement. To hold such an agreement void as a matter of law would deprive the disadvantaged party of the benefit of an advantageous contract.

Furthermore, our conclusion best comports with the need to facilitate the resolution of title disputes in a reasonable amount of time. If deeds executed by attorneys-in-fact on behalf of incompetent principals were considered void as a matter of law, a claimant could seek to invalidate a deed many years after its execution. Such is the case here, where Appellees have sought to invalidate the deed approximately twenty-five years after its execution. To the contrary, a claim against a voidable deed is subject to a statute of limitations. *See* CIV. PRAC. & REM. § 16.051; *see also* *Ford,* 235 S.W.3d at 618. Given these considerations, in addition to the precedent set forth in *Williams,* we hold that the deed at issue in this case was voidable at the option of the incompetent principal, rather than void as a matter of law.

 **[15]**  Appellees argue that, even if we hold that the deed at issue was voidable, the statute of limitations does not operate to bar the counterclaims made by Appellees. To support this contention, Appellees rely on Section 16.069 of the Texas Civil Practice and Remedies Code. CIV. PRAC. & REM. § 16.069 (West 2008). Cole and Strack respond that Section 16.069 cannot be used to revive Appellees' claim to disaffirm the deed. Cole and Strack also claim that Appellees have waived this argument on appeal because Appellees did not specifically plead Section 16.069 as grounds for avoiding the affirmative defense of statute of limitations and because Appellees did not assert Section 16.069 as an alternative ground in their motion for summary judgment.

Section 16.069(a) provides: "If a counterclaim or cross claim arises out of the same transaction or occurrence that is the basis of an action, a party to the action may file the counterclaim or cross claim even though as a separate action it would be barred by limitation on the date the party's answer is required." In such a case, "[t]he counterclaim or cross claim must be filed not later than the 30th day after the date on which the party's answer is required." *Id.* § 16.069(b).

 **[16]**   **[17]**   **[18]**   However, a party seeking to avail itself of a rule in avoidance of a statute of limitations must affirmatively plead its theory of avoidance in its original petition or a supplemental petition. TEX.R. CIV. P. 94; *Woods v. William M. Mercer, Inc.,* 769 S.W.2d 515, 518 (Tex.1988); *see also* *Proctor v. White,* 172 S.W.3d 649, 652 (Tex.App.–Eastland 2005, no pet.). Moreover, a party seeking summary judgment must include in its motion the specific grounds on which relief is requested. *See* TEX.R. CIV. P. 166a(c). An appellate court may not affirm a summary judgment on grounds not expressly set out in the motion for summary judgment. *State Farm Lloyds v. Page,* 315 S.W.3d 525, 532 (Tex.2010); *Stiles v. Resolution Trust Corp.,* 867 S.W.2d 24, 26 (Tex.1993).

 **\*6**  After the interpleader was filed in this case, Cole and Strack filed their original cross-claim against Appellees on January 6, 2011. In that cross-claim, they sought a declaration from the trial court regarding title to the NPRI based on the legal determination of the viability of the deed. They also asserted the affirmative defense of the four-year statute of limitations. Appellees timely filed a counterclaim in which they requested that the trial court declare the deed void and confirm their title to the NPRI. We have found no instance in the trial court in which Appellees asserted Section 16.069 as grounds for avoiding Cole and Strack's affirmative defense of statute of limitations. All of Appellees' claims rested on the trial court's determination that the deed was void. Accordingly, Appellees did not preserve for appeal their argument that Section 16.069 precludes the application of the statute of limitations.

Having determined that the deed was voidable, rather than void, and that the period of limitations to disaffirm the deed has elapsed, we hold that the trial court erred when it entered summary judgment in favor of Appellees. Cole and Strack's first issue on appeal is sustained.

In their second issue, Cole and Strack essentially ask us to hold, as a matter of law, that Appellees' claims are barred

by limitations. However, the trial court held that the deed was void and did not reach the statute of limitations issue; therefore, we are not able to address it in this appeal. In addition to the reasons previously stated in this opinion, we overrule Cole and Strack's second issue on appeal for the reason that the trial court did not rule on the statute of limitations issue and nothing in relation to its application is presented for our review.

We reverse the judgment of the trial court, and we remand to the trial court for proceedings consistent with this opinion, including a determination of the effect, if any, of the statute of limitations upon Appellees' claims.

Footnotes

1    *See* Act of May 5, 1971, 62nd Leg., R.S., ch. 173, § 3, 1971 Tex. Gen. Laws 967, 971, *amended by* Act of May 29, 1989, 71st Leg., R.S., ch. 404, § 1, 1989 Tex. Gen. Laws 1550, *repealed by* Act of April 15, 1993, 73rd Leg., R.S., ch. 49, § 2, 1993 Tex. Gen. Laws 102, 112 (current version at TEX. EST. CODE ANN.. §§ 751.002, 751.051 (West 2014)). Although Section 36A has been amended and repealed, it remains in effect for powers of attorney executed prior to its amendment and repeal.

---

**End of Document**                                    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

228 S.W.2d 364
Court of Civil Appeals of Texas, Eastland.

CRAWFORD et al.
v.
MORRIS et al.

No. 2775.    |    Feb. 3, 1950.    |    On
Motions for Rehearing March 17, 1950.
|    Rehearing Denied April 7, 1950.

W. E. Morris, and another, sued Catie Daniels Crawford, and others, in trespass to try title to an interest in land, and for other relief. The District Court, Eastland County, George L. Davenport, J., rendered judgment awarding title to the interest to plaintiffs and denying plaintiffs all other requested relief, and defendants appealed and plaintiff cross-assigned error. The Court of Civil Appeals, Grissom, C. J., held that power of attorney authorizing executrix of estate of a testator to sell land belonging to estate was terminated by death of a principal to power.

Judgment affirmed as reformed.

West Headnotes (3)

[1]    **Trespass to Try Title**
    👉 Weight and Sufficiency

    In action in trespass to try title to land, evidence established that executrix who conveyed land to plaintiff by general warranty deed conveyed all interest in the land that executrix had power to convey.

    Cases that cite this headnote

[2]    **Principal and Agent**
    👉 Death of Principal

    Where power of attorney to sell land belonging to estate of testator was executed to executrix of estate jointly and not severally, death of a principal to power terminated the power.

    2 Cases that cite this headnote

[3]    **Estoppel**
    👉 Weight and Sufficiency of Evidence

    In action in trespass to try title, evidence was insufficient to sustain finding that some devisees of testator did not knowingly receive their part of purchase price of land belonging to estate which was sold by executrix of estate, so as to estop them from asserting incapacity of executrix to convey their interests in the land under power of attorney executed by them which was terminated by death of a principal to power of attorney.

    1 Cases that cite this headnote

**Attorneys and Law Firms**

**\*364**  T. M. Collie, Eastland, for appellants.

Jack W. Frost, Eastland, for appellees.

**Opinion**

GRISSOM, Chief Justice.

On May 8, 1942, C. J. Daniels, who owned the 8.6 acres of land in controversy, died intestate and his father, G. W. Daniels, inherited one-half of said land and the other half was inherited by his brother and sisters. There was no administration on the estate of C. J. Daniels. In August, 1944, G. W. Daniels died. He left a will in which he devised his interest in said land to his surviving children, Catie Daniels Crawford, Mabel U. Daniels, Grace Daniels Shelton, Irvin Van Daniels and Vanita Daniels Tunnell, the brother and sisters of C. J. Daniels, deceased. Mabel U. Daniels was appointed independent executrix of G. W. Daniel's estate and qualified as such. Thereafter, in December, 1944, Mabel U. Daniels executed a general warranty deed to said 8.6 acres to W. E. Morris. Morris paid the market value for said tract, which was $80.00. The deed was signed 'Mabel U. Daniels For myself and as administratrix of the estate of C. J. Daniels, deceased.' Morris executed a deed purporting to convey one-half of the minerals in said tract to L. H. McCrea.

On July 29, 1948, Grace Daniels Shelton and Vanita Daniels Tunnell, joined by **\*365** their husbands, and Catherine Daniels Crawford and Irvin Van Daniels, executed an oil and gas lease to Alsabrook and Kemp for which they were paid

a cash bonus of $5,160.00. W. E. Morris and L. H. McCrea joined said parties in the execution of said lease.

In August, 1948, Morris and McCrea filed this suit against Catie Daniels Crawford, Mabel U. Daniels (Keefer) and husband, Vanita Daniels Tunnell and husband, Grace Daniels Shelton and husband and Irvin Van Daniels in trespass to try title to a 4/5ths interest in said 8.6 acre tract. It was apparently admitted that Mabel U. Daniels' 1/5th interest therein had been conveyed to the plaintiffs by her deed heretofore referred to.

Plaintiffs also alleged that defendants executed said oil and gas lease and wrongfully received $5,160.00 as a bonus for their execution of said lease; that said bonus was the property of plaintiffs but was received and appropriated by defendants and, therefore, plaintiffs were entitled to judgment against defendants for said amount. As an alternative plea to that in trespass to try title, plaintiffs alleged that in the event they were denied relief in their action to try title they were entitled to judgment against Mabel U. Daniels Keefer because of her execution of the warranty deed to plaintiffs. Plaintiffs alleged that Mabel U. Daniels was never administratrix of the estate of C. J. Daniels but that she conveyed to Morris the fee simple title to said tract. Plaintiffs alleged they were entitled to recover damages for loss of said title in the sum of $5,240.00, for which they ask judgment against Mabel U. Daniels Keefer. Defendants excepted to said petition, among other things, because of a failure to allege facts showing that defendants were not entitled to receive the bonus for said oil and gas lease. Defendants answered by pleas of not guilty and general denial.

On January 19, 1949, plaintiffs filed an amended petition which contained the same allegations with reference to trespass to try title and the allegations that the defendants, except Mabel U. Daniels Keefer and husband, wrongfully received $5,160.00 as a bonus for said lease. They also alleged, as they had in their original petition, the execution of the deed to Morris by Mabel U. Daniels (now Keefer) and that she thereby conveyed to Morris title to said tract; that she was never administratrix of the estate of C. J. Daniels; that she was independent executrix of the estate of G. W. Daniels; that she was qualified and acting in such capacity when she executed the deed to Morris. Plaintiffs alleged that the execution of said deed by Mabel U. Daniels to Morris in the manner heretofore shown, was the result of a mistake on her part, or the person who drafted the deed for her signature, or others unknown to plaintiffs, but that it was intended by the execution of said deed to convey the interest of Mabel

U. Daniels individually and of the estate of G. W. Daniels, deceased; that the deed should be reformed to speak the truth and convey the interests intended. Plaintiffs alleged that Morris paid the full agreed consideration to Mabel U. Daniels, individually and as independent executrix of the estate of G. W. Daniels, and that said estate had received and appropriated its part of the purchase price.

Plaintiffs further alleged that when Mabel U. Daniels executed the deed to Morris, in December, 1944, she was the attorney in fact for the other defendants, her brother and sisters, by virtue of a power of attorney exceuted in 1942, whereby said brother and sisters and her father, G. W. Daniels, authorized her to sell the land in controversy, which they inherited from C. J. Daniels. Plaintiffs allege that it was the purpose of Mabel U. Daniels in executing the deed to convey all of said land and all of the interests therein owned by defendants, and that she executed the same individually as independent executrix of the estate of G. W. Daniels, deceased, and as attorney in fact for the other defendants and that said deed should be so reformed.

Trial was to the court. The court rendered judgment awarding title to plaintiffs but denying them all other relief. Defendants have appealed. Plaintiffs have cross assigned error to the refusal of the **\*366** court to render judgment for the bonus collected by defendants.

[1] The evidence was sufficient to show that Mabel U. Daniels intended to and did convey the interest owned by her individually, and the interests she had the power to convey as independent executrix of the estate of G. W. Daniels. She had qualified in that capacity. The estate owed debts that had not been paid. She executed a general warranty deed that purported to convey all interests in the land and she collected the market value of same. The face of the instrument showed she intended to convey in some additional capacity than as an individual. These and other circumstances shown were sufficient to support a conclusion that she intended to and did convey all the interest in the land that she had power to convey. See Hill v. Conrad, 91 Tex. 341, 43 S.W. 789; Morgan et al. v. White et al., Tex.Civ.App., 20 S.W.2d 366; Arnold v. Southern Pine Lumber Co., 58 Tex.Civ.App. 186, 123 S.W. 1162; McGraw v. Merchants' & Planters' Nat. Bank, Tex.Civ.App., 34 S.W.2d 633, 634; Texas Pac. Coal & Oil Co. et al. v. Norton, Tex.Civ.App., 238 S.W. 273, 275, 91 A.L.R. 434, 462.

[2] Appellants' contention that the power of attorney executed to Mabel U. Daniels by her father and the surviving brother and sisters of C. J. Daniels was terminated by the

death of one of the principals, to-wit: G. W. Daniels, must be sustained. Where the power is created by two or more principals jointly and not severally, as here, and one dies the power is thereby terminated. 2 Am. Jur. 53; 2 C.J.S., Agency, s 86, page 1178; Vol. 1, Restatement of the Law of Agency, Sec. 123, page 315. See also 23 Words and Phrases, Perm. Ed., page 86 and 39 Words and Phrases, Perm. Ed., page 64.

 [3]  It follows that the portion of the judgment which rests upon a finding of a conveyance under said power of attorney cannot be sustained. A finding of a conveyance by Mabel U. Daniels of any greater interest than that owned by her individually and that which she had power to sell as independent executrix of the estate of G. W. Daniels, deceased, cannot be sustained. Therefore, a judgment awarding plaintiffs any greater interest in the land cannot be upheld, unless defendants (appellants here) are estopped to assert the incapacity of Mabel U. Daniels to convey under said power of attorney the interests inherited by her brother and sisters from C. J. Daniels, deceased. Apparently, the estoppel asserted is based upon the theory that her brother and sisters knowingly received their part of the purchase price of such

interest. See 31 C.J.S., Estoppel, s 70, page 264; Williams v. Texas Employers Ins. Ass'n, Tex.Civ.App., 135 S.W.2d 262, 264, writ ref., and 17 tex.Jur. 138. The evidence ref., and 17 Tex.Jur. 138. The evidence knowingly received same.

The judgment is reversed and the cause remanded.

### On Motions for Rehearing.

On February 3, 1950, judgment of the trial court was reversed and the cause remanded. Both appellees and appellants have filed motions for rehearing. All parties have also filed an agreement that the facts were fully developed on all issues on the former trial and request rendition of a final judgment on the record now before this court. In accord with said agreement and motions that final judgment be rendered, said motions for rehearing are to that extent granted and in all other respects overruled.

The judgment of the trial court is reformed so as to award to appellants a 4/10ths undivided interest in the land in controversy. In all other respects the judgment is affirmed.

---

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

701 S.W.2d 238
Supreme Court of Texas.

Ida E. DOWNER, Petitioner,

v.

AQUAMARINE OPERATORS, INC., Respondent.

No. C–4141.  |  Dec. 4, 1985.
|  Rehearing Denied Jan. 15, 1986.

Wife of deceased seaman brought action for damages against shipowner. Trial court struck shipowner's answer as discovery abuse sanction and signed interlocutory default judgment as to liability. Jury trial on issue of damages was had in the 334th District Court, Harris County, Ken Harrison, J. Shipowner appealed. The Court of Appeals, 689 S.W.2d 472, reversed judgment of trial court. Wife appealed. The Supreme Court, Wallace, J., held that: (1) trial court had authority under rule regarding failure of party to appear at oral deposition to strike answer of shipowner; (2) trial court correctly imposed discovery sanction of striking shipowner's answer; and (3) trial court correctly refused to admit evidence of contributory negligence.

Judgment of Court of Appeals reversed and judgment of trial court affirmed.

West Headnotes (8)

[1]     **Pretrial Procedure**
         Corporate officers, agents, and employees
         President of company which was party to action was a "party" within meaning of Rule 215a(c) regarding failure of party to appear at oral deposition, where president testified he was in complete charge of all operations of the company. Vernon's Ann.Texas Rules Civ.Proc., Rule 215a(c) (Repealed).

         27 Cases that cite this headnote

[2]     **Pretrial Procedure**
         Amendment or modification
         Trial court's plenary jurisdiction gives it not only authority but responsibility to review any pretrial order upon proper motion, and in doing so, it

is presumed that court is familiar with entire record of case up to and including motion to be considered.

         8 Cases that cite this headnote

[3]     **Pretrial Procedure**
         Striking pleadings
         **Pretrial Procedure**
         Dismissal or default judgment
         In refusing to grant new trial and reinstate party's answer which had been struck at prior hearing on Motion for Sanctions as discovery sanction, trial court could consider evidence introduced subsequent to original sanctions hearing. Vernon's Ann.Texas Rules Civ.Proc., Rule 215a(c) (Repealed).

         33 Cases that cite this headnote

[4]     **Appeal and Error**
         Abuse of discretion
         Test for whether trial court abused its discretion is whether court acted without reference to any guiding rules and principles, i.e., whether the act was arbitrary or unreasonable, and mere fact that trial judge may decide matter within his discretionary authority in different manner than appellate judge in similar circumstance does not demonstrate that an abuse of discretion has occurred.

         3406 Cases that cite this headnote

[5]     **Pretrial Procedure**
         Striking pleadings
         **Pretrial Procedure**
         Dismissal or default judgment
         Trial court correctly imposed discovery sanction of striking defendant's answer and signing interlocutory default judgment as to liability under Rule 215a(c)(Repealed) regarding failure of party to appear at oral deposition, where shipowner voluntarily sent crew to sea rather than producing them for depositions as agreed on two occasions, attorney for wife of deceased seaman stated shipowner's attorney waited until one hour past deposition time to advise wife's

attorney that wife's attorney would have to fly to another city to take depositions on following day, and shipowner failed to produce president of shipowner and immediate supervisor of captain for deposition and did not explain this failure. Vernon's Ann.Texas Rules Civ.Proc., Rule 215a(c) (Repealed).

17 Cases that cite this headnote

**[6]** **Appeal and Error**
　🗝 Sustaining challenge or excusing juror

Alleged error of trial court in refusing to strike a juror for cause did not result in harm, where challenged juror was a spare.

1 Cases that cite this headnote

**[7]** **Damages**
　🗝 Scope of issues and questions considered

Trial court correctly refused to admit evidence of contributory negligence in trial to determine damages, where defendant's answer had been struck and default judgment rendered as to liability and defendant had no pleading to support contributory negligence.

14 Cases that cite this headnote

**[8]** **Appeal and Error**
　🗝 Amount of recovery or extent of relief

Alleged error of trial court in awarding prejudgment interest was not presented to trial court and was thus waived on appeal.

4 Cases that cite this headnote

**Attorneys and Law Firms**

**\*239** John O'Quinn, Frank M. Staggs, Jr., O'Quinn & Hagans, Houston, for petitioner.

Terry P. Ayre and Thomas A. Brown, Brown, Sims, Wise & White, Houston, for respondent.

**Opinion**

WALLACE, Justice.

This is an appeal from a judgment for damages in a suit brought under the Jones Act and under admiralty law. The trial dealt only with damages because the trial court struck the defendant's answer as a discovery abuse sanction and signed an interlocutory default judgment as to liability. The court of appeals reversed the trial court judgment, holding that the action of **\*240** that court was an error of law and an abuse of discretion. 689 S.W.2d 472. We reverse the judgment of the court of appeals and affirm the judgment of the trial court.

The issues before us are whether TEX.R.CIV.P. 215a(c), as it existed prior to the amendment effective August 1, 1984, authorized the trial court to strike defendant's answer, and, if so, whether the exercise of that authority constituted an abuse of discretion.

Edward P. Downer was a seaman aboard the vessel Four Point IV. He drowned while attempting to free a line that had fouled the vessel's propeller. Ida E. Downer, his widow, brought this action against Aquamarine Operators, Inc., the owner and operator of the vessel. The case was filed in the 151st District Court of Harris County. Both Downer and Aquamarine are residents of Harris County, Texas.

Downer filed Notice of Intent to Take the Depositions of All Members of The Crew on June 1. The notice identified each crew member, including the captain, Chester P. Dalfrey, by name only. Downer also requested depositions of the immediate supervisor of Chester Dalfrey and the custodian of Edward Downer's personnel file. On June 1, Aquamarine notified Downer that the crew was at sea and would not appear. Aquamarine at that time agreed to produce the requested persons on June 22. On June 21, Aquamarine again notified Downer that the crew was at sea and would not appear. It agreed to produce them on July 5.

Downer filed written Notice of Intent to Take Depositions of the same individuals for July 5. On that date, the requested deponents did not appear, whereupon Downer filed a Motion for Sanctions. A hearing on the Motion for Sanctions was set for August 22. Aquamarine made no appearance at the hearing; the trial court granted the Motion for Sanctions and signed an Order Striking Aquamarine's Answer.

Downer filed a Motion for Interlocutory Default Judgment to which Aquamarine responded. The response contained Aquamarine's reasons for not producing the requested individuals for depositions and its failure to appear at the sanctions hearing.

The reason offered for the first two occasions was that work for the FOUR POINT IV was scarce and, when work was available, it was necessary to send the vessel and crew to sea rather than produce them for depositions. On the third occasion, the vessel was in port at New Iberia, Louisiana, but Coast Guard regulations required a skeleton crew to be kept aboard at all times. Aquamarine's attorney stated that he notified Downer's attorney on July 1 of the necessity to take the depositions in New Iberia. Downer's attorney stated that he first learned that the individuals would not appear as noticed when Aquamarine's attorney called him an hour after the depositions were scheduled to commence. Both agreed that Aquamarine requested that the depositions be taken in New Iberia on July 6. However, Downer's attorney stated that he could not do so because he was preferentially set for trial in Houston starting at 9:00 a.m. on July 6.

The reason given by Aquamarine for not appearing at the sanctions hearing was that Hurricane Alicia had struck La Porte, the residence of Mr. Ayres, Aquamarine's lead counsel, four days previously. Mr. Ayres was involved in cleaning up after the hurricane and mitigating the damages to his home. Also, he had a hearing set in federal court in Beaumont on the following day and was directing all of his available attention to that matter.

To his Motion to Reconsider the Sanctions, Mr. Ayres attached an affidavit from his secretary, which stated that she had called the clerk of the court on July 7, and had advised her that Mr. Ayres had to make a docket call in Angleton on August 22. She understood the clerk to say that the sanctions hearing would be reset for September 6. In response to this motion, Downer's attorney advised the court by letter of his version of the circumstances leading up to the non-appearance on July 5, and the time when he was first advised **\*241** that the named individuals would not appear. Attached to this letter to the court was a copy of a letter dated July 28, written by Mr. Bales, an associate of Mr. Ayres, which confirmed that the sanctions hearing was set for August 22.

With the above information before it, the trial court overruled Aquamarine's Motion to Reconsider the Sanctions and to reinstate its answer. The court signed an order granting an interlocutory default judgment as to liability. Aquamarine filed a Motion to Set Aside the Default Judgment. The motion contained practically the same information as the Motion to Reconsider Sanctions set out above. The trial court considered this motion and overruled it. On April 16, 1984, the case was preferentially set for trial for June 4, and the trial court refused to consider Aquamarine's Second Motion to Set Aside the Interlocutory Default Judgment and Reinstate Defendant's Pleadings.

A jury trial was had in a different court, the 334th District, on the issue of damages. At the trial, Chester Dalfrey testified that he was captain of the FOUR POINT IV and as such he was in complete charge of the vessel with authority over all of its operations. Mr. Clark Ivans testified that he was president of Aquamarine at all times pertinent to this case, and that as such, he was the immediate supervisor of Chester Dalfrey.

 **[1]** We now address the issue of whether the trial court had authority under Rule 215a(c) to strike Aquamarine's answer. That rule stated in pertinent part:

> If a party or an officer or managing agent of a party, except for good cause shown, fails to appear before the officer who is to take his oral deposition ... the court in which the action is pending on motion and notice may strike out all or any part of the pleading of that party or dismiss the action or proceeding or any part thereof....

As noted above, Ivans testified that as president of Aquamarine he was in complete charge of all operations of the company. Thus he was a party as contemplated by Rule 215a(c).

 **[2]** **[3]** The next question is whether the trial court, in refusing to grant a new trial and reinstate Aquamarine's answer, could consider the evidence introduced subsequent to the original sanctions hearing. Aquamarine contends that the trial court, in imposing sanctions, could consider only the evidence before it at the time of the sanctions hearing, and not any evidence subsequently produced. A trial court's plenary jurisdiction gives it not only the authority but the responsibility to review any pre-trial order upon proper motion. In doing so, it is presumed that the court is familiar with the entire record of the case up to and including the motion to be considered. The plenary jurisdiction of the

trial court in this case continued through the final judgment and overruling of Aquamarine's motion for new trial. When considering the motion for new trial, the court had before it the reasons advanced by Aquamarine for not appearing for depositions or the sanctions hearing; Downer's response to Aquamarine's motions; and the evidence produced at the trial on damages. Thus, the court of appeals erred in holding that the trial court did not have authority under Rule 215a(c) to strike Aquamarine's answer.

We now turn to the court of appeals holding that the trial court abused its discretion in striking Aquamarine's answer. The court of appeals concluded its review of the abuse of discretion issue by stating: "The facts of the case simply do not, in our opinion, show this to be an appropriate case to impose the ultimate sanctions of striking the pleadings and entering default judgment." We interpret that statement to mean that the court of appeals disagreed with the decision of the two trial judges who reviewed the matter.

 **[4]**    The test for abuse of discretion is not whether, in the opinion of the reviewing court, the facts present an appropriate case for the trial court's action. Rather, it is a question of whether the court acted without reference to any guiding rules and **\*242** principles. *Craddock v. Sunshine Bus Lines,* 134 Tex. 388, 133 S.W.2d 124, 126 (Tex.Comm.App.—1939, opinion adopted). Another way of stating the test is whether the act was arbitrary or unreasonable. *Smithson v. Cessna Aircraft Co.,* 665 S.W.2d 439, 443 (Tex.1984); *Landry v. Travelers Insurance Co.,* 458 S.W.2d 649, 651 (Tex.1970). The mere fact that a trial judge may decide a matter within his discretionary authority in a different manner than an appellate judge in a similar circumstance does not demonstrate that an abuse of discretion has occurred. *Southwestern Bell Telephone Co. v. Johnson,* 389 S.W.2d 645, 648 (Tex.1965); *Jones v. Strayhorn,* 159 Tex. 421, 321 S.W.2d 290, 295 (Tex.1959).

To determine the trial judge's guiding rules and principles in imposing sanctions for discovery abuse, we must look to the Texas Rules of Civil Procedure as promulgated and amended by this Court as well as the decisions of appellate courts of this State and of the United States. The Texas Rules of Civil Procedure pertaining to discovery and sanctions for noncompliance have been amended several times, culminating in Rule 215a as it existed at the time of this case, and now embodied in Rule 215. The use of sanctions by trial courts to prevent discovery abuse has developed steadily over the past several years. These changes reflect the continuing pattern both to broaden the discovery process and to encourage sanctions for failure to comply.

The United States Supreme Court in *National Hockey League v. Metropolitan Hockey Club, Inc.,* 427 U.S. 639, 96 S.Ct. 2778, 49 L.Ed.2d 747 (1976) approved the use of sanctions not only to assure compliance with the discovery process but also to deter those who might be tempted to abuse discovery in the absence of a deterrent.

This court and various courts of appeals have also followed this progression. *See, e.g., Dyson v. Olin Corp.,* 692 S.W.2d 456 (Tex.1985), (Kilgarlin, J., concurring) (unnamed witness not permitted to testify); *Jarrett v. Warhola,* 695 S.W.2d 8 (Tex.App.—Houston [14th Dist.] 1985, writ ref'd), (plaintiff's cause of action dismissed); *City of Houston v. Arney,* 680 S.W.2d 867 (Tex.App.—Houston [1st Dist.] 1984, no writ) (defendant's answer struck for failure to answer interrogatories); *Southern Pacific Transportation v. Evans,* 590 S.W.2d 515 (Tex.Civ.App.—Houston [1st Dist.] 1979, writ ref'd n.r.e.) (defendant's answer struck and interlocutory default judgment rendered as to liability), *cert. denied,* 449 U.S. 994, 101 S.Ct. 531, 66 L.Ed.2d 291 (1980).

In various speeches and law review articles, different members of this court have encouraged trial judges to use sanctions to the degree necessary to assure compliance with discovery procedures and deter abuse of the process. Barrow and Henderson, *1984 Amendments to the Texas Rules of Civil Procedure Affecting Discovery,* 15 ST. MARY'S L.J. 713 (1984) (presented to the Texas College of the Judiciary Nov. 29, 1984); Kilgarlin and Jackson, *Sanctions for Discovery Abuse Under New Rule 215,* 15 ST. MARY'S L.J. 767 (1984); Pope and McConnico, *Practicing Law With the 1981 Texas Rules,* 32 BAYLOR L.REV. 457 (1981); Spears, *The Rules of Civil Procedure: 1981 Changes In Pretrial Discovery,* 12 ST. MARY'S L.J. 633 (1981).

The trial court in this case was free to examine the factors before it to determine whether to levy sanctions. Among these were the following: (1) whether voluntarily sending the crew to sea rather than producing them for depositions as agreed on two occasions was in conscious disregard of this court's rules; (2) whether the contradictory statements of both attorneys indicated that Aquamarine's attorney did in fact wait until one hour past the scheduled time for depositions on July 5, to advise Downer's attorney that he would have to fly to New Iberia and take depositions on the following day; (3) whether Aquamarine's attorney consciously disregarded the sanctions

hearing in preference to his personal needs and the federal court case set the following day; (4) whether the information contained in the secretary's affidavit as to the date of the sanctions hearing conflicted with the letter from an attorney **\*243** in that law firm confirming that the hearing was set on August 22; and (5) the unexplained failure of Aquamarine to produce for depositions on any of the occasions in question Clark Ivans, the immediate supervisor of Chester Dalfrey and the president of Aquamarine.

**[5]** The record contains no indication that the trial court was capricious, arbitrary, or unreasonable. Thus, the court of appeals erred in holding that the trial court abused its discretion.

In determining whether to reverse and render this cause or to remand it to the court of appeals, we must look to the four points of error raised by Aquamarine before the court of appeals but not addressed by that court. If those points raise questions of law, as opposed to questions of fact, they can be addressed by this court.

The first point was that Downer's First Amended Original Petition was insufficient to support the judgment. The contention is that the facts supporting the cause of action were not pleaded. TEX.R.CIV.P. 47 requires that a petition contain a short statement of the cause of action sufficient to give fair notice of the claim involved. Our rules do not require pleadings to contain evidence or factual detail. That point is overruled.

**[6]** The second point was that the trial court improperly refused to strike a juror for cause. After the court had ruled on challenges for cause, there were 26 names left on the jury list. Each party was given six jury strikes, so, after making those strikes, 14 names remained on the list. The challenged juror was Number 14 and was thus a spare. There was no harm in refusing to dismiss him for cause.

**[7]** The third point was that the trial court improperly refused to admit evidence of Downer's contributory negligence. Contributory negligence is an affirmative defense which must be pleaded. Aquamarine's answer had been struck and default judgment rendered as to liability. Thus, defendant had no pleading to support contributory negligence, so the court did not err in refusing to admit the requested evidence.

**[8]** Aquamarine's remaining point before the court of appeals was that the trial court erred in awarding prejudgment interest in a Jones Act case tried to a jury. This point was not presented to the trial court and was thus waived.

Aquamarine's points of error presented to the court of appeals but not considered by that court concerned questions of law over which we have jurisdiction. There is no merit to these points so it is not necessary for this cause to be remanded to the court of appeals.

The judgment of the court of appeals is reversed and the judgment of the trial court is affirmed.

---

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

349 S.W.3d 679
Court of Appeals of Texas,
Houston (14th Dist.).

Alphonsus O. EZEOKE, Appellant,
v.
Cynthia TRACY, Appellee.

No. 14–10–00153–CV.　|　Aug. 4, 2011.

**Synopsis**
**Background:** Husband's attorney sought sanctions in form of attorney's fees and expenses against wife's attorney, alleging that wife's attorney failed to serve copy of motion as represented in certificate of service and filed motion for continuance for improper purposes. The 245th District Court, Harris County, Annette Kuntz, J., awarded sanctions. Wife's attorney appealed.

**Holdings:** The Court of Appeals, William J. Boyce, J., held that:

[1] evidence was insufficient to support imposition of sanctions absent findings that conduct significantly interfered with court's legitimate exercise of core functions;

[2] no nexus existed between amount of attorney's fees and expenses awarded and targeted conduct, as would be required to support sanctions order; and

[3] attorney did not have reasonable opportunity to respond to allegations.

Reversed and remanded.

West Headnotes (11)

**[1]　Costs**
　　Nature and Grounds of Right
Trial courts have inherent power to impose sanctions for bad faith abuse of the judicial process even when the targeted conduct is not expressly covered by a rule or statute.

3 Cases that cite this headnote

**[2]　Appeal and Error**
　　Costs and Allowances
The exercise of the trial court's inherent power to award sanctions is reviewed for abuse of discretion.

3 Cases that cite this headnote

**[3]　Costs**
　　Nature and Grounds of Right
The scope of a trial court's discretion to impose sanctions under its inherent power is limited by the recognition that this power exists to the extent necessary to deter, alleviate, and counteract bad faith abuse of the judicial process, such as any significant interference with the traditional core functions of state courts.

2 Cases that cite this headnote

**[4]　Costs**
　　Nature and Grounds of Right
For a trial court's inherent power to award sanctions to apply, there must be some evidence and factual findings that the conduct complained of significantly interfered with the court's legitimate exercise of one of these powers.

2 Cases that cite this headnote

**[5]　Appeal and Error**
　　Costs and Allowances
Imposition of sanctions under Chapter 10 of the Civil Practices and Remedies Code, for submission of pleading of improper purposes, is reviewed on appeal for abuse of discretion. V.T.C.A., Civil Practice & Remedies Code §§ 10.001-10.006.

Cases that cite this headnote

**[6]　Appeal and Error**
　　Costs and Allowances

To determine if sanctions were appropriate or just, the appellate court must ensure there is a direct nexus between the improper conduct and the sanction imposed; the nexus requirement ensures that the sanction is directed against the abuse and toward remedying the prejudice caused to the innocent party.

Cases that cite this headnote

**[7]** **Costs**
⚷ Nature and Grounds of Right

The two-prong inquiry into whether a nexus exists and whether the sanction is excessive applies to sanctions imposed under rule providing for penalties for failure to serve pleadings. Vernon's Ann.Texas Rules Civ.Proc., Rules 21b, 215.2(b).

Cases that cite this headnote

**[8]** **Attorney and Client**
⚷ Liability for costs; sanctions

Evidence was insufficient to support trial court's imposition of sanctions on attorney, pursuant to court's inherent power, for failing to comply with local rules requiring attendance at mediation before trial, failure to appear at mediation, and oral misrepresentations to court about having a vacation letter on file, where order imposing sanctions made no findings that attorney's conduct significantly interfered with court's legitimate exercise of core functions such as hearing evidence, deciding issues of fact raised by the pleadings, deciding questions of law, entering final judgment, or enforcing a judgment.

3 Cases that cite this headnote

**[9]** **Attorney and Client**
⚷ Liability for costs; sanctions

No nexus existed between amount of attorney's fees and expenses awarded and targeted conduct, as would be required to support sanctions order arising out of attorney's conduct in divorce proceedings in which attorney allegedly failed to serve copy of motion on other attorney; none of the fees or expenses detailed by other attorney

during sanctions hearing were attributed to this conduct. Vernon's Ann.Texas Rules Civ.Proc., Rules 21b, 215.2(b).

Cases that cite this headnote

**[10]** **Attorney and Client**
⚷ Liability for costs; sanctions

Even if attorney had notice of motion for sanctions against him and notice of sanctions hearing, attorney did not have reasonable opportunity to respond to allegations, as would support award of sanctions, where attorney had given prior notice of his absence from the country during time period when sanctions hearing was held, attorney was in fact out of country, attorney returned to country as scheduled shortly after hearing was held, and there was no indication attorney purposefully evaded hearing. V.T.C.A., Civil Practice & Remedies Code § 10.003.

1 Cases that cite this headnote

**[11]** **Attorney and Client**
⚷ Liability for costs; sanctions

A reasonable opportunity for an attorney to respond to a sanctions request contemplates something more than the chance to ask one trial court judge to reverse sanctions that already have been imposed by another trial court judge.

Cases that cite this headnote

**Attorneys and Law Firms**

**\*680** Alphonsus O. Ezeoke, Stafford, pro se.

**\*681** Cynthia Brown Tracy, Houston, pro se.

Panel consists of Justices BROWN, BOYCE, and JAMISON.

## OPINION

WILLIAM J. BOYCE, Justice.

Alphonsus O. Ezeoke appeals from an order awarding attorney's fees and expenses as sanctions against him and in favor of Cynthia Tracy. We reverse and remand.

## BACKGROUND

This appeal arises from litigation in which attorney Ezeoke represented Jossie Herrera and attorney Tracy represented Natanael Herrera.

Jossie and Natanael Herrera were divorced on April 2, 2008. Acting on Natanael Herrera's behalf, Tracy filed a Motion to Modify the Parent–Child Relationship and a Motion to Confirm Child Support Arrears on April 8, 2009. Acting on Jossie Herrera's behalf, Ezeoke filed an Amended Motion to Deny Relief in Suit Affecting Parent–Child Relationship on May 14, 2009. Tracy contends that Ezeoke did not serve this pleading on her or her client on the day reflected in the certificate of service.

The attorneys exchanged numerous communications between May and December 2009. An unsuccessful mediation was held on May 27, 2009. The trial court issued a scheduling order on June 23, 2009, which included notice of a January 11, 2010 trial setting. The scheduling order also included a notice requiring mediation to be completed before the final trial on the merits scheduled for January 11, 2010. Tracy contends that she attempted without success on multiple occasions in November and December 2009 to communicate with Ezeoke to schedule mediation. On December 7, 2009, Tracy filed an Opposed Motion to Compel Mediation and set the motion for hearing on January 6, 2010.

Ezeoke filed a motion on December 18, 2009 seeking a continuance of (1) the hearing on Tracy's motion to compel mediation set for January 6, 2010; and (2) the January 11, 2010 trial setting. Ezeoke filed a supporting affidavit in which he stated, "This case is scheduled for mediation and trial because of the attitude of Cynthia Tracy and her office and the continued unprofessional and megalomaniacal [sic] attitude of Ms. Tracy towards me. This case should not even be at this stage but for the attitude of Ms. Tracy." He further stated, "[T]he only way to stop the nonsense and the egos involved in this case is for the Court to intervene and settle this case for the parties without the attorneys' egos as impediment."

Ezeoke's affidavit in support of the motion for continuance also stated that he would be leaving the United States on December 19, 2009 and traveling to Nigeria to fulfill certain obligations in his home town. Ezeoke's affidavit stated that he would return to the United States on January 15, 2010, and that he had retained an attorney to appear on his behalf in connection with the hearing on the motion for continuance.

Tracy filed a First Amended Motion for Sanctions Including For Failure to Serve and Response to Motion for Continuance on January 4, 2010, in which she invoked the trial court's authority to impose sanctions based on (1) the trial court's inherent power; (2) Chapter 10 of the Civil Practice and Remedies Code relating to signing of pleadings and motions; and (3) Texas Rule of Civil Procedure 21b relating to sanctions for failure to serve copies of pleadings, which incorporates by reference the **\*682** sanctions available under Rule 215.2(b). [1] Tracy did not invoke Rule 13 in her January 4, 2010 sanctions motion, and on appeal she disclaims any reliance upon Rule 13. The motion includes a certificate of service in which Tracy certified that "a true copy of the above was served on each attorney of record or party in accordance with the Texas Rules of Civil Procedure on January 4, 2010." The motion also includes a notice of hearing on the first amended motion for sanctions at 10:00 a.m. on January 11, 2010.

The trial court conducted a hearing on Ezeoke's motion for continuance on January 6, 2010. An attorney hired by Ezeoke appeared at this hearing; Ezeoke did not. The trial court denied the continuance on that date, and also signed an order directing the parties to attend mediation on January 7, 2010. The attorney hired by Ezeoke signed the mediation order "approved as to form only" on behalf of Ezeoke. Neither Ezeoke nor his client Jossie Herrera appeared at the mediation on January 7, 2010.

Tracy's January 4, 2010 sanctions motion asserted that Ezeoke (1) failed to serve a copy of the Amended Motion to Deny Relief in Suit to Modify the Parent–Child Relationship when it was filed on May 14, 2009, as represented in the certificate of service; and (2) filed a Motion for Continuance on December 18, 2009, which contained personal attacks on Tracy, for improper purposes including harassment, delay, and increasing the cost of litigation. Among other things, Tracy asked the trial court to award "reasonable attorney's fees in the amount of at least $1,500 ...."

The trial court conducted a hearing on the sanctions motion on January 11, 2010. Tracy was present at the hearing, along

with Jossie Herrera. Ezeoke was not present, and no attorney appeared on his behalf.

At the January 11, 2010 hearing, Tracy summarized her contentions regarding the conduct prompting her request for sanctions. Tracy asserted that this conduct involved "an ongoing pattern of misrepresentation and misciting the facts to the Court...." She summarized her contentions regarding the two matters raised in her January 4, 2010 motion—namely, Ezeoke's conduct in connection with failing to serve the Amended Motion to Deny Relief in Suit to Modify the Parent–Child Relationship on May 14, 2009, and the filing of the Motion for Continuance on December 18, 2009.

Tracy raised two additional complaints at the January 11, 2010 sanctions hearing regarding Ezeoke's conduct in (1) failing to appear at mediation on January 7, 2010; and (2) causing Tracy to wait in court for an hour in June 2009 while Ezeoke attempted to demonstrate to the court that he had a valid vacation letter on file. The trial court admitted all exhibits proffered by Tracy and took judicial notice of the entirety of the court's file during the hearing. **\*683** Jossie Herrera testified that she had not been notified of the mediation scheduled for January 7, 2010.

Tracy requested an award of $3,081.58 in attorney's fees and expenses at the sanctions hearing, and submitted a supporting spreadsheet as an exhibit. This amount consists of (1) $2,074.34 attributed to correspondence, a motion, a proposed order, a hearing, and a no-show fee related to the mediation scheduled for January 7, 2010; (2) $757.24 attributed to preparation and presentation of the January 4, 2010 motion for sanctions, and preparation of the sanctions order; and (3) $250 attributed to time lost due to Ezeoke's "misrepresentation on vacation letter" in June 2009. [2]

The trial court signed an order on January 11, 2010 in which it assessed sanctions against Ezeoke individually and directed him to pay $3,081.58 in attorney's fees and expenses as requested to "Cynthia B. Tracy, Attorney at Law, P.C." The trial court found good cause to sanction Ezeoke because he

- failed to "comply with the Local Rules of Harris County requiring the parties to attend mediation prior to trial set for January 11, 2010," which necessitated a motion to compel mediation, and failed to appear at mediation on January 7, 2010;

- made "misrepresentations on June 5, 2009 to the court about having a vacation letter on file for a time period he

stated he was unavailable, causing an additional delay in the proceedings when he had no vacation letter in Harris County on file for that time period;"

- failed to serve a copy of the Amended Motion to Deny Relief in Suit to Modify the Parent–Child Relationship on May 14, 2009; and

- filed a motion for continuance on December 18, 2009 that included "unfounded accusations, misrepresentations, and name-calling of opposing counsel," and that was "without merit since Alphonsus Ezeoke had failed to file a vacation letter with Harris County for that time period and had knowledge of the trial setting since July 7, 2009."

The trial court also made three specific findings in support of its sanctions award: (1) the motion for continuance was "signed in violation of Texas Civil Practice & Remedies Code Section 10.001 and contrary to the principles set for[th] in the Texas Lawyer's Creed;" (2) the motion for continuance was "brought for an improper purpose, including harassment, delay, and/or has increased the costs of this litigation;" and (3) "[t]here is a direct relationship between the sanctions imposed and the offensive conduct."

The trial court also signed an Agreed Order in Suit to Modify Parent–Child Relationship on January 11, 2010. The agreed order states that Jossie Herrera "appeared in person, and released her attorney of record, Alphonsus O. Ezeoke, as her attorney who did not appear for trial after being duly notified."

On January 28, 2010, Ezeoke filed a Motion for New Hearing on Attorney Cynthia Tracy's Motion for Sanctions and a notarized affidavit signed by Ezeoke. The motion contains a "verification" signed by Ezeoke, but the "verification" is not notarized. **\*684** Among other things, Ezeoke's affidavit states that he bought tickets for travel from Houston to Nigeria to attend to certain obligations in his home town. Ezeoke attached a copy of an itinerary from Emirates Airline indicating that Ezeoke left Houston for Nigeria on December 21, 2009 and returned to Houston on January 17, 2010. Ezeoke contended that sanctions were not warranted because

- Tracy failed to establish that the standards for awarding sanctions were met;

- "the Court and Ms. Tracy were aware that Mr. Ezeoke was out of the country" when the January 4, 2010 motion

for sanctions was filed and when it was heard on January 11, 2010;

• the motion for continuance was not brought for an improper purpose;

• Ezeoke's statements in the motion for continuance criticizing Tracy "are factually correct" and "completely true" because Tracy "has been a complete impediment to the settlement of this case" and her "unprofessional attitude is unquestionable;"

• Ezeoke did not make misrepresentations to the trial court on June 5, 2009 about having a vacation letter on file for a time period during which he said he was unavailable;

• Ezeoke served Tracy with the Amended Motion to Deny Relief in Suit to Modify Parent–Child Relationship by handing a copy of this pleading to a mediator on May 27, 2009, who in turn handed it to Tracy;

• the previous mediation on May 27, 2009 was unsuccessful;

• Ezeoke and his client Jossie Herrera did not receive sufficient notice of the January 7, 2010 mediation and did not have enough time to attend because the order compelling mediation on January 7, 2010 was signed on January 6, 2010, while Ezeoke was out of the country;

• the January 4, 2010 motion for sanctions did not include failure to mediate as one of the grounds for seeking sanctions;

• the amount awarded for attorney's fees and expenses is excessive;

• "[t]he Sanction was filed after the Petitioner was sure that the Respondent's attorney was out of the country and was sure that the motion for sanctions would be granted by default;" and

• Ezeoke received insufficient notice of the hearing on the motion for sanctions.

A hearing on the motion for rehearing was held on February 4, 2010 before a judge other than the one who signed the January 11, 2010 sanctions order. Ezeoke and Tracy both were present; no transcript of that hearing has been included in the record on appeal. An order denying the motion for reconsideration was signed on February 4, 2010. Ezeoke timely appealed.

Ezeoke challenges the January 11, 2010 sanctions order in four issues on appeal. Ezeoke contends that the trial court erred in sanctioning him because (1) sanctions are not warranted, the applicable standards have not been satisfied, insufficient notice was provided, and the amount of sanctions is excessive; (2) sanctions are not appropriate based on his statements about opposing counsel because those statements are a truthful personal opinion; (3) the trial court erred in finding that Ezeoke failed to serve the Amended Motion to Deny Relief in Suit to Modify Parent–Child Relationship; and (4) a failure to mediate does not justify sanctions because Tracy did not complain of that conduct in **\*685** her sanctions motion. [3]

## ANALYSIS

### I. Sanctions Standards

The trial court's imposition of sanctions rests on its invocation of (1) its inherent authority to impose sanctions; (2) Chapter 10 of the Civil Practice and Remedies Code, which authorizes sanctions against an attorney who signs a pleading and submits it for improper purposes such as harassment, unnecessary delay, or needless increase in the cost of litigation; and (3) Rule 21b relating to failure to serve pleadings, which incorporates by reference the penalties available under Rule 215.2(b). *See* Tex. Civ. Prac. & Rem.Code Ann. §§ 10.001–.006 (Vernon 2002); Tex.R. Civ. P. 21b; 215.2(b).

 **[1]  [2]  [3]  [4]**  Trial courts have inherent power to impose sanctions for bad faith abuse of the judicial process even when the targeted conduct is not expressly covered by a rule or statute. *See, e.g., Eichelberger v. Eichelberger,* 582 S.W.2d 395, 398–99 (Tex.1979). The exercise of this inherent power is reviewed for abuse of discretion. *McWhorter v. Sheller,* 993 S.W.2d 781, 788–89 (Tex.App.-Houston [14th Dist.] 1999, pet. denied). The scope of a trial court's discretion in this context is limited by the recognition that this power "exists to the extent necessary to deter, alleviate, and counteract bad faith abuse of the judicial process, such as any significant interference with the traditional core functions of Texas courts." *Id.* at 789 (citing *Kutch v. Del Mar College,* 831 S.W.2d 506, 509–10 (Tex.App.-Corpus Christi 1992, no writ)). "Accordingly, for inherent power to apply, there must be some evidence and factual findings that the conduct complained of significantly interfered with the court's legitimate exercise of one of these powers." *Id.* The

core functions of Texas courts subject to protection by the inherent power to sanction encompass " 'hearing evidence, deciding issues of fact raised by the pleadings, [and] deciding questions of law....' " *Trevino v. Ortega,* 969 S.W.2d 950, 958 (Tex.1998) (Baker, J., concurring) (quoting *Kutch,* 831 S.W.2d at 510); *see also Kutch,* 831 S.W.2d at 510 (additional core functions of the judiciary include entering final judgment and enforcing judgment).

[5] [6] [7] Imposition of sanctions under Chapter 10 also is reviewed for abuse of discretion. *Low v. Henry,* 221 S.W.3d 609, 614 (Tex.2007). "To determine if the sanctions were appropriate or just, the appellate court must ensure there is a direct nexus between the improper conduct and the sanction imposed." *Id.* (citing *Spohn Hosp. v. Mayer,* 104 S.W.3d 878, 882 (Tex.2003), and *TransAmerican Natural Gas Corp. v. Powell,* 811 S.W.2d 913, 917 (Tex.1991)). The nexus requirement ensures that the sanction is "directed against the abuse and toward remedying the prejudice caused [to] the innocent party." *TransAmerican,* 811 S.W.2d at 917. Additionally, the sanction must not be excessive. *Id.* The two-prong inquiry into whether a nexus **\*686** exists and whether the sanction is excessive applies as well to sanctions imposed under Rule 215.2(b). *Spohn Hosp.,* 104 S.W.3d at 882.

## II. Application of Standards

### A. Inherent Power to Impose Sanctions

[8] The trial court imposed sanctions based in part on its findings that Ezeoke failed to comply with local rules requiring the parties to attend mediation before trial; failed to appear at mediation on January 7, 2010; and made oral misrepresentations to the court in June 2009 about having a vacation letter on file for a time period he stated he was unavailable. Chapter 10, Rule 21b, and Rule 215.2(b) do not apply to this conduct because it does not pertain to signing or filing pleadings; serving pleadings; or discovery. Therefore, inherent power is the only permissible basis invoked by the trial court for sanctioning Ezeoke for this conduct.

The January 11, 2010 order does not meet the requirements for imposing sanctions pursuant to the trial court's inherent power because the order makes no findings that Ezeoke's conduct significantly interfered with the court's legitimate exercise of core functions such as hearing evidence, deciding issues of fact raised by the pleadings, deciding questions of law, entering final judgment, or enforcing a judgment.

*See McWhorter,* 993 S.W.2d at 789 (reversing imposition of sanctions pursuant to inherent power when "no such finding was made" addressing core functions). Without such findings, the January 11, 2010 order cannot be affirmed based on the trial court's invocation of its inherent power to impose sanctions.

### B. Rule 215.2(b)

[9] The trial court relied on Rule 21b and Rule 215.2(b) in sanctioning Ezeoke for failing to serve a copy of the Amended Motion to Deny Relief in Suit to Modify the Parent–Child Relationship on May 14, 2009. However, there is no nexus between this conduct and any amount encompassed by the trial court's award of $3,081.58 in attorney's fees and expenses. None of the fees or expenses detailed in the spreadsheet admitted into evidence as Exhibit 38 during the January 11, 2010 sanctions hearing are attributed to this conduct. The January 11, 2010 sanctions order awards only attorney's fees and expenses; it does not award any amounts purely as a penalty. And unlike Chapter 10, no provision in Rule 21b or Rule 215.2(b) references an award of expenses and attorney's fees incurred by the prevailing party in presenting a motion for sanctions. *See* Tex. Civ. Prac. & Rem.Code § 10.002(c). Because there is no nexus between the amount awarded and this targeted conduct, the failure to effect timely service of this pleading does not support the trial court's January 11, 2010 sanctions order. *See Spohn Hosp.,* 104 S.W.3d at 882.

### C. Civil Practice and Remedies Code Chapter 10

[10] The trial court invoked Chapter 10 in sanctioning Ezeoke for filing a motion for continuance on December 18, 2009 that included "unfounded accusations, misrepresentations, and name-calling of opposing counsel," and that was "without merit since Alphonsus Ezeoke had failed to file a vacation letter with Harris County for that time period and had knowledge of the trial setting since July 7, 2009." The trial court specifically found that (1) the motion for continuance was "signed in violation of Texas Civil Practice & Remedies Code Section 10.001 and contrary to the principles set for[th] in the Texas Lawyer's Creed;" (2) the motion for continuance was "brought for an improper purpose, **\*687** including harassment, delay, and/or has increased the costs of this litigation;" and (3) "[t]here

is a direct relationship between the sanctions imposed and the offensive conduct."

Ezeoke contends, among other things, that he did not receive the notice required under section 10.003 because the motion for sanctions was served and the sanctions hearing was held while he was out of the country. *See* Tex. Civ. Prac. & Rem.Code Ann. § 10.003 ("The court shall provide a party who is the subject of a motion for sanctions under Section 10.002 notice of the allegations and a reasonable opportunity to respond to the allegations."). Tracy contends that Ezeoke has not rebutted the prima facie evidence of service established by her certificate of service on the sanctions motion because (1) the denial of notice in Ezeoke's unverified motion for rehearing is ineffective, and (2) Ezeoke's affidavit in support of his motion for rehearing does not deny notice or receipt of service.

We need not choose between these positions because the January 11, 2010 sanctions order does not satisfy section 10.003 even if it is assumed that Ezeoke had notice of the January 4, 2010 motion for sanctions and the January 11, 2010 sanctions hearing. Section 10.003 requires not just notice, but also a "reasonable opportunity to respond to the allegations." The uncontroverted record establishes that Ezeoke (1) had given prior notice of his absence from the country during the time period when the sanctions hearing was held; (2) was in fact out of the country; and (3) returned to the United States as scheduled shortly after the hearing was held. There is no indication in the record that Ezeoke purposefully evaded the sanctions hearing, which was noticed after his announced departure for a date before his scheduled return. These circumstances do not demonstrate that a "reasonable

opportunity to respond to the allegations" was provided before sanctions were imposed.

 **[11]** We express no opinion about the legitimacy of the reasons Ezeoke gave to explain his absence and justify his departure for Nigeria without first having obtained a ruling on his motion for continuance. Depending on the circumstances, a lawyer's purposeful absence despite a known court setting may or may not warrant sanctions. A lawyer who gambles by requesting a continuance and then leaving the country before the request has been ruled on reasonably can anticipate adverse consequences. But if sanctions are requested and considered, and if the record discloses no reason why the absent lawyer cannot be afforded a reasonable opportunity to respond and to participate in a sanctions hearing upon his scheduled return, then the imposition of sanctions *in absentia* is as much a cause for concern as the unexcused absence itself. *Cf. Low,* 221 S.W.3d at 618 (absent attorney was represented by counsel at sanctions hearing). [4]

Because Ezeoke was not afforded the "reasonable opportunity to respond" required by section 10.003, the January 11, 2010 sanctions order cannot be upheld based on the trial court's invocation of Chapter 10. A remand for proceedings in conformity with section 10.003 is warranted. [5]

## *688 CONCLUSION

The trial court's January 11, 2010 sanctions order is reversed, and the matter is remanded for further proceedings consistent with this opinion.

Footnotes

[1]    On May 11, 2009, Tracy filed an Answer to Motion to Deny Relief in Suit to Modify Parent–Child Relationship and Request for Sanctions. In that pleading, Tracy contended sanctions were warranted because Ezeoke falsely alleged that the suit to modify was filed within one year after the rendition of the order sought to be modified. Tracy filed a First Amended Answer to Motion to Deny Relief in Suit to Modify Parent–Child relationship and Request for Sanctions on June 3, 2009. In this pleading, Tracy contended sanctions were warranted because Ezeoke (1) falsely alleged that the motion to modify was filed within one year after rendition of the order sought to be modified; and (2) failed to serve a copy of an Amended Motion to Deny Relief in Suit to Modify Parent–Child relationship when it was filed on May 14, 2009. There is no indication in the appellate record that the trial court ruled on either of the two earlier sanctions requests.

[2]    As filed, the January 4, 2010 motion sought sanctions against both Ezeoke and his client, Jossie Herrera. During the hearing on January 11, 2010, Tracy clarified that she sought sanctions solely on behalf of her professional corporation, "Cynthia Tracy, Attorney–at–Law, P.C.," and not on behalf of her client. Tracy also clarified that she was requesting sanctions solely against Ezeoke individually and not against his client, Jossie Herrera.

[3]    As a threshold matter, we reject Tracy's contention that Ezeoke waived all challenges to the imposition of sanctions because he did not object to the imposition of sanctions before or at the sanctions hearing. The motion for sanctions was filed on January 4, 2010,

and the hearing was held on January 11, 2010. It is undisputed on this record that Ezeoke was out of the country until mid-January. Under these circumstances, Ezeoke's timely "Motion for a New Hearing on Attorney Cynthia Tracy's Motion for Sanctions" filed on January 28, 2010 sufficed to preserve his challenges to the imposition of sanctions. *See Howell v. Tex. Workers' Comp. Comm'n,* 143 S.W.3d 416, 450 (Tex.App.-Austin 2004, pet. denied); *Kiefer v. Cont'l Airlines, Inc.,* 10 S.W.3d 34, 41 (Tex.App.-Houston [14th Dist.] 1999, pet. denied).

4 This concern is not diminished by the fact that a hearing on Ezeoke's motion for rehearing was held on February 4, 2010 in front of a different judge. A "reasonable opportunity to respond" to a sanctions request contemplates something more than the chance to ask one trial court judge to reverse sanctions that already have been imposed by another trial court judge.

5 In light of this remand, we express no opinion regarding (1) the trial court's finding that Ezeoke included "unfounded accusations, misrepresentations, and name-calling of opposing counsel" in the motion for continuance; or (2) Ezeoke's contentions on appeal regarding this finding. This issue should be addressed in the first instance on remand in conformity with section 10.003.

---

**End of Document** © 2015 Thomson Reuters. No claim to original U.S. Government Works.

351 S.W.3d 408
Court of Appeals of Texas,
Fort Worth.

Paula GAUGHAN and Dean Sanders, Appellants,

v.

NATIONAL CUTTING HORSE
ASSOCIATION, Appellee.

No. 02–09–00450–CV. | July 28,
2011. | Rehearing Overruled Oct. 6, 2011.

**Synopsis**
**Background:** Member of nonprofit corporation filed action against corporation for declaratory judgment that books and records of the corporation that he sought to inspect were not confidential and were therefore available to general public. On cross-motions for summary judgment, the 67th District Court, Tarrant County, Donald J. Cosby, J., granted summary judgment to corporation, awarded attorney fees to corporation, and incorporated a previously-entered protective order against member into final judgment. Member appealed.

**Holdings:** The Court of Appeals, Anne Gardner, J., held that:

[1] former statutory provisions did not provide a right of the public to inspect all books and records of a nonprofit corporation;

[2] former statute allowed nonprofit corporation to require a pledge or order of nondisclosure in order for a member to be able to inspect and copy its records;

[3] trial court did not err by entering protective order prohibiting member from disclosing documents designated as confidential by corporation;

[4] records designated as confidential by corporation were entitled to confidential treatment without an in camera examination; and

[5] summary judgment affidavit by lead counsel for corporation was sufficient to support attorney fee award of $75,000.

Affirmed.

West Headnotes (13)

**[1]** **Declaratory Judgment**
　🔑 Appeal and Error

The Court of Appeals would not address three judicial declarations that plaintiff sought via summary judgment, where plaintiff did not assert on appeal that the trial court erred by denying her motion for summary judgment on those grounds.

Cases that cite this headnote

**[2]** **Corporations and Business Organizations**
　🔑 Inspection of corporate books and records

Former statutory provisions did not provide a right of the public to inspect all books and records of a nonprofit corporation; not all records were financial records available to the public generally, and the right of a member of nonprofit corporation to inspect a broader range of records than was allowed to the public did not provide a right to publish such information to the public. Vernon's Ann.Texas Civ.St. arts. 1396–2.23(B), 1396–2.23A (Expired).

1 Cases that cite this headnote

**[3]** **Statutes**
　🔑 Similar or related statutes

When the legislature passes two separate statutes on the same general subject matter, it is presumed to have done so for a particular purpose, and meaning must be given to both statutes.

Cases that cite this headnote

**[4]** **Corporations and Business Organizations**
　🔑 Inspection of corporate books and records

Although amounts received from or paid to vendors, sponsors, or employees may have constituted financial records of a nonprofit corporation that were available for public inspection under former statutory provision, the underlying contracts themselves, or the

employees' addresses and social security numbers, were not "financial records" that the public was entitled to inspect. Vernon's Ann.Texas Civ.St. art. 1396–2.23A (Expired).

Cases that cite this headnote

**[5]     Corporations and Business Organizations**
    Inspection of corporate books and records

Former statute, providing for the inspection rights of a member of nonprofit corporation, allowed nonprofit corporation to require a pledge or order of nondisclosure in order for a member to be able to inspect and copy its records. Vernon's Ann.Texas Civ.St. art. 1396–2.23 (Expired).

Cases that cite this headnote

**[6]     Corporations and Business Organizations**
    Inspection of corporate books and records

Trial court did not err, in action by member of nonprofit corporation for declaratory judgment that books and records of the corporation that she sought to inspect were not confidential, by entering a protective order prohibiting member from disclosing documents designated as confidential by the corporation, or by declaring that corporation fully complied with all legal requirements relating to member's requests to review its records; member received records from corporation that public did not have the right to inspect, and her right to inspect and copy those documents was subject to protection from further disclosure as confidential. Vernon's Ann.Texas Civ.St. art. 1396–2.23(B) (Expired).

Cases that cite this headnote

**[7]     Corporations and Business Organizations**
    Inspection of corporate books and records

Under former statute, a nonprofit corporation member's own right to inspect and copy books and records of corporation did not trump privileges or other rights to confidentiality provided for by Texas law. Vernon's Ann.Texas Civ.St. art. 1396–2.23(B) (Expired).

Cases that cite this headnote

**[8]     Corporations and Business Organizations**
    Inspection of corporate books and records

Even members of a nonprofit corporation do not have unfettered access to the nonprofit's corporate records. Vernon's Ann.Texas Civ.St. arts. 1396–2.23(B).

Cases that cite this headnote

**[9]     Corporations and Business Organizations**
    Inspection of corporate books and records

By accepting and renewing her membership each year in nonprofit corporation, member agreed to abide by the rules, policies, and agreements made by the corporation, including policies for treating employee and third party business information as confidential.

Cases that cite this headnote

**[10]     Corporations and Business Organizations**
    Inspection of corporate books and records

There was no evidence in declaratory judgment action by member of nonprofit corporation that member took any action pursuant to terms of a protective order to contest corporation's designation of certain records disclosed to member as "confidential," and therefore those records were entitled to confidential treatment under the law without an in camera examination, where protective order provided means by which member could challenge corporation's designation of confidentiality.

Cases that cite this headnote

**[11]     Judgment**
    Attorneys

Summary judgment affidavit by lead counsel for nonprofit corporation was sufficient to support attorney fee award of $75,000 in unsuccessful action by corporation member for declaratory judgment that certain corporation records disclosed to him were not confidential and thus were available to general public;

counsel outlined work performed, opined that reasonable and necessary fees were $84,243, and testified that he had been involved in numerous such cases in Tarrant County, that he was familiar with usual and customary fees in such cases, and that fees charged ranged from $100 to $300 per hour depending upon the person performing those services and that person's level of experience.

Cases that cite this headnote

**[12] Judgment**
 Attorneys

While reasonableness of an attorney's fee award often presents a question of fact, an affidavit filed by the movant's attorney that sets forth his qualifications, his opinion regarding reasonable attorney's fees, and the basis for his opinion will be sufficient to support summary judgment, if uncontroverted.

8 Cases that cite this headnote

**[13] Costs**
 Declaratory judgment

Given that certain records disclosed to member of nonprofit corporation were entitled to confidential treatment, services rendered by corporation's lead counsel in reviewing, designating, and producing those records in response to member's request were reasonable and necessary, for purposes of calculating attorney fee award in member's unsuccessful action for declaratory judgment that no records disclosed to him were entitled to confidential treatment. Vernon's Ann.Texas Civ.St. art. 1396–2.23(B) (Expired).

Cases that cite this headnote

**Attorneys and Law Firms**

**\*410** James W. Walker, Dan Gus, Walker Sewell LLP, Dallas, for Appellants.

James W. Morris, Goins Underkofler Crawford & Langdon LLP, for Appellee.

PANEL: GARDNER and McCOY, JJ.; and WILLIAM BRIGHAM (Senior Justice, Retired, Sitting by Assignment).

**OPINION**

ANNE GARDNER, Justice.

**I. Introduction**

Appellants Paula Gaughan and Dean Sanders (collectively, Gaughan) and Appellee National Cutting Horse Association (the NCHA) filed cross-motions for summary judgment in Gaughan's suit against the NCHA for a declaratory judgment that the NCHA's books and records that Gaughan sought to inspect and copy are not confidential. The trial court initially entered a protective order in favor of the NCHA that prohibited Gaughan from disseminating the NCHA's books and records to others. Later, the trial court granted **\*411** the NCHA's motion for summary judgment, denied Gaughan's motion for summary judgment, and incorporated the protective order into the final judgment. Gaughan contends in three issues that the trial court erred by entering the protective order and thereby prohibiting her from disclosing documents designated as confidential by the NCHA, by granting summary judgment for the NCHA on the ground that the NCHA's records are entitled to confidential treatment under the law, by denying her motion, and by ruling that there are no genuine issues of material fact concerning the reasonableness and necessity of the NCHA's attorney's fees. We affirm.

**II. Factual and Procedural Background**

The NCHA is a non-profit corporation organized and existing under Texas law. Gaughan is a member in good standing of the NCHA. [1] On April 21, 2008, Gaughan made a written request pursuant to article 1396–2.23 of the Texas Non–Profit Corporation Act to "inspect the books and various financial records of the NCHA." [2] Gaughan requested six categories of documents from the NCHA—including employment contracts, bank statements, payroll records, and payments to vendors—for the stated purpose that Gaughan was "genuinely interested in fostering increased participation

in NCHA events by lowering the costs associated with that participation and making sure that the membership dues and other monies received by the NCHA are being spent with the best interests of the NCHA membership in mind." The NCHA responded to Gaughan's letter on April 28, 2008, enclosing audited financial statements for the years 2004 through 2007, but it requested that Gaughan clarify her stated purpose, pay for staff and professional time necessary to respond to the request, and agree to maintain the confidentiality of certain information relating to third parties (such as employees and vendors) before the NCHA would produce the remaining requested records.

Gaughan responded to the NCHA on May 9, 2008, disagreeing that her stated purpose was inadequate but also clarifying that she wished to review the financial records to confirm that the "NCHA is not guilty of waste or mismanagement in its financial affairs and in the administration of the NCHA's business." Gaughan declined to enter into a confidentiality agreement and objected to paying for staff or professional fees associated with the NCHA's compliance with her inspection request. Gaughan also requested that all responsive documents be produced within one week.

The NCHA responded on May 13, 2008, again asserting the confidentiality of some of its records, specifically records relating to its employees, third-party vendors, and sponsors. The NCHA stated that the confidentiality of its records "does not mean that you cannot have access to some or all of the information you desire[,] but it does mean that any access you may have must be in accordance with procedures which are in the best interest of [the NCHA] and include fulfilling [the NCHA]'s obligation of confidentiality."

Gaughan filed suit against the NCHA on May 20, 2008, seeking a judicial declaration **\*412** that she is entitled to inspect and photocopy each of the categories of records identified in her April 21, 2008 letter. Gaughan also sought and obtained a temporary restraining order to prevent the NCHA from destroying or altering the records she sought to inspect and copy. The NCHA filed a motion to dissolve the temporary restraining order and offered to disclose all documents requested by Gaughan subject to entry of a protective order to prevent her disclosure of information the NCHA believed to be confidential. Following the hearing on the NCHA's motion, the trial court dissolved the temporary restraining order and granted the NCHA's request for entry of a protective order.

The trial court then signed a protective order permitting the NCHA to designate certain documents that it had agreed to produce to Gaughan as confidential (by stamping "Confidential" in a conspicuous manner on each page to be so designated) and prohibiting Gaughan from reproducing, disclosing, or disseminating those documents to anyone other than her counsel except upon order of the trial court. The order stated that it was entered solely to facilitate review and provided that at any time after delivery of documents designated as confidential, counsel for Gaughan could challenge the designation by written notice to the NCHA and a motion to challenge the confidential nature of all or a portion of the information, in which event the NCHA would have the opportunity to establish that the disputed documents were entitled to confidential treatment.

After entry of the protective order, the NCHA produced 89,214 pages of documents to Gaughan but designated 36,556 of those pages as confidential as permitted by the protective order. It is undisputed that Gaughan reviewed and copied all documents she requested from the NCHA, including the documents designated as confidential. The NCHA also counterclaimed against Gaughan, seeking recovery of its attorney's fees and a judicial declaration that it had "acted reasonably and in accordance with the law in responding to [Gaughan's] requests to review the NCHA documents."

 **[1]**   Gaughan and the NCHA eventually filed cross-motions for summary judgment. In her motion, Gaughan requested, among other things, a judicial declaration that "NCHA may not prevent [her] from disclosing to her fellow NCHA members or to other third parties the substance and form of all records reflecting the NCHA's financial activity." [3] Gaughan argued that articles 1396–2.23 and 1396–2.23A of the non-profit corporation act required the NCHA to make its books and records available to members and the general public alike, that the NCHA is therefore precluded from designating any of its financial records as confidential, and that the trial court should withdraw the protective order because it contravenes articles 1396–2.23 and 1396–2.23A. In addition, Gaughan's motion for summary judgment included the following alternative request for relief:

Strictly in the alternative, and only because [the trial court's] Protective Order **\*413** otherwise requires it and remains in force until it is withdrawn as requested hereinabove, Gaughan moves the Court to conduct an in

camera inspection of the 36,556 pages of NCHA books and records that the NCHA has classified as confidential and, upon inspection of same, declare that they are not properly classified as confidential documents *given the statutory mandate that they be made available to the NCHA members and the general public alike.* [Emphasis added.]

The NCHA's motion sought summary judgment on its claims for a judicial declaration and attorney's fees. Within the motion, the NCHA argued that Gaughan did not need to file the lawsuit to obtain the requested documents; that Texas law supports the trial court's entry of the protective order; that the protective order provided a mechanism for Gaughan to challenge the NCHA's designation of any document as confidential; and that Gaughan had never challenged the NCHA's designation of any document as confidential—despite having possession of the vast majority of the documents for months—but instead claimed that no information contained in the documents requested under art. 1396–2.23 could be treated as confidential and that the protective order regarding the documents requested was contrary to law.

In its final judgment granting the NCHA's motion for summary judgment and denying that of Gaughan, the trial court declared that the NCHA had fully complied with all of Gaughan's requests to review documents of the association and all legal requirements, that the NCHA had designated documents as confidential in accordance with the protective order, that Gaughan had taken no action to contest the designations, and that the documents designated as confidential by the NCHA were thus entitled to confidential treatment as a matter of law. The trial court further ordered Gaughan to return all records marked as "Confidential" to the NCHA and to not disclose, disseminate, or reveal any of the "Confidential" records or their contents to any third parties. This appeal followed.

### III. Standard of Review

We review a summary judgment de novo. *Travelers Ins. Co. v. Joachim,* 315 S.W.3d 860, 862 (Tex.2010). We consider the evidence presented in the light most favorable to the nonmovant, crediting evidence favorable to the nonmovant if reasonable jurors could, and disregarding evidence contrary to the nonmovant unless reasonable jurors could not. *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding,* 289 S.W.3d 844, 848 (Tex.2009). We indulge every reasonable inference and resolve any doubts in the nonmovant's favor. *20801, Inc.*

*v. Parker,* 249 S.W.3d 392, 399 (Tex.2008). A defendant who conclusively negates at least one essential element of a cause of action is entitled to summary judgment on that claim. *Frost Nat'l Bank v. Fernandez,* 315 S.W.3d 494, 508 (Tex.2010); *see* Tex.R. Civ. P. 166a(b), (c). When both parties move for summary judgment and the trial court grants one motion and denies the other, the reviewing court should review both parties' summary judgment evidence and determine all questions presented. *Mann Frankfort,* 289 S.W.3d at 848; *see Myrad Props., Inc. v. LaSalle Bank Nat'l Ass'n,* 300 S.W.3d 746, 753 (Tex.2009). The reviewing court should render the judgment that the trial court should have rendered. *Mann Frankfort,* 289 S.W.3d at 848.

### IV. Discussion

#### A. The Protective Order

Gaughan contends in her first issue that the trial court erred by entering the protective **\*414** order and declaring by summary judgment that any of the NCHA's records regarding its business transactions with sponsors, vendors, and employees are entitled to confidential treatment under the law. She contends the trial court's orders are contrary to the Texas statutes that require non-profit corporations to make their financial records open and available for inspection and copying by the general public. Specifically, Gaughan argues that because the NCHA is a non-profit corporation obligated by article 1396–2.23A to make its records, books, and annual reports available to the public for inspection and copying, it cannot shield those records behind a claim of confidentiality. The NCHA responds that a member of a non-profit corporation may inspect "a much broader spectrum of records" under article 1396–2.23 than the public is entitled to inspect under article 1396–2.23A and that protective orders are permissible under Texas law to ensure that confidential information provided to members pursuant to these or similar inspection statutes is protected from disclosure to others.

#### 1. Articles 1396–2.23 and 1396–2.23A

Article 1396–2.23 of the Texas Non–Profit Corporation Act provides:

A. Each corporation shall keep correct and complete books and records of account and shall keep minutes of the proceedings of its members, board of directors, and committees having any authority of the board of directors and shall keep at its registered office or principal office

in this State a record of the names and addresses of its members entitled to vote.

B. A member of a corporation, on written demand stating the purpose of the demand, has the right to examine and copy, in person or by agent, accountant, or attorney, at any reasonable time, for any proper purpose, the books and records of the corporation relevant to that purpose, at the expense of the member.

Tex.Rev.Civ. Stat. Ann. art. 1396–2.23 (expired Jan. 2010). Similarly, but not identically, article 1396–2.23A provides, in relevant part:

A. A corporation shall maintain current true and accurate *financial records* with full and correct entries made with respect to all *financial transactions* of the corporation, including all income and expenditures, in accordance with generally accepted accounting practices.

B. Based on these records, the board of directors shall annually prepare or approve a *report of the financial activity* of the corporation for the preceding year....

C. All records, books, and annual reports *of the financial activity of the corporation* shall be kept at the registered office or principal office of the corporation in this state for at least three years after the closing of each fiscal year and shall be available to the public for inspection and copying there during normal business hours. The corporation may charge for the reasonable expense of preparing a copy of a record or report.

*Id.* art. 1396–2.23A (expired Jan. 2010) (emphasis added).

**2. Scope and Purpose of article 1396–2.23A (public's right to inspect)**

 [2]     Gaughan argues that, because article 1396–2.23A mandates public access to the financial records of a non-profit corporation, the protective order allowing the NCHA to shield its financial records from public disclosure by designating them as confidential is contrary to Texas law. However, Gaughan's argument is premised on the incorrect assumption that all of the records of a non-profit corporation that a member is entitled to inspect and copy are **\*415** financial records available to the public generally. As is clear from article 1396–2.23(B), a member of a non-profit corporation may, following written demand stating a proper purpose, examine "the books and records of [that] corporation relevant to that purpose." *Id.* art. 1396–2.23(B). Under article 1396–

2.23A, however, a member of the public may only inspect the "records, books, and annual reports of the *financial activity* of the corporation." *See id.* art. 1396–2.23A (emphasis added). Thus, the NCHA argues, a member of the public may only inspect financial records of a non-profit corporation while a member of the corporation may inspect all records of that corporation. *See id.* arts. 1396–2.23, 1396–2.23A.

The records Gaughan received from the NCHA include both financial records available for inspection by the public and non-financial records not available for inspection by the public. For example, Gaughan received vendor, sponsorship, and employment contracts and documents containing the addresses and Social Security Numbers of the NCHA's employees. Article 1396–2.23A, addressing the public's right of inspection, does not provide that the public has the right to inspect records that are not financial records.

 [3]     Moreover, article 1396–2.23, addressing the right of a member to inspect a broader spectrum of records than is allowed for the public, provides for neither a right of inspection by the public of such records nor a right by a member to publish such information to the public.[4] Thus, the NCHA argues, and we agree, that Gaughan's theory that she is entitled to disseminate or share with the public all documents she received would engraft a right of inspection by the public onto article 1396–2.23, which speaks only to the right of inspection by members. If the legislature had intended that a member would have the right to disclose all books and records of a non-profit corporation to the public, there would have been no need for two separate statutes and no need to require a member to provide a written request stating a proper purpose. Therefore, we decline to adopt Gaughan's interpretation of the two statutes by conflating them so as to provide a right of the public to inspect all books and records of a non-profit corporation, including records only available to members.

The Texas Supreme Court has held that the phrase "financial records" in article 1396–2.23A "does not include the names of contributors or members" and that article 1396–2.23A "does not require the blanket disclosure of contributors' names for public inspection." *In re Bay Area Citizens Against Lawsuit Abuse,* 982 S.W.2d 371, 381–82 (Tex.1998) (hereinafter *BACALA* ). In so holding, the *BACALA* court looked to the legislative intent of that statute, observing that it appeared "that article 1396–2.23A was intended to remedy a specific problem: the lack of accountability regarding a non-profit corporation's use of funds solicited from the public." *Id.* at 381 (citing *Texas Appellate Practice & Educ. Resource Ctr. v.*

*Patterson,* 902 S.W.2d 686, 689 (Tex.App.-Austin 1995, writ denied)). In that regard, the court quoted relevant background information from the bill analysis regarding article 1396–2.23A's purpose:

> **\*416** During the last interim, the author attempted to conduct a study of a non-profit drug rehabilitation program in Houston. This program had been soliciting funds from the public and portrayed itself as a charitable endeavor. However, there were rumors that its funds were being used for investments in such businesses as nightclubs. During the six month investigation, the author of this bill was unable to determine how the program's funds were being used because the records were inadequate. *A major recommendation from the study was that Texas law should be amended to require non-profit organizations soliciting funds from the public to keep adequate records showing how the funds were actually being used.*

*Id.* at 381 (quoting Senate Comm. on Bus. & Indus. Bill Analysis, Tex. S.B. 857, 65th Leg., R.S. (1977)). Thus, the *BACALA* court concluded the purpose of the legislation was not to force non-profit corporations to identify the exact sources of their income but was instead designed "to expose the nature of the expenditures of that money once received from the public and to make non-profit organizations accountable to their contributors for those expenditures." *Id.* The court continued, "[T]he seemingly broad scope of the statute's language is not matched by the legislative intent behind the statute." *Id.; see also Patterson,* 902 S.W.2d at 688–89 (concluding legislature designed art. 1396–2.23A as a mechanism for making non-profit corporations accountable for donations solicited from the public).

 **[4]**  It follows that, although amounts received from or paid to vendors, sponsors, or employees may constitute "financial records," the underlying contracts themselves (or the employees' addresses and social security numbers) are not financial records that the public is entitled to inspect. *See BACALA,* 982 S.W.2d at 381–82. Thus, even assuming that the public is entitled by art. 1396–2.23A to inspect all financial documents of a non-profit corporation without regard to confidentiality, a question we are not called upon to

decide, we must still determine whether documents Gaughan may inspect under art. 1396–2.23 (and which are not available to the public) may be subject to protection from disclosure to others because of confidentiality considerations. [5]

### 3. Scope and Purpose of article 1396–2.23 (member's right to inspect)

 **[5]**    **[6]**    Gaughan asserts that the scope of article 1396–2.23, which provides for the inspection rights of a member of a non-profit corporation, is absolute in prohibiting any record from being treated as confidential and does not allow a non-profit corporation to require a pledge or order of non-disclosure in order to inspect and copy its records. We disagree for reasons urged by the NCHA.

Decisions under article 1396–2.23 recognize that the statute is not absolute in its disclosure requirements for members and that orders to protect confidential information are proper in requests made under that statute. In *Citizens Ass'n for Sound Energy (CASE) v. Boltz,* 886 S.W.2d 283, 285–86 (Tex.App.-Amarillo 1994, writ denied), *cert. denied,* 516 U.S. 1029, 116 S.Ct. 675, 133 L.Ed.2d 524 (1995), a member of CASE, a non-profit association, sought review of CASE's records under article 1396–2.23. CASE opposed the production of certain documents and challenged the constitutionality of the statute. *Id.* at 286. **\*417** The trial court entered a protective order addressing the confidential nature of the requested documents and ordered CASE to produce such documents under that protective order. *Id.* at 287. On appeal by CASE, the court of appeals affirmed, holding that in view of the protective order which prohibited the member from disclosing the confidential information contained in such documents, CASE's challenges to the statute were without merit. *Id.*

In *Professional Microfilming, Inc. v. Houston,* 661 S.W.2d 767, 768 (Tex.App.-Fort Worth 1983, orig. proceeding), a case in which mismanagement of Professional Microfilming, Inc. (PMI) was alleged, this court considered a financial records request by a shareholder and former director of PMI. On mandamus, PMI complained of a discovery order by the trial court that would have allowed the shareholder, who had become a competitor of PMI, to review records containing PMI's sensitive customer, cost, and pricing information pursuant to a request made under business corporations act article 2.44. [6] *Id.* at 768–69. PMI asserted that any such review of PMI's confidential information by the shareholder would be damaging to PMI. *Id.* The trial court required PMI

to produce the information but entered an order prohibiting the shareholder and former director from disclosing any of the contents of those records to third parties. *Id.* at 769. In denying mandamus relief sought by PMI, this Court stated:

> We also hold that Judge Houston's discovery order adequately considered the sensitivity of the requested data, and the potential for misuse of that data by Hightower and Eikon. Judge Houston's order enjoined Hightower from disclosing the information or using it for purposes other than those connected with the litigation. The order also provided that the documents requested to be produced be sealed in envelopes and filed with the court, to be opened only by order of the court. *Judge Houston thus set up a procedure which would allow him to examine each document before disclosing it to Hightower, and impose even greater restrictions than the initial injunction if necessary.*

*Id.* at 770 (emphasis added). Thus, we acknowledged in *PMI* that the need to protect certain confidential information from dissemination to others may exist *even when* a statutory right to inspection by the shareholder is invoked. *Id.; see also Lewis v. Pa. Bar Ass'n,* 549 Pa. 471, 701 A.2d 551, 555 (1997) (holding documents otherwise accessible to members may be protected from disclosure to third parties by considerations of privacy, such as references to employee's health records; privilege, such as records protected by attorney-client privilege or work product doctrine; or confidentiality where both corporate purpose and public's interest are served by keeping information confidential); *Stroud v. Grace,* 606 A.2d 75, 89 (Del.1992) (holding corporation's refusal to provide certain financial information to shareholder without confidentiality agreement signed by shareholders did not violate corporation's duty of disclosure); **\*418** *Pershing Square, L.P. v. Ceridian Corp.,* 923 A.2d 810, 819–20 (Del.Ch.2007) (holding publication to others by shareholder may be limited where information is confidential and release would harm company); *Disney v. The Walt Disney Co.,* 857 A.2d 444, 446 (Del.Ch.2004) (holding that shareholder could not use right of inspection to publicly disseminate otherwise confidential records and that production was properly conditioned upon confidentiality agreement, subject to challenge of company's designation in court if parties could not resolve disagreements).

Gaughan relies upon *Sharyland Water Supply Corp. v. Block,* 755 F.2d 397 (5th Cir.1985), as the single case to support her position. Gaughan cites a statement from the opinion in that case for the proposition that article 1396–2.23 neither forbids a member from disclosing books and records provided to him by a non-profit corporation nor requires the member to pledge non-disclosure to others in order to obtain the corporation's books and records. *Id.* at 398. But *Sharyland* does not support the proposition that no restrictions on dissemination to others can be placed on an article 1396–2.23 request by a member of a non-profit corporation. That case did not deal with the right to inspect books and records under article 1396–2.23; rather, it involved a Freedom of Information Act request made to a third party to whom the corporation had provided information as part of a loan application. *Id.* Moreover, *Sharyland* is distinguishable because it involved audited financial statements that a member of the public is entitled to inspect under article 1396–2.23A. *Id.* at 399. The NCHA does not dispute that its audited financial reports are subject to disclosure under the Freedom of Information Act.

[7] [8] In addition, a member's own right to inspect and copy books and records under article 1396–2.23 does not trump privileges or other rights to confidentiality provided for by Texas law. In *Huie v. DeShazo,* 922 S.W.2d 920, 923–25 (Tex.1996), the supreme court held that a trustee's duty of disclosure does not override the attorney-client privilege and expressly rejected a claim that the provisions of article 1396–2.23 overrode a claim of attorney-client privilege. In analyzing an argument similar to the one made by Gaughan in this case, the Texas Supreme Court held as follows:

> [Real party in interest] Chenault relies on *Burton v. Cravey,* 759 S.W.2d 160 (Tex.App.-Houston [1st Dist.] 1988, no writ), for the proposition that the attorney-client privilege does not apply where a party has a right to information independently of the rules of discovery. In *Burton,* condominium owners filed a trial court mandamus action against the condominium association to enforce their statutory right to inspect the association's books and records. *See* Tex. Prop.Code Ann. § 81.209; Tex.Rev.Civ. Stat. Ann. art. 1396–2.23. The trial court allowed inspection of the records, including those in the possession of the association's attorney, finding as a factual matter that the attorney's records constituted part of the association's records. The court of appeals affirmed, holding that the attorney-client privilege did not apply in light of the owners' unqualified right of inspection. 759 S.W.2d at 162.
>
> It is unclear whether the records at issue in *Burton* were merely records of the association in the possession of the attorney, or whether they contained separate confidential

attorney-client communications. To the extent that they consisted of the former, we agree that they were not protected. *See* [*Nat'l Tank Co. v.*] *Brotherton,* 851 S.W.2d [193,] 199 [ (Tex.1993) ]. *However, to the extent that the court held that the owners'* **\*419** *statutory right of inspection somehow trumped the privilege for confidential attorney-client communications, we disapprove of its holding, for the reasons previously discussed. We also disapprove of the court's dicta that the trial court could, in its discretion decline to apply the attorney-client privilege even if all the elements of Rule 503 were met. See* 759 S.W.2d at 162.

*Id.* at 924 (emphasis added). Other jurisdictions agree. *See Schein v. N. Rio Arriba Elec. Coop., Inc.,* 122 N.M. 800, 806, 932 P.2d 490 (N.M.1997) (holding corporate documents subject to attorney-client privilege may be withheld from shareholders but upholding denial of protection for information examined by trial court in camera and found not to contain indicia of confidentiality); *Nat'l Football League Props., Inc. v. Superior Court,* 65 Cal.App.4th 100, 75 Cal.Rptr.2d 893, 898 (1998) (holding shareholder status does not in and of itself entitle an individual to unfettered access to corporate confidences); *Riser v. Genuine Parts Co.,* 150 Ga.App. 502, 504, 258 S.E.2d 184 (Ga.Ct.App.1979) (holding trial court did not err by denying corporate information to shareholder that contained confidential management information, legal opinions, and personnel evaluation in absence of compelling reason); *Morton v. Rogers,* 20 Ariz.App. 581, 586, 514 P.2d 752 (Ariz.Ct.App.1973) (holding right of director and shareholder to examine books and records does not extend to trade secrets); *see also In re LTV Secs. Litig.,* 89 F.R.D. 595, 604 (N.D.Tex.1981) (applying federal law in securities fraud suit and recognizing shareholder's statutory or common law right to inspection could not overcome otherwise valid assertion of attorney-client privilege); 5A FLETCHER CYCLOPEDIA OF THE LAW OF CORPORATIONS § 2239.10 (2011) (collecting cases holding shareholders not entitled to trade secrets or confidential information contained in books and records of corporation unless such affects financial status of corporation or value of stock).[7]

 [9]    Moreover, by accepting and renewing her membership each year in the NCHA, Gaughan has agreed to abide by the rules, policies, and agreements made by the NCHA. Gaughan has not disputed that those rules include the Employee Handbook and the Financial Disclosure Policy and Procedure adopted by the executive committee of the NCHA in 2004,

which contain the association's policies for treating employee and third party business information as confidential. By its Employee Handbook and the Disclosure Policy, the NCHA makes representations to its employees, vendors, sponsors, and other persons with whom it does business that it will maintain certain information as confidential. Gaughan disputes that any employment contract or business agreement with vendors or sponsors produced to her by the NCHA contain confidentiality agreements, but the documents in question have not been made a part of the record on appeal. In any event, the Disclosure Policy limits the right of the NCHA and its members to further disseminate such information to others because the NCHA has an obligation to protect the information **\*420** as confidential. Gaughan has not argued or cited any authority to the effect that she cannot contractually agree not to disseminate to the public or the press any confidential information provided to her as a member.

That Gaughan may be entitled to review the requested records under the applicable statute as a member of the corporation does not mean that she can do so without maintaining the confidentiality of information contained in those documents as agreed by her and as ordered by the trial court. The above-referenced cases recognize that fact. The same type of prophylactic protective order afforded in both *CASE* and *PMI* was properly afforded by the trial court in this case; that is, Gaughan's receipt, inspection, and copying of the books and records of the NCHA was subject to the procedure outlined in the order prohibiting her from sharing with others the documents designated "Confidential" by the NCHA unless she challenged the confidential designation of specific documents or categories of documents, providing the NCHA the opportunity to furnish proof to support its designation of confidentiality. We agree with the NCHA that this is the only way to balance and reconcile Gaughan's statutory right to review such documents and the NCHA's duty to maintain as confidential third party business information contained in those documents.

### 4. Confidentiality as to other members of the NCHA

On appeal, Gaughan has argued that she only wishes to share the documents in question with her fellow members of the NCHA, not the general public, in order to enable the membership to make informed decisions as to their votes for officers and directors as well as to participate in governance by determining the most reasonable and prudent course for the future of the association. But we note that Gaughan requested in both the trial court and in this court that the protective order be set aside in its entirety, which would

enable her to publish all of the information to the press and public as well as her fellow members. Moreover, the NCHA is a national organization with over 20,000 members. The NCHA acknowledges that other members have a right to review its records upon written request for a proper purpose stated. However, the Texas statutes make the NCHA the repository of its books and records. If other members request inspection, the NCHA is entitled to require those members to agree to abide by its disclosure policy or to enforce that policy as to confidential information just as it did as to Gaughan. If Gaughan is allowed to disseminate those records to other members, the NCHA will be unable to track the dissemination or to require that those other members abide by its Disclosure Policy as to confidential information to ensure that the confidential information is protected.

Because Gaughan received records from the NCHA that the public does not have the right to inspect under article 1396–2.23A, and because her right to inspect and copy those documents was subject to protection from further disclosure as confidential, the trial court did not err by entering the protective order or by declaring that the records produced to Gaughan were subject to confidential treatment prohibiting her from further disseminating them to others. Moreover, because it is undisputed that the NCHA produced to Gaughan all records that she requested, the trial court did not err by declaring that the NCHA "fully complied with all legal requirements relating to [Gaughan's] requests to review records of the association." We therefore overrule Gaughan's first issue. [8]

**\*421  B. Designation of Documents as Confidential Under Protective Order**

 [10]   Gaughan argues in her second issue that the trial court erred by declaring that the NCHA's financial records are entitled to confidential treatment under the law because it did not examine the records in camera to determine whether the assertion of confidentiality was valid. The NCHA responds that Gaughan did not follow the terms of the protective order to challenge the designation of any records as confidential.

After the trial court entered the protective order, the NCHA produced 89,214 pages of documents to Gaughan and designated 36,556 of those pages as confidential. The protective order provided that "any time after the delivery of Confidential Information, counsel for [Gaughan] may challenge the Confidential designation of all or any portion thereof by providing written notice thereof to counsel for

the NCHA" and that if the parties could not reach an agreement, Gaughan could "file a motion with the Court to challenge the confidential nature of all or a portion of the Confidential Information." The trial court's judgment includes a declaration that Gaughan "took no action pursuant to the terms of the [Protective] Order to contest the 'Confidential' designation of records and, therefore, the documents designated as 'Confidential' by the NCHA are therefore entitled to confidential treatment under the law."

Gaughan argues that the trial court erred by making this declaration because she gave written notice to the NCHA's counsel on March 18, 2009, and included within her motion for summary judgment a global request for in camera review of the 36,556 pages of confidential documents. However, the March 18 letter is not in the summary judgment record. While the NCHA's March 23 letter responding to the March 18 letter is in the summary judgment record, the March 23 letter from the NCHA's counsel only mentions a general assertion by Gaughan that she "has the right to keep and disseminate all information produced by the NCHA in this matter." The March 23 letter does not mention or refute any contentions as to why all or part of the documents designated as confidential by the NCHA should not be designated as confidential, nor does it suggest that Gaughan sent the March 18 letter for the purpose of complying with the protective order. Thus, contrary to Gaughan's contention, the summary judgment record does not contradict the trial court's declaration that Gaughan "took no action pursuant to the terms of the [Protective] Order to contest the 'Confidential' designation of records." And because Gaughan did not present summary judgment evidence that she complied with the protective order, the trial court did not err by declaring that "the documents designated as 'Confidential' by the NCHA are therefore entitled to confidential treatment under the law."

Under the unique facts and procedural posture of this case, we hold that the trial court did not err by declaring that Gaughan "took no action pursuant to the terms of the [Protective] Order to contest the 'Confidential' designation of records" and  **\*422**  that "the documents designated as 'Confidential' by the NCHA are therefore entitled to confidential treatment under the law." We overrule Gaughan's second issue. [9]

**C. Attorney's Fees**
 [11]   Gaughan contends in her third issue that the trial court erred by granting summary judgment for the NCHA's

attorney's fees because fact issues remain as to whether the fees were reasonable and necessary.

 **[12]**    "While reasonableness of an attorney's fee award often presents a question of fact, an 'affidavit filed by the movant's attorney that sets forth his qualifications, his opinion regarding reasonable attorney's fees, and the basis for his opinion will be sufficient to support summary judgment, if uncontroverted.' " *Cammack the Cook, L.L.C. v. Eastburn,* 296 S.W.3d 884, 894 (Tex.App.-Texarkana 2009, pet. denied) (quoting *In re Estate of Tyner,* 292 S.W.3d 179, 184 (Tex.App.-Tyler 2009, no pet.)); *see Bocquet v. Herring,* 972 S.W.2d 19, 21 (Tex.1998) ("In general, '[t]he reasonableness of attorney's fees ... is a question of fact for the jury's determination.' ") (quoting *Trevino v. Am. Nat'l Ins. Co.,* 140 Tex. 500, 168 S.W.2d 656, 660 (1943)). Texas courts consider eight factors when determining the reasonableness of attorney's fees:

> (1) the time and labor required, the novelty and difficulty of the questions involved, and the skill required to perform the legal service properly;
>
> (2) the likelihood ... that the acceptance of the particular employment will preclude other employment by the lawyer;
>
> (3) the fee customarily charged in the locality for similar legal services;
>
> (4) the amount involved and the results obtained;
>
> (5) the time limitations imposed by the client or by the circumstances;
>
> (6) the nature and length of the professional relationship with the client;
>
> (7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and
>
> (8) whether the fee is fixed or contingent on results obtained or uncertainty of collection before the legal services have been rendered.

*Arthur Andersen & Co. v. Perry Equip. Corp.,* 945 S.W.2d 812, 818 (Tex.1997) (citing Tex. Disciplinary R. Prof. Conduct 1.04, reprinted in Tex. Gov't Code, tit. 2, subtit. G app. (State Bar Rules, art. X, § 9) (West 2005)).

The NCHA offered an affidavit by its lead counsel as summary judgment evidence of the reasonableness and

necessity of its attorney's fees. [10] In the affidavit, the NCHA's counsel outlined the work performed for the NCHA in the case and, among other things, testified (1) that he had been "practicing law for over twenty **\*423** two years in the State of Texas"; (2) that he had been involved in "numerous cases like this one in Tarrant County, Texas"; (3) that he was "familiar with the usual and customary fees for the work done on cases of this type in Tarrant County, Texas"; (4) that the fees charged by his firm ranged from $100 to $300 per hour "depending upon the person performing these services and their level of experience"; (5) that the hourly rates were reasonable and necessary for the services performed; and (6) that "based on the work done in the case, the amount of time spent, the nature of the tasks performed[,] and the amount in controversy," it was his opinion that "the reasonable and necessary attorneys' fees incurred by the NCHA" were $84,243. Gaughan did not file any controverting summary judgment evidence. Thus, NCHA presented uncontroverted summary judgment evidence of four of the *Arthur Andersen* factors. *See id.*

Gaughan argues that the trial court erred by granting summary judgment for the NCHA because the issues of reasonableness and necessity are questions of fact and because the fees that the NCHA's counsel testified were reasonable and necessary included $5,800 in fees charged before the lawsuit was filed, over $3,200 for services by an attorney not listed on the pleadings in the case for "attention to file on pending issues," and "tens of thousands of dollars in attorneys' fees for the review and provision of the NCHA's financial records." Gaughan argues that these charges "represented fact issues that precluded the entry of summary judgment."

 **[13]**    First, while the reasonableness and necessity of attorney's fees is generally a question of fact, "[a]n attorney's affidavit can sufficiently establish the reasonableness of attorney's fees for purposes of summary judgment." *Basin Credit Consultants, Inc. v. Obregon,* 2 S.W.3d 372, 373 (Tex.App.-San Antonio 1999, pet. denied); *see Cammack the Cook,* 296 S.W.3d at 894; *see also Bocquet,* 972 S.W.2d at 21 (stating that "in general," reasonableness of attorney's fees is a question of fact). Second, the NCHA sought more than $84,000 in attorney's fees, but the trial court awarded the NCHA $75,000 in attorney's fees. It therefore appears that the trial court did not award the NCHA the $5,800 in fees charged before the lawsuit or the approximately $3,200 for services by the attorney for "attention to file on pending issues." Even if it did, the applicable statute does not prohibit recovery of fees incurred before the lawsuit is filed or billed by an attorney not

listed on the pleadings. *See* Tex. Civ. Prac. & Rem.Code Ann. § 37.009 (West 2008) ("In any proceeding under this chapter, the court may award costs and reasonable and necessary attorney's fees as are equitable and just."). Finally, we held above that, given the unique factual and procedural context of this case, the NCHA's records are entitled to confidential treatment. Therefore, the services performed by the NCHA's attorneys in reviewing, designating, and producing records to Gaughan were not rendered unreasonable or unnecessary based on Gaughan's contention that no NCHA records are entitled to confidential treatment.

The NCHA's summary judgment established its entitlement to summary judgment as to the amount of attorney's fees, and Gaughan's arguments are mere criticisms of the amount sought without contradicting evidence. *See Basin Credit*

*Consultants,* 2 S.W.3d at 373, 374 (holding that opposing affidavit did not create fact issue for summary judgment purposes because it only criticized the amount of fees sought as excessive and did not "set forth the affiant's qualifications or the basis for his opinion as to what a reasonable fee **\*424** would be"). We hold that the trial court did not err by granting summary judgment to the NCHA for $75,000 in attorney's fees, and we overrule Gaughan's third issue.

## V. Conclusion

Having overruled each of Gaughan's three issues, we affirm the trial court's judgment.

Footnotes

1     Sanders was originally a plaintiff in this lawsuit, but he withdrew from the lawsuit as a plaintiff. He is a party to this appeal because he and Gaughan are jointly and severally liable under the trial court's judgment for the NCHA's attorney's fees.

2     The written request actually cited Texas Business Organizations Code section 22.351, the successor to article 1396–2.23. *See* Tex. Bus. Org.Code Ann. § 22.351 (West 2009). However, the parties agree that article 1396–2.23 applies to this case.

3     Gaughan sought three additional judicial declarations via summary judgment, but she does not assert on appeal that the trial court erred by denying her motion for summary judgment on those grounds. Thus, we do not address Gaughan's request for those three additional judicial declarations. *See generally LeBlanc v. Riley,* No. 02–08–00234–CV, 2009 WL 885953, at \*3 (Tex.App.-Fort Worth Apr. 2, 2009, no pet.) (mem. op.) (holding that a general issue broadly challenging a summary judgment is permissible but requiring an appellant to present argument and legal authority on appeal to preserve error on a particular cause of action on which the trial court granted summary judgment).

4     When the legislature passes two separate statutes on the same general subject matter, it is presumed to have done so for a particular purpose, and meaning must be given to both statutes. *See Aldine Indep. Sch. Dist. v. Ogg,* 122 S.W.3d 257, 270 (Tex.App.-Houston [1st Dist.] 2003, no pet.); *Font v. Carr,* 867 S.W.2d 873, 881 (Tex.App.-Houston [1st Dist.] 1993, writ dism'd w.o.j.).

5     Because Gaughan is a member of the NCHA, the applicable statute in this case is article 1396–2.23(B), governing the right of a member of a non-profit corporation, not the right of the public under article 1396–2.23A.

6     Texas Business Corporations Act article 2.44 entitled directors and certain shareholders of a corporation to review the books and records of a corporation for any proper purpose. Tex.Rev.Civ. Stat. Ann. art. 2.44. (expired Jan. 2010); *see also* Tex. Bus. Org.Code Ann. § 21.218 (West 2009) (current version of expired article 2.44). That statute, which is applicable to for-profit corporations, is similar to article 1396.–2.23, which is applicable to non-profit corporations and at issue in this case. Texas courts have looked to precedent under article 2.44 when dealing with issues presented under article 1396–2.23. *See CASE,* 886 S.W.2d at 289.

7     Gaughan does not contend that she has been denied the opportunity to inspect confidential or attorney-client communications, but the broader principle revealed by *BACALA, Huie, CASE, PMI,* and similar opinions—that the scope of the right of inspection for members of a non-profit corporation may be limited by legitimate considerations of privilege, trade secrets, and confidentiality—as well as the differing access granted to members and the public under articles 1396–2.23 and 1396–2.23A, reveals that even members of a non-profit corporation do not have unfettered access to the non-profit's corporate records.

8     Gaughan's first issue contends that the trial court erred by declaring that the NCHA's "financial records" are entitled to confidential treatment, but it is clear from Gaughan's briefing on appeal and in the trial court that she contends that the trial court erred by entering the protective order concerning any of the records she requested from the NCHA. As discussed above, however, Gaughan requested and received records that a non-member may not inspect.

9     We do not reach the issues of whether the NCHA met its burden of establishing confidentiality as to particular categories of records, or whether a non-member may disseminate to other non-members information received pursuant to article 1396–2.23A. Those issues are not before us given the unique procedural posture of this case and Gaughan's request that the trial court declare that all records produced by the NCHA are not confidential despite her receipt of documents to which a non-member does not have the right to

inspect. *See generally Timpte Indus., Inc. v. Gish,* 286 S.W.3d 306, 310 (Tex.2009) ("It is well settled that a trial court cannot grant a summary judgment motion on grounds not presented in the motion.").

10      The NCHA attached redacted fee statements and a summary of the rates and fees charged by the law firm to the affidavit.

**End of Document**                                                    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

56 Tex.Civ.App. 511
Court of Civil Appeals of Texas.

GILMER et al.

v.

VEATCH et al.

June 24, 1909.    |    Rehearing
Denied June 30, 1909.

Error from District Court, Orange County; W. B. Powell,
Judge.

Action by May Veatch and others against A. Gilmer and
others. Judgment in part for plaintiffs, and defendants bring
error. Reformed and affirmed.

See, also, 117 S. W. 430.

West Headnotes (6)

**[1]**    **Appeal and Error**
 Propositions and Statements Accompanying
Assignment of Errors

Assignments of error, not followed or supported
by such statements as is required by the rules of
the appellate court, will not be considered.

3 Cases that cite this headnote

**[2]**    **Principal and Agent**
 What Law Governs

Where a power of attorney not coupled with
an interest was given in California with nothing
in its terms to indicate where it was to be
executed, and in an attempt to carry out the
powers conferred land in Texas is sought to be
sold, the law of Texas will control.

Cases that cite this headnote

**[3]**    **Principal and Agent**
 Agency Coupled with Interest

A power of attorney given by joint owners of
land to another joint owner of the same land

to sell and convey it, which conveys to the
attorney no interest in the land to be sold, is not a
"power coupled with an interest"-(citing Words
and Phrases, vol. 6, pp. 5478-5480; vol. 8, p.
7758).

1 Cases that cite this headnote

**[4]**    **Principal and Agent**
 Disability of Principal

Where a woman, after executing a power of
attorney to sell her interest in land and before
a sale was made by the agent, married, the
marriage revoked the power.

1 Cases that cite this headnote

**[5]**    **Principal and Agent**
 Death of Principal

In Texas lands cannot be sold under a naked
power of attorney after the death of the principal.

Cases that cite this headnote

**[6]**    **Vendor and Purchaser**
 Relation of Vendor to Former Owner

Two persons who had inherited an undivided
interest in land which was the community
property of their grandparents executed a power
of attorney to an agent, authorizing him to "sell
and transfer our interest in the estate of" the
grandfather. The agent sold their entire interest
in the land by deed conveying all the interest they
had as heirs at law in the land. *Held,* that the
purchaser who took in good faith, for value, and
with no notice that the land had been community
land, other than the deed, took the heirs' interest
in the land inherited from their grandmother as
well as their grandfather; the deed not giving
notice that the land may have been community
property.

1 Cases that cite this headnote

 **\*\*545**  The sale of land under the power of attorney referred
to was by deed conveying all the interest that J. Allen Veatch

and May Veatch had as heirs at law in the land in question. The purchaser took in good faith for value, and without notice other than the deed that the property had been the community property of the heirs' grandparents.

**Attorneys and Law Firms**

 **\*512**  Geo. E. Holland, for plaintiffs in error.  **\*513**  W. D. Gordon, for defendants in error.

**Opinion**

MCMEANS, J.

Suit by John Alfred Veatch and others, heirs of John A. Veatch, deceased, against A. Gilmer and others, of trespass to try title to a part of the Kennard league of land, in Sabine and Newton counties. A trial in the court below resulted in a judgment against defendants for the title and possession of an undivided interest amounting to 762 acres of the land in controversy. From this judgment John Alfred Veatch alone appealed, and the judgment of the lower court was affirmed by the Court of Civil Appeals of the Fourth District (111 S. W. 746). A petition for a writ of error was granted by the Supreme Court, and that court on a cross-assignment of error reformed the judgment of the trial court and Court of Civil Appeals, and the judgment, as reformed, was affirmed (117 S. W. 430). A sufficiently full statement of the issues will be found in the opinions referred to, and need not be repeated here.

The appellees on that appeal filed and presented cross-assignments of error, only two of which were passed upon by the Court of Civil Appeals, that court holding that, defendants nor any of appellant's coplaintiffs having perfected an appeal, the cross-assignments of error, which had no reference to appellant, or that portion of the judgment appealed from, were not entitled to consideration. This appeal is by writ of error sued out by defendants in the court below against all the plaintiffs except John Alfred Veatch, and the assignments of error here presented are identical with the assignments presented on cross-appeal.

Plaintiff in error's fifth assignment assails the trial court's eighth conclusion of law, which is as follows: "I find that the power of attorney from J. Allen Veatch and May Veatch is valid, but only authorizes the conveyance of their interest in their grandfather's, John A. Veatch's, estate, and did not authorize the conveyance of the mother's interest or the part inherited by them from their grandmother, and that they are entitled to recover an undivided 111 acres of the land in suit." John A. Veatch during his lifetime became the owner of the

south half and of an undivided one-eighth of the north half of the Kennard league. He sold 1,427 acres, and died possessed of 1,349 acres. This was the community property of John A. Veatch and his wife, who died in 1845. John A. Veatch died in 1870. J. Allen Veatch and  **\*\*546**  May Veatch are their grandchildren, and are entitled to an undivided 222 acres of the 1,349 acres, unless their title was divested by a sale made by S. H. Veatch under a written power of attorney executed by them to him authorizing him to "sell and transfer our interest in the estate of John A. Veatch, deceased." Acting under this power, S. H. Veatch sold the entire interest of J. Allen Veatch and May Veatch in the Kennard league. The trial court held that this power of attorney only authorized S. H. Veatch to sell the interest of the land that was inherited by his principals from John A. Veatch, deceased, and not the interest inherited by them from their deceased grandmother, who was  **\*514**  the wife of John A. Veatch, and awarded to May and John Allen Veatch 111 acres, which was one-half of the amount shown to have passed to them by descent from their grandparents. Following the opinion of the Supreme Court on the appeal of John Alfred Veatch, before referred to, and adopting the reasons therein given, we hold that the assignment is well taken, and that under the agreed facts the defendants in the court below, plaintiffs in error here, are entitled to the share of J. Allen Veatch and May Veatch of 222 acres, instead of the one-half thereof as awarded by the judgment of the lower court.

Plaintiff in error's first assignment of error is: "The trial court erred in his fourth conclusion of law in holding that the powers of attorney were naked powers, and not coupled with an interest." Under this assignment, the proposition is advanced that, "when an interest in the property to be dealt with under the agency is at the same time in the same person with a power to dispose of it, this constitutes a power coupled with an interest." The question here presented is whether a power of attorney, given by one joint owner of land to another joint owner to sell and convey it, is a power "coupled with an interest" within the legal meaning of that term. Plaintiffs in error contend that the instrument does not carry with it an interest in the land to be sold in order to couple an interest with the power; that the power is one thing, and the interest is another; and that when the power to sell is in the same person who has an interest in the thing to be sold, however that interest is acquired, the power becomes one coupled with an interest, and irrevocable. The powers of attorney in question were given by persons who owned an undivided interest in the same land. No interest or estate in the land to be sold was conferred by the instruments upon the agent, but merely authorized him to sell and convey their land. We do not think

the contention is sound. See Words and Phrases, tit. "Power Coupled with an Interest." The assignment is overruled.

The second assignment complains that the trial court erred in its fourth and fifth conclusions of law in holding that the power of attorney from Gitchell and wife was governed by the laws of Texas, and was revoked at the death of the makers. This instrument was a general power of attorney, and was executed in the state of California. There was nothing in its terms to indicate where or in what state it was to be executed. It was, in fact, attempted to be executed by the sale of lands in Texas after the death of the makers. The statute of California provides that "agency is terminated by notice to the agent of the death of the employer." The power of attorney conferred upon the agent no interest or estate in the property to be sold; in other words, the power was not "coupled with an interest." We think that, when in an attempt to carry out the powers conferred land in this state was attempted to be sold, the law as recognized and applied by the courts of this state must control, and the mere fact that the instruments were signed and delivered in California would not alter this rule. That the sale of lands in this state under a naked power of attorney after the death of the principal cannot be upheld seems to be well settled. Cleveland v. Williams, 29 Tex. 219, 94 Am. Dec. 274; Renfro v. Waco (Tex. Civ. App.) 33 S. W. 767; **\*515** Kent v. Cecil (Tex. Civ. App.) 25 S. W. 715; Connor v. Parsons (Tex. Civ. App.) 30 S. W. 85; Cox v. Bray, 28 Tex. 263. The assignment is overruled.

Fannie Veatch, after the execution of her power of attorney, and before a sale of her interest in the land was made by her agent, married; and the court concluded as a matter of law that her marriage revoked the power. This conclusion is assailed by the third assignment of error. We find no error in the court's conclusion. Judson v. Sierra, 22 Tex. 371; Henderson v. Ford, 46 Tex. 627.

The fourth assignment is not followed by a statement sufficient to explain it, as required by rule 31 (31 S. W. vii), and will not, therefore, be considered.

The sixth assignment was disposed of by the Supreme Court, and the seventh by the Court of Civil Appeals in the opinions above referred to, and for that reason will not be here discussed.

We are of the opinion that, instead of recovering of J. Allen Veatch and May Veatch 111 acres of the land, the plaintiffs in error should have recovered 222 acres; and accordingly the judgment will in that respect be reformed, and in all other respects affirmed.

Reformed and affirmed.

**Parallel Citations**

121 S.W. 545

---

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

922 S.W.2d 920
Supreme Court of Texas.

Harvey K. HUIE, Jr., Individually, as
Independent Executor of the Estate of
Adeline M. Huie, Deceased, and as Trustee
of the Melissa Huie Chenault Trust, Relator

v.

The Honorable Nikki
DeSHAZO, Judge, Respondent.

No. 95–0873.  |  Argued Nov. 30,
1995.  |  Decided Feb. 9, 1996.  |
Rehearing Overruled June 28, 1996.

Trust beneficiary sought to compel discovery, from an attorney, of communications by a trustee to the attorney relating to trust administration, in a suit by beneficiary alleging that trustee breached his fiduciary duty. The trial court ordered the attorney to disclose communications made before suit was filed. The Court of Appeals denied relief and the trustee petitioned for writ of mandamus. The Supreme Court, Phillips, C.J., held that: (1) attorney-client privilege applied, notwithstanding trustee's fiduciary duties to fully disclose all material facts; (2) privilege did not affect trustee's duty to disclose and provide full trust accounting; (3) attorney-client relationship existed between trustee and attorney; (4) trust was not client; (5) crime-fraud exception to attorney-client privilege did not apply; (6) compensation of attorney with trust funds did not preclude attorney-work-product privilege; and (7) whether disputed documents were prepared in anticipation of litigation was to be considered on remand.

Writ conditionally granted.

West Headnotes (15)

**[1]** **Privileged Communications and
Confidentiality**
 Fiduciary exception

**Privileged Communications and
Confidentiality**
 Trustees, guardians, and administrators;
pension plans

Attorney-client privilege protected confidential communications between trustee and attorney from discovery by trust beneficiary, notwithstanding trustee's fiduciary duty to fully disclose material facts regarding administration of trust; trustee, rather than trust beneficiary, is client. V.T.C.A., Property Code § 113.151(a); Rules of Civ.Evid., Rule 503(b).

39 Cases that cite this headnote

**[2]** **Trusts**
 Representation of cestui que trust by trustee

Trustee's fiduciary duty toward trust beneficiary, to fully disclose all material facts, exists independently of rules of discovery and applies even if no litigious dispute exists between trustee and beneficiaries. V.T.C.A., Property Code § 113.151(a).

10 Cases that cite this headnote

**[3]** **Trusts**
 Representation of cestui que trust by trustee

Trustee's duty of full disclosure extends to all material facts affecting beneficiaries' rights and is not limited by any communications by trustee with attorney that may be protected by attorney-client privilege. V.T.C.A., Property Code § 113.151(a); Rules of Civ.Evid., Rule 503(b).

11 Cases that cite this headnote

**[4]** **Privileged Communications and
Confidentiality**
 Elements in general; definition

Attorney-client privilege protects confidential communications between client and attorney made for purpose of facilitating rendition of professional legal services to client. Rules of Civ.Evid., Rule 503(b).

25 Cases that cite this headnote

**[5]** **Privileged Communications and
Confidentiality**

☞ Factual information; independent knowledge; observations and mental impressions

While attorney-client privilege extends to entire communication, including facts contained in that communication, client cannot cloak material fact with privilege merely by communicating it to an attorney. Rules of Civ.Evid., Rule 503(b).

9 Cases that cite this headnote

**[6]  Privileged Communications and Confidentiality**

☞ Trustees, guardians, and administrators; pension plans

While trustee must fully disclose material facts regarding administration of trust, attorney-client privilege protects confidential communications between trustee and his or her attorney. V.T.C.A., Property Code § 113.151(a); Rules of Civ.Evid., Rule 503(b).

3 Cases that cite this headnote

**[7]  Privileged Communications and Confidentiality**

☞ Trustees, guardians, and administrators; pension plans

Trustee which retains attorney for advice in administering trust is real client, rather than trust beneficiaries, when determining whether attorney-client privilege applies. Rules of Civ.Evid., Rule 503(a)(1).

10 Cases that cite this headnote

**[8]  Privileged Communications and Confidentiality**

☞ Trustees, guardians, and administrators; pension plans

Neither trust beneficiary nor trust itself was client of attorney retained by trustee and, thus, attorney-client privilege applied to confidential communication by trustee to attorney concerning administration of trust. Rules of Civ.Evid., Rule 503(a)(1).

6 Cases that cite this headnote

**[9]  Privileged Communications and Confidentiality**

☞ Criminal or other wrongful act or transaction; crime-fraud exception

Crime-fraud exception to attorney-client privilege did not apply to confidential communications concerning trust administration from trustee to attorney given that trustee's invocation of attorney-client privilege did not violate duty of full disclosure and, thus, attorney could not be compelled to testify about communications. Rules of Civ.Evid., Rule 503(d)(1).

8 Cases that cite this headnote

**[10]  Privileged Communications and Confidentiality**

☞ Presumptions and burden of proof

Party resisting discovery bears burden of proving any applicable privilege.

10 Cases that cite this headnote

**[11]  Pretrial Procedure**

☞ Work-product privilege

Attorney work-product privilege applied to prelitigation communications which trustee prepared in anticipation of litigation.

1 Cases that cite this headnote

**[12]  Pretrial Procedure**

☞ Work-product privilege

Whether attorney retained by trustee was compensated from trust funds, rather than trustee personally, was not determinative of whether attorney work-product privilege protected communications made to trustee; any impropriety in compensating attorney from trust funds would not abrogate work-product privilege.

Cases that cite this headnote

**[13]** **Pretrial Procedure**
 👉 Work-product privilege

Determinative factor for application of attorney work-product privilege is whether litigation was anticipated.

Cases that cite this headnote

**[14]** **Mandamus**
 👉 Matters of discretion

Trial court's erroneous legal conclusion, even in an unsettled area of law, is an abuse of discretion for purposes of determining whether mandamus relief is inappropriate; trial court has no discretion when determining what law is or applying law to facts.

87 Cases that cite this headnote

**[15]** **Mandamus**
 👉 Proceedings in civil actions in general

Mandamus relief was appropriate from order erroneously compelling disclosure of potentially privileged information by attorney retained by trustee, given that trustee lacked adequate remedy by appeal.

11 Cases that cite this headnote

**\*921** On petition for writ of mandamus.

**Attorneys and Law Firms**

G. David Ringer, Timothy D. Zeiger, Michael D. McKinley, Dallas, Douglas W. Alexander, Austin, Dwight M. Francis, Dallas, for Relator.

Donovan Campbell, Jr., T. Wesley Holmes, James J. Hartnett, Jr., James J. Hartnett, Sr., Jack M. Kinnebrew, Gary E. Clayton, and Kim Kelly Lewis, Dallas, for Respondent.

Jay J. Madrid, R. Gregory Brooks, Madrid, Corallo & Brooks, P.C., Dallas, for J. Peter Kline, Robert L. Miars, John A. Beckert, Richard N. Beckert, Edward J. Rohling, Jack Craycroft and Harvey Hotel Corp.

**Opinion**

Chief Justice PHILLIPS delivered the opinion of the Court, in which all Justices join.

The issue presented in this original mandamus proceeding is whether the attorney-client privilege protects communications between a trustee and his or her attorney relating to trust administration from discovery by a trust beneficiary. We hold that, notwithstanding the trustee's fiduciary duty to the beneficiary, only the trustee, not the trust beneficiary, is the client of the trustee's attorney. The beneficiary therefore may not discover communications between the trustee and attorney otherwise protected under Texas Rule of Civil Evidence 503. Because the trial court ruled otherwise, we conditionally grant writ of mandamus.

**I**

Harvey K. Huie, the relator, is the executor of the estate of his deceased wife, who died in 1980. Huie is also the trustee of **\*922** three separate testamentary trusts created under his wife's will for the primary benefit of the Huies' three daughters. One of the daughters, Melissa Huie Chenault, filed the underlying suit against Huie in February 1993 for breach of fiduciary duties relating to her trust.[1] Chenault claims that Huie mismanaged the trust, engaged in self-dealing, diverted business opportunities from the trust, and commingled and converted trust property. Huie's other two daughters have not joined in the lawsuit.

Chenault noticed the deposition of Huie's lawyer, David Ringer, who has represented Huie in his capacity as executor and trustee since Mrs. Huie's death. Ringer has also represented Huie in many other matters unrelated to the trusts and estate during that period. Before Chenault filed suit, Ringer was compensated from trust and estate funds for his fiduciary representation. Since the suit, however, Huie has personally compensated Ringer for all work.

Although Ringer appeared for deposition, he refused to answer questions about the management and business dealings of the trust, claiming the attorney-client and attorney-work-product privileges. Chenault subsequently moved to compel responses, and Huie moved for a protective order. After an evidentiary hearing, the trial court held that the attorney-client privilege did not prevent beneficiaries of the trust from discovering pre-lawsuit communications between

Huie and Ringer relating to the trust. The court's order, signed July 19, 1995, does not cite to any of the exceptions under Texas Rule of Civil Evidence 503 or otherwise disclose the court's rationale. [2] The court held that the attorney-client privilege protected only communications made under the following circumstances: 1) a litigious dispute existed between Chenault and Huie; 2) Huie obtained legal advice to protect himself against charges of misconduct; and 3) Huie paid for the legal counsel without reimbursement from the estate or trust. The court accordingly ordered Ringer to answer questions relating to events before February 1993, when suit was filed and Huie began personally compensating Ringer. The court also held that the attorney-work-product privilege did not apply to communications made before Chenault filed suit, again without stating its reasoning.

The court of appeals, after granting Huie's motion for leave to file petition for writ of mandamus, subsequently vacated that order as improvidently granted, denying relief. After Huie sought mandamus relief from this Court, we stayed Ringer's deposition pending our consideration of the merits.

## II

 [1]    The attorney-client privilege protects from disclosure confidential communications between a client and his or her attorney "made for the purpose of facilitating the rendition of professional legal services to the client...." TEX.R.CIV.EVID. 503(b). This privilege allows "unrestrained communication and contact between an attorney and client in all matters in which the attorney's professional advice or services are sought, without fear that these confidential communications will be disclosed by the attorney, voluntarily or involuntarily, in any legal proceeding." *West v. Solito,* 563 S.W.2d 240, 245 (Tex.1978). The privilege thus "promote[s] effective legal services," which "in turn promotes the broader societal interest of the effective administration of justice." *Republic Ins. Co. v. Davis,* 856 S.W.2d 158, 160 (Tex.1993).

The Texas Trust Code provides that "[a] trustee may employ attorneys ... reasonably necessary in the administration of the trust estate." TEX.PROP.CODE § 113.018. Chenault  **\*923** does not dispute that Huie employed Ringer to assist Huie in the administration of the Chenault trust. Indeed, Chenault does not seriously dispute that an attorney-client relationship existed between Huie and Ringer about trust matters. [3] Further, Rule 503 contains no exception to the privilege for

fiduciaries and their counsel. Chenault nonetheless contends that communications between Huie and Ringer regarding trust matters cannot be privileged as to Chenault, a trust beneficiary, even if the elements of Rule 503 are otherwise met. Chenault's primary argument is that Huie's fiduciary duty of disclosure overrides any attorney-client privilege that might otherwise apply.

 [2]    Trustees and executors owe beneficiaries "a fiduciary duty of full disclosure of all material facts known to them that might affect [the beneficiaries'] rights." *Montgomery v. Kennedy,* 669 S.W.2d 309, 313 (Tex.1984). *See also* TEX.PROP.CODE § 113.151(a) (requiring trustee to account to beneficiaries for all trust transactions). This duty exists independently of the rules of discovery, applying even if no litigious dispute exists between the trustee and beneficiaries.

Chenault argues that the trustee's duty of disclosure extends to any communications between the trustee and the trustee's attorney. The fiduciary's affairs are the beneficiaries' affairs, according to Chenault, and thus the beneficiaries are entitled to know every aspect of Huie's conduct as trustee, including his communications with Ringer. We disagree.

 [3]    [4]    [5]    The trustee's duty of full disclosure extends to all *material facts* affecting the beneficiaries' rights. Applying the attorney-client privilege does not limit this duty. In Texas, the attorney-client privilege protects confidential communications between a client and attorney made for the purpose of facilitating the rendition of professional legal services to the client. *See* TEX.R.CIV.EVID. 503(b). While the privilege extends to the entire communication, including facts contained therein, *see GAF Corp. v. Caldwell,* 839 S.W.2d 149, 151 (Tex.App.—Houston [14th Dist.] 1992, orig. proceeding); 1 STEVEN GOODE ET. AL, TEXAS PRACTICE: GUIDE TO THE TEXAS RULES OF EVIDENCE: CIVIL AND CRIMINAL, § 503.5 n. 15 (1993), a person cannot cloak a material fact with the privilege merely by communicating it to an attorney. *See, e.g., National Tank Co. v. Brotherton,* 851 S.W.2d 193, 199 (Tex.1993).

This distinction may be illustrated by the following hypothetical example: Assume that a trustee who has misappropriated money from a trust confidentially reveals this fact to his or her attorney for the purpose of obtaining legal advice. The trustee, when asked at trial whether he or she misappropriated money, cannot claim the attorney-client privilege. The act of misappropriation is a material fact of which the trustee has knowledge independently of

the communication. The trustee must therefore disclose the fact (assuming no other privilege applies), even though the trustee confidentially conveyed the fact to the attorney. However, because the attorney's only knowledge of the misappropriation is through the confidential communication, the attorney cannot be called on to reveal this information.

Our holding, therefore, in no way affects Huie's duty to disclose all material facts and to provide a full trust accounting to Chenault, even as to information conveyed to Ringer. In the underlying litigation, Chenault may depose Huie and question him fully regarding his handling of trust property and other factual matters involving the trust. Moreover, the attorney-client privilege does not bar Ringer from testifying about factual matters involving the trust, as long as he is not called on to reveal confidential attorney-client communications.

The *communications* between Ringer and Huie made confidentially and for the purpose **\*924** of facilitating legal services are protected. The attorney-client privilege serves the same important purpose in the trustee-attorney relationship as it does in other attorney-client relationships. A trustee must be able to consult freely with his or her attorney to obtain the best possible legal guidance. Without the privilege, trustees might be inclined to forsake legal advice, thus adversely affecting the trust, as disappointed beneficiaries could later pore over the attorney-client communications in second-guessing the trustee's actions. Alternatively, trustees might feel compelled to blindly follow counsel's advice, ignoring their own judgment and experience. *See In re Prudence–Bonds Corp.,* 76 F.Supp. 643, 647 (E.D.N.Y.1948) (concluding that, without the privilege, "the experience in management and best judgment by [the trustee] is put aside ... which, in the end may result in harm to the [beneficiaries]").

Chenault relies on *Burton v. Cravey,* 759 S.W.2d 160 (Tex.App.—Houston [1st Dist.] 1988, no writ), for the proposition that the attorney-client privilege does not apply where a party has a right to information independently of the rules of discovery. In *Burton,* condominium owners filed a trial court mandamus action against the condominium association to enforce their statutory right to inspect the association's books and records. *See* TEX.PROP.CODE § 81.209; TEX.REV.CIV.STAT.ANN. art. 1396–2.23. The trial court allowed inspection of the records, including those in the possession of the association's attorney, finding as a factual matter that the attorney's records constituted part of the association's records. The court of appeals affirmed, holding

that the attorney-client privilege did not apply in light of the owners' unqualified right of inspection. 759 S.W.2d at 162.

It is unclear whether the records at issue in *Burton* were merely records of the association in the possession of the attorney, or whether they contained separate confidential attorney-client communications. To the extent that they consisted of the former, we agree that they were not protected. *See Brotherton,* 851 S.W.2d at 199. However, to the extent that the court held that the owners' statutory right of inspection somehow trumped the privilege for confidential attorney-client communications, we disapprove of its holding, for the reasons previously discussed. We also disapprove of the court's dicta that the trial court could, in its discretion, decline to apply the attorney-client privilege even if all the elements of Rule 503 were met. *See* 759 S.W.2d at 162.

Chenault also relies on a study by the Section of Real Property, Probate and Trust Law of the American Bar Association, entitled *Report of the Special Study Committee on Professional Responsibility—Counselling the Fiduciary. See* 28 REAL PROP., PROB. & TR.J. 823 (1994). This study concludes that, while counsel retained by a fiduciary ordinarily represents only the fiduciary, the counsel should be allowed to disclose confidential communications relating to trust administration to the beneficiaries. *Id.* at 849–850. The study reasoned as follows:

> The fiduciary's duty is to administer the estate or trust for the benefit of the beneficiaries. A lawyer whose assignment is to provide assistance to the fiduciary during administration is also working, in tandem with the fiduciary, for the benefit of the beneficiaries, and the lawyer has the discretion to reveal such information to the beneficiaries, if necessary to protect the trust estate. The interests of the beneficiaries should not be compromised by a barrier of confidentiality.

*Id.* Several English common-law cases, and treatises citing those cases, also support this view. *See, e.g., In re Mason,* 22 Ch.D. 609 (1883); *Talbot v. Marshfield,* 2 Dr. & Sm. 549 (1865); *Wynne v. Humbertson,* 27 Beav. 421 (1858). *See also* BOGART, THE LAW OF TRUSTS AND TRUSTEES, § 961 (2nd. ed. 1983); SCOTT, THE LAW OF TRUSTS, § 173 (3rd ed. 1967).

We decline to adopt this approach. We find the countervailing arguments supporting application of the privilege, discussed previously, more persuasive. Moreover, Rule 503 contains no exception applicable to fiduciaries **\*925** and their attorneys. If the special role of a fiduciary does justify such an exception, it should be instituted as an amendment to Rule 503 through the rulemaking process. Ringer testified that he had the "fullest expectation" that his communications with Huie would be privileged. This expectation was justified considering the express language of Rule 503 protecting confidential attorney-client communications. We should not thwart such legitimate expectations by retroactively amending the rule through judicial decision.

 **[6]**    We thus hold that, while a trustee must fully disclose material facts regarding the administration of the trust, the attorney-client privilege protects confidential communications between the trustee and his or her attorney under Rule 503. [4]

## III

### A

 **[7]**    We also reject the notion that the attorney-client privilege does not apply because there was no true attorney-client relationship between Huie and Ringer. This argument finds support in some other jurisdictions, where courts have held that an attorney advising a trustee in connection with the trustee's fiduciary duties in fact represents the trust beneficiaries. Accordingly, the trustee has no privilege to withhold confidential communications from the beneficiaries. *See, e.g., Wildbur v. ARCO Chemical Co.,* 974 F.2d 631 (5th Cir.1992); *United States v. Evans,* 796 F.2d 264 (9th Cir.1986); *In the Matter of Torian,* 263 Ark. 304, 564 S.W.2d 521 (1978); *Riggs Nat'l Bank of Washington v. Zimmer,* 355 A.2d 709 (Del.Ch.1976); *In re Hoehl's Estate,* 181 Wis. 190, 193 N.W. 514 (1923). The court in *Riggs* reasoned as follows:

> As a representative for the beneficiaries of the trust which he is administering, the trustee is not the real client in the sense that he is personally being served. And, the beneficiaries are not simply incidental beneficiaries who

> *chance* to gain from the professional services rendered. The very intention of the communication is to aid the beneficiaries.... In effect, the beneficiaries were the clients of [the trustees' attorney] as much as the trustees were, and perhaps more so.

355 A.2d at 713–14.

 **[8]**    We conclude that, under Texas law at least, the trustee who retains an attorney to advise him or her in administering the trust is the real client, not the trust beneficiaries. *See Thompson v. Vinson & Elkins,* 859 S.W.2d 617 (Tex.App. —Houston [1st Dist.] 1993, writ denied) (beneficiary lacked standing to sue trustee's attorney for malpractice, as no attorney-client relationship existed between them). "Client" is defined under Rule 503 as

> a person, public officer, or corporation, association, or other organization or entity, either public or private, who is rendered professional legal services by a lawyer, or who consults a lawyer with a view to obtaining professional legal services from him.

TEX.R.CIV.EVID. 503(a)(1). It is the trustee who is empowered to hire and consult with the attorney and to act on the attorney's advice. While Huie owes fiduciary duties to Chenault as her trustee, he did not retain Ringer to represent Chenault, but to represent himself in carrying out his fiduciary duties. Ringer testified, for example, that he has "never given any legal advice to Mrs. Chenault," and in fact had only seen her on a few isolated occasions. It would strain reality to hold that a trust beneficiary, who has no direct professional relationship with the trustee's attorney, is the real client. *See In re Prudence–Bonds Corp.,* 76 F.Supp. 643 (E.D.N.Y.1948); **\*926** *Shannon v. Superior Court,* 217 Cal.App.3d 986, 266 Cal.Rptr. 242, 246 (1990). We thus hold that Huie, rather than Chenault, was Ringer's client for purposes of the attorney-client privilege.

### B

Chenault also advances an argument on post-submission brief to this Court that the *trust* itself was Ringer's real client. This approach, however, is inconsistent with the law of trusts. Mrs.

Huie created the testamentary trusts by devising property to *Huie* as trustee. *See* TEX.PROP.CODE § 112.001(3). It is Huie that holds the trust property for the benefit of Chenault, and it is Huie that is authorized to hire counsel. *See* TEX.PROP.CODE § 113.018. The term "trust" refers not to a separate legal entity but rather to the *fiduciary relationship* governing the trustee with respect to the trust property. *See* TEX.PROP.CODE § 111.004. Ringer thus represented Huie in his capacity as trustee, not the "trust" as an entity.

## IV

 [9]  Chenault also argues that communications between Ringer and Huie should be disclosed under the crime-fraud exception to the attorney-client privilege. *See* TEX.R.CIV.EVID. 503(d)(1). Chenault does not argue that the alleged breaches of trust for which she is suing are crimes or fraud within this exception; rather, she contends that the failure to disclose communications in and of itself is fraud. Because we have held that the trustee's invocation of the attorney-client privilege does not violate his or her duty of full disclosure, we find Chenault's crime-fraud argument to be without merit.

## V

### A

 [10]  The party resisting discovery bears the burden of proving any applicable privilege. *See State v. Lowry,* 802 S.W.2d 669, 671 (Tex.1991). Chenault argues that even if the attorney-client privilege is otherwise available, Huie failed to carry his evidentiary burden to establish its applicability in this case.

Ringer, who was allowed to give testimony in narrative form, testified in part as follows:

> The questions that were propounded to me during my deposition by [Chenault's counsel] I believe were argumentative, and they sought to go at the very core of things I understood, things that I knew, or even questions that related to whether something occurred or not, would go to the essence of the advice

and communication. I have always handled my work with Mr. Huie with the fullest expectation that my correspondence with him and my communications with him and his correspondence with me and his communication with me would be privileged.... I also have Mr. Huie's instruction and expectation that his communications be confidential....

Ringer did not specifically address any of the numerous certified questions before the court, and thus there is no testimony about whether or why each particular question calls for the disclosure of confidential communications. Chenault thus contends that Huie did not prove "what particular deposition testimony would entrench upon the alleged attorney-client privilege...." Huie responds that many of the questions on their face call for privileged communications, but at the same time concedes that other questions "arguably present a close question as to whether confidential attorney-client communications ... would be compromised."

The trial court's ruling is based on its conclusion that the attorney-client privilege does not apply to any pre-litigation communications between a trustee and the trustee's attorney, a contention we have rejected. In light of this holding, we believe the trial court should have an opportunity to consider, in the first instance, whether Huie has carried his evidentiary burden as to each of the certified questions for which Ringer claimed, on Huie's behalf, the attorney-client privilege. The court may, in its discretion, receive further evidence from the parties.

### B

Chenault further argues that many of the certified questions relate to federal tax returns **\*927** filed by the estate. Relying on cases interpreting the federal attorney-client privilege, she contends that the privilege does not apply when an attorney is employed to prepare tax returns, as the attorney is primarily performing accounting, rather than legal, services. *See, e.g., In re Grand Jury Investigation,* 842 F.2d 1223, 1225 (11th Cir.1987); *United States v. Davis,* 636 F.2d 1028, 1043 (5th Cir.1981); *Canaday v. United States,* 354 F.2d 849, 857 (8th Cir.1966). *But see Colton v. United States,* 306 F.2d 633, 637 (2d Cir.1962), *cert. denied,* 371 U.S. 951, 83 S.Ct. 505, 9 L.Ed.2d 499 (1963).

The attorney-client privilege embodied in Rule 503 requires that the communication be "made for the purpose of facilitating the rendition of professional legal services to the client...." The trial court, in considering whether Huie has met his evidentiary burden, should in the first instance determine whether this element is satisfied as to each of the certified questions.

## VI

 **[11]**    The trial court also overruled Huie's attorney-work-product objections as to communications made before the date Chenault filed suit. Huie contends that the work-product privilege protects communications made after 1988, the time when he contends that he anticipated litigation.

An attorney's "work product" refers to "specific documents, reports, communications, memoranda, mental impressions, conclusions, opinions, or legal theories, prepared and assembled in actual anticipation of litigation or for trial." *National Tank Co. v. Brotherton,* 851 S.W.2d 193, 200 (Tex.1993). The trial court did not rule on Huie's claims of work-product privilege independently of his claims of attorney-client privilege; rather, the court summarily overruled both of these claims as to all pre-litigation communications. It thus appears that the trial court concluded, as it did for the attorney-client privilege, that the work-product privilege simply does not apply in the fiduciary-attorney relationship prior to the time suit is actually filed.

 **[12]**    **[13]**    We disagree with this conclusion. The policy reasons supporting the attorney-client privilege in the context of the fiduciary-attorney relationship support even more strongly the work-product privilege, as the latter protects the confidentiality of work prepared in anticipation of litigation. There can be little dispute that a fiduciary must be allowed some measure of confidentiality in defending against an anticipated suit for breach of fiduciary duty. Further, we do not believe it is determinative that Ringer was compensated from trust funds, rather than by Huie personally, before Chenault filed suit. The determinative factor for the work-product privilege is instead whether litigation was anticipated. While we express no opinion on

whether it was *proper* for Ringer to be compensated from trust funds for any work that may have been done in anticipation of litigation, we hold that any such impropriety would not abrogate the work-product privilege. *See Lasky, Haas, Cohler & Munter v. Superior Court,* 172 Cal.App.3d 264, 218 Cal.Rptr. 205 (1985) (public policy underlying full disclosure by trustee does not overcome work-product privilege, even where attorney is compensated from trust corpus).

Because the trial court concluded that the work-product privilege did not apply to materials or communications generated prior to the time suit was filed and Huie began personally compensating Ringer, it appears that the court never reached the issue of when Huie anticipated litigation. The court should therefore reconsider Huie's work-product objections in accordance with this opinion.

## VII

 **[14]**    **[15]**    Chenault argues that because the legal question confronting the trial court was an issue of first impression in Texas, the court could not have "abused its discretion" in resolving the issue, and thus mandamus relief is inappropriate. We disagree. "A trial court has no 'discretion' in determining what the law is or applying the law to the facts." *Walker v. Packer,* 827 S.W.2d 833, 840 (Tex.1992). Consequently, the trial court's erroneous legal conclusion, even in an **\*928** unsettled area of law, is an abuse of discretion. *See Lunsford v. Morris,* 746 S.W.2d 471 (Tex.1988). Moreover, because the trial court's order compels the disclosure of potentially privileged information, Huie lacks an adequate remedy by appeal. *See Walker,* 827 S.W.2d at 843.

We therefore conditionally grant the writ of mandamus and direct the trial court to vacate its July 19, 1995, discovery order. The trial court shall reconsider Huie's claims of attorney-client and attorney-work-product privilege in accordance with this opinion. The court may in its discretion receive additional evidence from the parties.

**Parallel Citations**

64 USLW 2540, 39 Tex. Sup. Ct. J. 288

Footnotes

Chenault sued individually, as next friend of her minor daughter, and as next friend of her minor niece, who is under Chenault's conservatorship. Chenault also named several business associates of Huie as additional defendants.

The trial court initially relied on Texas Rule of Civil Evidence 503(d)(5), which creates an exception to the attorney-client privilege as between joint clients of an attorney regarding matters of common interest to the clients. The court, however, later amended its order to delete this reference.

Chenault argues for the first time in a post-submission brief that Ringer represented the trust itself as an entity, rather than Huie as trustee. This argument is addressed in section III–B below.

Chenault also argues that Huie, by accepting the appointment as trustee with knowledge of his duty of disclosure, impliedly waived the protection of the attorney-client privilege. Because we conclude that a trustee does not violate the duty of full disclosure by invoking the attorney-client privilege, we reject this waiver argument.

---

**End of Document**
© 2015 Thomson Reuters. No claim to original U.S. Government Works.

982 S.W.2d 371
Supreme Court of Texas.

In re BAY AREA CITIZENS AGAINST
LAWSUIT ABUSE, Relator.

No. 97–0812. | Argued Feb. 3,
1998. | Decided Dec. 10, 1998.

Citizens and taxpayers brought action against city and nonprofit organizations, claiming improper use of property and improper transfer of public funds. The District Court denied plea to jurisdiction, and ordered nonprofit organization to provide discovery relating to identity of its contributors. The Corpus Christi Court of Appeals denied nonprofit organization's motion for leave to file writ of mandamus, and organization petitioned for mandamus relief from the Supreme Court. The Supreme Court, Abbott, J., held that: (1) appeal would provide adequate remedy with regard to plea to jurisdiction; (2) requiring disclosure of donor lists would violate First Amendment; (3) requiring disclosure of only corporate contributors would violate First Amendment; and (4) Texas Non–Profit Corporation Act did not require disclosure of donor lists.

Petition denied in part and conditionally granted in part.

West Headnotes (18)

**[1]** **Mandamus**
 Rulings as to pleadings

Nonprofit organization challenging denial of plea to jurisdiction could not obtain relief by way of writ of mandamus, in action by city taxpayers alleging improper use of property and public funds, in absence of any showing that situation was extraordinary one in which remedy by appeal was inadequate.

8 Cases that cite this headnote

**[2]** **Mandamus**
 Remedy by Appeal or Writ of Error

A party seeking mandamus relief must establish that it has no adequate remedy by appeal.

13 Cases that cite this headnote

**[3]** **Mandamus**
 Modification or vacation of judgment or order

When a discovery order violates First Amendment rights, the party seeking mandamus generally has no adequate remedy by appeal. U.S.C.A. Const.Amend. 1.

13 Cases that cite this headnote

**[4]** **Constitutional Law**
 Freedom of Association

Freedom of association for the purpose of advancing ideas and airing grievances is a fundamental liberty guaranteed by the First Amendment. U.S.C.A. Const.Amend. 1.

1 Cases that cite this headnote

**[5]** **Constitutional Law**
 Freedom of Association

Because compelled disclosure of the identities of an organization's members or contributors may have a chilling effect on the organization's contributors as well as on the organization's own activity, the First Amendment requires that a compelling state interest be shown before a court may order disclosure of membership in an organization engaged in the advocacy of particular beliefs. U.S.C.A. Const.Amend. 1.

1 Cases that cite this headnote

**[6]** **Constitutional Law**
 Freedom of Association
**Constitutional Law**
 Political Rights and Discrimination

It is immaterial to scope of First Amendment protection whether the beliefs sought to be advanced by association pertain to political, economic, religious or cultural matters. U.S.C.A. Const.Amend. 1.

Cases that cite this headnote

**[7]    Constitutional Law**

⚷ Freedom of Association

State action which may have the effect of curtailing the freedom to associate is subject to the closest scrutiny. U.S.C.A. Const.Amend. 1.

Cases that cite this headnote

**[8]    Constitutional Law**

⚷ Freedom of Association

To secure an order preventing the disclosure of its donor lists, organization bears the initial burden to make a prima facie showing that disclosure orders will burden First Amendment rights. U.S.C.A. Const.Amend. 1.

Cases that cite this headnote

**[9]    Constitutional Law**

⚷ Freedom of Association

Showing of harm to First Amendment rights that is required to protect organization's donor lists from disclosure is light; evidence offered need show only a reasonable probability that the compelled disclosure will subject donors to threats, harassment, or reprisals from either government officials or private parties. U.S.C.A. Const.Amend. 1.

3 Cases that cite this headnote

**[10]    Constitutional Law**

⚷ Discovery requests and subpoenas

**Privileged Communications and Confidentiality**

⚷ Constitutional privileges in general

Evidence of past boycott threats made against businesses that supported nonprofit organization satisfied organization's initial burden to make a prima facie showing that discovery orders requiring disclosure of donor lists would burden First Amendment rights, thus requiring compelling state interest to justify such orders. U.S.C.A. Const.Amend. 1.

2 Cases that cite this headnote

**[11]    Constitutional Law**

⚷ Particular Issues and Applications

When a litigant seeks, through the power of the courts, to discover information protected by the First Amendment, the litigant must make a showing of need beyond its mere relevance; litigant seeking such information must demonstrate that it is substantially related to a compelling government interest. U.S.C.A. Const.Amend. 1.

Cases that cite this headnote

**[12]    Constitutional Law**

⚷ Discovery requests and subpoenas

**Privileged Communications and Confidentiality**

⚷ Constitutional privileges in general

Nonprofit organization's donor lists did not have a sufficient nexus to the taxpayers' interest in proving wrongful use of property and public funds to be subject to discovery, consistent with First Amendment, in suit by taxpayers; identity of private contributors was not required to show improper use of public funds or use of property in violation of conditions in deed. U.S.C.A. Const.Amend. 1.

Cases that cite this headnote

**[13]    Constitutional Law**

⚷ Discovery requests and subpoenas

**Pretrial Procedure**

⚷ Order

Discovery orders requiring disclosure of nonprofit organization's donor lists would burden First Amendment, due to threats of political and economic reprisals, even if disclosure were limited to corporate contributors, thus precluding discovery in absence of compelling state interest; besides discouraging corporations from donating to organization, disclosure of corporate contributors' names would burden organization's and its individual contributors' rights of association. U.S.C.A. Const.Amend. 1.



1 Cases that cite this headnote

18 Cases that cite this headnote

**[14]    Corporations and Business Organizations**
      Books and records

Nonprofit organization's obligation under Texas Non–Profit Corporation Act to prepare and disclose "financial records" did not require disclosure of donor lists. Vernon's Ann.Texas Civ.St. art. 1396–2.23A.

3 Cases that cite this headnote

**[15]    Constitutional Law**
      Avoidance of constitutional questions

Court should, if possible, interpret statute in a manner that avoids constitutional infirmities.

4 Cases that cite this headnote

**[16]    Statutes**
      Language

When interpreting a statute, court begins with the words of the statute itself.

10 Cases that cite this headnote

**[17]    Statutes**
      Intent

Courts look to legislative intent when construing a statute.

8 Cases that cite this headnote

**[18]    Statutes**
      Language and intent, will, purpose, or policy
**Statutes**
      Legislative History
**Statutes**
      Construction in View of Effects, Consequences, or Results

To determine legislative intent, courts may consider the language of the statute, the legislative history, the nature and object to be obtained, and the consequences that would follow from alternate constructions.

**Attorneys and Law Firms**

**\*372** William W. Pierson, Myra K. Morris, Corpus Christi, Chester J. Makowski, Houston, for Relator.

Darrell L. Barger, Patricia ann Shackelford, Gonzalo Joseph Barrientos, Corpus Christi, David W. Holman, Houston, David L. Perry, Corpus Christi, for Respondent.

**Opinion**

ABBOTT, Justice, delivered the opinion for a unanimous Court.

In this mandamus proceeding, Bay Area Citizens Against Lawsuit Abuse ("BACALA") complains of two discovery orders requiring BACALA to produce certain documents and answer certain deposition questions concerning the identities of its contributors. BACALA further complains that the trial court improperly denied its plea to the jurisdiction. We find that BACALA has failed to show that it lacks an adequate remedy by appeal from the trial court's denial of the plea to the jurisdiction; however, we conditionally grant mandamus relief with respect to those portions of the discovery orders requiring BACALA to disclose its contributors' identities.

**\*373  I**

**Background**

In 1950, the City of Corpus Christi deeded property located at 1201 N. Shoreline to the Corpus Christi Chamber of Commerce. The deed provided that the Chamber would:

(a) ... erect upon the property herein conveyed a permanent building ... to house said Chamber ...;

(b) ... maintain ... a permanent all-year Tourist Information Bureau in said Building, and provide such literature as is customarily employed ... extolling the benefits and advantages of the City of Corpus Christi;

(c) ... provide in said building such space ..., for the displaying of exhibits, depicting the commercial,

industrial, agricultural, mineral and maritime assets of the City....

The deed also contained the following reversion clause:

> [I]n the event said grantee shall ... permit the use of said land or premises, or any part thereof, for any purpose other than herein provided without the written permission of the grantor, the property conveyed hereby together with all improvements thereon shall revert to the City of Corpus Christi....

In accordance with the deed, the Chamber built and has maintained a building on the property.

In response to the business community's support for tort reform, the Chamber created a lawsuit abuse committee. In 1994, the Chamber entered a joint venture agreement merging its lawsuit abuse committee with BACALA.

BACALA is a non-profit corporation organized under Texas law and qualifying under section 501(c)(6) of the Internal Revenue Code. According to its articles of incorporation, BACALA's purpose is to "promote common business interests and to better business conditions in the Corpus Christi Bay Area by effecting a basic change in the public's attitude toward liability and litigation so as to end this strangling lawsuit crisis and prevent its recurrence." BACALA has a board of trustees, but does not have members. It does, however, have contributors.

Soon after the BACALA/Chamber joint venture, the Chamber merged into the Greater Corpus Christi Business Alliance ("the Alliance"). The Alliance is a private, non-profit Texas corporation comprising the Chamber, the Convention and Visitors Bureau, and the Economic Development Corporation. Pursuant to a consulting agreement with the City, the Alliance took responsibility for tourist promotion, began receiving substantial tax monies from the City to promote convention and tourism,[1] and moved into the Chamber building on the Shoreline property.

Although BACALA maintained a separate identity from the Alliance, the Alliance allowed BACALA to use rent-free office space on the Shoreline property from July 1994 to April 1997. During this time, BACALA used an Alliance telephone extension and other utilities, reimbursing the Alliance for long distance and postage. The building was divided such that

departments funded by public tax monies were located on one side of the building while privately funded entities, including BACALA, were on the other. Other entities that have occupied the Shoreline building include Beautify Corpus Christi, SCORE, and the Minority Business Opportunity Commission.

A few citizens and taxpayers of Corpus Christi (collectively "taxpayers"), sued the Alliance, BACALA, and the City of Corpus Christi seeking to restrain and enjoin BACALA's and the Alliance's allegedly improper use of the Shoreline property and public tax revenues "for private special interests." The taxpayers allege that the City's transfer of public funds to the Alliance and its authorizing the Alliance's and BACALA's use of the Shoreline property constitute "the granting of public monies and other things of value to the Defendant corporations for special private purposes" in violation of Article III, Section 52 of the Texas Constitution.[2] The **\*374** taxpayers also seek to recover all allegedly illegal and unauthorized payments previously made by the City to the Alliance and BACALA, and to determine whether the Shoreline property has reverted to the City under the terms of the deed.

## II

### Procedural History

BACALA filed a plea to the jurisdiction, arguing that the taxpayers lacked standing to sue BACALA. BACALA argued that because the taxpayers could not properly sue for the recovery of *past* expenditures and because BACALA had already vacated the Shoreline property, the trial court lacked subject matter jurisdiction. The trial court denied BACALA's plea.

During discovery, the taxpayers noticed the deposition of Kim Keef, BACALA's executive director and designated representative, and attached a subpoena duces tecum. In response, BACALA filed a motion to quash and for protective order, arguing that the taxpayers' claim for illegal expenditures of monies by the Alliance did not directly involve BACALA, and therefore BACALA should not be subject to harassing and burdensome discovery requests. The trial court ordered BACALA to produce Keef for deposition and to preserve all objections at that time. The court also ruled that disputes concerning the production of documents should

be deferred until after the deposition. The deposition went forward as ordered; however, BACALA's counsel objected to approximately thirty questions on the basis that they violated BACALA's constitutional rights. The taxpayers filed a motion to compel answers to the deposition questions, arguing that the information sought concerning, among other things, BACALA's sources of funding and contributions was necessary "to determine the propriety of the use of public funds and public property."

The taxpayers also served a deposition on written questions on BACALA's custodian of records, requesting a broad range of BACALA's financial documents. BACALA produced some of the requested documents; however, it filed a motion for protective order asserting that some of the discovery requests violated the United States and Texas Constitutions, were overly broad, unduly burdensome, not calculated to lead to the discovery of admissible evidence, not relevant, and exceeded the scope of permissible discovery. In response, the taxpayers filed a motion to compel production of all documents and things sought in the subpoena duces tecum and the deposition on written questions. The motion to compel included BACALA's contributor lists.

The trial court ordered Keef to answer certain questions concerning BACALA's mailing and contributor lists, the creative sources and funding for BACALA's advertisements, any affiliation with other Citizens Against Lawsuit Abuse organizations, any use of out-of-state phone banks, and any relationship to a private industry. The trial court further ordered BACALA to produce "the list of donors and amounts of donations for the years 1994, 1995, and 1996," subject to a protective order limiting the information's use to preparation for this litigation.

BACALA filed a motion for leave to file a writ of mandamus with the Thirteenth Court of Appeals. The court of appeals granted an emergency stay and requested briefing, but subsequently denied the motion. BACALA then filed a petition for writ of mandamus with this Court. In its petition, BACALA complains of (1) the trial court's order denying BACALA's plea to the jurisdiction, (2) the order that BACALA produce a list of donors and their donation amounts, and (3) the order that Keef answer deposition questions concerning BACALA's donor list.

**III**

**Plea to the Jurisdiction**

**[1]** BACALA asserts that the taxpayers do not have standing to bring suit against BACALA and therefore the trial court abused its discretion by denying its plea to the jurisdiction. We hold that BACALA is not entitled to mandamus relief for the trial **\*375** court's denial of its plea to the jurisdiction because BACALA has failed to show that it lacks an adequate remedy by appeal.

**[2]** A party seeking relief must establish that it has no adequate remedy by appeal. *See Walker v. Packer, 827 S.W.2d 833, 840 (Tex.1992).* Generally, "appeal is an adequate remedy to address a trial court's denial of a plea to the jurisdiction, and therefore a writ of mandamus will not issue to correct it." *Canadian Helicopters Ltd. v. Wittig, 876 S.W.2d 304, 306, 308–09 (Tex.1994); see also Bell Helicopter Textron, Inc. v. Walker, 787 S.W.2d 954, 955 (Tex.1990) (quoting Abor v. Black, 695 S.W.2d 564, 566–67 (Tex.1985)).* Although there may be some extraordinary situations in which remedy by appeal is inadequate and mandamus relief is justified, BACALA has made no showing that this case involves such a situation. *Bell Helicopter, 787 S.W.2d at 955.* Because BACALA has failed to show that it lacks an adequate remedy by appeal for the trial court's denial of its plea to the jurisdiction, we need not address whether the trial court abused its discretion in denying the plea. *See Canadian Helicopters, 876 S.W.2d at 310.*

**IV**

**Discovery Orders**

BACALA complains of the trial court's discovery orders requiring BACALA to provide deposition testimony and produce documents disclosing the names of BACALA's contributors.[3] BACALA argues that the names of its contributors are not relevant to the litigation and are protected by the associational rights guaranteed by the First Amendment of the United States Constitution.[4]

**[3]** When a discovery order violates First Amendment rights, the party seeking mandamus generally has no adequate remedy by appeal. *See Tilton v. Moye, 869 S.W.2d 955, 958 (Tex.1994) (citing Walker, 827 S.W.2d at 843).* Because the portions of the trial court's orders directing BACALA to

disclose its contributors' names violate the First Amendment, we conditionally grant mandamus relief.

## A

### Freedom of Association

[4] [5] [6] [7] BACALA asserts that the trial court's orders compelling disclosure of its contributors' names impermissibly burden both its own and its contributors' First Amendment rights. Freedom of association for the purpose of advancing ideas and airing grievances is a fundamental liberty guaranteed by the First Amendment.[5] *NAACP v. Alabama,* 357 U.S. 449, 460, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958). Compelled disclosure of the identities of an organization's members or contributors may have a chilling effect on the organization's contributors as well as on the organization's own activity. *See Buckley v. Valeo,* 424 U.S. 1, 66–68, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976). For this reason, the First Amendment requires that a compelling state interest be shown before a court may order disclosure of membership in an organization engaged in the advocacy of particular beliefs. *Tilton,* 869 S.W.2d at 956 (citing *NAACP,* 357 U.S. at 462–63, 78 S.Ct. 1163). " '[I]t is immaterial whether the beliefs sought to be advanced by association pertain to political, economic, religious or cultural matters, and state action which may have the **\*376** effect of curtailing the freedom to associate is subject to the closest scrutiny.' " *Id.* (quoting *NAACP,* 357 U.S. at 460–61, 78 S.Ct. 1163).

## B

### Burden on Right of Association

[8] [9] To secure an order preventing the disclosure of its donor lists, BACALA bears the initial burden to make a *prima facie* showing that the trial court's orders will burden First Amendment rights. *See Buckley,* 424 U.S. at 74, 96 S.Ct. 612; *New York State Nat'l Org. for Women v. Terry,* 886 F.2d 1339, 1355 (2d Cir.1989), *cert. denied,* 495 U.S. 947, 110 S.Ct. 2206, 109 L.Ed.2d 532 (1990); *Brock v. Local 375, Plumbers Int'l Union,* 860 F.2d 346, 349–50 (9th Cir.1988). Many courts have grappled with the question of what constitutes a sufficient showing of harm to First Amendment rights. *Brock,* 860 F.2d at 350 n. 1 (listing cases). In order to guarantee protection of a party's First Amendment

rights, however, the burden must be light. *Terry,* 886 F.2d at 1355 ("[I]n making out a *prima facie* case of harm the burden is light."). The Supreme Court has recognized that "unduly strict requirements of proof could impose a heavy burden" and that a party "must be allowed sufficient flexibility in the proof of injury to assure a fair consideration of [its] claim." *Buckley,* 424 U.S. at 74, 96 S.Ct. 612. "The evidence offered need show only a reasonable probability that the compelled disclosure of a party's contributors' names will subject them to threats, harassment, or reprisals from either Government officials or private parties." *Id.* The proof may include "specific evidence of past or present harassment of members due to their associational ties, or of harassment directed against the organization itself." *Id.*

[10] At the hearing on the taxpayers' motion to compel and BACALA's motion for protective order, BACALA submitted several letters as evidence that its supporters had been subject to boycott threats. The first letter was a law firm's resignation from the Chamber because of the Chamber's position concerning tort reform. A second letter prevailed upon local lawyers to urge their clients not to do business with BACALA supporters, listing Chamber members who voted to support BACALA and major contributors to BACALA. This letter stated that BACALA "is basically about limiting and destroying our right to trial by jury." Another letter, from a lawyer to a local district judge, explained that the lawyer would not be contributing to a judicial conference because the conference would be held at a barbecue restaurant owned by a BACALA supporter. This letter referred to BACALA as "an organization which has degradated [sic] our judiciary, our judicial system and the citizens who spend their valuable time serving so faithfully on our juries" and asserted that the author "simply will not knowingly do business with anyone who so attacks our judicial system or the good people who run and participate in it." A final letter, from a lawyer to the president of the U.S. Lexington Museum on the Bay, stated that the lawyer would not support the association because its deputy executive director was BACALA's treasurer. BACALA also offered testimonial evidence that many contributors donate money on an anonymous basis and that some fear an adverse impact on their businesses if they are identified as BACALA supporters.

The taxpayers respond that they introduced evidence to show that disclosure would result in no such reprisals. For example, one of the taxpayers' lawyers, the author of the letter concerning the barbecue restaurant, testified that he had recently eaten at the barbecue restaurant and that he and the

restaurant owner were long-time friends. The taxpayers do not dispute, however, that the threats were made or that they were intended when made; they merely claim that the threats should no longer be taken seriously.

The taxpayers further argue that BACALA's evidence of retaliation is too speculative to satisfy its burden of proof. *See Buckley,* 424 U.S. at 70, 96 S.Ct. 612. In *Buckley,* the Court concluded that the appellants' evidence of retaliation was "highly speculative" and therefore *NAACP v. Alabama* was inapposite. *Id.* at 69–73, 96 S.Ct. 612. The *Buckley* appellants relied primarily on the "clearly articulated fears of individuals, well experienced **\*377** in the political process" and testimonial evidence that "one or two persons refused to make contributions because of the possibility of disclosure." *Id.* at 71–72, 96 S.Ct. 612. The appellants offered no stronger evidence of threats or harassment. *Id.* at 72 n. 88, 96 S.Ct. 612.

BACALA's evidence is stronger than that offered by the appellants in *Buckley.* As opposed to mere subjective fears and testimony that some donors would refuse to donate, BACALA's evidence demonstrates that individuals opposed to BACALA's agenda had boycotted the business establishments of persons affiliated with BACALA and encouraged others to do the same. This is the type of "specific evidence of past or present harassment of members due to their associational ties" and "harassment directed against the organization" recognized by the Court in *Buckley. Buckley,* 424 U.S. at 74, 96 S.Ct. 612. The evidence shows actual, non-speculative hostility and demonstrates a reasonable probability of economic reprisals against contributors that may burden First Amendment rights. *Cf. NAACP,* 357 U.S. at 462, 78 S.Ct. 1163. Under such circumstances, compelled disclosure of BACALA's contributor lists may dissuade contributors and hinder BACALA's and its contributors' ability to pursue collective advocacy of their beliefs. *See id.* at 462–63, 78 S.Ct. 1163.

The taxpayers also argue that the alleged harm falls short of the type of retaliation shown by parties in other cases such as *Brown v. Socialist Workers '74 Campaign Comm.,* 459 U.S. 87, 99, 103 S.Ct. 416, 74 L.Ed.2d 250 (1982), and *NAACP v. Alabama,* in which courts protected associations from disclosing supporters' names. In *Brown,* for example, the campaign committee introduced evidence of harassment including threatening phone calls, hate mail, destruction of property, and physical violence. We agree with the taxpayers that the threat to BACALA is not as severe as that demonstrated in cases such as *Brown* or *NAACP.*

However, such a factual record of violent past harassment is not the only situation in which courts have recognized a potential infringement on an association's First Amendment rights. *Local 1814, Int'l Longshoremen's Assoc. v. Waterfront Comm'n of New York Harbor,* 667 F.2d 267, 271 (2d Cir.1981); *see also Community–Service Broadcasting of Mid–America, Inc. v. Federal Communications Comm'n,* 593 F.2d 1102, 1118 (D.C.Cir.1978) ("The absence of such concrete evidence [of harassment], however, does not mandate dismissal of the claim out of hand; rather it is the task of the court to evaluate the likelihood of any chilling effect...."). In *Local 1814,* the court found it sufficient that longshoremen contributors would perceive a connection between contributing to a political fund and being called before the Waterfront Commission and would therefore discontinue their contributions. *Local 1814,* 667 F.2d at 272; *see also Tilton,* 869 S.W.2d at 956 (holding trial court's order of production of ministry's contributor lists unconstitutional when requests were aimed at persons sharing particular beliefs and the harm alleged was that contributors could be subpoenaed for questioning). And in *Pollard v. Roberts,* the Supreme Court affirmed the district court's recognition of the potential infringement on First Amendment rights that could result from political and economic reprisals, even though no factual showing of such reprisals had been made:

> While there is no evidence of record in this case that any individuals have as yet been subjected to reprisals on account of the contributions in question, it would be naive not to recognize that the disclosure of the identities of contributors ... would subject at least some of them to *potential economic or political reprisals* of greater or lesser severity....
>
> ... Disclosure or threat of disclosure well may tend to discourage both membership and contributions thus producing financial and political injury to the party affected.

*Pollard v. Roberts,* 283 F.Supp. 248, 258 (E.D.Ark.), *aff'd. per curiam,* 393 U.S. 14, 89 S.Ct. 47, 21 L.Ed.2d 14 (1968) (emphasis added).

In sum, BACALA has offered factual, non-speculative evidence of economic and political reprisals against itself and its contributors. This evidence is sufficient to satisfy its burden of proof.

**\*378  C**

**Compelling State Interest**

 **[11]**   **[12]**   The taxpayers argue that the information covered by the trial court's orders is relevant to their case and thus discoverable. When a litigant seeks, through the power of the courts, to discover information protected by the First Amendment, the litigant must make a showing of need beyond its mere relevance. *See, e.g., Federal Election Comm'n v. Larouche Campaign,* 817 F.2d 233, 234–35 (2d Cir.1987); *Tilton,* 869 S.W.2d at 956. The litigant seeking information must demonstrate that the information required to be disclosed is substantially related to a compelling government interest. *See Buckley,* 424 U.S. at 64, 96 S.Ct. 612; *Gibson v. Florida Legislative Investigation Comm.,* 372 U.S. 539, 546, 83 S.Ct. 889, 9 L.Ed.2d 929 (1963); *Ex parte Lowe,* 887 S.W.2d 1, 3 (Tex.1994).

The taxpayers admit that their interest in BACALA's donor information "is based solely on the relevance such information has to the disputed issues in this lawsuit—the proper use of public funds and the nature of the use being made of public property." We hold that the taxpayers have failed to show a substantial relation between the identity of BACALA's contributors and the taxpayers' goal of exposing and preventing the alleged misuse of the property and public funds.

The taxpayers assert that BACALA's donor information is necessary to determine whether public monies and property were used in violation of the Texas Constitution, Article III, Section 52(a) and whether the Shoreline property reverted to the City. The taxpayers have alleged that public tax money was improperly conveyed to BACALA through the Alliance. In their motion to compel, the taxpayers argued that they sought the financial records of BACALA and "the member entities of the Alliance" to "reconstruct the path of public, tax payer money through the various accounts held by the Alliance and its member entities for the years 1994, 1995 and 1996." However, the names of BACALA's contributors other than the Alliance are not relevant to such a determination, especially in light of the heightened relevance standard required by the Constitution. *See Pollard,* 283 F.Supp. at 257 ("Even if it be conceded that defendant's investigation might be advanced if he knew that certain individuals had made contributions ..., we do not think that that fact would make relevant the disclosure of all of the contributors...."). Further,

the Alliance has already provided records of any monies it has given to BACALA.

Concerning the use of the property, the taxpayers assert that if the source of BACALA's funding was not the local citizenry of Corpus Christi, but instead was large, out-of-town corporations anticipating litigation in the area and attempting to influence the public and the local jury pool, that would be "highly relevant to the issue of whether public property and funds are being misused." They also argue that the list of contributors is relevant to debunk BACALA's position that its activities benefit local business and industry. Assuming that the taxpayers' claims are tenable, disclosure of the contributors' names is still not justified. The location of BACALA's contributors does not help to determine whether public property and funds are being misused: where the money comes from sheds no light on how it is used. Nor do the location and identity of BACALA's contributors bear a substantial relation to a determination of whether the Alliance has violated the deed, causing the property to revert to the City. Moreover, the remedy sought for the alleged misuse of the property is to prevent BACALA's further use of the building. BACALA has already vacated the property. Thus, disclosure of BACALA's contributors' names simply does not have a sufficient nexus to the taxpayers' interest in proving BACALA's and the Alliance's alleged wrongful use of the property and public funds. *See Pollard,* 283 F.Supp. at 258 ("[I]n order to overcome the prohibitions of [the First] Amendment the defendant was required to make a far greater showing of relevancy and public interest in the disclosure than has been made here."). Accordingly, we hold that the trial court abused its discretion by ordering disclosure of BACALA's **\*379** donor lists. [6]

**D**

**Corporate Donors**

 **[13]**   The taxpayers alternatively contend that even if the donor lists in general are protected from disclosure, the names of BACALA's corporate donors may still be disclosed because corporations do not have First Amendment rights. The taxpayers argue that there is "no freedom of association claim for corporate donors" because "a corporation, being a creature of State, has no 'personal' constitutional rights that can be asserted on its behalf." To support their position, the taxpayers cite *Super X Drugs of Texas, Inc. v. State,*

[505 S.W.2d 333, 337 (Tex.Civ.App.—Houston [14th Dist.] 1974, no writ)](), in which the court held that a corporation has no Fifth Amendment right against self-incrimination because that right is a personal right that belongs to individuals, not corporations. Thus, the taxpayers conclude, "BACALA cannot assert 'freedom of association' claims on behalf of its corporate donors and mandamus cannot extend to those donors."

The Supreme Court's decision in *[First National Bank of Boston v. Bellotti,]()* [435 U.S. 765, 98 S.Ct. 1407, 55 L.Ed.2d 707 (1978)](), undermines the taxpayers' argument. In *Bellotti,* the Supreme Court rejected the argument that corporations, as creatures of the state, have only those rights granted them by the state, noting that "such an extreme position could not be reconciled either with the many decisions holding state laws invalid under the Fourteenth Amendment when they infringe protected speech by corporate bodies, or with decisions affording corporations the protection of constitutional guarantees other than the First Amendment." *Id.* at [778 n. 14, 98 S.Ct. 1407]() (citations omitted). The Court further recognized that "[c]orporate identity has been determinative in several decisions denying corporations certain constitutional rights, such as the privilege against compulsory self-incrimination, ... but this is not because the States are free to define the rights of their creatures without constitutional limit." *Id.* at [779 n. 14, 98 S.Ct. 1407.]()

The taxpayers' argument is further undermined by the Supreme Court's holding that "[t]he proper question ... is not whether corporations 'have' First Amendment rights and, if so, whether they are coextensive with those of natural persons. Instead, the question must be whether the [state action] abridges expression that the First Amendment was meant to protect." *Bellotti,* [435 U.S. at 776, 98 S.Ct. 1407.]() Thus, the taxpayers' focus on whether BACALA's corporate contributors have constitutional rights is misplaced. Instead, the proper question is whether disclosure of their identities "abridges expression that the First Amendment was meant to protect." *Id.*

When considering whether disclosure will burden First Amendment rights, the focus should be broader than the rights of the corporate contributors alone. *Cf. [Bellotti,]()* [435 U.S. at 776, 98 S.Ct. 1407]() ("The Constitution often protects interests broader than those of the party seeking their vindication."). Besides discouraging corporations from donating to BACALA, disclosure of the corporate contributors' names would also burden BACALA's and its individual contributors' rights of association. BACALA's evidence of political and economic reprisals against its supporters is sufficient to indicate a reasonable probability that disclosure of its corporate contributors' names would decrease the number of contributions made to BACALA by those corporations. *See [Pollard,]()* **\*380** [283 F.Supp. at 258]() ("Disclosure or threat of disclosure well may tend to discourage both membership and contributions thus producing financial and political injury to the party affected."); *[United States Servicemen's Fund v. Eastland,]()* [488 F.2d 1252, 1265–68 (D.C.Cir.1973)]() (when disclosure results in a drop in contributions, that disclosure violates a corporation's First Amendment rights of association and assembly), *rev'd on other grounds,* [421 U.S. 491, 95 S.Ct. 1813, 44 L.Ed.2d 324 (1975).]() *Cf. [NAACP,]()* [357 U.S. at 459–60, 78 S.Ct. 1163]() ("The reasonable likelihood that the Association itself through diminished financial support and membership may be adversely affected if production is compelled is a further factor pointing towards our holding that petitioner has standing to complain of the production order on behalf of its members."). This, in turn, would burden the rights of individuals who were not dissuaded from contributing. *See [Medrano v. Allee,]()* [347 F.Supp. 605, 619 (S.D.Tex.1972)]() (the right to assemble is in part a collective right, and abridgment of that right by dissuading others from exercising it effectively curtails its exercise by those who are not intimidated), *aff'd in part and vacated in part on other grounds,* [416 U.S. 802, 94 S.Ct. 2191, 40 L.Ed.2d 566 (1974).]() As we stated previously, the taxpayers have failed to show a substantial relation between the identity of BACALA's contributors, corporate or otherwise, and the alleged misuse of the property to justify this burden on First Amendment rights.

### E

### The Texas Non–Profit Corporation Act

 [14]    The taxpayers also argue that [article 1396–2.23A]() of the Texas Non–Profit Corporation Act [7] requires BACALA to disclose all of its financial information, including the identities of its contributors. The taxpayers further argue that since BACALA voluntarily incorporated as a nonprofit corporation, it waived any constitutional rights it might have in protecting the identity of its contributors.

BACALA agrees that some financial records, such as financial statements and tax returns, are subject to disclosure under article 1396–2.23A. BACALA has produced those records to the taxpayers. However, BACALA and amici argue that article 1396–2.23A is unconstitutional if it also requires disclosure of BACALA's contributors. [8]

 [15]    We should, if possible, interpret the statute in a manner that avoids constitutional infirmities. *Barshop v. Medina County Underground Water Conservation Dist.,* 925 S.W.2d 618, 629 (Tex.1996). We must thus determine whether the interpretation of article 1396–2.23A urged by the taxpayers would render the statute unconstitutional.

 [16]    [17]    [18]    When interpreting a statute we begin with the words of the statute itself. *Smith v. Clary Corp.,* 917 S.W.2d 796, 799 (Tex.1996). When interpreting civil statutes, we give words their ordinary meaning. TEX. GOV'T CODE § 312.002. Courts also look to legislative intent when construing a statute. *Union Bankers Ins. Co. v. Shelton,* 889 S.W.2d 278, 280 (Tex.1994). To determine legislative intent, courts may consider the language of the statute, the legislative history, the nature and object to be obtained, and the consequences that would follow from alternate constructions. *Id.; see also* TEX. GOV'T CODE  § 312.005 ("In interpreting a statute, a court shall ... consider at all times the old law, the evil, and the remedy.").

Article 1396–2.23A is entitled "Financial Records and Annual Reports." It states that non-profit corporations "shall maintain current true and accurate financial records with full and correct entries made with respect to all financial transactions of the corporation, including all income and expenditures, in accordance with generally accepted accounting practices." TEX.REV.CIV. STAT. ANN.. art. 1396–2.23A(A). Based on these records, a board of directors must annually prepare or **\*381** approve a report of the financial activity of the corporation for the preceding year. *Id.* art. 1396–2.23A(B). In addition, article 1396–2.23A requires that "[a]ll records, books, and annual reports of the financial activity of the corporation shall be kept at the registered office or principal office of the corporation ... and shall be available to the public for inspection and copying there during normal business hours." *Id.* art. 1396–2.23A(C).

The statute's directive that non-profit corporations maintain "financial records with full and correct entries made with respect to all financial transactions of the corporation, including all income and expenditures," suggests that more

than just the amount received must be maintained. *Id.* art. 1396–2.23A(A). However, the statute does not expressly require that contributors' identities be made available to the public.

Looking to legislative intent, it appears that article 1396–2.23A was intended to remedy a specific problem: the lack of accountability regarding a non-profit corporation's use of funds solicited from the public. *Texas Appellate Practice & Educ. Resource Ctr. v. Patterson,* 902 S.W.2d 686, 689 (Tex.App.—Austin 1995, writ denied). The bill analysis provides relevant background information regarding article 1396–2.23A's purpose:

> During the last interim, the author attempted to conduct a study of a non-profit drug rehabilitation program in Houston. This program had been soliciting funds from the public and portrayed itself as a charitable endeavor. However, there were rumors that its funds were being used for investments in such businesses as nightclubs. During the six month investigation, the author of this bill was unable to determine how the program's funds were being used because the records were inadequate. *A major recommendation from the study was that Texas law should be amended to require non-profit organizations soliciting funds from the public to keep adequate records showing how the funds were actually being used.*

SENATE COMM. ON BUS. & INDUS., BILL ANALYSIS, Tex. S.B. 857, 65 [th] Leg., R.S. (1977) (emphasis added). Thus, the purpose of the legislation was not to force non-profit corporations to identify the exact sources of their income; rather, it was to expose the nature of the expenditures of that money once received from the public and to make non-profit organizations accountable to their contributors for those expenditures. Thus, the seemingly broad scope of the statute's language is not matched by the legislative intent behind the statute.

The statute's uncertainty as to whether it requires disclosure of contributors leads us to conclude that it does not. The statute can be upheld as constitutional when interpreted as not requiring disclosure of contributors' names. If, however,

the statute grants blanket access to all non-profit corporations' donor lists, it would violate the First Amendment in some circumstances, thus rendering it unconstitutional as applied in those circumstances.[9] In BACALA's case, compulsory disclosure would encroach on freedom of association. BACALA and amici are correct that the statute cannot constitutionally be applied to BACALA because there is no substantial relation between the information sought by the taxpayers (BACALA's contributors' identities) and a compelling state interest.[10] Because we must construe the Act to avoid such constitutional infirmities, *Barshop, 925 S.W.2d at 629,* we hold that the phrase "financial records" does not include the names of contributors or members. Therefore, article 1396–2.23A does not require **\*382** the blanket disclosure of contributors' names for public inspection.

\* \* \* \* \*

In sum, we deny BACALA's request for mandamus relief from the trial court's denial of its plea to the jurisdiction because BACALA has failed to show that it lacks an adequate remedy by appeal. However, the trial court's orders requiring BACALA to produce the names of its donors violates the First Amendment and BACALA has no adequate remedy by appeal. Therefore, we conditionally grant BACALA's petition for writ of mandamus in part. We direct the trial court to vacate those portions of its discovery orders requiring BACALA to disclose the identities of its donors. We are confident that the district court will comply; only if its fails to promptly do so will the writ issue.

Footnotes

1      The Convention and Visitors Bureau began receiving hotel/motel tax revenues from the City. The Chamber and the Economic Development Corporation remained privately funded.

2      "[T]he Legislature shall have no power to authorize any ... city ... to lend its credit or to grant public money or thing of value in aid of, or to any individual, association or corporation whatsoever...." TEX. CONST. art. III, § 52.

3      Although the trial court ordered Keef to answer deposition questions covering a variety of topics, BACALA complains only of the portion of the order requiring Keef to testify about BACALA's donor list. Similarly, although the trial court ordered BACALA to produce a number of different documents, BACALA complains only of the portion of the trial court's order requiring BACALA to produce its donor lists for 1994, 1995, and 1996. Therefore, the other portions of the discovery orders are not before us.

4      Although BACALA asserted associational rights under Article I, Section 27 of the Texas Constitution, BACALA cited authority only under the U.S. Constitution. Consequently, we do not consider the extent to which Article I, Section 27 provides an independent basis for protection. *See Tilton v. Moye,* 869 S.W.2d 955, 956 n. 2 (Tex.1994).

5      U.S. CONST. amend. I ("Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press, or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.").

6      The taxpayers assert that the trial court's protective order, which limits the use of the donor information to litigation purposes only, alleviates any First Amendment concerns. A protective order allows a court to grant disclosure rights while deferring to First Amendment concerns. *Ex parte Lowe,* 887 S.W.2d at 4. Especially when the information is sought by private litigants, the existence of a protective order limiting dissemination of the information to litigation purposes may be a factor to be considered when determining whether disclosure is justified, although the protective order "itself does not justify disclosure." *Id.* However, the protective order in this case does not alleviate BACALA's First Amendment concerns because the taxpayers' lawyers, who would receive the information under the protective order, are the very persons who have made some of the boycott threats.

7      TEX.REV.CIV. STAT. ANN.. art. 1396–2.23A (Vernon 1997).

8      In support of this proposition amicus briefs were submitted by the American Civil Liberties Union of Texas, other Citizens Against Lawsuit Abuse organizations, and a coalition of non-profit corporations, joined by the Texas Medical Association.

9      *See, e.g., Familias Unidas v. Briscoe,* 619 F.2d 391, 398 (5 th Cir.1980).

10      As stated *supra,* the Constitution requires that once a party makes a *prima facie* showing of harm from disclosure of contributors' identities, the party seeking to compel disclosure "must show convincingly a substantial relation between the information sought and a subject of overriding and compelling state interest." *Ex parte Lowe,* 887 S.W.2d at 3. The state interest served by the statute is ensuring the accountability of non-profit corporations for expenditures of contributions. Even if this interest is a compelling state interest, there is no "substantial relation" between requiring disclosure of contributors' identities and ensuring such accountability. *See Pollard,* 283 F.Supp. at 257 (finding no showing that disclosure of contributors' identities was relevant to the state's unquestionably legitimate interest in preventing vote buying).

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

106 S.W.3d 788 (Mem)
Court of Appeals of Texas,
Texarkana.

In re Catrena Roberts CAMPBELL.

No. 06–03–00060–CV.   |   Submitted
May 12, 2003.   |   Decided May 13, 2003.

Original Habeas Corpus Proceeding.

**Attorneys and Law Firms**

Melvyn Carson Bruder, Dallas, for relator.

David M. Stagner, Stagner & Corley, Sherman, Ed T. Smith, Bonham, for real party in interest.

Before MORRISS, C.J., ROSS and CARTER, JJ.

**OPINION**

Opinion by Justice ROSS.

Catrena Roberts Campbell filed a petition with this Court seeking issuance of a writ of habeas corpus. Her petition was based on an order of contempt entered in connection with a child custody proceeding. The order found her in contempt for twenty-eight violations and sentenced her to thirty days on each act of contempt, but then suspended the imposition of those sentences if Campbell cooperated with a therapist.

The portion of the order holding Campbell in contempt and imposing punishment has now been vacated by the trial court. Accordingly, the order about which this original proceeding complains no longer exists, and the petition is moot.

Accordingly, we dismiss the petition for writ of habeas corpus as moot.

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

700 S.W.2d 916
Supreme Court of Texas.

Sue JOHNSON, Relator,
v.
The Honorable FOURTH COURT
OF APPEALS, Respondent.

No. C–4100.  |  Dec. 11, 1985.

Rape victim sued guard and agency providing security for apartment complex for negligence. The jury found guard and agency negligent, and that guard's conduct was proximate cause of assault but that security agency's was not. Jury did not answer damage issue and court granted plaintiff's motion for mistrial. Security agency sought mandamus in Court of Appeals. The San Antonio Court of Appeals, Fourth Supreme Judicial District, Antonio G. Cantu, J., conditionally granted mandamus, in response to which trial court rendered judgment that plaintiff take nothing. Trial court granted plaintiff's timely motion for new trial, and security agency sought mandamus relief. Court of Appeals granted relief, and plaintiff filed writ of mandamus to Supreme Court seeking to compel Court of Appeals to rescind its judgment. The Supreme Court, McGee, J., held that Court of Appeals' grant of mandamus ordering trial court to rescind grant of new trial was improper.

So ordered.

West Headnotes (3)

[1]      **Mandamus**
          Nature and Scope of Remedy in General
          Mandamus issues only to correct clear abuse of discretion or violation of duty imposed by law when there is no other adequate remedy by law, and Court of Appeals acts in excess of its writ power when it grants mandamus relief absent these circumstances, under V.T.C.A., Government Code § 22.221(b).

          612 Cases that cite this headnote

[2]      **Mandamus**
          Matters of Discretion

Mandamus will not issue to control action of lower court in matter involving discretion, therefore relator, attacking ruling of trial court as abuse of discretion must establish that facts and law permit trial court to make but one decision.

372 Cases that cite this headnote

[3]      **Mandamus**
          Motions and Orders in General
         **Mandamus**
          Scope of Inquiry and Powers of Court
          Supreme Court had to make independent inquiry as to whether trial court's order was so arbitrary, unreasonable or based upon so gross and prejudicial an error of law as to establish abuse of discretion when reviewing Court of Appeals' decision on mandamus, and writ of mandamus would issue only to correct clear abuse of discretion.

          634 Cases that cite this headnote

**Attorneys and Law Firms**

 **\*916**  Law offices of Pat Maloney, Janice Maloney, San Antonio, for relator.

House & House, C.G. House, San Antonio, for respondent.

**ORIGINAL MANDAMUS**

McGEE, Justice.

The question in this mandamus proceeding is whether a trial court has discretion to grant a new trial in the interest of justice. We hold that the granting of a new trial for that reason is within the trial court's discretion and conditionally order the court of appeals to vacate its previous judgment.

Relator, Sue Johnson, was raped and brutally beaten in her apartment. She sued the security guard on duty the night of the incident and the security agency providing security for the apartment complex. The cause was tried to a jury which found the guard negligent and his conduct a proximate cause of the assault. The security agency was found negligent but its negligence was not found to be a proximate cause. The

damage issue was conditionally submitted and so the jury did not answer it. Johnson objected to the incomplete verdict before the jury was discharged and asked for a mistrial. The mistrial was granted.

The security agency sought mandamus in the court of appeals, arguing that the mistrial was erroneously granted. The **\*917** court of appeals conditionally granted the mandamus in an unpublished opinion, holding that (1) there was no irreconcilable conflict in the jury's answers and (2) Johnson waived her right to a jury trial on damages by failing to object to the conditional submission of the damages special issue.

In response to the mandamus, the trial court rendered judgment that Johnson take nothing from defendants. Johnson, thereafter, timely filed a motion for new trial which was granted.

The security agency again sought mandamus relief and, in an unpublished opinion, the court of appeals again granted it, this time overturning the trial court's order of new trial because it was "granted for the same reasons the mistrial was erroneously granted." Johnson, by mandamus action to this court, seeks to compel the court of appeals to rescind its judgment.

Since June 19, 1983, the courts of appeals have exercised concurrent mandamus jurisdiction with the Supreme Court over district judges of this state. Government Code, ch. 480, §§ 22.002 and 22.221, 1985 Tex.Sess.Law Serv. 3367, 3369, 3386 (to be codified at TEX.GOV'T CODE §§ 22.002(a) and 22.221(b) (Vernon)). As a result of this expansion of jurisdiction, we have increasingly been asked to decide whether a court of appeals has abused its discretion in granting mandamus relief. This issue typically arises when the court of appeals grants mandamus relief to a party based upon an abuse of discretion in the trial court. The party adversely affected by the mandamus judgment seeks review by mandamus in this Court, arguing that the court of appeals abused its discretion in holding that the trial court abused its discretion. The use of the phrase, "abuse of discretion," to describe the alleged misfeasance of both the trial court and the court of appeals is unfortunate because its meaning in each context is not the same. The discretion exercised by a trial court when ruling on an interlocutory matter is ordinarily quite broad, whereas the discretion exercised by an appellate court possessing mandamus power is much more confined.

 **[1]**    Although the writ of mandamus is a discretionary remedy, its use is subject to certain conditions. *See Appellate Procedure in Texas,* § 1.2(1)(b) (2d ed. 1979). Namely, the court of appeals may issue writs of mandamus "agreeable to the principles of law regulating those writs." TEX.GOV'T CODE § 22.221(b). Mandamus issues only to correct a clear abuse of discretion or the violation of a duty imposed by law when there is no other adequate remedy by law. *State v. Walker,* 679 S.W.2d 484, 485 (Tex.1984). The court of appeals, therefore, acts in excess of its writ power (abuses its discretion) when it grants mandamus relief absent these circumstances. *See Peeples v. Fourth Court of Appeals,* ——— S.W.2d ——— (Tex.1985); *Ginsberg v. Fifth Court of Appeals,* 686 S.W.2d 105 (Tex.1985).

 **[2]**    A trial court, on the other hand, abuses its discretion when it reaches a decision so arbitrary and unreasonable as to amount to a clear and prejudicial error of law. *King v. Guerra,* 1 S.W.2d 373, 376 (Tex.Civ.App.—San Antonio 1927, writ ref'd); *Bush v. Vela,* 535 S.W.2d 803, 805 (Tex.Civ.App.— Corpus Christi 1976, mand. overr.). A relator who attacks the ruling of a trial court as an abuse of discretion labors under a heavy burden. *Lutheran Social Services, Inc. v. Meyers,* 460 S.W.2d 887, 889 (Tex.1970). The relator must establish, under the circumstances of the case, that the facts and law permit the trial court to make but one decision. This determination is essential because mandamus will not issue to control the action of a lower court in a matter involving discretion. *Pat Walker & Company, Inc. v. Johnson,* 623 S.W.2d 306, 308 (Tex.1981). As we wrote in *Jones v. Strayhorn,* 159 Tex. 421, 321 S.W.2d 290, 295 (1959):

> When it is once decided that a trial judge exercising a "discretionary" authority has but one course to follow and one way to decide then the discretionary power is effectually destroyed and the rule which **\*918** purports to grant such power is effectively repealed.

In order to find an abuse of discretion, the reviewing court must conclude that the facts and circumstances of the case extinguish any discretion in the matter.

 **[3]**    We apply these principles in mandamus proceedings. Our focus remains on the trial court's order regardless of the court of appeals' decision on mandamus. We make an independent inquiry whether the trial court's order is so arbitrary, unreasonable, or based upon so gross and

prejudicial an error of law as to establish abuse of discretion. A mere error in judgment is not an abuse of discretion. Although we may believe that the court of appeals has exercised better judgment than the trial court in the matter, we must nevertheless grant the mandamus and direct the court of appeals to vacate its judgment if there is some basis in reason and law for the order of the trial court. If the matter is truly one requiring the exercise of discretion, such discretion lies with the trial court. An appellate court may not substitute its discretion for that of the trial court. *Davis v. Huey,* 571 S.W.2d 859, 863 (Tex.1978); *Jones v. Strayhorn,* 159 Tex. 421, 321 S.W.2d 290, 295 (1959). The writ of mandamus will issue only in a proper case to correct a clear abuse of discretion. *See Crane v. Tunks,* 160 Tex. 182, 328 S.W.2d 434 (1959); *Womack v. Berry,* 156 Tex. 44, 291 S.W.2d 677 (1956).

Trial courts have always had broad discretion in the granting of new trials. *Johnson v. Court of Civil Appeals for the Seventh Supreme Judicial Dist. of Texas,* 162 Tex. 613, 350 S.W.2d 330 (1961); *Wright v. Swayne,* 104 Tex. 440, 140 S.W. 221 (1911). In *Johnson,* we recognized two instances when a Texas appellate court has overturned the trial court's grant of a new trial. These instances are:

1. When the trial court's order was wholly void as where it was not rendered in the term in which the trial was had; and

2. Where the trial court has granted a new trial specifying in the written order the sole ground that the jury's answers to special issues were conflicting.

*Johnson,* 350 S.W.2d at 331.

Neither of the above instances are present in this case. The motion for new trial was granted during the trial court's plenary power over the case and the trial court did not specify conflict in answers as grounds for granting the motion.

The security agency argues that Johnson's motion for new trial was premised on the same grounds asserted in its motion for mistrial (that is, waiver of damages and irreconcilable conflict in the jury's answers), which were rejected by the court of appeals. Therefore, the agency urges that the trial court abused its discretion by granting the new trial on those identical grounds. Johnson's motion for new trial did include a ground previously presented in her motion for mistrial, that is, no waiver of damages. However, Johnson additionally prayed that the trial court grant her motion for new trial "in the interest of justice and fairness." The court's order stated that:

> After reading said motion for new trial and hearing argument of counsel on said motion for new trial, [the trial court] finds that said motion is good and that a new trial should be granted.

The order does not state the grounds on which the trial court granted Johnson's motion for new trial. Upon inquiry by the security agency, Judge Haberman stated:

> In total fairness of the entire case, the court is granting a new trial.

The record does not disclose that the new trial was granted on the same grounds previously overruled by the court of appeals. We hold that the trial court granted the new trial "in the interest of justice and fairness." This was not an abuse of discretion. Accordingly, the trial court's judgment should not have been disturbed.

We conditionally grant Johnson's petition for writ of mandamus. The writ will issue only if the court of appeals does not vacate its mandamus judgment.

---

**End of Document**
© 2015 Thomson Reuters. No claim to original U.S. Government Works.

39 S.W.3d 191
Supreme Court of Texas.

Douglas LEHMANN and
Virginia Lehmann, Petitioners,
v.
HAR–CON CORPORATION, Respondent.
Melvin G. Harris and Helena M. Harris, Petitioners,
v.
Harbour Title Company, Respondent.

Nos. 99–0406, 99–0461.  |  Argued
Jan. 26, 2000.  |  Decided Feb. 1, 2001.

In personal injury action, the 129th District Court, Harris County, granted summary judgment in favor of one defendant. Plaintiffs appealed. In unrelated action for tort and breach of contract, the 281st District Court, Harris County, granted summary judgment for one defendant. Plaintiffs appealed. The Houston Court of Appeals, Fourteenth District, 1998 WL 429853 and 1999 WL 211859, dismissed appeals as untimely perfected. Plaintiffs in both cases petitioned for review, and cases were consolidated. The Supreme Court, Hecht, J., held that: (1) inclusion of a Mother Hubbard clause does not indicate that a judgment rendered without a conventional trial is final for purposes of appeal, overruling *Mafrige*, 866 S.W.2d 590, and (2) orders from which plaintiffs had appealed were not final, appealable judgments.

Reversed and remanded.

Baker, J., filed concurring opinion in which Enoch and Hankinson, JJ., joined in part.

West Headnotes (12)

**[1]**    **Appeal and Error**
          👉 Necessity of final determination

As a general rule, an appeal may be taken only from a final judgment.

320 Cases that cite this headnote

**[2]**    **Appeal and Error**
          👉 Final Judgments or Decrees

Whether a judicial decree is a final, appealable judgment must be determined from its language and the record in the case.

34 Cases that cite this headnote

**[3]**    **Judgment**
          👉 Final judgment

A judgment that finally disposes of all remaining parties and claims, based on the record in the case, is final, regardless of its language.

112 Cases that cite this headnote

**[4]**    **Judgment**
          👉 Final judgment

A judgment that actually disposes of every remaining issue in a case is not interlocutory merely because it recites that it is partial or refers to only some of the parties or claims.

11 Cases that cite this headnote

**[5]**    **Judgment**
          👉 Final judgment

If a court has dismissed all of the claims in a case but one, an order determining the last claim is final.

16 Cases that cite this headnote

**[6]**    **Appeal and Error**
          👉 Nature and Scope of Decision

If the intent to dispose of all claims is clear from the order, then the order is final and appealable, even though the record does not provide an adequate basis for rendition of judgment.

62 Cases that cite this headnote

**[7]**    **Appeal and Error**
          👉 Nature and Scope of Decision

Inclusion of a Mother Hubbard clause—which is the statement, "all relief not granted is denied," or essentially those words—does not indicate that a judgment rendered without a conventional

trial is final for purposes of appeal; overruling *Mafrige v. Ross*, 866 S.W.2d 590.

109 Cases that cite this headnote

**[8]**   **Appeal and Error**
  Nature of remedy by dismissal

Right to appeal should not be lost by an overly technical application of the law.

5 Cases that cite this headnote

**[9]**   **Appeal and Error**
  Final Judgments or Decrees

In cases in which only one final and appealable judgment can be rendered, when there has not been a conventional trial on the merits, an order or judgment is not final for purposes of appeal unless it actually disposes of every pending claim and party or unless it clearly and unequivocally states that it finally disposes of all claims and all parties.

626 Cases that cite this headnote

**[10]**   **Appeal and Error**
  Finality as to All Parties
  **Appeal and Error**
  Determination of part of controversy

An order does not dispose of all claims and all parties, for purposes of appealability, merely because it is entitled "final," or because the word "final" appears elsewhere in the order, or even because it awards costs, nor does an order completely dispose of a case merely because it states that it is appealable; rather, there must be some other clear indication that the trial court intended the order to completely dispose of the entire case.

236 Cases that cite this headnote

**[11]**   **Appeal and Error**
  Finality as to All Parties
  **Appeal and Error**
  Determination of part of controversy

Order that did not indicate that it was a final judgment and did not dispose of all pending claims and parties was not a final, appealable judgment.

330 Cases that cite this headnote

**[12]**   **Appeal and Error**
  Finality as to All Parties
  **Appeal and Error**
  Determination of part of controversy

Order stating that plaintiffs took nothing as to "one of the defendants" was not a final, appealable judgment; language did not suggest that all of plaintiffs' claims were denied, and defendant named in order was not the only defendant remaining in the case.

100 Cases that cite this headnote

**Attorneys and Law Firms**

 **\*192**  Howard R. King, Hill Angel & King, Houston, for Petitioner in No. 99-0406.

James E. Simmons, Simmons & Lawrence, John H. Thomisee, Jr., Henry S. Platts, Chalker Bair, Houston, for Respondent in No. 99-0406.

James F. Tyson, Houston, Jerry D. Conner, Conner & Dreyer, Houston, for Petitioner in No. 99-0461.

Ben A. Baring, Paul J. McConnell, III, DeLange Hudspeth McConnell & Tibbetts, Houston for Respondent in No, 99-0461.

**Opinion**

Justice HECHT delivered the opinion of the Court, in which Chief Justice PHILLIPS, Justice OWEN, Justice ABBOTT, and Justice O'NEILL joined.

In these two consolidated cases we revisit the persistent problem of determining when a judgment rendered without a conventional trial on the merits is final for purposes of appeal. We consider only cases in which one final and appealable judgment can be rendered and not cases, like some probate and receivership proceedings, in which multiple judgments final for purposes of appeal can be rendered on certain

discrete issues. [1] And we consider a judgment's finality only for purposes of appeal and not for other purposes, such as issue and claim preclusion. [2] In *Mafrige v. Ross,* [3] we held that a summary judgment is final if it contains language purporting to dispose of all claims and parties. We gave as one example of such language what we have called a "Mother Hubbard" clause [4] —a recitation that all relief not expressly granted is denied. [5] Since then, the routine inclusion of this general statement in otherwise plainly interlocutory orders and its ambiguity in many contexts have rendered it inapt for determining finality when there has not been a conventional trial. We no longer believe that a Mother Hubbard clause in an order or in a judgment issued without a full trial can be taken to indicate finality. We therefore hold that in cases in which only one final and appealable judgment can be rendered, a judgment issued without a conventional trial is final for purposes of appeal if and only if either it actually disposes of all claims and parties then before the court, regardless of its language, or it states with unmistakable clarity that it is a final judgment **\*193** as to all claims and all parties. In the two cases before us, the court of appeals concluded that judgments that do not meet this test were final and dismissed the appeals as having been untimely perfected. [6] We reverse and remand for consideration of the merits of the appeals.

## I

### *Lehmann v. Har–Con Corp.*

Douglas and Virginia Lehmann sued the University of St. Thomas and Har–Con Corp. in the district court in Harris County to recover damages for injuries Douglas suffered in a construction accident. The University cross-claimed against Har–Con for indemnity. The Lehmanns settled with Har–Con and executed a release, agreeing in part to indemnify Har–Con against certain claims which had been or could be asserted by or through them. Virginia then filed an amended petition on behalf of her minor son against both defendants, claiming damages for loss of parental consortium because of his father's injuries. In response, Har–Con filed a counterclaim against Virginia and a third-party petition against Douglas, seeking indemnity from them under the terms of their prior release.

The Lehmanns and Har–Con all moved for summary judgment on Har–Con's indemnity claims. The district court

denied the Lehmanns' motion and granted Har–Con's motion. The court's order granting Har Con's motion stated in full:

**[caption]**

**ORDER**

On this *12* day of *March,* 1998 came on to be considered the Motion for Summary Judgment of HAR–CON CORPORATION. After considering the motion, the response, the summary judgment evidence and the argument of counsel, the Court is of the opinion that the motion should be in all things granted. It is therefore,

> ORDERED, ADJUDGED AND DECREED that the Motion for Summary Judgment by HAR–CON CORPORATION be and it is hereby GRANTED.

All relief not expressly granted herein is denied.

Signed this the *12* day of *March,* 1998

> s/_____

JUDGE PRESIDING

[s/ Attorneys for Har–Con Corporation]

The order did not reference Virginia's claims on behalf of her son against Har–Con, although it would appear that Har Con's summary judgment on its indemnity claim would effectively bar recovery for Virginia's son. The order also did not reference Virginia's son's claims against the University, which would not appear to be affected by Har–Con's summary judgment. The order contained a "Mother Hubbard" clause stating that "[a]ll relief not expressly granted herein is denied."

The district clerk advised the Lehmanns by postcard that an interlocutory summary judgment order had issued. The record does not reflect whether the parties received a copy of the actual order after it was signed. The Lehmanns tell us that the practice of the district clerk in Harris County is not to send copies of orders to the parties but to give parties notice by postcard when orders are signed. The notice does not completely describe the content of the order.

The Lehmanns appear to have believed that the summary judgment order was interlocutory because they moved to sever it and Har–Con's claims into a separate action, ostensibly to make the summary judgment final. The court

granted the motion to sever on the twenty-fifth day after the summary judgment order was signed. Twenty-eight days after the severance **\*194** order was signed, the Lehmanns noticed their appeal from the summary judgment order.

If the summary judgment was not final until the severance order was signed, then the Lehmanns' appeal was timely. But the court of appeals held that the summary judgment order was final when it issued because of the Mother Hubbard clause and that the order was not modified by the severance so as to restart the time for perfecting appeal. [7] Because the Lehmanns did not perfect appeal within thirty days of the signing of the order as prescribed by the rules of appellate procedure, [8] the court dismissed the appeal for want of jurisdiction. In holding that the summary judgment order was final, the court followed our decision in *Mafrige,* although the court expressed concerns that the inclusion of a Mother Hubbard clause in an otherwise plainly interlocutory order should not make the order final.

We granted the Lehmanns' petition for review and consolidated it for argument and decision with *Harris v. Harbour Title Co.* [9]

### *Harris v. Harbour Title Co.*

Melvin and Helena Harris sued five defendants—Greenfield Financial Corp. and Larry J. Greenfield ("the Greenfield defendants"), Tim Rice and Rice Development, Inc. ("the Rice defendants"), and Harbour Title Co.—in the district court in Harris County on breach-of-contract and tort claims arising from a conveyance of real property. The court granted an interlocutory default judgment against Tim Rice on liability only, leaving for later a determination of the damages to be assessed against him. The Harrises nonsuited their claims against the Greenfield defendants. The fifth defendant, Harbour Title Co., moved for summary judgment, which the court granted with the following order:

[caption]

**Order Granting Harbour Title Company's**

**Motion for Summary Judgment**

On August 28, 1998, came on to be heard the Motion for Summary Judgment of one of the defendants, Harbour Title Company, and the Court having considered the Motion, together with any response, and the supplemental briefing filed by the parties to date is of the opinion that said Motion is with merit and should be granted. It is therefore

> ORDERED that defendant Harbour Title Company's Motion for Summary Judgment is in all things granted; it is further

> ORDERED that the Plaintiffs, Melvin G. Harris and Helena M. Harris take nothing as to any of their claims against Harbour Title Company.

> All relief requested and not herein granted is denied.

> SIGNED this *15* day of October 1998.

> s/_____

> JUDGE PRESIDING

> APPROVED AND ENTRY REQUESTED:

> [s/ Attorneys for Harbour Title Company]

Although the order did not reference the Harrises' pending claims against the Rice defendants, it nevertheless contained a Mother Hubbard clause stating that "[a]ll relief requested and not herein granted is denied." The Harrises assert that they received notice of the order by a postcard that described the order as an interlocutory summary judgment, but the postcard is not in our record. The record does not reflect whether the parties obtained a copy of the order after it was signed. It appears that the district clerk followed her usual procedure of notifying the parties by **\*195** postcard in lieu of providing copies of the order.

The district court apparently did not consider the summary judgment order to be final; forty-six days after it was signed, the court generated a form order setting the case for trial the next year. The Harrises, too, appear to have believed the summary judgment to be interlocutory; two weeks after the order issued setting the case for trial, the Harrises obtained what was captioned a "Final Default Judgment" against the Rice defendants. Twenty-five days later the Harrises noticed their appeal from Harbour Title's summary judgment.

If Harbour Title's summary judgment did not dispose of the Harrises' claims against the Rice defendants, and the default

judgment against those defendants was the final order in the case, then the Harrises' appeal was timely. But following *Mafrige,* as it had done in *Lehmann,* the court of appeals concluded that the summary judgment order was final and therefore dismissed the appeal as not having been timely perfected. We granted the Harrises' petition for review and consolidated it with *Lehmann* for argument and decision. [10]

## II

### A

[1] [2] Though its origins are obscure and its rationale has varied over time, [11] the general rule, with a few mostly statutory exceptions, is that an appeal may be taken only from a final judgment. [12] A judgment is final for purposes of appeal if it disposes of all pending parties and claims in the record, except as necessary to carry out the decree. [13] (An order that does not dispose of all pending parties and claims may also be final for purposes of appeal in some instances, such as orders that resolve certain discrete issues in some probate [14] and receiverships [15] cases, but we exclude those cases from consideration here. Nor do we consider when a judgment may be final for purposes other than appeal, such as claim and issue preclusion. [16] ) Because the law does not require that a final judgment be in any particular form, whether a judicial decree is a final judgment must be determined from its language and the record in the case. Since timely perfecting appeal (as well as filing certain post-judgment motions and requests) hangs on a party's making this determination correctly, certainty is crucial.

From the beginning, however, certainty in determining whether a judgment is final has proved elusive. What has vexed courts in this State and elsewhere is this: must a final judgment dispose of all parties and claims specifically, or may it do so by general language or even by inference? If a specific disposition of each party and **\*196** claim is strictly required, a judgment apparently intended by the parties and the trial court to be final and appealable may not be. An appeal from such a judgment must be dismissed or at least abated, resulting in delay and a waste of the courts' and the parties' resources. More importantly, if a judgment intended to be final did not meet the strict requirements, then the case would remain open, allowing the possibility of further proceedings and appeal years later. On the other hand, if a judgment

may dispose of all parties and claims by general language or inference, a party or trial court may think that a judgment is interlocutory, only to be told later by the appellate court after the time for appeal has passed that the judgment was final. A party who is uncertain whether a judgment is final must err on the side of appealing or risk losing the right to appeal.

In 1881, after struggling with these problems for many years, [17] we attempted to resolve them in the case of *Linn v. Arambould.* [18] There we stated that a final judgment after trial must dispose of the issues "intrinsically, and not inferentially." [19] That is, specificity was strictly required. The results of this rule were predictable. Appellate courts frequently declared shabbily drafted judgments interlocutory even though the trial courts and the parties had obviously intended for them to be final. [20] Confused parties were spending time and money attempting to appeal from possibly final judgments, only to have the appellate courts dismiss the appeals for want of jurisdiction. [21] As this Court later reflected on *Arambould* 's intrinsic-disposition requirement for finality:

> By its application most judgments easily became black or white—final or interlocutory; but all too often judgments which were obviously intended to be final were being held interlocutory because of careless draftsmanship. The rule had to be changed to accommodate oversight or carelessness. [22]

In 1896 we altered course. In *Rackley v. Fowlkes,* [23] the plaintiff had, in a prior suit, sued for title to real property and for rent for the four years the property was in the defendant's possession, but at trial he offered no evidence of the amount of rent due until after the evidence was closed, and because the offer was late the court refused to hear it. The court in that suit rendered judgment awarding title to the plaintiff without mentioning his claim for rent. When the plaintiff filed a second suit for the rent, the defendant asserted res judicata in defense. The trial court rendered judgment for the plaintiff, concluding that the rent claim had not been adjudicated in the prior suit, and the court of civil appeals affirmed. We reversed the judgments of the lower courts, not because the rent claim should have been adjudicated **\*197** in the first suit, but because it *was* adjudicated:

> The proposition seems to be sound in principle and well supported by authority that where the pleadings and

judgment in evidence show that the pleadings upon which the trial was had put in issue plaintiff's right to recover upon two causes of action, and the judgment awards him a recovery upon one, but is silent as to the other, such judgment is prima facie an adjudication that he was not entitled to recover upon such other cause. This liberal construction of the judgment against the party who sought to recover therein is supported by the presumption that the court performed the duty devolved upon it upon the submission of the cause by disposing of every issue presented by the pleadings so as to render its judgment final and conclusive of the litigation, and by the further fact that the policy of the law favors the speedy settlement of litigation and opposes the harassing of the defendant with two suits for the same cause. [24]

Three years later we used the rule stated for purposes of res judicata in *Rackley* to determine whether a judgment was final for purposes of appeal. In *Davies v. Thomson,* [25] the plaintiffs sued for money and an interest in real property as their share of a joint venture. The trial court rendered judgment on a jury verdict awarding the plaintiffs money without mentioning the claim for an interest in real property. We held that the judgment disposed of both claims was therefore final and appealable. [26]

Neither *Rackley* nor *Davies* mentioned *Arambould* or attempted to reconcile their results with the rule in that case, thereby generating confusion in the appellate courts over how to determine finality in cases involving cross-claims and counterclaims. Some courts treated judgments that merely implicitly disposed of all claims as final, while other courts required that final judgments expressly adjudicate each claim. [27] In 1913, the Court resolved the conflict in *Trammell v. Rosen,* [28] rejecting the rule stated in *Arambould.* The plaintiff in *Trammell* sued on a promissory note secured by property that the defendant and his wife claimed was their homestead. The couple counterclaimed to establish their homestead claim and for damages for wrongful sequestration. The trial court instructed a verdict for the plaintiff on his claim and against the defendants on their counterclaim. The judgment recited the verdict and awarded damages to the plaintiff but did not mention the counterclaim. [29] Citing *Rackley,* the Court concluded that the judgment was final, reasoning that by granting the plaintiff's claim the trial court implicitly but necessarily denied the defendants' counterclaim. [30] Still, the Court strongly encouraged courts to expressly address each claim and party in final judgments to avoid further confusion:

We feel constrained to hold that the judgment of the trial court, although irregular and imperfect in form, is sufficient to support the appeal. However, we feel impelled to say, also, that we think that, as a matter of practice, and to avoid confusion, every final judgment should plainly, explicitly, and specifically dispose of each and every party to the cause, and of each and every issue therein presented by the pleadings. [31]

**\*198** Two cases decided after *Trammell* suggest that the entire record should be considered in determining whether a post-trial judgment is final. In *Hargrove v. Insurance Investment Corp.,* we held that a judgment for the plaintiff was final when "considered as a whole in the light of the entire record". [32] Similarly, in *Ferguson v. Ferguson,* we held that a judgment awarding the plaintiff recovery on some of her claims while silent as to others was final, stating that "[i]n arriving at whether or not a judgment is final, the pleadings and evidence must also be taken into consideration". [33] Neither case should be read to deviate from the presumptive rule of *Trammell.* We did not hold in either case that the record could be used to show that a post-trial judgment final on its face was really not final. In two other cases during the same time period we did not mention the record in applying *Trammell.* [34]

In 1966, we reaffirmed *Rackley, Davies,* and *Trammell* in *North East Independent School District v. Aldridge.* [35] The school district sued Aldridge for breach of contract, and he asserted in his defense that he had contracted only as an agent for his principal. He also brought a third-party action against his principal, alleging that the principal was responsible for any damages to which the school district might be entitled. The trial court granted a partial summary judgment holding Aldridge personally liable to the district and directed that the case proceed to trial to determine the amount of damages to be awarded. The parties then stipulated to the amount of damages, and the trial court rendered judgment for the district against Aldridge based on the stipulation. The judgment did not mention Aldridge's third-party action against his principal. The court of civil appeals dismissed Aldridge's appeal, holding that the trial court's judgment was not final. [36] We held that the judgment against Aldridge disposed of the third-party action and was final for purposes of appeal. After reviewing the courts' historical difficulties in making finality determinations, we stated the following rule

for determining, in most instances, whether judgments in which parties and issues made by the pleadings are not disposed of in express language are, nevertheless, final for appeal purposes. When a judgment, not intrinsically interlocutory in character, is rendered and entered in a case regularly set for conventional trial on the merits, no order for a separate trial of issues having been entered ..., it will be presumed for appeal purposes that the Court intended to, and did, dispose of all parties legally before it and of all issues made by the pleadings between such parties. [37] We added: "Of course, the problem [of determining whether judgments are final] can be eliminated entirely by a careful drafting of judgments to conform to the pleadings or by inclusion in judgments of a simple statement that all relief not expressly granted is denied." [38] Inclusion of a catch-all statement—which we later denominated a "Mother Hubbard" clause [39]—would make clear that a post-trial judgment on the merits, presumed to have disposed of all claims, did indeed do so.

**\*199 B**

The presumption that a judgment rendered after a conventional trial on the merits is final and appealable has proved fairly workable for nearly a century, but we have never thought that it could be applied in other circumstances, as we first explained nearly sixty years ago. In *Davis v. McCray Refrigerator Sales Corp.,* [40] the plaintiff sued for the unpaid balance of the purchase price of a refrigerator, and the defendant counterclaimed for cancellation of the debt and for damages for payments already made and lost merchandise due to improper refrigeration. The defendant also filed a plea in abatement on the grounds that the plaintiff was a foreign corporation not licensed to do business in Texas and therefore not entitled to sue in state court. The trial court deferred ruling on the defendant's plea until after the case was tried on the merits. After the jury returned a verdict, the trial court rendered judgment both that the plaintiff's claim be dismissed and that the plaintiff take nothing. [41] The only basis the trial court had for dismissal was the defendant's plea in abatement, while the only basis for rendering a take-nothing judgment was plaintiff's failure of proof at trial. The judgment did not mention the defendant's counterclaim. The court of civil appeals rejected the defendant's argument that the judgment was interlocutory and reversed and rendered judgment for the plaintiff. [42] This Court reversed and dismissed the appeal.

Citing *Trammell,* the Court acknowledged that while a final judgment need not expressly dispose of each issue so long as other provisions of the judgment necessarily imply that the unmentioned issues have been disposed of, a dismissal of the plaintiff's suit did not necessarily imply a disposal of the defendant's cross-action . [43] The Court explained:

> [I]f the court had intended to merely sustain the plea in abatement and dismiss plaintiff's suit, and had intended to retain the defendant's cross-action for further consideration, it would have entered the very judgment that was entered in this case. The mere failure of the judgment to refer to defendant's cross-action was not sufficient in itself to raise an inference that it was thereby intended to dispose of the cross-action. [44]

Although the judgment did not "merely" sustain the plea in abatement but also decreed that the plaintiff take nothing, the inclusion of the dismissal in the judgment as the first basis for decision was enough to make *Trammell* 's presumptive finality rule inapplicable.

*Davis* may have departed too far from *Trammell.* The trial court's decree following a jury trial on the merits that the plaintiff take nothing without mention of the defendant's counterclaim should perhaps have been presumed to deny all relief, despite the alternative ruling that the plaintiff's claim should be dismissed. But regardless of *Davis* 's unusual circumstances, the case makes the point, which we expressly acknowledged in *Aldridge,* that "[i]t will not be presumed that a judgment dismissing a plaintiff's suit on nonsuit, plea to the jurisdiction, plea in abatement, for want of prosecution, etc., also disposed of the issues in an independent cross-action." [45]

We have since held that "etc." includes default judgments and summary judgments. [46] The reason for not applying a presumption in any of these circumstances **\*200** is that the ordinary expectation that supports the presumption that a judgment rendered after a conventional trial on the merits will comprehend all claims simply does not exist when some form of judgment is rendered without such a trial. On the contrary, it is quite possible, perhaps even probable these days in cases involving multiple parties and claims, that any judgment rendered prior to a full-blown trial is intended to dispose of only part of the case. Accordingly, the finality of the judgment must be determined without the benefit of any presumption.

**[3]** **[4]** **[5]** A judgment that finally disposes of all remaining parties and claims, based on the record in the case, is final, regardless of its language. [47] A judgment that actually disposes of every remaining issue in a case is not interlocutory merely because it recites that it is partial or refers to only some of the parties or claims. Thus, if a court has dismissed all of the claims in a case but one, an order determining the last claim is final. [48] This is settled law in Texas, and while there have been proposals to change it by rule, proposals that are currently pending consideration by this Court's Advisory Committee, we are not inclined to depart from it here. The language of an order or judgment cannot make it interlocutory when, in fact, on the record, it is a final disposition of the case.

**[6]** But the language of an order or judgment *can* make it final, even though it should have been interlocutory, if that language expressly disposes of all claims and all parties. It is not enough, of course, that the order or judgment merely use the word "final". The intent to finally dispose of the case must be unequivocally expressed in the words of the order itself. But if that intent is clear from the order, then the order is final and appealable, even though the record does not provide an adequate basis for rendition of judgment. So, for example, if a defendant moves for summary judgment on only one of four claims asserted by the plaintiff, but the trial court renders judgment that the plaintiff take nothing on all claims asserted, the judgment is final—erroneous, but final. [49] A judgment that grants more relief than a party is entitled to is subject to reversal, but it is not, for that reason alone, interlocutory. [50]

Texas appellate courts, this Court included, have had difficulty determining when a judgment is final on its face —by its own express terms, in other words—even though it should not have been because no sufficient basis for rendering a final judgment was presented. In *Schlipf v. Exxon Corp.,* [51] the plaintiffs sued for gas royalties and prejudgment interest, and moved for summary judgment only on the royalties issue. Neither the defendant nor an intervenor moved for summary judgment against the plaintiffs. The trial court granted the plaintiffs' motion, awarding the royalties claimed, but denied prejudgment interest. The judgment recited:

> the relief herein granted Plaintiffs, ... is in satisfaction of all of their claims and causes of action ... and all claims and/or causes of action herein asserted by all parties herein and not herein granted are hereby in all things denied and concluded.... [52]

**\*201** We held that this language conclusively disposed of all parties and issues, as it clearly did, although in reaching this conclusion, we reiterated our observation in *Aldridge* that the finality of a judgment would be made clear "by inclusion ... of a simple statement that all relief not expressly granted is denied." [53] This observation, appropriate in *Aldridge* in reference to judgments after a conventional trial on the merits, was misleading in *Schlipf,* because the only "relief" properly under consideration when the order issued was that raised by the motion for summary judgment [54]—the plaintiffs' entitlement to royalties. After a full trial on the merits, the statement in a judgment that all relief not requested is denied signifies finality; there is no expectation that the court tried only part of the case, absent an order for severance or separate trials. But after a motion for partial summary judgment, the same statement in a judgment is ambiguous. It may refer only to the motion on which the trial court is ruling, not to all claims of all parties, and not even to other claims of the movant.

Two years later, in *Teer v. Duddlesten,* we emphasized that the *Aldridge* language—all relief not expressly granted is denied—which we termed for the first time a "Mother Hubbard" clause, has no place in partial summary judgments because, by definition, those proceedings do not address all of the facts and issues in a case. [55] A Mother Hubbard clause, we said, could not convert a partial summary judgment into a final order. [56] Following *Teer,* most courts of appeals held that a Mother Hubbard clause could not make final a judgment rendered without a full trial, [57] although other courts reached the contrary conclusion. [58]

We attempted to clarify matters in *Mafrige v. Ross.* [59] There, two plaintiffs sued some twelve defendants for malicious prosecution, slander, libel, conspiracy, and negligence. [60] No party other than the plaintiffs asserted any claims. The defendants, some individually and some in groups, filed a total of eight summary judgment motions, some directed against one of the plaintiffs and some against both. [61] Only one motion addressed both of the plaintiffs and all of the claims asserted; [62] even together, the other seven motions did not address both plaintiffs and all claims. [63] The trial court granted all eight motions with eight separate orders, one for each motion. [64] Each order stated that the **\*202** plaintiff or plaintiffs, depending on whether the motion had been directed at one or both, were to take nothing against the movant or

movants.[65] Thus, taken together, the eight orders provided that both of the plaintiffs were to take nothing against all of the defendants. On the plaintiffs' appeal, however, the court of appeals held that there was not a final judgment because most of the defendants had not moved for summary judgment on all claims by both plaintiffs and thus were not entitled to a final judgment, and the "take nothing" language of the orders did not make them final.[66] The court also held that if the orders had contained Mother Hubbard clauses they would have been final under this Court's precedents, although the court of appeals did not agree that that would have been the proper result.[67]

We reversed, holding that the "take nothing" language in the eight summary judgment orders disposed of all claims asserted by both plaintiffs against each of the defendants and thus constituted a final judgment. We then explained:

> If a summary judgment order appears to be final, as evidenced by the inclusion of language purporting to dispose of all claims or parties, the judgment should be treated as final for purposes of appeal. If the judgment grants more relief than requested, it should be reversed and remanded, but not dismissed. We think this rule to be practical in application and effect; litigants should be able to recognize a judgment which on its face purports to be final, and courts should be able to treat such a judgment as final for purposes of appeal.[68]

As examples of "language purporting to dispose of all claims or parties," we gave not only the "take nothing" language of the orders before us, and the statement that summary judgment is granted as to all claims asserted, but also the standard Mother Hubbard clause-that all relief not expressly granted is denied.[69] In so doing we revived the ambiguity created in *Schlipf* that *Teer* had tried to end.

The ambiguity has persisted in our decisions. In *Martinez v. Humble Sand & Gravel, Inc.,*[70] we held that the inclusion of a Mother Hubbard clause in an order did not necessarily make it final. There, some but not all of the defendants moved for summary judgment, and the trial court granted the motions, dismissing the plaintiff's cause of action against "those

Defendants", but also ordering that summary judgment was proper "as to all remaining Defendants", thereby suggesting that the court intended to render a final summary judgment.[71] However, the trial court subsequently severed the summary judgment by order inviting other defendants to move on the same grounds.[72] Although this order contained a Mother Hubbard clause, we held that judgment had not been rendered for the non-moving defendants.[73]

But in *Bandera Electric Cooperative, Inc. v. Gilchrist,*[74] we held that a Mother Hubbard clause in a summary judgment made it final. There the plaintiff moved for summary judgment on its claims without mentioning the defendant's counterclaims.[75] The defendant did not move for summary judgment. The trial court **\*203** granted the plaintiff's motion by order that included a Mother Hubbard clause. We concluded that the order was final, albeit erroneous.[76] We attempted to explain that our ruling was consistent with *Martinez* because the conflict in the orders involved in that case showed that they were not final even though "a Mother Hubbard clause ... would have created a final and appealable judgment".[77] Besides its obvious inadequacy in explaining the result in *Martinez,* this explanation suggested that a Mother Hubbard clause would by itself make any summary judgment final, contrary to our holding in *Teer.*

Determining the significance of omitting a Mother Hubbard clause in an order has been no easier. In *Park Place Hosp. v. Estate of Milo,* we suggested that the absence of a Mother Hubbard clause indicated that a summary judgment was intended to be interlocutory.[78] There, the trial court granted summary judgment for three of five remaining defendants and later severed the judgment from the case. We concluded that the judgment did not become final for purposes of appeal until it was severed, in part based on the omission of a Mother Hubbard clause. But in two other cases we held that the omission of a Mother Hubbard clause did not make a summary judgment interlocutory that otherwise appeared final. In *Continental Airlines, Inc. v. Kiefer,*[79] the defendant moved for summary judgment "on all claims brought by" the plaintiffs. After the motion was filed, but before it was heard and decided, the plaintiffs amended their pleadings to add additional claims. The defendant did not amend its motion to address these later claims. The trial court granted what it entitled a "final summary judgment", dismissing the plaintiffs' cause of action—"cause", singular—although

multiple causes of action had been asserted. We held that the judgment was final, explaining as follows:

> Finality "must be resolved by a determination of the intention of the court as gathered from the language of the decree and the record as a whole, aided on occasion by the conduct of the parties." 5 RAY W. MCDONALD, TEXAS CIVIL PRACTICE § 27:4[a], at 7 (John S. Covell, ed., 1992 ed.); *see Ferguson v. Ferguson,* 161 Tex. 184, 338 S.W.2d 945, 947 (1960). In the circumstances described here, we think the district court intended to render a final, appealable judgment.... Neither the parties nor the court of appeals have suggested that the judgment was not final. [80]

The judgment did not include a Mother Hubbard clause, but we did not find its omission significant. We reached a similar conclusion in *Inglish v. Union State Bank.* [81]

In sum, our opinions have not been entirely consistent on whether the inclusion or omission of a Mother Hubbard clause does or does not indicate that a summary judgment is final for purposes of appeal. This ambivalence has resulted in considerable confusion in the courts of appeals. [82]

### III

### A

 **[7]**   Much confusion can be dispelled by holding, as we now do, that the inclusion of a Mother Hubbard clause—by which we mean the statement, "all relief not granted is denied", or essentially those words—  **\*204**   does not indicate that a judgment rendered without a conventional trial is final for purposes of appeal. We overrule *Mafrige* to the extent it states otherwise. If there has been a full trial on the merits either to the bench or before a jury, the language indicates the court's intention to finally dispose of the entire matter, assuming that a separate or bifurcated trial is not ordered. But in an order on an interlocutory motion, such as a motion for partial summary judgment, the language is ambiguous. It may mean only that the relief requested *in the motion*—not all the relief requested by anyone in the case—and not granted by the order is denied. The clause may also have no intended meaning at all, having been inserted for no other reason than that it appears in a form book or resides on a word processor. For whatever reason, the standard Mother Hubbard clause is used in interlocutory

orders so frequently that it cannot be taken as any indication of finality.

As we have already explained, an order can be a final judgment for appeal purposes even though it does not purport to be if it actually disposes of all claims still pending in the case. Thus, an order that grants a motion for partial summary judgment is final if in fact it disposes of the only remaining issue and party in the case, even if the order does not say that it is final, indeed, even if it says it is not final. (Again, we do not consider here the various kinds of cases in which there may be more than one final judgment for purposes of appeal.) Also, an order can be final and appealable when it should not be. For example, an order granting a motion for summary judgment that addressed all of the plaintiff's claims when it was filed but did not address claims timely added by amendment after the motion was filed may state unequivocally that final judgment is rendered that the plaintiff take nothing by his suit. Granting more relief than the movant is entitled to makes the order reversible, but not interlocutory. [83]

While the present problems in determining whether an order is a final judgment should be lessened significantly by denying the standard Mother Hubbard clause of any indicia of finality in any order not issued after a conventional trial, the difficulty in determining what does make an order final and appealable remains. One solution would be stricter requirements for the form of a final judgment. Rule 58 of the Federal Rules of Civil Procedure takes this approach by requiring that to be final a judgment must "be set forth on a separate document" and be entered by the clerk on the civil docket. The separate-document requirement was added to the rule in 1963 to remove uncertainty over whether a trial judge's opinion or order constituted a final judgment. [84] Rule 58, with its dual requirements, " 'enhances certainty by insisting on formality.' " [85] The United States Supreme Court has insisted on strict compliance with the rule, quoting Professor Moore's observation that the rule

> " 'would be subject to criticism for its formalism were it not for the fact that something like this was needed to make certain when a judgment becomes effective, which has a most important bearing, inter alia, on the time for appeal and the making of post-judgment motions that go to the finality of the judgment  **\*205**  for purposes of appeal.' " [86]

The one recognized exception is a party's failure to object. [87]

The price of certainty, however, as federal rulemakers have come to realize, is that in many cases the failure to comply with Rule 58 means that no final judgment was ever rendered, and the time for appeal remains open. [88] A proposed amendment to Rule 58 would provide that if final judgment is not rendered on a separate document, it is deemed rendered on the sixtieth day after the clerk's entry on the civil docket. [89] While this proposal helps ensure that every case will be closed, it also makes it more likely that a party will not be aware that the time for appeal is running—the problem the 1963 amendment to Rule 58 was meant to cure—because he does not know of the clerk's entry on the civil docket.

There may be other solutions to these dilemmas which could be implemented by changes in our own rules, and this Court's Advisory Committee is presently studying the issues. But we do not write rules by opinion. [90] We must decide what Texas law requires for finality given the present rules.

 [8]    [9]    [10]    In the past we have tried to ensure that the right to appeal is not lost by an overly technical application of the law. [91] Fundamentally, this principle should guide in determining whether an order is final. Simplicity and certainty in appellate procedure are nowhere more important than in determining the time for perfecting appeal. From the cases we have reviewed here, we conclude that when there has not been a conventional trial on the merits, an order or judgment is not final for purposes of appeal unless it actually disposes of every pending claim and party or unless it clearly and unequivocally states that it finally disposes of all claims and all parties. An order that adjudicates only the plaintiff's claims against the defendant does not adjudicate a counterclaim, cross-claim, or third party claim, nor does an order adjudicating claims like the latter dispose of the plaintiff's claims. An order that disposes of claims by only one of multiple plaintiffs or against one of multiple defendants does not adjudicate claims by or against other parties. An order does not dispose of all claims and all parties merely because it is entitled "final", or because the word "final" appears elsewhere in the order, or even because it awards costs. Nor does an order completely dispose of a case merely because it states that it is appealable, since even interlocutory orders may sometimes be appealable. Rather, there must be some other clear indication that the trial court intended the order to completely dispose of the entire case. Language that the plaintiff take nothing by his claims in the case, or that the case is dismissed, shows finality if there are no other claims by other parties; but language that "plaintiff take nothing by his claims against X" when there is more than one defendant or other parties in the case does not indicate finality.

To determine whether an order disposes of all pending claims and parties, it may of course be necessary for the appellate court **\*206** to look to the record in the case. Thus, in the example just given, if the record reveals that there is only one plaintiff and only one defendant, X, the order is final, but if the record reveals the existence of parties or claims not mentioned in the order, the order is not final. On the other hand, an order that expressly disposes of the entire case is not interlocutory merely because the record fails to show an adequate motion or other legal basis for the disposition. The record may help illumine whether an order is made final by its own language, so that an order that all parties appear to have treated as final may be final despite some vagueness in the order itself, while an order that some party should not reasonably have regarded as final may not be final despite language that might indicate otherwise.

One may argue after *Aldridge* and *Mafrige* that it is perilous to suggest any particular language that will make a judgment final and appealable because that language can then be inserted in orders intended to be interlocutory. But to leave in doubt the degree of clarity required for finality creates its own problems. The Mother Hubbard clause proved to give no indication of finality not just because it found its way into every kind of order, but because it was inherently ambiguous, as we have explained. A statement like, "This judgment finally disposes of all parties and all claims and is appealable", would leave no doubt about the court's intention. An order must be read in light of the importance of preserving a party's right to appeal. If the appellate court is uncertain about the intent of the order, it can abate the appeal to permit clarification by the trial court. [92] But if the language of the order is clear and unequivocal, it must be given effect despite any other indications that one or more parties did not intend for the judgment to be final. An express adjudication of all parties and claims in a case is not interlocutory merely because the record does not afford a legal basis for the adjudication. In those circumstances, the order must be appealed and reversed.

### B

 [11]    [12]    Nothing in the order in *Lehmann* indicates that it is a final judgment, and it did not dispose of all pending claims and parties. The order in *Harris* states that plaintiffs take

nothing as to "one of the defendants", but that language does not suggest that all of the plaintiffs' claims were denied. As the order recites and as the record demonstrates, the defendant named in the order was not the only defendant remaining in the case. Thus, we conclude that a final and appealable judgment was not rendered in either case.

We are concerned that in neither case were the non-movants provided a copy of the court's signed order but were merely sent notice by postcard that an order had been signed. The Rules of Civil Procedure do not require clerks to send all parties copies of all orders, only final orders. [93] Nevertheless, the practice of courts in some counties is to require that a party seeking an order provide copies and addressed, postage-paid envelopes for all other parties. The Court's Advisory Committee should consider whether the rules should require that all parties be given copies of all orders signed in a case.

## IV

We must respond briefly to the concurring opinion. It would hold that no "type of conclusory finality language can ever be read to grant more relief than requested by the parties." [94] This goes too far. The legitimate problem with Mother Hubbard clauses, which we failed to appreciate in *Mafrige,* is that they are ambiguous: one cannot be sure whether the denial of all relief other than what has been expressly **\*207** granted is limited to relief requested in a motion or extends to all relief requested in the litigation. But it is a long way from the now well-established fact that Mother Hubbard clauses can understandably be misread to the concurring opinion's conclusion that clear language should be given no meaning. We require certainty for finality, but we cannot say that certainty is impossible.

The concurring opinion claims as authority for its position pre-*Mafrige* law, but before *Mafrige,* this Court repeatedly held that general language in a summary judgment finally disposed of the litigation even though no party had requested final relief. In *Schlipf v. Exxon Corp.* we held that an order granting the plaintiffs' motion for summary judgment on one of its claims and generally denying all other relief was final, even though no defendant had moved for summary judgment or requested the denial of any relief. [95] Similarly, in *Chessher v. Southwestern Bell Telephone Co.* we held that a summary judgment generally disposing of all four claims asserted by the plaintiff was final, even though the defendant

moved for summary judgment on only one of the claims. [96] Again in *Young v. Hodde,* we agreed that a Mother Hubbard clause in an order granting summary judgment for the plaintiff disposed of a defendant's counterclaim, even though the plaintiff's motion had addressed only his own claims and not the counterclaim. [97] It has simply never been the law in Texas that a summary judgment generally disposing of all claims and parties is nevertheless interlocutory merely because rendition of a final judgment was improper. In essence, the concurring opinion's position is that a trial court has no jurisdiction to grant more relief than is requested, and that if it does so, its action is absolutely void. We do not agree that a court's *power* to act, as distinct from the proper exercise of that power, is defined by a party's request for relief.

The concurring opinion acknowledges that its position may result in more appeals being taken from orders that look final but are really interlocutory, but it argues that appellate courts can easily deal with such problems by abating appeals to allow trial courts to clarify their orders. What the concurring opinion ignores is that trial courts and parties will assume that orders with general dispositive language mean what they say, only to learn months or years after an appeal should have been taken that no final judgment was ever rendered. JUSTICE BAKER would insist that every order granting summary judgment

> specifically identify: (1) the claims each party brought; (2) the grounds upon which each party seeks summary judgment; (3) each ground upon which the trial court granted summary judgment; and (4) each ground upon which the trial court denied summary judgment.

Any order that failed to meet these requirements would be interlocutory, according to JUSTICE BAKER, "*regardless* of how clearly it states that it is a final judgment disposing of all parties and issues." [98] The very real risk of such a rule is that thousands of judgments intended to be final would remain interlocutory because they did not comply with all of these requirements. **\*208** This is precisely what has happened in the federal system, as we have already explained, even though the federal rules impose far fewer requirements on final judgments than the concurring opinion would.

\* \* \* \* \*

For the reasons we have explained, the judgments of the court of appeals in these cases are reversed, and the cases are remanded to that court for further proceedings.

Justice BAKER filed a concurring opinion in which Justice ENOCH joined, except for Part IV and the discussion of Inglish and Bandera, and in which Justice HANKINSON joined, except Part IV.

The Court granted these petitions in *Lehmann* and *Harris* to solve the *Mafrige* problems. The Court fails to do so. Thus, while I concur in the result the Court reaches, I cannot agree with the reasoning it uses to reach that result.

In March 1993, we granted writ in *Mafrige v. Ross* to resolve the inherent problems in determining finality of summary judgments for purposes of appeal. 866 S.W.2d 590 (Tex.1993). There we recognized that determining finality had "been a recurring and nagging problem throughout the judicial history of this state." *Mafrige,* 866 S.W.2d at 590. Thus, in a major departure from our prior jurisprudence, we created a new rule providing: "If a summary judgment order appears to be final, as evidenced by the inclusion of language purporting to dispose of all claims or parties, the judgment should be treated as final for purposes of appeal." *Mafrige,* 866 S.W.2d at 592.

Despite the certainty we intended this bright-line rule to provide, the last seven years have proved that the *Mafrige* rule has created more problems than it solved—confusing the lower courts, operating as a trap for unwary litigants, and consistently bringing about arguably unjust and oftentimes absurd results. So, in November 1999, we granted the petitions in these cases to resolve the *Mafrige* problems. Inexplicably, the Court begins its opinion by chronicling the evolution of the rules and presumptions governing finality of orders following a conventional trial on the merits from the middle of the last century to the present.[1] Then, with very little discussion of the problems *Mafrige* and its progeny created in determining summary judgment finality, the Court concludes that the solution is to maintain the principle of the *Mafrige* legal fiction—with only slight modification.

However, rather than solve, the Court merely perpetuates the problems *Mafrige* created. The cases grappling to apply *Mafrige* illustrate that there is but one real solution. We should return to the principle we announced in *Teer v. Duddlesten*—that a Mother Hubbard clause simply "has no place in a partial summary judgment," and that a summary judgment order is not an appealable, final judgment unless it actually disposes of all parties and issues. 664 S.W.2d 702, 703–04 (Tex.1984).

The Court states: "[W]e do not write rules by opinion." 39 S.W.3d at 205. The Court is right; we should not establish rules by judicial fiat. We should not have done so in *Mafrige* and we should not have perpetuated the *Mafrige* problems with *Inglish* and *Bandera.* Any new summary judgment finality rule should be achieved by this Court's formally promulgating a new procedure rule. The Court should recognize this, overrule *Mafrige* and its progeny, and await a recommendation by **\*209** our rules advisory committee. Because the Court refuses to take this path, I concur in the judgment only.

### I. *MAFRIGE* AND ITS PROGENY

Before *Mafrige,* courts determined summary judgment finality by reviewing the live pleadings, the summary judgment motion, and the summary judgment order. *Harris County v. Nash,* 22 S.W.3d 46, 49–50 (Tex.App.—Houston [14th Dist.] 2000, pet. filed); *Kaigler v. General Elec. Ins. Mortgage Corp.,* 961 S.W.2d 273, 275 (Tex.App.—Houston [1st Dist.] 1997, no pet.). A summary judgment was deemed final and appealable only if it expressly disposed of all parties and issues or if it was severed from the remainder of the suit. *Pan Am. Petroleum Corp. v. Texas Pac. Coal & Oil Co.,* 159 Tex. 550, 324 S.W.2d 200, 200 (1959) ("[A] summary judgment which does not dispose of all parties and issues in the pending suit is interlocutory and not appealable unless a severance of that phase of the case is ordered by the trial court.").

With *Mafrige,* this Court attempted to simplify this process by holding that the "magic language" of a Mother Hubbard or similar finality clause conclusively transforms an interlocutory summary judgment into a final, appealable order. *Mafrige,* 866 S.W.2d at 592. We have twice revisited *Mafrige* to clarify its scope. *See Inglish v. Union State Bank,* 945 S.W.2d 810, 811 (Tex.1997) (holding that the *Mafrige* rule applies even when neither party appeals the erroneous summary judgment); *Bandera Elec. Coop., Inc. v. Gilchrist,* 946 S.W.2d 336, 337 (Tex.1997) (explaining that when the *Mafrige* rule renders a partial summary judgment final for

purposes of appeal, the appellate court should reverse and remand only the erroneously disposed claims). Unfortunately, *Mafrige* did little towards alleviating the lower courts' confusion—and *Inglish* and *Bandera* only compounded it. The Court's opinion suffers the same problem. Namely, its slightly-modified *Mafrige* rule falls far short of remedying the myriad of problems the *Mafrige* fiction and its progeny created.

## A. FINALITY LANGUAGE

One source of confusion under *Mafrige* has been uncertainty about what language triggers its finality rule. In *Mafrige,* we held that a partial summary judgment is treated as final for appeal purposes when the order contains a Mother Hubbard clause stating that "all relief not expressly granted is denied" or other language "purporting to dispose of all claims or parties." 866 S.W.2d at 590 & n. 1, 592. We further clarified that "other" finality language includes "a statement that the summary judgment is granted as to all claims asserted by the plaintiff, or a statement that the plaintiff takes nothing against defendant." *Mafrige,* 866 S.W.2d at 590 n. 1.; *see also Inglish,* 945 S.W.2d at 811 (holding statement that "[d]efendant is entitled to summary judgment in this case," and that plaintiff should "take nothing on account of his lawsuit" rendered partial summary judgment final for purposes of appeal); *Springer v. Spruiell,* 866 S.W.2d 592, 593 (Tex.1993) (holding that summary judgment order reciting plaintiffs "have and recover nothing" purported to dispose of all parties and issues).

Despite these examples, some lower courts have refused to hold orders containing this exact language final for purposes of appeal. *E.g., Carey v. Dimidjian,* 982 S.W.2d 556, 558 (Tex.App.—Eastland 1998, no pet.) (holding that order containing Mother Hubbard clause was not final and appealable where the motion was labeled "Partial Summary Judgment" and the parties treated the order as interlocutory); *Hinojosa v. Hinojosa,* 866 S.W.2d 67, 69–70 (Tex.App.—El Paso 1993, no writ) (holding that order containing Mother Hubbard clause did not render judgment final because it did not dispose of counterclaim). Other courts have struggled with what "other" language purports to render a judgment final—often reaching opposite conclusions about identical clauses. *Compare* **\*210** *Postive Feed, Inc. v. Guthmann,* 4 S.W.3d 879, 881 (Tex.App.—Houston [1st Dist.] 1999, no pet.) (holding that order granting defendant's summary judgment "in all things" purported to be final), *with St. Paul*

*Ins. Co. v. Mefford,* No. 05–96–01581–CV, 1998 WL 821537 (Tex.App.—Dallas Nov. 30, 1998, no pet.) (not designated for publication), 1998 WL 821537, at *2 [2] (holding that order granting defendant's summary judgment "in all things" did not purport to be final).

While the Court recognizes that the "routine inclusion of [a Mother Hubbard clause] in otherwise plainly interlocutory orders and its ambiguity in many contexts have rendered it inapt for determining finality," 39 S.W.3d at 192, it ignores the obvious problems courts have faced interpreting *other* language "purporting to dispose of all claims or parties." *Mafrige,* 866 S.W.2d at 592. In fact, despite the Court's extensive analysis and discussion, its holding represents but a minor departure from *Mafrige.*

Its modified rule has two parts. The first represents no change in Texas law. It simply reiterates that a summary judgment order that *actually* disposes of all parties and issues is final for purposes of appeal. 39 S.W.3d at 192. The second part provides that a Mother Hubbard clause is no longer enough to invoke the fiction that an otherwise interlocutory order is treated as final for purposes of appeal. Instead, to invoke the *Mafrige* fiction, an interlocutory order must now "clearly and unequivocally state [ ] that it finally disposes of all claims and all parties." 39 S.W.3d at 205. The Court further explains that the statements "plaintiff take nothing by his claims in the case" and "[t]his judgment finally disposes of all parties and all claims and is appealable" clearly and unequivocally state that an order is final. 39 S.W.3d at 205. In essence, the Court's rule does no more than replace one set of magic language with another—while ignoring the reality that courts will likely face the same challenges deciding what language "clearly and unequivocally states" that an order is final, 39 S.W.3d at 205, as they did deciding what other language clearly "purport[s] to dispose of all claims or parties" under *Mafrige.* 866 S.W.2d at 592.

## B. OMITTED PARTIES

Applying *Mafrige* to omitted parties, like those in both *Lehmann* and *Harris,* has also troubled the lower courts. Specifically, they have struggled with deciding when finality language operates to render a summary judgment final against omitted parties. This issue often surfaces when both the summary judgment motion *and* the resulting order omit any specific reference to one or more parties. [3] In this situation, several courts have held that *Mafrige* applies, reasoning that

issues and parties are co-extensive and thus if "an order disposes of all issues in a case, then it necessarily disposes of all parties to a case, and vice versa." *Kaigler,* 961 S.W.2d at 276; *see also Lehmann v. Har–Con Corp.,* 988 S.W.2d 415, 416–17 (Tex.App.—Houston [14th Dist.] 1999, pet. granted); *Harper v. Newton,* 910 S.W.2d 9, 12 n. 1 (Tex.App.—Waco), *rev'd sub nom. on other grounds, Dallas County v. Harper,* 913 S.W.2d 207 (Tex.1995).

In contrast, other courts have interpreted *Mafrige* more narrowly, reasoning that an "order that explicitly grants a summary judgment in favor of less than all the defendants *does not* clearly evidence an intent to dispose of all claims against all defendants, especially those against whom **\*211** summary judgment was not sought, regardless of the inclusion of a Mother Hubbard clause." *Lowe v. Teator,* 1 S.W.3d 819, 823–24 (Tex.App.—Dallas 1999, pet. filed); *see also Midkiff v. Hancock E. Tex. Sanitation, Inc.,* 996 S.W.2d 414, 416 (Tex.App.—Beaumont 1999, no pet.); *Vanderwiele v. Llano Trucks, Inc.,* 885 S.W.2d 843, 845 (Tex.App.—Austin 1994, no writ).

Here the Court summarily dismisses this omitted parties problem:

> Nothing in the order in *Lehmann* indicates that it is a final judgment, and it did not dispose of all pending claims and parties. The order in *Harris* states that plaintiff take nothing as to "one of the defendants", but that language does not suggest that all of the plaintiffs' claims were denied. As the order recites and as the record demonstrates, the defendant named in the order was not the only defendant remaining in the case. Thus, we conclude that a final appealable judgment was not rendered in either case.

39 S.W.3d at 206. Despite the presence of a Mother Hubbard clause, the trial court and parties in *Lehmann* continued treating the order as interlocutory-even in the face of this Court's admonishment that a Mother Hubbard clause indicates finality.[4] 988 S.W.2d at 416. The Court now holds that the order did not purport to be final based solely on its new rule discounting the dispositive effect of Mother Hubbard clauses.

However, the Court's resolution merely sidesteps the real problem. What happens in the next case when, on facts identical to *Lehmann,* a trial court signs an interlocutory summary judgment with the Court's new magic language rather than a Mother Hubbard clause? We are right back where we started. Substituting one magic phrase for another leads nowhere.

The reality is simply that omitted parties oftentimes do not believe that a summary judgment order that they have not seen, that does not mention them, and that results from a hearing in which they did not participate will operate to dispose of them or their claims. But, under the Court's standard, if these parties do not perfect a timely appeal from the erroneous judgment, their right to appeal is forever lost. This result elevates form over substance and hinders parties' rights to have the merits of their claims considered. *See, e.g., Rodriguez v. NBC Bank,* 5 S.W.3d 756, 763 n. 4 (Tex.App.—San Antonio 1999, no pet.) (recognizing this Court's "express goal of reaching the merits of a cause of action, instead of dismissing actions on procedural technicalities").

## C. OMITTED CROSS–CLAIMS AND COUNTERCLAIMS

The courts of appeals have also treated omitted cross-claims and counterclaims inconsistently—despite our holding in *Bandera.* In *Bandera,* the trial court signed an order with a Mother Hubbard clause that did not mention the defendant's counterclaims. 946 S.W.2d at 337. This Court explained that "[b]ecause the order contained a Mother Hubbard clause denying all other relief, it also purported to dispose of [the defendant's] counterclaims." *Bandera,* 946 S.W.2d at 337. But several courts have refused to apply *Mafrige* in this situation, maintaining that a summary judgment that does not mention counterclaims or cross-claims cannot purport to be final-regardless of whether it contains finality language. *E.g., Sommers v. Concepcion,* 20 S.W.3d 27, 33 (Tex.App.—Houston [14th Dist.] 2000, pet. denied); *Hervey v. Flores,* 975 S.W.2d 21, 25 (Tex.App.—El Paso 1998, pet. denied); *cf. Coleman Cattle Co., Inc. v. Carpentier,* 10 S.W.3d 430, 433 n. 2 (Tex.App.—Beaumont 2000, no pet.). Other courts have followed *Bandera* 's mandate, holding that finality language—such as "plaintiff takes nothing" **\*212** —renders a judgment final for appeal purposes, despite omission of any reference to defendant's counterclaims. *In re Monroe,* No. 05–99–01758–CV, 2000 WL 378519 (Tex.App.—Dallas Mar.31, 2000, orig. proceeding) (not designated for

publication), 2000 WL 378519, at *1–2; *see also Kaigler,* 961 S.W.2d at 275–76.

The Court's rule does not provide a satisfactory remedy for this situation either. The Court states:

> An order that adjudicates only the plaintiff's claims against the defendant does not adjudicate a counterclaim, cross-claim, or third party claim, nor does an order adjudicating claims like the latter dispose of the plaintiff's claims. An order that disposes of claims by only one of multiple plaintiffs or against one of multiple defendants does not adjudicate claims by or against other parties. An order does not dispose of all claims and all parties merely because it is entitled "final," or because the word "final" appears elsewhere in the order, or even because it awards costs. Nor does an order completely dispose of a case merely because it states that it is appealable, since even interlocutory orders may sometimes be appealable. Rather, there must be some other clear indication that the trial court intended the order to completely dispose of the entire case.

39 S.W.3d at 205.

Under its modified finality rule, the lower courts' disagreement in this area will continue because too many questions are left unanswered. For example, should a "final" summary judgment order stating that defendant is granted summary judgment "in all things" dispose of a cross-claim by another defendant as well as the claim by the plaintiff that brought the original claim? In this situation, there is no doubt that the order is unambiguous. However, it is likewise clear, but not from the order, that the third party's claim against the defendant was never considered. Should an order granting summary judgment for a plaintiff that recites it is a final and appealable order be final for counterclaims not mentioned in the motion or order? The order unequivocally states that it is a final, appealable order. Nonetheless there is a counterclaim that has not been considered. The Court states that a summary judgment granted for a plaintiff "does not adjudicate a counterclaim" and then goes on to say that

to make the order final there must be "some other clear indication that the trial court intended the order to completely dispose of the entire case." 39 S.W.3d at 205. In the example above, does the additional statement that "this is a final, appealable order" provide this "other clear indication"? These very issues are repeatedly raised in the courts of appeals, and the Court's modified rule simply does not resolve them.

## D. TRIAL COURTS' AND PARTIES' INTENT

Differing philosophies about the effect the trial courts' and parties' intent should have on how *Mafrige* applies has created the most confusion and inconsistency. The courts of appeals have taken three approaches. Some courts apply a bright-line test, holding that a Mother Hubbard clause or other finality language *always* renders an order final for appeal purposes, regardless of any evidence of contrary intent. *E.g., Preston v. American Eagle Ins. Co.,* 948 S.W.2d 18, 20–21 & n. 1 (Tex.App.—Dallas 1997, no writ) (holding that summary judgment purported to be final despite fact it was entitled "partial summary judgment"); *cf. In re Cobos,* 994 S.W.2d 313, 315 (Tex.App.—Corpus Christi 1999, orig. proceeding) ("As *Mafrige* and *Inglish* make clear, the intent of the trial court is not the controlling consideration in determining whether a judgment is final."). Other courts modify this approach, looking only within the four corners of the order and giving effect to any evidence of contrary intent found there. *E.g., Rodriguez,* 5 S.W.3d at 763–64 (Tex.App.—San Antonio 1999, no pet.) ("Looking within the four corners of the summary judgment order, the plain language of the **\*213** Mother Hubbard clause did not, and could not, purport to grant or deny any more relief than the relief which [the defendant] sought."); *Midkiff,* 996 S.W.2d at 416 (looking to order "as a whole" to conclude that summary judgment order containing Mother Hubbard clause did not purport to be final).

Finally, despite our holding in *Inglish* that the trial court's intent is irrelevant in this context, other courts still refuse to apply *Mafrige* if there is evidence of contrary intent *anywhere* in the record. This usually occurs when the parties and court treat an order as interlocutory by continuing with the litigation rather than appealing the erroneous order. *E.g., Lowe,* 1 S.W.3d at 823–24 (holding that summary judgment could not be final where the record reflected that there were parties who did not participate in the summary judgment proceeding); *Carey,* 982 S.W.2d at 558 (relying, in part, on court's and

parties' treatment of order containing Mother Hubbard clause as interlocutory to conclude judgment was not final).

The Court's solution to this problem is as confusing as the rule it seeks to supplant. It appears to reject the bright-line approach *Mafrige* espouses and instead adopt a rule combining the second and third approaches. First, the Court notes that an order is final for appeal purposes if it "unequivocally states that it finally disposes of all parties and all claims and is appealable." 39 S.W.3d at 205. It also explains that "[i]f the language of the order is clear and unequivocal, it must be given effect despite any other indications that one or more parties did not intend for the judgment to be final." 39 S.W.3d at 206. From these statements, the Court's new rule walks and talks a lot like a bright-line *Mafrige* rule, with magic language establishing finality.

However, the Court also states that "[t]o determine whether an order disposes of all pending claims and parties, it may of course be necessary for the appellate court to look to the record in the case." 39 S.W.3d at 205. This sounds more like a pre-*Mafrige* rule, where a court must look to the record and the order to determine if an order actually disposes of all pending parties and issues.

Because of the lower courts' confusion and disagreement about the role of intent in determining finality, I am convinced that the Court has not provided a workable rule that clearly defines that role as it applies to determining summary judgment finality.

### E. APPLYING *MAFRIGE* TO NON–SUMMARY JUDGMENT ORDERS

Finally, the question of whether *Mafrige* applies outside the summary judgment context has confused the lower courts. Courts of appeals have applied *Mafrige* to a plea to the jurisdiction, *Webb v. HCM Mgmt. Corp.,* No. 07–96–0369–CV, 1998 WL 16033 (Tex.App.—Amarillo Jan. 12, 1998, pet. denied) (not designated for publication) 1998 WL 16033, at *1; an agreed judgment, *In re Cobos,* 994 S.W.2d at 315–16; a directed verdict, *e.g., Polley v. Odom,* 957 S.W.2d 932, 943 (Tex.App.—Waco 1997, judgm't vacated); and a severance order, *Harris County Flood Control Dist. v. Adam,* 988 S.W.2d 423, 427 (Tex.App.—Houston [1st Dist.] 1999, pet. filed). In contrast, at least one court has declined to apply *Mafrige* to a dismissal for want of jurisdiction. *In re Tejas,* Nos. 01–98–00688–CV, 01–98–00689–CV, 01–98–00690–CV, 1998 WL 394562 (Tex.App.—Houston [1st Dist.] July 13, 1998, orig. proceeding) (not designated for publication), 1998 WL 394562, at *1 n. 1. And another has expressly refused to extend *Mafrige* to any order that is not a summary judgment. *Biltmore Swim & Racquet Club Recreational Ass'n v. McAbee,* No. 05–98–00252–CV, 1998 WL 459819 (Tex.App.—Dallas Aug.10, 1998, no pet.) (not designated for publication), 1998 WL 459819, at *1.

In *Aldridge,* this Court held that a presumption of finality exists when an order is signed following a traditional trial on the **\*214** merits. *Aldridge,* 400 S.W.2d at 897–98. But we specifically noted that such a finality presumption would not be appropriate in other contexts. *Aldridge,* 400 S.W.2d at 897. Then in *Mafrige* we carved out an exception to what we had said in *Aldridge* by holding that an irrebuttable finality presumption applies to summary judgments containing a Mother Hubbard or similar finality clause. *Mafrige,* 866 S.W.2d at 592. Here again, just as we had limited *Aldridge* to conventional trials on the merits, we expressly limited *Mafrige* to summary judgments. *Mafrige,* 866 S.W.2d at 591 ("[T]he issue is whether ... a summary judgment, which purports to be final by the inclusion of Mother Hubbard language or its equivalent, should be treated as final for purposes of appeal."). Unfortunately, several courts of appeals have erroneously applied *Mafrige* in other contexts, causing confusion over how to determine finality of various other types of orders.

*Mafrige* and its progeny *are* limited to summary judgments —*with good reason.* No good can come of interjecting additional uncertainty into (1) conventional trials on the merits, to which the majority acknowledges the *Aldridge* presumption has "proved a fairly workable" rule, 39 S.W.3d at 200, or (2) numerous other types of orders, when even the majority acknowledges that "the ordinary expectation" supporting a finality presumption "simply does not exist when some form of judgment is rendered without such a trial" because "it is quite possible, perhaps even probable these days ... that any judgment rendered prior to a full-blown trial is intended to dispose of only part of the case." 39 S.W.3d at 200.

However, the Court's opinion here implicates finality of all judgments. This expansion into issues not before the Court today can only cause mischief in areas already plagued by confusion. If the Court persists in adhering to *Mafrige*'s

principles, it should at least limit its holding, as we did in *Mafrige,* to summary judgments.

## II. POLICY CONSIDERATIONS

Not surprisingly, the post-*Mafrige* era has given rise to considerable analysis by courts and commentators of both the competing policies *Mafrige* implicates and suggestions for reform. A few have applauded the bright-line rule. *See Kaigler,* 961 S.W.2d at 275–76 (recognizing that the rule provides harsh results, but emphasizing that uniform enforcement "encourage[s] attentiveness to correct judgments"); *Boyce, Mafrige v. Ross and the Pitfalls of Presumptions,* APPELLATE ADVOCATE, Nov. 1997, at 7 (opining that *Mafrige* "resolved the confusion created by prior contradictory language and flatly inconsistent holdings").

However, praises have been few and far between. Criticism has been the rule and the comments call for this Court to reconsider our decision:

> What began as a benign growth allowing review of unripe claims on appeal, in *Mafrige,* became a malignant cancer cutting off causes of action before trial, in *Inglish.* If it were up to me, I would lock Mother Hubbard in the cupboard and return to the rule before *Aldridge* that a judgment is final and appealable only if it expressly disposes of all parties and all claims in the case. That appellants can even cite authority for the absurd result they seek, illustrates how wrong a turn the law has taken in this area—and how strong the need to right it.

*Harris County Flood Control Dist.,* 988 S.W.2d at 427–28 (Taft, J., concurring in denial of rehearing en banc); *see also, e.g., Lehmann,* 988 S.W.2d at 418 ("*Mafrige* is not as clear to litigants as the supreme court believes it is.... In short, *Mafrige* has created several problems: 1) it is catching the parties by surprise ...; 2) it exalts form over substance; and 3) in more than a few situations, it ignores common sense."); Carlson & Dunn, *Navigating* **\*215** *Procedural Minefields: Nuances in Determining Finality of Judgments, Plenary Power, and Appealability,* 41 S. TEX. L.REV. 953, 971 (2000) ("[D]espite the appeal of the certainty provided by

this bright-line rule, the reality is that still, after seven years, it continues to operate as a trap for unwary litigants, bringing about arguably unjust and oftentimes draconian results."); Swanda, *Summary Judgment, Mother Hubbard Clauses, and Mafrige v. Ross,* APPELLATE ADVOCATE, May 1997, at 3 (complaining that the questions *Mafrige* raises "are just as elusive" as the questions it sought to resolve).

Strong policies support our practice of adhering to settled rules of law "unless there exists the strongest reasons for chang[e]." *Benavides v. Garcia,* 290 S.W. 739, 740–41 (Tex. Comm'n App.1927, judgm't adopted). But we have also recognized the "doctrine of stare decisis does not stand as an insurmountable bar to overruling precedent." *Gutierrez v. Collins,* 583 S.W.2d 312, 317 (Tex.1979). "Generally, we adhere to our precedents for reasons of efficiency, fairness, and legitimacy." *Weiner v. Wasson,* 900 S.W.2d 316, 320 (Tex.1995). However, when adherence to a judicially-created rule of law no longer furthers these interests, and "the general interest will suffer less by such departure, than from a strict adherence," we should not hesitate to depart from a prior holding. *Benavides,* 290 S.W. at 740. The lower courts' application of *Mafrige* over the last seven years illustrates undeniably that this is just such a case.

We intended *Mafrige, Inglish,* and *Bandera* to provide certainty to litigants. Instead, they have bred chaos. Most disturbing is that the casebooks are now replete with examples of dismissed cases where the parties and courts clearly intended an order containing finality language to be interlocutory. [5] *E.g., Inglish,* 945 S.W.2d at 811; *In re Cobos,* 994 S.W.2d at 315–16; *Pena v. Valley Sandia, Ltd.,* 964 S.W.2d 297, 298–99 (Tex.App.—Corpus Christi 1998, no pet.); *Kaigler,* 961 S.W.2d at 275–76. Even the Court acknowledges:

> [T]he ordinary expectation that supports the presumption that a judgment rendered after a conventional trial on the merits will comprehend all claims simply does not exist when some form of judgment is rendered without such a trial. On the contrary, it is quite possible, perhaps even probable these days in cases involving multiple parties and claims, that any judgment rendered prior to a full-blown trial is intended to dispose of only part of the case. Accordingly, the finality of the judgment must be determined without the benefit of any presumption.

39 S.W.3d at 200. Because of this reality, it is difficult to understand why the Court persists in adhering to *Mafrige*'s principles.

The author of the Court's opinion recently opined: "Appellate procedure should not be tricky. It should be simple, it should be certain, it should make sense, and it should facilitate consideration of the parties' argument on the merits...." *Lane Bank Equip. Co. v. Smith Southern Equip., Inc.,* 10 S.W.3d 308, 314 (Tex.2000) (Hecht, J., concurring). This Court has repeatedly refused to adopt positions which elevate form over substance. *See, e.g., Phillips v. Beaber,* 995 S.W.2d 655, 658 (Tex.1999); *Nueces Canyon Consol. Indep. Sch. Dist. v. Central Educ. Agency,* 917 S.W.2d 773, 775–76 (Tex.1996). The Court here even recognizes that "[s]implicity and certainty in appellate procedure are nowhere more important than in determining the time for perfecting appeal." 39 S.W.3d at 205. Unfortunately though, the Court declines to embrace this opportunity **\*216** to effectuate meaningful change and provide certainty for courts and litigants. Instead the Court leaves them as it found them, grappling with determining whether summary judgment orders are fictitiously made final.

### III. THE SOLUTION

The Court notes: "[W]e do not write rules by opinion. We must decide what Texas law requires for finality, given the present rules ." 39 S.W.3d at 205. Yet, the *Mafrige* finality rule this Court created represented such a major departure from prior Texas law. In fact, but for the judicially-created *Mafrige* rule, no one would dispute that "what Texas law requires for finality" of summary judgments is an order actually disposing of all parties and issues.

Rather than simply amend the *Mafrige* finality rule and perpetuate the problems the unworkable system *Mafrige* and its progeny created, the Court should focus on shaping a real solution—one providing the desired certainty and protecting parties' right to appellate review. This requires wiping the slate clean. *Mafrige* created enough problems with its fictional finality and its holding that trial courts can use magic language to create final summary judgments by granting relief not requested. 866 S.W.2d at 591–92. In *Inglish* we compounded the problem by confirming that *Mafrige* applies even when the parties continue litigating rather than appealing a partial summary judgment made final under *Mafrige.* 945 S.W.2d at 811. We completed the trilogy in *Bandera,* holding that when a party appeals a summary judgment granting more

relief than requested, the court of appeals should address the merits of the appeal, remanding only the part of the judgment that exceeds the relief requested in the summary judgment motion. 946 S.W.2d at 337. Undeniably, these rules were designed to simplify summary judgment finality. But, in application, these cases only demonstrate that we should have adhered to our own admonishments that this Court simply should not make rules by opinion. *E.g., Alvarado v. Farah Mfg. Co.,* 830 S.W.2d 911, 915 (Tex.1992) (explaining that we should not revise rules by opinion); *see also Verburgt v. Dorner,* 959 S.W.2d 615, 619 (Tex.1997) (Baker, J., dissenting) (noting that this Court's jurisprudence forbids rule amendments by judicial fiat).

Thus, we should overrule *Mafrige, Inglish,* and *Bandera*—to the extent they created new rules by judicial fiat—and instead tackle the problems of summary judgment finality through our rulemaking process. Accordingly, we should return to our prior position that a Mother Hubbard clause (or other magic language) has no place in any summary judgment order—final or partial—and that a trial court may not *sua sponte* grant more relief than the parties request simply by adding conclusory finality language to a summary judgment order. Further, a summary judgment should be entitled to no presumption at all about whether it is final.

Returning to the law as it was pre-*Mafrige* requires determining the state of the law before *Mafrige. Mafrige* actually held two things: (1) that " 'Mother Hubbard' language or its equivalent in an order granting summary judgment makes an otherwise partial summary judgment final for appeal purposes;" and (2) that if a summary judgment "grants more relief than requested, it should be reversed and remanded, but not dismissed." 866 S.W.2d at 590, 592.

Before *Mafrige,* this first holding was not the law. In *Teer v. Duddlesten* we held that:

> There is no presumption in partial summary judgments that the judgment was intended to make an adjudication about all parties and issues. The Mother Hubbard clause that "all relief not expressly granted is denied" has no place in a partial summary judgment hearing. The concepts of a partial summary judgment on the one hand, and a judgment **\*217** that is presumed to determine all issues and facts on the other, are inconsistent.

664 S.W.2d at 704. In *Mafrige* we recognized this earlier statement in *Teer,* but rejected it and held that finality

language could render a partial summary judgment final for purposes of appeal. 290 S.W.2d at 592.

*Mafrige*'s second holding—that a summary judgment granting more relief than requested should be reversed and remanded, but not dismissed—does not appear to be an entirely new rule. In both *Teer* and *Chessher,* another pre-*Mafrige* case, we reversed and remanded (rather than dismissed) summary judgment orders after determining that they were interlocutory because they granted more relief than requested. *See Teer,* 664 S.W.2d at 705; *Chessher v. Southwestern Bell Tel. Co.,* 658 S.W.2d 563, 564 (Tex.1983). *But see Ross v. Arkwright Mut. Ins. Co.,* 834 S.W.2d 385, 393 (Tex.App.—Houston [14th Dist.] 1992) (opining that these cases are "in direct contravention of TEX.R. CIV. P. 166a(c)" and discussing disagreement in the courts over whether summary judgment orders granting more relief than requested were interlocutory or appealable, but erroneous, judgments), *rev'd sub. nom. Mafrige,* 866 S.W.2d at 590. Thus, while the courts were not entirely in agreement, it appears we had already established the rule that a summary judgment order granting more relief than requested is not interlocutory—it is simply erroneous. For this reason, I agree with the Court that if an order actually does dispose of each claim and every party, it is an appealable judgment, even if it grants more relief than requested. This is consistent with the long-standing rule that if an order *actually* disposes of all parties and issues, it is final for appeal purposes. *E.g., Houston Health Clubs, Inc. v. First Court of Appeals,* 722 S.W.2d 692, 693 (Tex.1986). However, consistent with my view that we should overrule *Mafrige* and its progeny and recognize no presumption *for or against* finality, I do not believe any type of conclusory finality language can ever be read to grant more relief than requested by the parties.[6]

We should determine summary judgment finality by comparing the live pleadings and the summary judgment order. A summary judgment order should only be final if it matches the contents of the pleadings. And, as was the law before *Bandera,* a court of appeals should summarily reverse any summary judgment granting more relief than requested, without any *sua sponte* severance of some issues while others are remanded.

Wiping the slate clean by overruling the rules created in *Mafrige, Inglish,* and *Bandera* while we study the best method of tackling summary judgment finality through our formal rule-promulgation process is the better solution for several reasons. First, this approach strikes a more reasonable balance between the competing policies of promoting certainty and preserving parties' rights to appellate review. And, under this approach, the trial court and the parties drafting summary judgment orders would have the burden, and *the incentive,* to ensure that the pleadings, summary judgment motions, and the summary judgment orders match. If a premature appeal is taken, the court of appeals need only compare the pleadings, motions, and order. If the order does not dispose of parties or issues raised in the pleadings, then it is interlocutory and the court must dismiss the appeal.[7] If the order explicitly **\*218** disposes of issues and parties not raised in the motion, it is erroneous and the court must reverse the entire order.

Most importantly, this approach alters the consequences of poorly-drafted orders. Specifically, the consequence flowing from a poorly drafted order becomes the risk of a *premature* appeal rather than an *untimely* one. This eliminates the greatest risk *Mafrige* created—that an interlocutory order, contrary to the trial court's and (at least one party's) intent, will be fictitiously made final, starting the appellate and plenary power timetables even while the litigation continues. No one would argue that conducting a trial after the trial court's plenary power has expired is not a waste of judicial resources. Moreover, because overruling *Bandera* eliminates the benefits of a premature appeal, taking such an appeal would not be a cost-efficient mistake for litigants to make, increasing the incentive to ensure orders are more clearly drafted. If a premature appeal is nonetheless taken, it would not create an onerous burden for the appellate court. The opposing party need only file a brief pointing out that the pleadings, motion, and order do not match, leading to automatic remand or dismissal.

No one disputes that rules governing summary judgment finality could be helpful to the bench and bar and facilitate judicial efficiency. But history, as well as our own precedent, has shown that judicial opinions are not the place to achieve this. Any attempt to adhere to the *Mafrige* principle or retain parts of it while rejecting others can only lead to more problems. Instead, this Court should overrule *Mafrige* and its progeny and start anew. As the Court even notes, our rules advisory committee is currently studying summary judgment finality. 39 S.W.3d at 216. Retaining parts of *Mafrige, Inglish, Bandera* as modified by the Court's less-than-clear opinion today—only to follow with promulgation of a concurrent finality rule—will only lead to more confusion.

I agree that the cases here should be reversed. But, because the Court refuses to fix the problems its judicial rulemaking

in *Mafrige* caused and allow our rulemaking process to work, I cannot join the Court's opinion.

## IV. RECOMMENDATION

I recognize that the Supreme Court of Texas Advisory Committee on Rules of Civil Procedure has been studying the problem of summary judgment finality. It has proposed an amendment to Rule 166a of the *Texas Rules of Civil Procedure:*

> (j) Statement of Grounds. An order granting summary judgment must state the ground or grounds on which the motion was granted. No judgment may be affirmed on other grounds stated in the motion unless they are asserted by appellee in the appellate court as alternative grounds for affirmance.

I do not believe this proposed amendment goes far enough.

First I would suggest to the committee that they consider requiring each summary judgment order specifically identify: (1) the claims each party brings; (2) the grounds upon which each party seeks summary judgment; (3) each ground upon which the trial court granted summary judgment; and (4) each ground upon which the trial court denied summary judgment.

This solution is intuitive. In the vast majority of cases, this formality, rather than including magic language, would provide notice to parties about what has actually happened. In practice, this procedure alleviates many problems *Mafrige*'s finality rule has caused.

Under this approach, a summary judgment is not final unless the order specifically identifies each claim for relief, the grounds upon which each party seeks summary judgment, and the court's disposition **\*219** of each claim and party. The appellate court's jurisdiction is determined only by looking at whether the trial court rendered an order expressly disposing of all remaining parties and issues. If the trial court errs by omitting certain claims or parties from the order, as happened in *Lehmann* and *Harris,* it is not a final order for purposes of appeal. Under this approach a party *never* loses its right to appeal based upon the finality of a summary judgment order *that is silent* about the party or its claims or that *sua sponte* grants relief no party requested without mentioning the parties

or claims—*regardless* of how clearly it states that it is a final judgment disposing of all parties and issues.

Most significantly, *in practice* this would lead to better drafting and fewer erroneous appeals. Specifically, if required to expressly list each ground upon which summary judgment is requested, trial courts are not likely to *add* grounds to their order that the summary judgment motion did not raise.

Second, I would suggest the committee consider a rule requiring that the prevailing party, who is charged with drafting the court's order, serve copies on all other parties at least ten days *before* the trial court is to sign and enter the order. Consistent with this suggestion, I agree with the Court's suggestion that the clerk send copies of all the actual signed orders—rather than just a postcard indicating that the court has signed an order.

The majority's author criticizes my first recommendation, asserting that there is a "very real risk" that requiring judges to be explicit in their summary judgment orders would result in "thousands of judgments intended to be final ... remain[ing] interlocutory." 39 S.W.3d at 196. He contends that "[t]his is precisely what has happened in the federal system even though the federal rules impose far fewer requirements on final judgments than the dissent would." 39 S.W.3d at 208. Federal Rule 58, to which he refers, requires that *all final judgments* "be set forth on a separate document" and be entered by the clerk on the docket. FED.R.CIV.P. 58.

This criticism only serves to amplify the real dangers of straying outside the summary judgment context in these cases. How finality of different types of judgments is determined must be governed by the *nature* of the judgment. *Houston Health Clubs, Inc., 722 S.W.2d at 693* ("In determining whether a judgment is final, different presumptions apply depending on whether the judgment follows a conventional trial on the merits or results from default or a motion for summary judgment."). Cognizant of this, my recommendation, unlike Federal Rule 58, is limited to summary judgment finality.

The live pleadings define the issues in a case. The issues tried do not always mirror these pleadings. *See Vance v. Wilson,* 382 S.W.2d 107, 108 (Tex.1964). Nonetheless, we have repeatedly recognized that a presumption should exist that all issues presented by the pleadings are disposed of in a conventional trial on the merits. *See Aldridge,* 400 S.W.2d at 897–98; *Vance,* 382 S.W.2d at 108. This presumption

can be rebutted by a contrary showing in the record. *See Richey v. Bolerjack,* 589 S.W.2d 957, 959 (Tex.1979). But absent such a rebuttal, this presumption prevents judgments from languishing after trial based solely on variations in the pleadings and judgment. This presumption has saved us from the types of problems the federal system has experienced.

However, we sensibly limited this presumption to judgments "not intrinsically interlocutory in character." *Aldridge,* 400 S.W.2d at 897. We have also explained that summary judgments are intrinsically interlocutory and thus they should not be presumed final. *Houston Health Clubs, Inc.,* 722 S.W.2d at 693. Thus, there is nothing illogical about requiring that finality language be explicit. And I respectfully disagree that my recommendation, limited to summary judgments, will cause such **\*220** major havoc in the court system. Further, I believe the additional formality in this context is worth the certainty and protections such a rule provides.

### V. CONCLUSION

In Texas, the test for determining summary judgment finality has always been whether the judgment disposes of all parties and all issues raised in the pleadings. In *Mafrige* we created a legal fiction to simplify the process of determining finality. But *Mafrige* created more problems than it solved. It is beyond me why the Court insists on struggling through pages and pages of history about presumptions, magic language, and Mother Hubbard clauses instead of squarely considering the problems *Mafrige* caused and providing a solution. Its willingness to cling to this legal fiction, while refusing to recognize that our rulemaking in *Mafrige* and its progeny was not the correct solution, will only create more problems.

I concur in the judgment in these cases. But, because the Court declines to overrule *Mafrige, Inglish,* and *Bandera,* and await our promulgation of a rule governing summary judgment finality, I do not concur in its reasoning.

### Parallel Citations

44 Tex. Sup. Ct. J. 364

Footnotes

1  *See Crowson v. Wakeham,* 897 S.W.2d 779, 783 (Tex.1995) (involving probate proceedings); *Huston v. Federal Deposit Ins. Corp.,* 800 S.W.2d 845, 847 (Tex.1990) (involving receivership proceedings).

2  *See Street v. Honorable Second Court of Appeals,* 756 S.W.2d 299, 301 (Tex.1988).

3  866 S.W.2d 590 (Tex.1993).

4  *Teer v. Duddlesten,* 664 S.W.2d 702, 704 (Tex.1984).

5  *Mafrige,* 866 S.W.2d at 590 n. 1.

6  *Lehmann v. Har–Con Corp.,* 1998 WL 429853 (Tex.App.—Houston [14th Dist.] 1998), 988 S.W.2d 415 (1999) (op. on reh'g); *Harris v. Harbour Title Co.,* 1999 WL 211859 (Tex.App.—Houston [14th Dist.] 1999).

7  988 S.W.2d 415 (op. on reh'g).

8  *See* TEX.R.APP. P. 26.1 (appellate time limits).

9  43 TEX. SUP.CT. J. 94, 96 (Nov. 12, 1999).

10  43 TEX. SUP.CT. J. 94, 96 (Nov. 12, 1999).

11  *See* CHARLES ALAN WRIGHT, ARTHUR R. MILLER, & EDWARD H. COOPER, FEDERAL PRACTICE & PROCEDURE §§ 3906–3907 (1992).

12  *See, e.g., North East Indep. Sch. Dist. v. Aldridge,* 400 S.W.2d 893, 895 (Tex.1966); *Gulf C. & S. F. Ry. v. Fort Worth & N. O. Ry.,* 68 Tex. 98, 2 S.W. 199, 200 (1886), *op. on reh'g,* 68 Tex. 98, 3 S.W. 564 (1887); see TEX. CONST. art. V, § 3–b (direct appeals to the Supreme Court); TEX. CIV. PRAC. & REM.CODE §§ 15.003(c) (interlocutory joinder and intervention appeals), 51.012 (court of appeals jurisdiction), 51.014 (interlocutory appeals); TEX. GOV'T CODE §§ 22.001(c) (direct appeals), 22.225(d) (interlocutory appeal to the Supreme Court).

13  *See Jack B. Anglin Co., v. Tipps,* 842 S.W.2d 266, 272 (Tex.1992); *Linn v. Arambould,* 55 Tex. 611, 617–18 (1881) (surveying several tests for determining when a judgment is final). *See generally* 49 C.J.S. *Judgments* § 11 (1947); 46 AM.JUR.2D *Judgments* § 200–206 (1994).

14  *Crowson v. Wakeham,* 897 S.W.2d 779, 783 (Tex.1995).

15  *Huston v. Federal Deposit Ins. Corp.,* 800 S.W.2d 845, 847 (Tex.1990).

16  *See Street v. Second Court of Appeals,* 756 S.W.2d 299, 301 (Tex.1988).

17    *See Hanks v. Thompson,* 5 Tex. 6, 8 (1849) (defining a final judgment as awarding the judicial consequences which the law attaches to the facts and determining the subject matter of the controversy between the parties); *accord West v. Bagby,* 12 Tex. 34 (1854). *See also Fitzgerald v. Fitzgerald,* 21 Tex. 415 (1858); *Hancock v. Metz,* 7 Tex. 177 (1851) (both holding that a judgment for the defendant for costs did not constitute a final judgment); *Warren v. Shuman,* 5 Tex. 441, 450 (Tex.1849) (finding that a judgment that awards costs without disposing of the subject matter of the controversy is not a final judgment). *See generally* 31 JEREMY C. WICKER, TEXAS PRACTICE, CIVIL TRIAL & APPELLATE PROCEDURE § 506, at 289–311 (1985) (chronicling, in depth, the challenges of distinguishing between final and interlocutory judgments in various contexts beginning in the mid–19th century).

18    55 Tex. 611 (1881).

19    *Id.* at 619.

20    *See Aldridge,* 400 S.W.2d at 895.

21    *See, e.g., East & West Tex. Lumber Co. v. Williams,* 71 Tex. 444, 9 S.W. 436 (1888); *Hill v. Templeton,* 25 S.W. 652 (Tex.Civ.App.1894); *Mills v. Paul,* 4 Tex.Civ.App. 503, 23 S.W. 395 (1893).

22    *Aldridge,* 400 S.W.2d at 895.

23    89 Tex. 613, 36 S.W. 77, 78 (1896).

24    *Id.* at 78 (citations omitted).

25    92 Tex. 391, 49 S.W. 215 (1899).

26    *Id.* at 217.

27    *See Trammell v. Rosen,* 106 Tex. 132, 157 S.W. 1161, 1162 (1913) (listing the various appellate courts subscribing to each school of construction).

28    *Id.*

29    *Id.* at 1161.

30    *Id.* at 1161–1163.

31    *Id.* at 1163. *See also Burton Lingo Co. v. First Baptist Church,* 222 S.W. 203, 204 (Tex. Comm'n App.1920, holding approved) (citing *Trammell* for support of its presumption that the judgment disposed of a claim).

32    142 Tex. 111, 176 S.W.2d 744, 746 (1944).

33    161 Tex. 184, 338 S.W.2d 945, 947 (1960).

34    *Gamble v. Banneyer,* 137 Tex. 7, 151 S.W.2d 586 (1941); *Vance v. Wilson,* 382 S.W.2d 107 (Tex.1964) (res judicata).

35    400 S.W.2d 893 (Tex.1966).

36    *North East Indep. Sch. Dist. v. Aldridge,* 392 S.W.2d 607 (Tex.Civ.App.—San Antonio 1965), *rev'd and remanded,* 400 S.W.2d 893 (Tex.1966).

37    400 S.W.2d at 897–898.

38    *Id.* at 898.

39    *Teer v. Duddlesten,* 664 S.W.2d 702, 704 (Tex.1984).

40    136 Tex. 296, 150 S.W.2d 377 (1941).

41    *McCray Refrigerator Sales Corp. v. Davis,* 140 S.W.2d 477, 478 (Tex.Civ.App.—Fort Worth 1940), *rev'd,* 136 Tex. 296, 150 S.W.2d 377 (1941).

42    *Id.*

43    150 S.W.2d at 378.

44    *Id.*

45    *Aldridge,* 400 S.W.2d at 897.

46    See, e.g., *Houston Health Clubs, Inc. v. First Court of Appeals,* 722 S.W.2d 692 (Tex.1986), and the cases cited therein.

47    *Farmer v. Ben E. Keith Co.,* 907 S.W.2d 495, 496 (Tex.1995) (per curiam); *H.B. Zachry Co. v. Thibodeaux,* 364 S.W.2d 192, 193 (Tex.1963) (per curiam); *McEwen v. Harrison,* 162 Tex. 125, 345 S.W.2d 706, 707 (1961).

48    *Farmer,* 907 S.W.2d at 496; *H.B. Zachry Co.,* 364 S.W.2d at 193; *McEwen,* 345 S.W.2d at 707.

49    *Young v. Hodde,* 682 S.W.2d 236 (Tex.1984) (per curiam); *Chessher v. Southwestern Bell Tel. Co.,* 658 S.W.2d 563, 564 (Tex.1983) (per curiam).

50    Id.

51    644 S.W.2d 453 (Tex.1982) (per curiam).

52    *Id.* at 454.

53    *Id.*

54    *See New York Underwriters Ins. Co. v. Sanchez,* 799 S.W.2d 677, 678 (Tex.1990) (per curiam); *Young v. Hodde,* 682 S.W.2d 236 (Tex.1984) (per curiam); *Chessher v. Southwestern Bell Tel. Co.,* 658 S.W.2d 563, 564 (Tex.1983) (per curiam).

55    *Teer v. Duddlesten,* 664 S.W.2d 702, 704 (Tex.1984).

56    *Id.*

57    *E.g., Bethurum v. Holland,* 771 S.W.2d 719 (Tex.App.—Amarillo 1989, no writ); *Sakser v. Fitze,* 708 S.W.2d 40, 42 (Tex.App.—Dallas 1986, no writ) (declaring that a Mother Hubbard clause in an order does not convert an intrinsically interlocutory partial summary judgment into a final judgment).

58    *E.g., Georgetown Assoc., Ltd. v. Home Fed. Sav. & Loan Ass'n,* 795 S.W.2d 252, 253 (Tex.App.—Houston [14th Dist.] 1990, writ dism'd w.o.j.); *Hodde v. Young,* 672 S.W.2d 45, 47 (Tex.App.—Houston [14th Dist.] ) (holding that a judgment was final and appealable because it contained a Mother Hubbard clause), *writ ref'd, n.r.e.,* 682 S.W.2d 236 (Tex.1984) (per curiam) (noting that the erroneous rendition of a final judgment is not fundamental error).

59    866 S.W.2d 590 (Tex.1993).

60    *Id.* at 590.

61    *Id.*

62    *Ross v. Arkwright Mut. Ins. Co.,* 834 S.W.2d 385, 388–389 (Tex.App.—Houston [14th Dist.] 1992), *rev'd sub nom. Mafrige v. Ross,* 866 S.W.2d 590 (Tex.1993).

63    *Id.*

64    866 S.W.2d at 590–591.

65    *Id.*

66    *Ross,* 834 S.W.2d at 394.

67    *Id.* at 393–395.

68    *Mafrige,* 866 S.W.2d at 592; *accord Springer v. Spruiell,* 866 S.W.2d 592 (Tex.1993) (per curiam).

69    *Id.* at 590 n. 1.

70    875 S.W.2d 311 (Tex.1994) (per curiam).

71    *Id.* at 313.

72    *Id.*

73    *Id.*

74    946 S.W.2d 336 (Tex.1997) (per curiam).

75    *Id.* at 337.

76    *Id.*

77    *Id.* at 337 n. 2.

78    909 S.W.2d 508, 510 (Tex.1995).

79    920 S.W.2d 274, 276 (Tex.1996).

80    *Id.* at 277.

81    945 S.W.2d 810 (Tex.1997) (per curiam).

82    *See, e.g.,* Elaine A. Carlson & Karlene S. Dunn, *Navigating Procedural Minefields: Nuances in Determining Finality of Judgments, Plenary Power, and Appealability,* 41 SO. TEX. L.REV.. 953, 969–1001 (2000); William J. Cornelius & David F. Johnson, *Tricks, Traps, and Snares in Appealing a Summary Judgment in Texas,* 50 Baylor L.Rev. 813, 825–835 (1998).

83    *See Young v. Hodde,* 682 S.W.2d 236, 237 (Tex.1984) (per curiam); *Chessher v. Southwestern Bell Tel. Co.,* 658 S.W.2d 563, 564 (Tex.1983) (per curiam); *Schlipf v. Exxon Corp.,* 644 S.W.2d 453 (Tex.1983) (per curiam).

84    *Bankers Trust Co. v. Mallis,* 435 U.S. 381, 384–385, 98 S.Ct. 1117, 55 L.Ed.2d 357 (1978).

85    CHARLES ALAN WRIGHT, ARTHUR R. MILLER, & MARY KAY KANE, FEDERAL PRACTICE & PROCEDURE § 2781 (2d ed.1995) (quoting Benjamin Kaplan, *Amendments of the Federal Rules of Civil Procedure, 1961–1963,* 77 HARV. L.REV. 801, 831 (1964)).

86    *United States v. Indrelunas,* 411 U.S. 216, 220–221, 93 S.Ct. 1562, 36 L.Ed.2d 202 (1973).

87    *Bankers Trust,* 435 U.S. at 387–388, 98 S.Ct. 1117.

88    COMMITTEE ON RULES OF PRACTICE & PROCEDURE OF THE JUDICIAL CONFERENCE OF THE UNITED STATES, PRELIMINARY DRAFT OF PROPOSED AMENDMENTS TO THE FEDERAL RULES OF APPELLATE, BANKRUPTCY, CIVIL, AND CRIMINAL PROCEDURE 100–114 (Aug.2000).

89    Id.

90    *State Dept. of Highways & Pub. Transp. v. Payne,* 838 S.W.2d 235, 241 (Tex.1992); *Alvarado v. Farah Mfg. Co.,* 830 S.W.2d 911, 915 (Tex.1992).

91    *Verburgt v. Dorner,* 959 S.W.2d 615, 616–617 (Tex.1997).

92    TEX.R.APP. P. 27.2.

93    *See* TEX.R. CIV. P. 306a(3).

94    *Post* at 217.

95    644 S.W.2d 453 (Tex.1982) (per curiam).

96    658 S.W.2d 563 (Tex.1983) (per curiam). Although our opinion did not quote the trial court's order, an examination of the record in the case reveals that the order recited that the court had considered the defendant's motion for summary judgment, the plaintiff's responses, and the defendant's reply, and had notified the parties that "it had determined to grant the defendant's motion for summary judgment." The decretal portion of the order stated "that plaintiff, Paul G. Chessher, take nothing of and from defendant, Southwestern Bell Telephone Company. Costs of court are hereby taxed against plaintiff, Paul G. Chessher."

97    *Young v. Hodde,* 682 S.W.2d 236, 236–237 (Tex.1984) (per curiam), *writ ref'd n.r.e.,* 672 S.W.2d 45 (Tex.App.—Houston [14th Dist.] ).

98    *Post* at 219 (emphasis in original).

1     These rules and presumptions are irrelevant to the issues before the Court today. As we have repeatedly admonished—in *Mafrige,* in *Aldridge,* and even in the Court's opinion today—the rules governing finality after a conventional trial are wholly inappropriate for determining finality of summary judgments. *See Mafrige,* 866 S.W.2d at 592; *North East Indep. Sch. Dist. v. Aldridge,* 400 S.W.2d 893, 897–98 (Tex.1966); *Lehmann,* 39 S.W.3d 191.

2     The unpublished opinions cited in Part I are cited only as examples, not as precedent. *See* TEX.R.APP. P. 47.7.

3     This issue also arises when a trial court expressly mentions and disposes of a party even though that party was not mentioned in the motion for summary judgment. Here, the lower courts have been more willing to apply *Mafrige* and hold that the order purports to dispose of all parties and issues. *See, e.g., Mikulich v. Perez,* 915 S.W.2d 88, 91–92 (Tex.App.—San Antonio 1996, no writ).

4     In fact, the district clerk sent all the parties (including those omitted from the summary judgment order) a postcard indicating that an "Order for Interlocutory Summary Judgment" had been signed. *Lehmann,* 988 S.W.2d at 416.

5     Oftentimes in these cases litigation continues to move forward. Any error in including magic finality language in a summary judgment is not discovered until it is too late; the appellate timetable has expired and the trial court has lost plenary power to act. The litigants have forever lost their right to complain of the judgment.

6     It would *not* be enough for a court to generally state "plaintiff takes nothing," "defendant is granted summary judgment in all things," or "this is a final appealable judgment." Conclusory finality clauses (i.e. "magic language") do not indicate that a trial court *actually* granted relief *not requested* for or against parties or issues are *not mentioned* in the order.

7     Of course, this procedure would not apply if the order fell within the category of cases for which there can be more than one final judgment, or the category of orders for which a court of appeals has been granted statutory authority to review interlocutory orders.

---

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

45 S.W. 1032
Court of Civil Appeals of Texas.

NEHRING ET AL.

v.

MCMURRAIN ET AL.

June 1, 1898.

Appeal from district court, Travis county; R. E. Brooks, Judge.

Trespass to try title by Victoria McMurrain and others against Fritz Nehring and others. From a judgment for plaintiffs, defendants appeal. Reversed.

West Headnotes (3)

**[1]      Death**
          Admissibility of Evidence as to Death

To rebut the presumption of death arising from a person's disappearance, testimony of a witness, who saw a person bearing the supposed deceased's name, as to his appearance, and conversations had with him in regard to his family connections, is admissible.

1 Cases that cite this headnote

**[2]      Principal and Agent**
          Death of Principal

A power to execute a conveyance of land is revoked by the death of the principal.

Cases that cite this headnote

**[3]      Trespass to Try Title**
          Declaration or Petition

In trespass to try title, where partition is desired, the interests of the several parties should be stated in the petition.

1 Cases that cite this headnote

**Attorneys and Law Firms**

 **\*1032**  David H. Hewlett and Geo. F. Pendexter, for appellants. Hugh L. Davis and Geo. S. Walton, for appellees.

**Opinion**

FISHER, C. J.

This, in effect, is an action of trespass to try title, brought June 29, 1896, by the appellees (plaintiffs below) against the appellants. The case was tried at the December term, 1897, of the district court of Travis county, and judgment below was rendered in favor of the plaintiffs on the following verdict: "We, the jury, find for the plaintiffs against all the defendants,-- Fritz Nehring, Theodore Plattore, J. Meil, John Priem, Rec. Hammann, and J. L. Hume,--and give the plaintiffs an undivided one-third interest in the 960 acres of land, as described in plaintiffs' petition." The judgment sets out the following agreement: "It is agreed between the parties plaintiff and defendant to this suit, in open court: That the defendants are the owners of an undivided two-thirds interest in and to 960 acres of land described in plaintiffs' petition, and that only an undivided one-third interest in said land is at issue in this case, and that, if plaintiffs are entitled to recover any part of the land in controversy in this suit, that such interest is an undivided one-third or one-sixth interest, according to the finding of the jury as to whether Frank Conrad, or his mother, Mrs. Smith, died first. That if the jury find Frank Conrad died, leaving his mother, Mrs. Smith, as his only heir, plaintiffs are entitled to recover an undivided one-third interest in said land; if Mrs. Smith died prior to Frank Conrad's death, plaintiffs are only entitled to recover an undivided one-sixth interest in said land." From this agreement it is apparent that the important question in the case is which of the two--Frank Conrad or his mother, Mrs. Smith--died first. The verdict of the jury, in effect, determined that Mrs. Smith survived her son, Frank Conrad. According to the evidence offered by the plaintiffs, Frank Conrad was born about 1850, and was last seen alive about the year 1866, and was last heard from when he was at New Orleans, some time in the year 1868. Mrs. Smith, his mother, it seems, disappeared about the year 1878, and has not been seen or heard of since that time. The presumption of death arising from a continued and unexplained absence for seven years and over of Frank Conrad was relied upon by the plaintiffs to establish the proposition that he died before his mother, Mrs. Smith. To rebut this presumption, the defendants offered in evidence the depositions of witness Achee, who, it seems, was not connected with the family of Conrad or his mother, Mrs. Smith. Upon objection by the

plaintiffs, these depositions were excluded, and this ruling is here complained of. The evidence of this witness was to the effect that in 1889, in Baton Rouge parish, La., he met with, and became acquainted with, a man by the name of Frank Conrad. The witness goes on and describes the appearance of this Frank Conrad, and gives his probable age, and testifies as to some conversations that he had with Frank Conrad, in which he gave an account of himself and his family connections. The issue raised by this evidence was one of identity, and not pedigree. If the purpose had been to establish the pedigree by the evidence of this witness, it would not have been admissible, but here the object was to identify the Frank **\*1033** Conrad known to this witness as the Frank Conrad who the plaintiffs claim had previously disappeared. The evidence of this witness would have some bearing upon the question of identity, and in rebutting the presumption of the death of Frank Conrad, which arose from his disappearance since 1868. The objections that could be urged to this evidence would not go to its admissibility, but could solely affect its credibility; and its effect in this latter respect was a question for the jury. Similarity of name is some evidence of identity. 9 Am. & Eng. Enc. Law, 863. And, on the question of identity, it is admissible to show the name the person bore, his personal appearance and conversations, and the account he gave of himself and his family connections and associations. Id., 866. And the information that is furnished upon this subject need not come from a source which is related to, or familiar with the family history of, the person who has disappeared. What knowledge may be possessed by strangers upon this subject is admissible. In Wentworth v. Wentworth, 71 Me. 74, the court said: "The rule of law is that upon a person's leaving his usual home and place of residence for temporary purposes, and not being heard of, or known to be living, for the term of seven years, the presumption is that he is not alive. It must appear that he has not been heard of by those persons who would naturally have heard from him during the time that he had been alive. The rule, however, does not confine the intelligence to any particular class of persons. It may be to persons in or out of the family. The mere failure to hear from an absent person for seven years, who was known to have a fixed place of residence abroad, would not be sufficient to raise the presumption of his death, unless due inquiry had been made at such place without getting tidings of him. Loring v. Steineman, 1 Metc. (Mass.) 211; Flynn v. Coffee, 12 Allen, 133; Doe v. Jesson, 6 East, 80; Doe v. Deakin, 4 Barn. & Ald. 433; Doe v. Andrews, 15 Adol. & E. (N. S.) 760; Bac. Abr. tit. 'Evidence' (H), and cases cited; 2 Greenl. Ev. § 278, and notes; White v. Mann, 26 Me. 361; Stevens v. McNamara, 36 Me. 178; Kidder v. Blaisdell, 45 Me. 467;

Stinchfield v. Emerson, 52 Me. 465. See Scott's Lessee v. Ratliffe, 5 Pet. 81." In Flynn v. Coffee, 12 Allen, 133, it was held "that, in order to rebut the presumption of death arising from the absence of seven years, evidence is admissible to show that the person has been heard from, as living within that time, though by others than the members of his family." Mullery v. Hamilton, 71 Ga. 720, was a case where a legacy had been left to a certain child; and the question was whether he survived the testatrix, and whether a certain person, who did survive her, and who claimed to be the legatee, was in fact so. On the question of identity it was held admissible to show the name such person bore, his personal appearance and conversation, and the account he gave of himself and his family connections and associations. And evidence of these facts was from witnesses, it seems, who were not connected with the family, and had no previous knowledge of its history. Our conclusion is that much of this testimony was admissible, and the court erred in excluding it.

There was no error of the court in overruling the applications of the defendants for a severance. They did not hold by distinct titles, emanating from different sources, but they all held under common vendors. Therefore it was not a case in which they could properly sever.

In response to the second assignment of error, it is sufficient to say that there was no judgment rendered for partition of the land. Therefore the failure of the plaintiffs, in their petition, to state the interest of the several parties, could not be held reversible error. But, in view of another trial, we suggest that, if a partition is desired, it would be proper for the plaintiffs to state the interest of the several parties, if it can be done.

There was no error in the ruling of the court in excluding the deed of partition made by Raymond. The death of Frank Conrad revoked the power and the authority of Raymond to execute the deed of partition.

There was no error in the charge of the court as complained of in the fifth assignment of error, when we consider the effect of the entire charge.

We express no opinion concerning the facts. This much is said in response to those assignments of error that complain of the error in refusing to grant a new trial on account of the insufficiency of evidence on certain questions.

We find no error in the eighth and ninth assignments of error.

For the reasons stated in refusing to admit the testimony discussed, the judgment is reversed, and the cause remanded. Reversed and remanded.

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

940 S.W.2d 594
Supreme Court of Texas.

SCOTT & WHITE MEMORIAL HOSPITAL d/
b/a Scott & White Memorial Hospital, Scott
& White Clinic, d/b/a Scott & White Clinic,
Allan E. Nickel, M.D., Emmett Mackan, M.D.,
Elias J. Fanous, M.D., Paul Wuthrich, M.D.,
Thomas Coburn, M.D., et al., Petitioners,
v.
Roy SCHEXNIDER, Christine Schexnider,
and Robert D. Green, Respondents.

No. 95–1242.  |  Dec. 13, 1996.

Plaintiffs brought medical malpractice action against hospital and doctors. The 169th District Court, Bell County, J.F. Clawson, J., granted summary judgment to certain defendants and granted defendants' motion for sanctions. The Austin Court of Appeals, Powers, J., 906 S.W.2d 659, reversed. On defendants' application for writ of error, the Supreme Court held that trial court had power during its plenary jurisdiction to grant motion for sanctions even though motion was not pending when nonsuit was filed, abrogating *Hjalmarson*, 840 S.W.2d 153.

Writ granted, Court of Appeals' judgment affirmed in part and reversed in part, and case remanded.

West Headnotes (4)

[1]     **Costs**
          Nature and Grounds of Right
        Trial court had power during its plenary jurisdiction to grant motion for sanctions, which was filed by defendants who were voluntarily nonsuited, even though motion was not pending when nonsuit was filed; abrogating *Hjalmarson*, 840 S.W.2d 153. Vernon's Ann.Texas Rules Civ.Proc., Rules 13, 162.

        63 Cases that cite this headnote

[2]     **Costs**
          Nature and Grounds of Right

Trial court's power to decide motion for sanctions pertaining to matters occurring before judgment is no different than its power to decide any other motion during its plenary jurisdiction. Vernon's Ann.Texas Rules Civ.Proc., Rule 13.

46 Cases that cite this headnote

[3]     **Costs**
          Nature and Grounds of Right

Time during which trial court has authority to impose sanctions on motion is limited to when it retains plenary jurisdiction and is not limited by rule governing nonsuits. Vernon's Ann.Texas Rules Civ.Proc., Rules 13, 162.

49 Cases that cite this headnote

[4]     **Costs**
          Nature and Grounds of Right

Courts impose sanctions against parties filing frivolous claims to deter similar conduct in the future and to compensate aggrieved party by reimbursing costs incurred in responding to baseless pleadings. Vernon's Ann.Texas Rules Civ.Proc., Rule 13.

12 Cases that cite this headnote

**Attorneys and Law Firms**

 **\*595**  Lisa L. Havens–Cortes, Bob Burleson, Burleson, Bowmer, Courtney, Burleson, Normand & Moore, Temple, David McAdams Sibley, Keith C. Cameron, Naman, Howell, Smith & Lee, Waco, for petitioners.

Jimmy Williamson, Houston, Michael L. Davis, Robert D. Green, Green, Downey & Black, Houston, for respondents.

**OPINION**

PER CURIAM.

We overrule Respondents' motion for rehearing. We withdraw our opinion of August 16, 1996, and substitute the following in its place.

Does the trial court have the power during its plenary jurisdiction to grant a motion for sanctions under Texas Rule of Civil Procedure 13 though the motion was not pending when a nonsuit was filed? We answer that question yes.

On January 7, 1992, Roy and Christine Schexnider filed a medical malpractice suit against Scott & White Memorial Hospital, Scott & White Clinic, and eight Scott & White doctors, including Dr. Nickel. The Schexniders added twenty-one other Scott & White doctors as defendants on January 28, 1992. On February 10, 1992, the Schexniders added two more Scott & White doctors, including Dr. Heriot.

As the case proceeded, the defendants neither requested discovery from the Schexniders nor challenged the pleadings or parties. Approximately two and a half years after the Schexniders filed suit, all defendants moved for summary judgment. The doctors supported their motions with affidavits in which they swore that the treatments they rendered met the applicable standard of care. The doctors signed and swore to the affidavits approximately a year before they filed their motion for summary judgment. Shortly after the defendants moved for summary judgment, but before the trial court ruled on the motions, the Schexniders nonsuited all the doctors except Drs. Nickel and Heriot by omitting them from their Third Amended Original Petition. On November 4, 1994, the trial court granted a final summary judgment in favor of the remaining defendants.

Thereafter, all of the defendants, including those who had been nonsuited, moved for sanctions under Rule 13, alleging that the Schexniders' suit was "groundless and brought in bad faith and for the purpose of harassment as to all non-party movants." After an evidentiary hearing, the trial court ordered the Schexniders' attorney, Robert D. Green, to pay $25,000.00 in sanctions to the nonsuited defendants. All of this occurred while the trial court retained plenary jurisdiction.

The court of appeals reversed both the summary judgment and the sanctions order, holding that Texas Rule of Civil Procedure 162, the rule governing nonsuits, deprived the trial court of jurisdiction to grant the motion for sanctions after the nonsuit. 906 S.W.2d 659. We agree with the court of appeals' decision to reverse the summary judgment, but we disagree with its conclusion that Rule 162 deprived the trial court of the **\*596** power to order sanctions while it retained plenary jurisdiction.

**[1]** Rule 162 applies only to sanctions motions filed before the nonsuit takes place and therefore does not apply to this case. [1] Rule 162 allows a nonsuit "any time before the plaintiff has introduced all of his evidence other than rebuttal evidence." It also provides that "[a] dismissal under this rule shall have no effect on any motion for sanctions, attorney's fees or other costs, *pending at the time of dismissal,* as determined by the court." (Emphasis added.) Because Rule 162 speaks only to the effects of a nonsuit on a motion for sanctions pending at the time of dismissal, the court of appeals reasoned that a trial court does not have jurisdiction over a later-filed sanctions motion. We disagree.

**[2]** **[3]** Absent the filing of certain motions not at issue here, a trial court's plenary power to act in a case does not expire until thirty days after the court has signed the judgment. TEX.R.CIV.P. 329b(d), (e). A trial court's power to decide a motion for sanctions pertaining to matters occurring before judgment is no different than its power to decide any other motion during its plenary jurisdiction. Thus, the time during which the trial court has authority to impose sanctions on such a motion is limited to when it retains plenary jurisdiction and is not limited by Rule 162. [2] Rule 162 merely acknowledges that a nonsuit does not affect the trial court's authority to act on a pending sanctions motion; it does not purport to limit the trial court's power to act on motions filed after a nonsuit. In this case, the trial court imposed sanctions while it retained plenary jurisdiction. Nothing in Rule 162 or any previous decision of this Court deprives a trial court of this power.

In reaching a contrary result, the court of appeals relied primarily upon *Hjalmarson v. Langley,* 840 S.W.2d 153 (Tex.App.—Waco 1992, orig. proceeding). In *Hjalmarson,* the defendant moved for Rule 13 sanctions two weeks after the trial court signed an order granting the plaintiff's nonsuit. Although the defendant filed the motion while the trial court had plenary jurisdiction, the trial court did not sign the order purporting to grant the motion until after the court's jurisdiction had expired. The court of appeals held that the sanctions order was void both because the trial court ruled on the motion without reinstating the case, and because the trial court had no power to act after expiration of its plenary jurisdiction. *Id.* at 154–55.

Although the court in *Hjalmarson* correctly concluded that the trial court could not grant the motion after its plenary jurisdiction had expired, it incorrectly concluded that the trial court must reinstate a case before granting a Rule 13

motion filed after a nonsuit. Reinstatement, governed by Rule 165a(3), applies to cases dismissed for want of prosecution, not to voluntary nonsuits. A trial court need not reinstate a case in order to exercise its powers under Rule 13.

 [4]   As we pointed out in *Aetna Casualty & Surety Co. v. Specia,* whether a sanction survives a nonsuit depends on the purpose served by imposing the sanction. 849 S.W.2d 805, 806–07 (Tex.1993). Rule 13 sanctions serve both deterrent and compensatory purposes. Courts impose sanctions against parties filing frivolous claims to deter similar conduct in the future and to compensate the **\*597** aggrieved party by reimbursing the costs incurred in responding to baseless pleadings. Rule 162 would frustrate these purposes if it allowed a party to escape sanctions by simply nonsuiting the aggrieved party. The United States Supreme Court has pointed to a similar rationale in upholding the imposition of sanctions under Federal Rule of Civil Procedure 11 three and a half years after voluntary dismissal of a case:

> Baseless filing puts the machinery of justice in motion, burdening courts and individuals alike with needless expense and delay. Even if the careless litigant quickly dismisses the action, the harm triggering Rule 11's concerns has already occurred. Therefore, a litigant who violates Rule 11 merits sanctions even after a dismissal. Moreover, the imposition of such sanctions on abusive litigants is useful to deter such misconduct. If a litigant could purge his violation of Rule 11 merely by taking a dismissal, he would lose all incentive to "stop, think and investigate more carefully before serving and filing papers."

*Cooter & Gell v. Hartmarx Corp.,* 496 U.S. 384, 398, 110 S.Ct. 2447, 2457, 110 L.Ed.2d 359 (1990) (citation omitted). [3]

While we reject the court of appeals' reason for reversing the sanctions order, the Schexniders presented two additional challenges to the sanctions order, neither of which was addressed by the court of appeals. The Schexniders presented points of error to the court of appeals challenging the evidence supporting the sanctions order, including whether the order was unjust and excessive. They also challenged the failure of the sanctions order to state the "particulars" supporting the imposition of sanctions, as Rule 13 requires. As these points present additional independent bases for the court of appeals' judgment, we may address them ourselves or direct the court of appeals to do so on remand. *See McKelvy v. Barber,* 381 S.W.2d 59, 64 (Tex.1964). We choose the latter.

Accordingly, the Court grants Petitioners' application for writ of error, and pursuant to Texas Rule of Appellate Procedure 170, without hearing oral argument, reverses the court of appeals' judgment with respect to Rule 13 sanctions and remands this case to that court for consideration of the Schexniders' other points of error attacking the sanctions order. We affirm the remainder of the court of appeals' judgment.

**Parallel Citations**

40 Tex. Sup. Ct. J. 198

Footnotes

[1]   We note that, effective September 1, 1995, the Legislature has specified that a court "may not award monetary sanctions on its own initiative unless the court issues its order to show cause before a voluntary dismissal or settlement of the claims made by or against the party ... to be sanctioned." TEX.CIV.PRAC. & REM.CODE § 10.004(e).

[2]   Several courts of appeals have also held that a trial court may not impose sanctions after its plenary jurisdiction has expired. *See Vera v. Perez,* 884 S.W.2d 182, 184 (Tex.App.—Corpus Christi 1994, no writ); *Jobe v. Lapidus,* 874 S.W.2d 764, 766–68 (Tex.App.—Dallas 1994, writ denied); *Warfield Elec. Of Texas, Inc. v. Harry Hines Prop. Venture,* 871 S.W.2d 273, 275 (Tex.App.—Eastland 1994, no writ). Another, however, has affirmed sanctions for filing a frivolous pleading imposed after a trial court's plenary jurisdiction expired, reasoning that some collateral matters that do not affect the judgment on the merits may be considered outside the jurisdictional time period. *Wolma v. Gonzalez,* 822 S.W.2d 302, 303 (Tex.App.—San Antonio 1991, orig. proceeding). We disapprove of *Wolma* to the extent it holds that a trial court may sanction pre-judgment conduct after its plenary jurisdiction has expired.

[3]   Since the United States Supreme Court decided *Cooter & Gell,* Rule 11 has been amended to create a safe harbor: "[A motion for sanctions] shall be served as provided in Rule 5, but shall not be filed with or presented to the court unless, within 21 days after service of the motion ... the challenged paper, claim, defense, contention, allegation, or denial is not withdrawn or appropriately corrected." FED.R.CIV.P. 11(c)(1)(A).

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

905 S.W.2d 43
Court of Appeals of Texas,
San Antonio.

Jose VELEZ and Manuel Munoz, Jr., Appellants,
v.
Jose Garcia DE LARA and Jose Botello, Appellees.

No. 04–93–00369–CV.    |    July 31, 1995.

Claimants appealed ruling of the 37th District Court of Bexar County, Andy Mireles, J., that vacated order of sanctions for discovery violations imposed by a different judge in same proceeding, denied claimants' motion for contempt, and declined to impose additional monetary sanctions. The Court of Appeals, Stone, J., held that: (1) trial court had authority to set aside sanctions order; (2) trial court had authority to rule on claimants' motion to compel and motion for additional sanctions; and (3) Court of Appeals had no jurisdiction to entertain an appeal from a refusal to hold a party in contempt.

Affirmed.

West Headnotes (10)

**[1]    Motions**
　　👉 Authority and jurisdiction of court or judge

Trial courts retain authority to reconsider any interlocutory order until the judgment becomes final.

4 Cases that cite this headnote

**[2]    Appeal and Error**
　　👉 Relating to witnesses, depositions, evidence, or discovery

Discovery sanctions cannot be the subject of an interlocutory appeal. Vernon's Ann.Texas Rules Civ.Proc., Rule 215, subd. 2, par. b.

2 Cases that cite this headnote

**[3]    Mandamus**
　　👉 Proceedings in civil actions in general

Discovery sanctions are rarely proper subject for mandamus review.

Cases that cite this headnote

**[4]    Judges**
　　👉 Judicial powers and functions in general

Jurisdiction to reconsider an interlocutory ruling is vested in the court rather than the individual judge, and one district judge may hold court for another district judge, and thus second judge in civil proceeding had authority to rule on motions for sanctions and for contempt brought for opposing party's failure to comply with first judge's order of sanctions. Vernon's Ann.Texas Const. Art. 5, § 11.

3 Cases that cite this headnote

**[5]    Judges**
　　👉 Judicial powers and functions in general

Second trial judge in civil proceeding had authority to review and set aside discovery sanctions imposed by previous judge. Vernon's Ann.Texas Const. Art. 5, § 11.

Cases that cite this headnote

**[6]    Appeal and Error**
　　👉 Questions of Fact on Motions or Other Interlocutory or Special Proceedings

A hearing on a motion for sanctions is like a nonjury trial and the trial judge's order will not be disturbed if it is supported by any evidence of probative force.

Cases that cite this headnote

**[7]    Appeal and Error**
　　👉 Depositions, affidavits, or discovery

In determining whether a trial court abused its discretion in issuing a sanctions order, appellate courts should view the evidence in the light most favorable to the trial court's ruling.

Cases that cite this headnote

**[8]** **Courts**

⚷ Abuse of discretion in general

A trial court abuses its discretion when it reaches a decision so arbitrary and unreasonable as to amount to a clear and prejudicial error of law.

Cases that cite this headnote

**[9]** **Pretrial Procedure**

⚷ Failure to Disclose; Sanctions

Trial court in civil proceeding did not abuse its discretion in its ruling on a motion for sanctions brought because of opposing party's alleged failure to comply with earlier judge's monetary sanctions for discovery violations, where court did not impose requested monetary sanctions but ordered moving party to clarify its objections to the discovery produced by opposing party, established a deadline for opposing party to furnish supplemental responses, and ordered opposing party to submit to second deposition, and where court heard extensive argument from both sides before ruling.

Cases that cite this headnote

**[10]** **Contempt**

⚷ Decisions reviewable

Court of Appeals has no jurisdiction to entertain an appeal from a refusal to hold a party in contempt; such refusal is not a final, appealable judgment.

3 Cases that cite this headnote

**\*44** Appeal from the 37th District Court of Bexar County, Trial Court No. 90–CI–09727; Andy Mireles, Judge Presiding [1].

**Attorneys and Law Firms**

Armando Lopez, Lopez, Sinderson & Fraga, L.L.P., Houston, for appellants.

Ricardo G. Cedillo, Susan G. Lozano, Davis, Adami & Cedillo, Inc., San Antonio, for appellees.

Before CHAPA, C.J., and RICKHOFF and STONE, JJ.

**OPINION**

STONE, Justice.

This is an appeal from an order entered by one district court judge setting aside a previous sanctions order entered by a different district court judge. Appellants contend the second trial judge was without authority to vacate the sanctions order because such orders can be reviewed on appeal only after entry of a final judgment on the merits. We find that the trial court had authority to set aside the order of sanctions and that it did not abuse its discretion in ruling on appellants' motions for additional sanctions. To the extent the trial court's order was a contempt adjudication, this court has no jurisdiction and expresses no opinion as to its validity.

Appellees Jose Garcia DeLara and Jose Botello were the national president and treasurer, respectively, of the League of United Latin American Citizens (LULAC), which maintained a bank account with the International Bank of Commerce (IBC). Appellees also maintained a separate undisclosed account at another bank under LULAC's name. At their 1990 annual meeting, the LULAC National Board of Directors elected appellants Jose Velez and Manuel Munoz to be the new president and treasurer, respectively, and authorized them to make signatory changes on all bank accounts. IBC instituted this suit as an interpleader action. Appellants filed a cross action on behalf of LULAC against Appellees for a full accounting and a turnover of all LULAC funds. IBC was ultimately dismissed from the litigation by agreement of all parties.

During the discovery process appellants claimed that appellees failed to respond to a subpoena duces tecum and did not willingly disclose the other bank account. Appellants filed a motion for sanctions and on February 25, 1991, the Honorable Judge Antonio Cantu ordered appellees to each pay a $100.00 fine and an additional $500.00 for each Friday after March 1, 1991, that they did not produce the information. Subsequently, appellees accidently produced a copy of one check from the other account. Appellants again moved for sanctions citing violations of the court's February 25th order. On August 1, 1991, Judge Cantu signed an order finding that appellees had violated his earlier order and fined each $500.00 for each Friday from March 1, 1991 to July 26, 1991, totalling $10,500.00 each, jointly and severally,

and he reaffirmed the $100.00 penalty against each. The order specifically recites that a motion for contempt will be entertained by the court if the parties refuse to abide by the terms of the order.

Appellees filed motions for reconsideration to have the sanctions order set aside, but these motions were never presented to the trial court. Appellants filed a motion for contempt alleging appellees' failure to comply with the order of August 1st signed by Judge Cantu. Appellants also filed motions to compel answers to interrogatories and for additional sanctions. The motions were heard by the Honorable Judge Susan Reed, who entered an order on November 18, 1991 which denied the motion for contempt, ruled that the previous sanctions granted by Judge Cantu for contempt were unenforceable as a matter of law, ordered appellants to clarify their objections to appellees' answers to interrogatories, ordered appellees to file any supplemental answers before November 25th, and ordered appellees to each submit to another deposition. Appellants thereafter non-suited their claims against appellees and perfected their appeal to this court complaining of the rulings issued by Judge Susan Reed.

## *45 AUTHORITY OF THE TRIAL COURT

Appellants contend that Judge Cantu's order was not reviewable by Judge Reed, but was only reviewable on appeal after final judgment. Appellants rely on TEX.R.CIV.P. 215(2)(b)(8), which states that a sanctions order "shall be subject to review on appeal from the final judgment." Appellants further note that discovery sanctions are not appealable until the trial court renders a final judgment, and that this means of appealing a sanction order is an adequate remedy. *Bodnow Corp. v. City of Hondo,* 721 S.W.2d 839, 840 (Tex.1986) (per curiam) (discovery sanctions not appealable until final judgment is rendered by trial court); *Stringer v. Eleventh Court of Appeals,* 720 S.W.2d 801, 802 (Tex.1986) (per curiam) (right to appeal discovery order after final judgment is adequate remedy). Appellants thus conclude that Judge Reed was without authority to modify or withdraw the sanctions orders previously signed by Judge Cantu.

 **[1]**   **[2]**   **[3]**    While the legal principles cited by appellants are generally true, they do not mandate the conclusion reached by appellants. We recognize that discovery sanctions cannot be the subject of an interlocutory appeal, and are rarely a proper subject for mandamus review. Rather, as Rule 215(2)

(b) states, such sanctions can be reviewed on appeal after entry of a final judgment. Nonetheless, trial courts retain authority to reconsider any interlocutory order until the judgment becomes final. *See Fruehauf Corp. v. Carrillo,* 848 S.W.2d 83, 84 (Tex.1993); *Kone v. Security Finance Co.,* 158 Tex. 445, 313 S.W.2d 281, 286 (1958). The Fort Worth Court of Appeals has specifically ruled that a subsequent judge can withdraw a previous sanctions order entered by another judge. *Carrizales v. Wal–Mart Stores, Inc.,* 794 S.W.2d 129, 130 (Tex.App.—Fort Worth 1990, writ denied) (successor judge had absolute right to set aside multimillion dollar sanction order entered by predecessor judge).

 **[4]**    Further, the record does not support appellants' claims that appellees engaged in "judge shopping" until they found a judge willing to set aside the sanctions order. Our state constitution provides that district judges may exchange districts or hold court for one another whenever it is expedient. TEX. CONST. art. 5, § 11. In Bexar County, which utilizes a central docket system, the presiding judge assigns cases to any available judge, including currently elected judges and visiting judges. *See* Local Rules of the Civil District Courts of Bexar County, Rule 3.2. Since the jurisdiction to reconsider an interlocutory ruling is vested in the court rather than the individual judge, and since one district judge may hold court for another district judge, Judge Reed had authority to rule on the motions for sanctions and for contempt. That authority was not vested solely in Judge Cantu as the judge who issued the sanctions order. *See Hyundai Motor America v. O'Neill,* 839 S.W.2d 474, 481 (Tex.App.—Dallas 1992, no writ).

## SANCTIONS ORDER

 **[5]**   **[6]**   **[7]**   **[8]**   **[9]**    To the extent Judge Reed's order constituted a review of the interlocutory sanctions order issued by Judge Cantu, it was an authorized exercise of her authority. Likewise, Judge Reed had authority to rule on the motions to compel and for sanctions. [2] We find no abuse of discretion in her ruling. A hearing on a motion for sanctions is like a non-jury trial and the trial judge's order will not be disturbed if it is supported by any evidence of probative force. *Tate v. Commodore County Mut. Ins. Co.,* 767 S.W.2d 219, 224 (Tex.App.—Dallas 1989, writ denied). In determining whether a trial court abused its discretion in issuing a sanctions order, appellate courts should view the evidence in the light most favorable to the trial court's ruling. *Vaughn v. Texas Employment Comm'n,* 792 S.W.2d 139, 142–43

(Tex.App.—Houston [1st. Dist.] 1990, no writ); *Parks v. U.S. Home Corp.,* 652 S.W.2d 479, 485 (Tex.App.—Houston [1st Dist.] 1983, writ dism'd). A trial court abuses its discretion when it reaches a decision so arbitrary and unreasonable as to amount to a clear and prejudicial **\*46** error of law. *See Downer v. Aquamarine Operators, Inc.,* 701 S.W.2d 238, 241–42 (Tex.1985), *cert. denied,* 476 U.S. 1159, 106 S.Ct. 2279, 90 L.Ed.2d 721 (1986); *City of Dallas v. Ormsby, et al.,* 904 S.W.2d 707, 709 (Tex.App.—Amarillo 1995, n.w.h.). In the instant case the court heard extensive argument from all parties, and rather than imposing monetary sanctions, the court: (1) ordered appellants to clarify their objections to the discovery produced by appellees; (2) established a deadline for appellees to furnish supplemental responses; and (3) ordered both appellees to submit to second depositions. We find no abuse of discretion in this ruling.

**CONTEMPT RULING**

 **[10]**   In addition to the motion to compel and for sanctions, appellants presented to Judge Reed their motion for contempt based upon appellees' alleged failure to comply with the order of August 1, 1990. That motion was denied by Judge Reed because she found the prior sanctions order to be unenforceable as a matter of law. This court has no jurisdiction to entertain an appeal from a refusal to hold a party in contempt because it is not a final, appealable judgment. *Norman v. Norman,* 692 S.W.2d 655, 655 (Tex.1985) (per curiam); *Ex parte Cardwell,* 416 S.W.2d 382, 384 (Tex.1967); *see also Gawlik v. Gawlik,* 707 S.W.2d 256, 257 (Tex.App.—Corpus Christi 1986, no writ).

To the extent appellants complain of the trial court's order refusing to hold appellees in contempt, this court has no jurisdiction and renders no opinion. In all other regards the judgment of the trial court is affirmed.

Footnotes

1    The actual order on appeal was signed by the Honorable Judge Susan Reed.

2    The motions to compel answers to interrogatories and for sanctions are not included in this Court's transcript; however, all parties argued the merits of these motions at the hearing before Judge Reed.

**End of Document**                                                   © 2015 Thomson Reuters. No claim to original U.S. Government Works.

**827 S.W.2d 833**
Supreme Court of Texas.

Charles F. WALKER and Mary
Jeanette Walker et al., Relators,

v.

The Honorable Anne PACKER, Judge, Respondent.

No. C–9403.   |   Feb. 19, 1992.   |   Rehearing
Overruled May 6, 1992.   |   Dissenting
Opinion by Justice Gammage May 7, 1992.

Parents of child born with brain damage, who had brought action against obstetrician, hospital where child was born, and nurse attending at delivery, brought petition for writ of mandamus arguing that the trial court abused its discretion by refusing to order hospital to produce documents from its insurer's files and by ordering that portions of other responsive documents be stricken. The Supreme Court, Phillips, C.J., held that: (1) plaintiffs had not presented sufficient record to demonstrate that trial court clearly abused its discretion in failing to grant plaintiffs requested discovery from one of defendants, and (2) plaintiffs had adequate remedy by way of appeal as to documents they sought from nonparty for impeachment purposes.

Petition denied.

Gonzalez, J., concurred with opinion.

Doggett, J., dissented with opinion in which Mauzy, J., joined.

Gammage, J., dissented with opinion.

West Headnotes (18)

[1]     **Mandamus**
         Presumptions and Burden of Proof
         Party seeking mandamus relief has burden of providing Supreme Court with sufficient record to establish right to mandamus relief.

         465 Cases that cite this headnote

[2]     **Mandamus**

         Presumptions and Burden of Proof
         Party seeking mandamus relief had burden of providing not only a petition and affidavit, but also a statement of facts from evidentiary hearing that had been held. Rules App.Proc., Rule 121(a)(2)(C, F).

         20 Cases that cite this headnote

[3]     **Mandamus**
         Presumptions and Burden of Proof
         Plaintiffs bringing motion for leave to file petition for writ of mandamus arguing that trial court clearly abused its discretion by refusing to order defendant to produce documents from insurer's files and by ordering that portions of other responsive documents be stricken failed to meet their burden of providing Court of Appeals with record upon which they could establish their right to mandamus relief; plaintiffs failed to provide Supreme Court with statement of facts from evidentiary hearing. Rules App.Proc., Rule 121(a)(2)(C, F).

         824 Cases that cite this headnote

[4]     **Pretrial Procedure**
         Request, Notice, or Motion and Response or Objection
         Trial court erred in mechanically applying *Russell* decision, which disapproved of global discovery of documents merely to impeach potential witness, to deny discovery of documentary evidence by medical malpractice plaintiffs to impeach one of defendants' expert witnesses, a faculty member in obstetrics; plaintiffs presented to trial court evidence of hospital's policy restricting faculty's freedom to testify for plaintiffs, raising the possibility that the faculty member was biased, and plaintiffs' request was narrowly tailored. Vernon's Ann.Texas Rules Civ.Proc., Rule 166b, subd. 2, par. a; Rules of Civ.Evid., Rule 613(b).

         9 Cases that cite this headnote

[5]     **Mandamus**
         Scope of Inquiry and Powers of Court

Trial court clearly abuses its discretion, for purposes of mandamus, with respect to resolution of factual issues or matters committed to trial court's discretion, only if trial court could reasonably have reached only one decision; reviewing court may not substitute its judgment for that of trial court.

781 Cases that cite this headnote

**[6]** **Mandamus**

👉 Matters of Discretion

On mandamus review of trial court's determination of legal principles, clear failure by trial court to analyze or apply the law correctly will constitute abuse of discretion, and may result in appellate reversal by extraordinary writ.

1803 Cases that cite this headnote

**[7]** **Mandamus**

👉 Scope of Inquiry and Powers of Court

On mandamus review of trial court's erroneous denial of requested discovery in medical malpractice case on sole basis of *Russell*, Supreme Court would consider the trial court's decision as a legal conclusion to be reviewed with limited deference.

20 Cases that cite this headnote

**[8]** **Mandamus**

👉 Proceedings in Civil Actions in General

Trial court's erroneous denial of plaintiffs' requested discovery in medical malpractice case to impeach one of defendants' expert witnesses on sole basis of *Russell* constituted clear abuse of discretion, for purposes of mandamus relief.

385 Cases that cite this headnote

**[9]** **Mandamus**

👉 Remedy by Appeal or Writ of Error

Requirement that person seeking mandamus relief establish lack of adequate appellate remedy is "fundamental tenet" of mandamus practice.

92 Cases that cite this headnote

**[10]** **Mandamus**

👉 Remedy by Appeal or Writ of Error

Mandamus will not issue where there is adequate remedy by appeal.

277 Cases that cite this headnote

**[11]** **Mandamus**

👉 Modification or Vacation of Judgment or Order

Party seeking review of discovery order by mandamus must demonstrate that the remedy offered by an ordinary appeal is inadequate.

24 Cases that cite this headnote

**[12]** **Mandamus**

👉 Remedy by Appeal or Writ of Error

Appellate remedy is not inadequate, for purposes of mandamus, merely because it may involve more expense or delay than obtaining an extraordinary writ.

135 Cases that cite this headnote

**[13]** **Mandamus**

👉 Modification or Vacation of Judgment or Order

Party will not have adequate remedy by way of appeal, for purposes of mandamus, when appellate court would not be able to cure the trial court's discovery error, which occurs when trial court erroneously orders disclosure of privileged information which will materially affect the rights of the aggrieved party.

176 Cases that cite this headnote

**[14]** **Mandamus**

👉 Remedy by Appeal or Writ of Error

Appeal will not be an adequate remedy, for purposes of mandamus, where the party's ability to present viable claim or defense at trial is vitiated or severely compromised by trial court's

discovery error, but it is not enough to show merely the delay, inconvenience or expense of an appeal, rather, the relator must establish the effective denial of reasonable opportunity to develop the merits of his or her case.

389 Cases that cite this headnote

**[15]** **Mandamus**

Modification or Vacation of Judgment or Order

When trial court imposes discovery sanctions which have effect of precluding decision on merits of party's claims, party's remedy by eventual appeal is inadequate, for purposes of mandamus, unless sanctions are imposed simultaneously with rendition of final, appealable judgment.

97 Cases that cite this headnote

**[16]** **Mandamus**

Modification or Vacation of Judgment or Order

Remedy by appeal may be inadequate, for purposes of mandamus, where trial court disallows discovery and missing discovery cannot be made part of appellate record, or trial court after proper request refuses to make it part of record, and reviewing court is unable to evaluate effect of trial court's error on the record before it.

46 Cases that cite this headnote

**[17]** **Mandamus**

Proceedings in Civil Actions in General

If trial court disallows discovery and missing discovery cannot be made part of appellate record, or trial court after proper request refuses to make it part of record, and reviewing court is unable to evaluate effect of trial court's error on record before it, court must carefully consider all relevant circumstances, such as claims and defenses asserted, type of discovery sought, what it is intended to prove, and presence or lack of other discovery, to determine whether

mandamus is appropriate. Vernon's Ann.Texas Rules Civ.Proc., Rule 166b, subd. 4.

18 Cases that cite this headnote

**[18]** **Mandamus**

Modification or Vacation of Judgment or Order

Medical malpractice plaintiff seeking documents from defendant hospital to impeach one of defendant's expert witnesses had adequate remedy by appeal, and, thus, mandamus was inappropriate way to compel discovery, where the information was not privileged, burdensome or harassing, nor did it vitiate or severely compromise the plaintiffs' ability to present a viable claim, the materials were considered below, and there was no reason why they would not be available on appeal.

121 Cases that cite this headnote

**Attorneys and Law Firms**

**\*835** Les Weisbrod and Michael S. Box, Dallas, for relators.

Philipa Remington, Stephen W. Johnson, James A. Williams, Kevin J. Keith, Martha L. Strother, Gary W. Sibley, Dallas and Delmar L. Cain, Austin, for respondent.

**OPINION**

PHILLIPS, Chief Justice.

This original mandamus action involves two pre-trial discovery requests sought by **\*836** relators, plaintiffs in a medical malpractice lawsuit. The first discovery dispute involves documents which the plaintiffs seek from one of the defendants, while the second involves documents which they seek from a nonparty for impeachment purposes. As to the first matter, we hold that relators have not presented a sufficient record to demonstrate that the trial court clearly abused its discretion in failing to grant them all requested relief. As to the second, we hold that relators have an adequate remedy by appeal. Thus, mandamus is inappropriate, and we deny the writ.

### *The St. Paul and Aetna Records*

Catherine Johanna Walker sustained brain damage at birth in January 1983. In January 1985, her parents, Charles F. and Mary Jeanette Walker, sued Dr. Paul Crider, the obstetrician, St. Paul Hospital, where Catherine was born, and Iris Jean White, a nurse attending at the delivery.

In August 1987, the Walkers served on St. Paul their third request for production of documents pursuant to Tex.R.Civ.P. 167. One request asked for:

> Any and all writings, notes, documents, letters, etc., concerning, mentioning, alluding to, or making reference to (either directly or indirectly), the tape recorded statement given by Nurse White to an Aetna adjuster, including but not limited to any notes or entries in any Aetna adjuster's file, any attorney's file, or any file or writing in possession of any employee, representative or agent of St. Paul Hospital. This request is in reference to the tape recorded statement which you have been unable to locate, but which was previously requested....

St. Paul responded as follows:

> In an effort to respond to this request, this Defendant again checked with all appropriate personnel and files at St. Paul Hospital and the law firm of Bailey and Williams. No such statement or taped recording was found. For the third time the Aetna Casualty and Surety Company was asked to check its records and files and a partially transcribed statement was located, a copy of which is attached. No taped recording was located.

Nearly two years later, the Walkers filed a motion to compel under Tex.R.Civ.P. 215, asserting that St. Paul failed to respond completely to the request. [1] The Walkers complained that "St. Paul Hospital did not even respond

to what was requested in the request for production—that is, writings, notes, and notations in the adjuster's file or attorney's file mentioning, alluding to, or making reference to the tape recorded statement of Nurse White." At about the same time, the Walkers also served on Aetna Casualty and Surety Company, St. Paul's insurer, an "Amended Notice of Intention to Take Deposition Upon Written Questions —Duces Tecum," seeking, among other things, the same documents. Aetna moved to quash the notice.

The trial judge appointed a special master to review the Walkers' motion to compel and Aetna's motion to quash. After an evidentiary hearing on September 5, 1989, the master prepared findings, which formed the basis for two extensive orders signed by the trial court on September 20, 1989. In the first order, the court found that the Walkers were "entitled to all documentation sought in [the request] from the files of Defendant St. Paul or its attorney of record, but not from the files of Aetna Insurance Company, except as they may appear in the files of St. Paul or the attorneys of record of St. Paul." The court also stated that it "has been advised that St. Paul has supplied all documentation that is responsive to [the request], but that additional documentation will be made available **\*837** to the Court for in camera review." The court therefore *sustained* the Walkers' motion to compel "to the extent that on Friday, September 8, 1989 the Special Master will review in the Chambers of the 134th District Court the relevant portions of the St. Paul files and their attorney [sic] files, which may be in response to Plaintiff's request...." The court, however, did not order St. Paul to produce documents from Aetna's files for *in camera* inspection. [2]

After the master's September 8 *in camera* inspection, the court ordered discovery of three additional documents from the files of St. Paul and its attorneys, which it found "relate to the matters sought in discovery and should be supplied after irrelevant portions of such documents are stricken."

After unsuccessfully seeking relief in the court of appeals, the Walkers moved for leave to file a petition for writ of mandamus with this court, arguing that the trial court clearly abused its discretion by refusing to order St. Paul to produce the documents from Aetna's files and by ordering that portions of the other responsive documents be stricken. The Walkers contend that the order was a clear abuse of discretion because St. Paul 1) never objected to the Walkers' request for production, 2) had a superior right to the Walkers to compel production of the documents in Aetna's possession, and 3) never asked that any parts of the documents be excised.

The record before us does not include the statement of facts from the evidentiary hearing on the Walkers' motion to compel production. Without it, we cannot determine on what basis the trial judge and the special master reached their conclusions. Since we cannot assess whether or not the trial court's order was correct, we obviously cannot take the additional step of determining that the court's order, if incorrect, constituted a clear abuse of discretion.

 **[1]**    **[2]**    **[3]**    As the parties seeking relief, the Walkers had the burden of providing this Court with a sufficient record to establish their right to mandamus relief. Since an evidentiary hearing was held, the Walkers had the burden of providing us not only a petition and affidavit, *see* Tex.R.App.P. 121(a)(2)(C) and (F), but also a statement of facts from the hearing. *See, e.g., Cameron County v. Hinojosa,* 760 S.W.2d 742, 744 (Tex.App.—Corpus Christi 1988, orig. proceeding); *Greenstein, Logan & Co. v. Burgess Mktg. Inc.,* 744 S.W.2d 170, 177 (Tex.App.—Waco 1987, writ denied); *see also Western Casualty & Surety Co. v. Spears,* 730 S.W.2d 821, 822 (Tex.App.—San Antonio 1987, orig. proceeding).[3] Having failed to meet this burden, the Walkers have not provided us with a record upon which they can establish their right to mandamus relief against St. Paul.

### *The Obstetrics Faculty Records*

 **[4]**    The second discovery dispute arises out of the Walkers' attempt to secure documentary evidence to impeach one of the defendants' expert witnesses, Dr. Larry Gilstrap, a faculty member in obstetrics at the University of Texas Health Science Center at Dallas ("the Center"). Gilstrap testified at his deposition that expert witness fees earned by obstetrics faculty members are deposited into a "fund" in the obstetrics "billing department"; that obstetrics faculty members get paid "indirectly" from this fund; that the fund is handled by Judy Wagers, a Center employee; and that he was unaware of any obstetrics department policy restricting faculty members from testifying for plaintiffs in medical malpractice cases.

 **\*838**  Thereafter, the Walkers noticed Wagers' deposition, requesting that she provide all documents regarding (1) the operation of the above-mentioned "fund" from 1985 to 1988; and (2) limitations placed upon obstetrics faculty members relating to their testimony in medical malpractice cases. The Center, on behalf of Wagers, moved to quash the notice, arguing that the request for documents was "vague and overly broad" and that production would be "costly and burdensome."

Two months later, in an unrelated lawsuit, the Walkers' counsel deposed Dr. Alvin L. Brekken, another obstetrics faculty member at the Center. Dr. Brekken testified that the obstetrics department's official policy, distributed in writing to all faculty members, requires a doctor to obtain authorization from other faculty members before testifying for any plaintiff in a medical malpractice case. Based on this testimony, the Walkers sought a court order to depose Wagers and obtain the requested documents.

After reviewing the Gilstrap and Brekken depositions and pleadings of counsel, the trial court ordered the Center to produce the documents for *in camera* review by the special master. Subsequently, in her September 20, 1989 order, the trial judge denied the discovery, stating in part:

> [S]uch requested discovery is improper pursuant to the Rulings of the Supreme Court of Texas in *Russell v. Young* [452 S.W.2d 434 (Tex.1970)], as the potential witness is not a party to the suit and the records do not relate to the subject matter of the suit, but are sought solely for the purpose of impeachment, according to the Plaintiffs' pleadings.

Although noting that some of the documents "would be relevant to this cause of action," the court nevertheless denied discovery because "all such documents are controlled by the *Russell* decision."

In *Russell,* a party sought wholesale discovery of financial records of a potential medical expert witness who was not a party to the lawsuit.[4] The documents requested did not relate directly to the subject matter of the suit, but were sought solely in an attempt to impeach the potential witness by showing bias or prejudice. The credibility of the witness, however, had not yet been put in doubt. Under these circumstances, we held that the documents were not discoverable, and we directed the trial court to vacate its order allowing the requested discovery. 452 S.W.2d at 435. We reasoned that "[t]here is ... a limit beyond which pre-trial discovery should not be allowed." *Id.* at 437.

The present case is distinguishable. Here, the Walkers presented to the trial court evidence of a specific circumstance

—the Center's policy restricting the faculty's freedom to testify for plaintiffs—raising the possibility that Dr. Gilstrap is biased. Thus, the Walkers are not engaged in global discovery of the type disapproved in *Russell;* rather, they narrowly seek information regarding the potential bias suggested by the witness' own deposition testimony and that of his professional colleague.

Our rules of civil procedure, and the federal rules upon which they are based, mandate a flexible approach to discovery. A party may seek any information which "appears reasonably calculated to lead to the **\*839** discovery of admissible evidence." Tex.R.Civ.P. 166b(2)(a). Evidence of bias of a witness is relevant and admissible. *See* Tex.R.Civ.Evid. 613(b).[5]

The trial court erred in failing to apply the foregoing rules to determine whether the documents were discoverable. Instead, the trial court simply read *Russell* as an absolute bar to discovery, even though the circumstances here are quite distinguishable. In so doing, the trial court misapplied the *Russell* holding. We expressly disapprove such a mechanical approach to discovery rulings.[6]

Having concluded that the trial court erred in denying the discovery based solely on *Russell,* we now must determine whether the appropriate remedy lies by writ of mandamus. "Mandamus issues only to correct a clear abuse of discretion or the violation of a duty imposed by law when there is no other adequate remedy by law." *Johnson v. Fourth Court of Appeals,* 700 S.W.2d 916, 917 (Tex.1985).[7] We therefore examine whether the trial court's error in the present case constituted a clear abuse of discretion and, if so, whether there is an adequate remedy by appeal.

## 1. *Clear Abuse of Discretion*
Traditionally, the writ of mandamus issued only to compel the performance of a ministerial act or duty. *See Wortham v. Walker,* 133 Tex. 255, 277, 128 S.W.2d 1138, 1150 (1939); *Arberry v. Beavers,* 6 Tex. 457 (1851); Helen A. Cassidy, *The Instant Freeze–Dried Guide to Mandamus Procedure in Texas Courts,* 31 S.Tex.L.Rev. 509, 510 (1990); Comment, *The Expanding Use of Mandamus to Review Texas District Court Discovery Orders: An Immediate Appeal Is Available,* 32 Sw.L.J. 1283, 1288 (1979).

Since the 1950's, however, this Court has used the writ to correct a "clear abuse of discretion" committed by the trial court. *See, e.g., Joachim v. Chambers,* 815 S.W.2d 234, 237 (Tex.1991); *Jampole v. Touchy,* 673 S.W.2d 569, 574 (Tex.1984); *West v. Solito,* 563 S.W.2d 240, 244 (Tex.1978); *Womack v. Berry,* 156 Tex. 44, 50, 291 S.W.2d 677, 682 (1956). *See generally,* David W. Holman & Byron C. Keeling, *Entering the Thicket? Mandamus Review of Texas District Court Witness Disclosure Orders,* 23 St. Mary's L.J. 365, 390 (1991); Cassidy, 31 S.Tex.L.Rev. at 510; Note, *The Use of Mandamus to Review Discovery Orders in Texas: An Extraordinary Remedy,* 1 Rev.Litig. 325, 326–27 (1981); Comment, 32 Sw.L.J. at 1290.

A trial court clearly abuses its discretion if "it reaches a decision so arbitrary and unreasonable as to amount to a clear and prejudicial error of law." *Johnson v. Fourth Court of Appeals,* 700 S.W.2d at 917. This standard, however, has different applications in different circumstances.

 [5]  With respect to resolution of factual issues or matters committed to the trial court's discretion, for example, the reviewing court may not substitute its judgment for that of the trial court. *See Flores v. Fourth Court of Appeals,* 777 S.W.2d 38, 41–42 (Tex.1989) (holding that determination **\*840** of discoverability under Tex.R.Civ.P. 166b(3)(d) was within discretion of trial court); *Johnson,* 700 S.W.2d at 918 (holding that trial court was within discretion in granting a new trial "in the interest of justice and fairness"). The relator must establish that the trial court could reasonably have reached only one decision. *Id.* at 917. Even if the reviewing court would have decided the issue differently, it cannot disturb the trial court's decision unless it is shown to be arbitrary and unreasonable. *Johnson,* 700 S.W.2d at 918.

 [6]  On the other hand, review of a trial court's determination of the legal principles controlling its ruling is much less deferential. A trial court has no "discretion" in determining what the law is or applying the law to the facts. Thus, a clear failure by the trial court to analyze or apply the law correctly will constitute an abuse of discretion, and may result in appellate reversal by extraordinary writ. *See Joachim v. Chambers,* 815 S.W.2d 234, 240 (Tex.1991) (trial court abused discretion by misinterpreting Code of Judicial Conduct); *NCNB Texas National Bank v. Coker,* 765 S.W.2d 398, 400 (Tex.1989) (trial court abused discretion by failing to apply proper legal standard to motion to disqualify counsel); *Eanes ISD v. Logue,* 712 S.W.2d 741, 742 (Tex.1986) (trial court abused discretion by erroneously finding constitutional violation).

**[7]** **[8]** In determining whether the trial court abused its discretion in the present case, we treat the trial court's erroneous denial of the requested discovery on the sole basis of *Russell* as a legal conclusion to be reviewed with limited deference to the trial court. This is consistent with our approach in previous mandamus proceedings arising out of the trial court's interpretation of legal rules. *Cf. Axelson, Inc. v. McIlhany,* 798 S.W.2d 550, 555 (Tex.1990); *Barnes v. Whittigton,* 751 S.W.2d 493, 495–96 (Tex.1988); *Terry v. Lawrence,* 700 S.W.2d 912, 913–14 (Tex.1985). Under this analysis, the trial court's erroneous interpretation of the law constitutes a clear abuse of discretion.

## 2. *Adequate Remedy by Appeal*

In order to determine whether the writ should issue, however, we must further decide whether the Walkers have an adequate remedy by appeal.

**[9]** Mandamus will not issue where there is "a clear and adequate remedy at law, such as a normal appeal." *State v. Walker,* 679 S.W.2d 484, 485 (Tex.1984). Mandamus is intended to be an extraordinary remedy, available only in limited circumstances. The writ will issue "only in situations involving manifest and urgent necessity and not for grievances that may be addressed by other remedies." *Holloway v. Fifth Court of Appeals,* 767 S.W.2d 680, 684 (Tex.1989) (quoting James Sales, *Original Jurisdiction of the Supreme Court and the Courts of Civil Appeals of Texas* in *Appellate Procedure in Texas,* § 1.4[1] [b] at 47 (2d ed. 1979)). The requirement that persons seeking mandamus relief establish the lack of an adequate appellate remedy is a "fundamental tenet" of mandamus practice. *Holloway,* 767 S.W.2d at 684.

**[10]** Our requirement that mandamus will not issue where there is an adequate remedy by appeal is well-settled. [8] On a few occasions, however, we have not focused **\*841** on this requirement when applying mandamus review of discovery orders. For example, in *Barker v. Dunham,* 551 S.W.2d 41 (Tex.1977), the trial court refused to compel defendant's representative to answer certain deposition questions, and the plaintiff applied to this Court for a writ of mandamus. We concluded that the trial court had abused its discretion, and ordered that the writ conditionally issue. We never discussed the well-settled requirement of inadequate remedy by appeal.

A few months later, in *Allen v. Humphreys,* 559 S.W.2d 798 (Tex.1977), the Court again conditionally issued a writ of mandamus to correct a discovery abuse without considering whether the relator had an adequate remedy by appeal. The real party in interest in *Allen* raised this argument, but the Court avoided the issue by citing *Barker. Id.* at 801.

Commentators quickly criticized the *Barker* and *Allen* opinions. *See* James Sales, *Pre–Trial Discovery in Texas,* 31 Sw.L.J. 1017, 1033 (1977); Comment, *The Expanding Use of Mandamus to Review Texas District Court Discovery Orders: An Immediate Appeal Is Available,* 32 Sw.L.J. 1283, 1300 (1979) (In most cases "forcing a party to await the completion of the trial in order to seek appellate review will not endanger his substantial rights...."); Note, *Mandamus May Issue To Compel A District Judge to Order Discovery,* 9 Tex.Tech L.Rev. 782 (1978) (mandamus should not be a substitute for appeal).

In *Jampole v. Touchy,* 673 S.W.2d 569 (Tex.1984), the Court again used the extraordinary writ of mandamus to compel discovery which had been denied by the trial court. Unlike in *Barker* and *Allen,* however, the Court in *Jampole* addressed whether relator had an adequate appellate remedy. The underlying suit in *Jampole* was a products liability action, and the disputed discovery materials included alternate design and assembly documents. The Court held that relator did not have an adequate remedy by appeal because denial of this discovery effectively prevented relator from proving the material allegations of his lawsuit. 673 S.W.2d at 576. Remedy by appeal in a discovery mandamus is not adequate where a party is required "to try his lawsuit, debilitated by the denial of proper discovery, only to have that lawsuit rendered a certain nullity on appeal...." *Id.*

Although the Court in *Jampole* recognized the need to address whether relator had an adequate remedy by appeal, it expressly refused to overrule *Barker* and *Allen. Id.* Perhaps because of this, we have on several occasions since *Jampole* used mandamus to correct discovery errors without considering whether the relator had an adequate appellate remedy. *See Loftin v. Martin,* 776 S.W.2d 145 (Tex.1989); *Barnes v. Whittington,* 751 S.W.2d 493 (Tex.1988); *Lunsford v. Morris,* 746 S.W.2d 471 (Tex.1988); *Turbodyne Corp. v. Heard,* 720 S.W.2d 802 (Tex.1986); *Terry v. Lawrence,* 700 S.W.2d 912 (Tex.1985); *Lindsay v. O'Neill,* 689 S.W.2d 400 (Tex.1985).

On many other occasions, however, we have still required a showing of inadequate **\*842** remedy by appeal in mandamus proceedings involving other types of pre-trial orders, even

those involving discovery. *See, e.g., TransAmerican Natural Gas Corp. v. Powell,* 811 S.W.2d 913, 919 (Tex.1991); *Hooks v. Fourth Court of Appeals,* 808 S.W.2d 56, 59–60 (Tex.1991); *Bell Helicopter Textron, Inc., v. Walker,* 787 S.W.2d 954, 955 (Tex.1990); *Stringer v. Eleventh Court of Appeals,* 720 S.W.2d 801, 801–02 (Tex.1986). In *Hooks,* for example, we reaffirmed that the "cost or delay of having to go through trial and the appellate process does *not* make the remedy at law inadequate." 808 S.W.2d at 60.

 **[11]**    The requirement that mandamus issue only where there is no adequate remedy by appeal is sound, and we reaffirm it today. No mandamus case has ever expressly rejected this requirement, or offered any explanation as to why mandamus review of discovery orders should be exempt from this "fundamental tenet" of mandamus practice. Without this limitation, appellate courts would "embroil themselves unnecessarily in incidental pre-trial rulings of the trial courts" and mandamus "would soon cease to be an extraordinary writ." *Braden v. Downey,* 811 S.W.2d 922, 928 (Tex.1991). We thus hold that a party seeking review of a discovery order by mandamus must demonstrate that the remedy offered by an ordinary appeal is inadequate. We disapprove of *Barker, Allen,* and any other authorities to the extent they might be read as abolishing or relaxing this rule.

 **[12]**    We further hold that an appellate remedy is not inadequate merely because it may involve more expense or delay than obtaining an extraordinary writ. As we observed in *Iley v. Hughes,* the "delay in getting questions decided through the appellate process ... will not justify intervention by appellate courts through the extraordinary writ of mandamus. Interference is justified only when parties stand to lose their substantial rights." 158 Tex. at 368, 311 S.W.2d at 652.

On some occasions, this Court has used, or at least mentioned, the more lenient standard first articulated in *Cleveland v. Ward,* 116 Tex. 1, 14, 285 S.W. 1063, 1068 (Tex.1926), that the remedy by appeal must be "equally convenient, beneficial, and effective as mandamus." *See, e.g., Jampole v. Touchy,* 673 S.W.2d 569, 576 (Tex.1984); *Crane v. Tunks,* 160 Tex. 182, 190, 328 S.W.2d 434, 439 (Tex.1959). This standard, literally applied, would justify mandamus review whenever an appeal would arguably involve more cost or delay than mandamus. This is unworkable, both for individual cases and for the system as a whole. Mandamus disrupts the trial proceedings, forcing the parties to address in an appellate court issues that otherwise might have been resolved as

discovery progressed and the evidence was developed at trial. Moreover, the delays and expense of mandamus proceedings may be substantial. This proceeding, for example, involving rulings on collateral discovery matters, has delayed the trial on the merits for over two years. The impact on the appellate courts must also be considered. We stated in *Braden* that "[t]he judicial system cannot afford immediate review of every discovery sanction." 811 S.W.2d 922, 928. It follows that the system cannot afford immediate review of every discovery order in general. [9] We therefore disapprove of *Cleveland, Crane, Jampole* and any other authorities to the extent that they imply that a remedy by appeal is inadequate merely because it might involve more delay or cost than mandamus.

Justice Doggett's dissent argues that because discovery errors often constitute harmless errors under Tex.R.App.P. 81(b)(1), parties denied mandamus relief will be deprived of any remedy since the **\*843** error will not provide a basis for appellate reversal. This is nothing more than a thinly disguised attack on the harmless error rule. Avoiding interlocutory appellate review of errors that, in the final analysis, will prove to be harmless, is one of the principal reasons that mandamus should be restricted.

Justice Doggett's dissent also suggests that we will be unable to develop a coherent body of discovery law without unrestricted mandamus review. We do not think, however, that losing parties will be reluctant to raise perceived discovery errors on appeal, nor will an appellate court be foreclosed from writing on discovery issues, even when the error may be harmless. *See, e.g., Lovelace v. Sabine Consolidated, Inc.,* 733 S.W.2d 648, 652–53 (Tex.App.— Houston [14th Dist.] 1987, writ denied).

Nor are we impressed with the dissenters' claim that strict adherence to traditional mandamus standards will signal an end to effective interlocutory review for some parties or classes of litigants. There are many situations where a party will not have an adequate appellate remedy from a clearly erroneous ruling, and appellate courts will continue to issue the extraordinary writ. In the discovery context alone, at least three come to mind.

 **[13]**    First, a party will not have an adequate remedy by appeal when the appellate court would not be able to cure the trial court's discovery error. This occurs when the trial court erroneously orders the disclosure of privileged information which will materially affect the rights of the aggrieved party,

such as documents covered by the attorney-client privilege, *West v. Solito,* 563 S.W.2d 240 (Tex.1978), or trade secrets without adequate protections to maintain the confidentiality of the information. *Automatic Drilling Machines v. Miller,* 515 S.W.2d 256 (Tex.1974). As we noted in *Crane:* "After the [privileged documents] had been inspected, examined and reproduced ... a holding that the court had erroneously issued the order would be of small comfort to relators in protecting their papers." 160 Tex. at 190, 328 S.W.2d at 439. It may also occur where a discovery order compels the production of patently irrelevant or duplicative documents, such that it clearly constitutes harassment or imposes a burden on the producing party far out of proportion to any benefit that may obtain to the requesting party. *See, e.g., Sears, Roebuck & Co. v. Ramirez,* 824 S.W.2d 558, 35 Tex.Sup.Ct.J. 454 (1992) (demand for tax returns); *General Motors Corp. v. Lawrence,* 651 S.W.2d 732 (Tex.1983) (demand for information about all vehicles for all years).

 [14]   [15]    Second, an appeal will not be an adequate remedy where the party's ability to present a viable claim or defense at trial is vitiated or severely compromised by the trial court's discovery error. It is not enough to show merely the delay, inconvenience or expense of an appeal. Rather, the relator must establish the effective denial of a reasonable opportunity to develop the merits of his or her case, so that the trial would be a waste of judicial resources. We recently held that when a trial court imposes discovery sanctions which have the effect of *precluding a decision on the merits of a party's claims*—such as by striking pleadings, dismissing an action, or rendering default judgment—a party's remedy by eventual appeal is inadequate, unless the sanctions are imposed simultaneously with the rendition of a final, appealable judgment. *TransAmerican Natural Gas Corp. v. Powell,* 811 S.W.2d 913, 919 (Tex.1991). Similarly, a denial of discovery going to the heart of a party's case may render the appellate remedy inadequate.

 [16]   [17]    Finally, the remedy by appeal may be inadequate where the trial court disallows discovery and the missing discovery cannot be made part of the appellate record, or the trial court after proper request refuses to make it part of the record, and the reviewing court is unable to evaluate the effect of the trial court's error **\*844** on the record before it. *See Tom L. Scott, Inc. v. McIlhany,* 798 S.W.2d 556, 558 (Tex.1990) ("[M]andamus is the only remedy because the protective order shields the witnesses from deposition and thereby prevents the evidence from being part of the record."); *see generally Jampole,* 673 S.W.2d at

576 ("Because the evidence exempted from discovery would not appear in the record, the appellate courts would find it impossible to determine whether denying the discovery was harmful."). If the procedures of Tex.R.Civ.P. 166b(4) are followed, this situation should only rarely arise. If and when it does, however, the court must carefully consider all relevant circumstances, such as the claims and defenses asserted, the type of discovery sought, what it is intended to prove, and the presence or lack of other discovery, to determine whether mandamus is appropriate. [10]

 [18]    In the present case, the Walkers seek documents from the Center to impeach one defendant's expert witness. This information is not privileged, burdensome or harassing, nor does it vitiate or severely compromise the Walkers' ability to present a viable claim. In fact, as we have already noted, the trial court may ultimately conclude that it is not admissible or even discoverable. Finally, although the materials are not before us, they were considered below, and we know of no reason why they would not be available on appeal. Therefore, under our traditional standards of mandamus review, as measured by the factors we mention above, the Walkers have an adequate remedy by appeal and mandamus is inappropriate.

For the above reasons, we conclude that the Walkers have not established their right to relief by mandamus on either discovery matter. Therefore, we deny the Walkers' petition for writ of mandamus.

GONZALEZ, J., concurs and files an opinion.

DOGGETT, J., dissents and files an opinion, joined by MAUZY, J.

GAMMAGE, J., dissents and files an opinion.

GONZALEZ, Justice, concurring.
I agree with the court's disposition of this cause but disagree with the court's opinion regarding the "Obstetrics Faculty Records." Specifically, I disagree with the court's attempt to distinguish *Russell v. Young,* 452 S.W.2d 434 (Tex.1970). Nevertheless, I concur in the result.

*Russell* holds that wholesale discovery of the private records of a *non-party witness* is not permitted if the sole purpose for discovery is to impeach the credibility of the non-party. [1] 452 S.W.2d at 435. The policy considerations of *Russell* still apply

today. By disapproving of *Russell* as "a mechanical approach to discovery rulings," at 839, the court forces trial courts to get further involved in discovery matters. This increases the backlog, delay, and cost of litigation by creating the need for more hearings.

In the instant case, the plaintiffs sought to discover documents from the University of Texas Health Science Center to confirm the existence of a written policy restricting faculty members from testifying for plaintiffs in medical malpractice cases. This policy was sought for use in impeaching defendant's expert witness, Dr. Gilstrap. In refusing discovery, the trial court concluded **\*845** that the relevance of this material was limited to impeachment. As such, the requested documents fell squarely within the prohibition of *Russell.*

Despite the court's mischaracterization of *Russell,* the issues and type of evidence sought here and in *Russell* are identical. Just as in *Russell,* the records sought in the instant case did not relate directly to the subject matter of the suit. The only difference between the present case and *Russell* is the identity of the party seeking the information. In *Russell,* a defendant sought evidence to impeach the plaintiffs' expert; here, the plaintiff sought evidence to impeach a defendant's expert. Surely, we cannot have a rule that changes in application depending on whether the relator is a plaintiff or a defendant in the trial court.

In my opinion, the court strains to distinguish *Russell.* The court suggests that the trial judge made a mistake in her ruling by failing to read *Russell* in conjunction with the rules of civil procedure and evidence. However, when we adopted the new Texas Rules of Civil Evidence, there was no discussion whatsoever that, by their adoption, we intended to reject the settled rule that information sought solely for impeachment of a non-party is not discoverable. *Russell,* 452 S.W.2d at 435; *see also W.W. Rodgers & Sons Produce Co. v. Johnson,* 673 S.W.2d 291, 294–95 (Tex.App.—Dallas 1984, orig. proceeding). Furthermore, the scope of discovery has not changed in the twenty years since *Russell* has been on the books. When *Russell* was decided, the scope of discovery was codified in Texas Rule of Civil Procedure 186a. It provided in pertinent part that:

> [p]arties may obtain discovery regarding any matter which is relevant to the subject matter in the pending action whether it relates to the claim or defense of the party seeking discovery

or the claim or defense of any other party.

This same text is now codified in Rule 166b(2)(a). Clearly, impeachment evidence regarding *collateral matters* would not relate to the subject matter of the pending action.

Implicitly, the court concludes that the credibility of a non-party witness alone is a relevant avenue of inquiry and, thus, is a matter properly open to discovery under some new, broader definition of relevancy.

While I agree that the definition of relevance in Rule 401 of the Texas Rules of Civil Evidence includes matters bearing on credibility, this alone does not explain or distinguish *Russell.* A witness' credibility has always been a relevant matter. As the United States Supreme Court has said: "[p]roof of bias is almost always relevant because the jury, as finder of fact and weigher of credibility, has historically been entitled to assess all evidence which might bear on the accuracy and truth of a witness' testimony." *United States v. Abel,* 469 U.S. 45, 52, 105 S.Ct. 465, 469, 83 L.Ed.2d 450 (1984). Yet in *Russell,* we said that a trial court lacked "authority" to order discovery from a *non-party* solely for purposes of impeachment. 452 S.W.2d at 435. We chose to withdraw all discretion in this particular area of discovery. *Russell* concedes that impeachment evidence may be relevant and admissible at trial, but holds that it cannot be discovered from a non-party for its own sake prior to trial. 452 S.W.2d at 436.

The fact that a matter may have some relevance yet not be subject to discovery is hardly a novel concept. The basic premise of the rules of discovery is to weigh the legitimate needs of litigation against the other rights and values that would be irreparably harmed by unfettered discovery. *Russell* strikes the proper balance by protecting non-party witnesses from indiscriminate invasions into their private lives where the information sought would not appreciably shed light on the issues of the case.

Furthermore, the decision in *Russell was not* grounded on whether the credibility of the witness had been placed in doubt. Instead, the court highlighted the fact that **\*846** the witness had not offered testimony at trial nor was his deposition introduced into evidence at trial. The court said:

> Relator has not yet taken the witness stand nor has his deposition been introduced into evidence because there has not yet been a trial;

relator's records cannot possibly have impeachment value because there is nothing yet to impeach and there may never be anything to impeach, depending upon the contents of the testimony, if any, which is introduced during the trial of the lawsuit.

*Russell,* 452 S.W.2d at 437. Thus, it is evident that the court has today reinterpreted *Russell* with little or nothing to gain in a way that further obscures the proper scope of discovery.

I am concerned that as a result of today's ruling, some *non-parties* will be subjected to harassment and intrusion into their private lives, and that trial courts will be inundated with hearings on collateral issues far afield from the merits of the cause of action or defense. The court has attempted to fix something that was not broken. This reinterpretation of *Russell* will further tax our overburdened judicial system without appreciably benefiting the litigants or the system.

Finally, for the reasons expressed in *Joachim v. Chambers,* 815 S.W.2d 234, 241 (Tex.1991) (Gonzalez, J., dissenting), I agree with the clarification of the standards for the issuance of mandamus.

DOGGETT, Justice, dissenting.

*Them that's got shall get*

*Them that's not shall lose*

*—God Bless The Child* [1]

With a double standard, the majority strikes a devastating blow at the most direct method of curbing abuses of judicial power. Many judicial excesses far beyond the scope of anything alleged in this particular case will henceforth receive only an official nod and wink from the Texas Supreme Court.

Mandamus is the legal tool by which appellate courts can promptly correct arbitrary and capricious rulings by trial judges. Today's opinion announces that this remedy will be available to support concealment of the truth but not its disclosure. Mandamus is officially declared a one-way street in the Texas courts—our judiciary can help to hide but not to detect.

Despite a determination that a "clear abuse of discretion" has occurred in this particular case, at 840, all relief is denied.

Finding a wrong and denying a remedy echoes the logic of the majority's recent conclusion that a tax is unconstitutional but must be paid anyway. *See Carrollton–Farmers Branch Indep. Sch. Dist. v. Edgewood Indep. Sch. Dist.,* 826 S.W.2d 489, 524 (1992) (*Edgewood III* ) (Doggett, J., dissenting). Rather than correcting the abuse, the court simply gives the Walkers the same message it gave Texas taxpayers—wait. Only after a full jury trial based upon incomplete discovery will the judiciary even consider any possibility of relief.

For those who have previously sought more specific guidelines for the use of mandamus concerning discovery orders, the majority responds with not one but two standards for reviewing trial court action: orders compelling discovery may be immediately corrected; review of denied discovery is postponed indefinitely in a manner to ensure that no meaningful relief will ever be forthcoming.

I.

What a different path this court now pursues than that so recently proclaimed in its unanimous decision that

Discovery is ... the linchpin of the search for truth, as it makes "a trial less **\*847** a game of blind man's bluff and more a fair contest with the issues and facts disclosed to the fullest practicable extent."

*State v. Lowry,* 802 S.W.2d 669, 671 (Tex.1991) (quoting *United States v. Proctor & Gamble Co.,* 356 U.S. 677, 682, 78 S.Ct. 983, 986, 2 L.Ed.2d 1077 (1958)). Similarly ignored are our recent, unanimous writings in *Axelson, Inc. v. McIlhany,* 798 S.W.2d 550, 553, 555 (Tex.1990, orig. proceeding) ("[Discovery should provide] the fullest knowledge of the facts and issues prior to trial.... [T]he ultimate purpose of discovery ... is to seek the truth...."); and *Tom L. Scott, Inc. v. McIlhany,* 798 S.W.2d 556, 559 (Tex.1990, orig. proceeding) ("The primary policy behind discovery is to seek truth so that disputes may be decided by facts that are revealed rather than concealed."). Without mandamus review to add meaning to these laudatory expressions, they are just hollow words. The new signal is clear—circumvent discovery and conceal information.

Today's opinion reflects the radical change in philosophy which has taken firm hold in this court—discovery is no longer a search for truth, it is merely a game of hide and seek. No longer may appellate courts intercede through mandamus even for the trial court's complete abuse of discretion in

denying access to vital data; under the newly-announced double standard, intervention can, however, be accorded for those who persevere in evasion.

When a local business is defrauded, when a community is exposed to dangerous toxic wastes, when a manufacturer ignores reports that a safety design change would reduce user injuries, when a monopoly extorts unfair gain from the public, when discrimination results in job loss, and in numerous other circumstances, the burden of proving wrongdoing is exceedingly difficult to satisfy without obtaining evidence of that wrong from the files of the perpetrator. In such situations denial of discovery effectively means denial of all relief. That reality does not go unrecognized by today's majority.

Entities that begin litigation in control of most of the relevant evidence can often defeat their adversaries simply by denying them the power of information:

> [T]hose with established positions of power are more likely to ... win by preventing their adversaries from producing evidence; they are less likely to be in the position of having to extract evidence from their opponents to make out their case.

23 Charles A. Wright & Kenneth W. Graham, Jr., *Federal Practice & Procedure* § 5422, at 674 (1980). With its separate and unequal treatment of litigants, the majority gives yet another edge to the already advantaged. Providing immediate review for orders that start the flow of information but refusing to consider those that stop it, the majority once again expresses its preference for helping the powerful over the seemingly powerless. Those opposing meaningful discovery

> tend to be institutions rather than individuals, and tend to be among the more wealthy and powerful segments of society. A review system that gives priority (that is, immediate review) to the complaints of privilege holders, but which consigns the complaints of parties seeking discovery until after final judgment, gives an advantage to those wealthy institutional litigants. They have the power to achieve more favorable results during the pretrial process; their opponents must wait.

Elizabeth G. Thornburg, *Interlocutory Review of Discovery Orders: An Idea Whose Time Has Come,* 44 Sw.L.J. 1045, 1082 (1990) (hereinafter *Review of Discovery Orders* ) (footnote omitted). [2] In this way the **\*848** majority ensures that the scales of justice—which at the onset of litigation are often in reality uneven—never achieve balance.

Until this court included discovery orders within the scope of mandamus review, very few reported opinions addressed this important subject. Trial judges were effectively accorded unlimited discretion with a "resulting atmosphere [that] was very hostile to discovery." *Id.* at 1071. As a practical matter, discovery battles, often both complex and time-consuming, were shunned. When the party controlling vital data exercises the power of withholding it, fighting every important request, the judicial command "go work it out" often amounts to a denial of meaningful discovery. The mud-wrestling that frequently ensues in such contests may discourage a trial judge from determining who is acting fairly and who started the fight. If mandamus is not available to correct ill-considered or hasty denials, the hope for ultimate justice in complex litigation is prematurely crushed. The majority's decision today marks a return to those dark ages when discovery was regularly denied as the path of least resistance and greatest convenience for the judiciary.

## II.

By its very nature, discovery involves a search for what is largely unknown from someone who may have an incentive to make that search as long and tortuous as possible. Efforts to prevent discovery have been limited only by the boundless imagination of the top legal talent in America. Requests are either too broad or too narrow; records produced are either minimal or in such voluminous, disorganized form as to make locating relevant information most difficult; vital documents vanish in "routine document destruction" programs or are misplaced. Accordingly, our discovery rules have required continual revision to cope with the newest ways invented by those intent on subverting the process. Each revision of the Texas Rules of Civil Procedure during the last decade has included attempted clarification and improvement of discovery procedures. This has produced a body of law that is "complex and rapidly evolving." David W. Holman & Byron C. Keeling, *Entering the Thicket? Mandamus Review of Texas District Court Witness Disclosure Orders,* 23 St. Mary's L.J.

365, 375 (1991) (hereinafter *Mandamus of Disclosure Orders* ).

Given the creativity of those who would thwart discovery, rules of procedure cannot be drawn to provide clear guidance in every situation; judicial interpretation is essential. The more complicated the rule, the more necessary the construction and the greater the likelihood for misinterpretation. *See id.* at 386 ("Erroneous interpretations of these changes ... are likely with the absence of prior significant precedent.... [and] could have a substantial effect on the subsequent course of a lawsuit."). This court's responsibility does not and cannot end when the text of promulgated amendments appears in the *Texas Bar Journal.* Rather, the court has a duty *both* to make the rules *and* to interpret them.

Our American system of jurisprudence is founded on the precept that it is of great benefit to have a written body of case law construing controlling legal principles and applying them to particular facts. This approach is undeniably desirable in the discovery context:

> In a system where trial court decisions are unreported and have no precedential value, the creation of a body of reported appellate case law regarding discovery has substantial value. Case law on discovery promotes uniform interpretation of the discovery rules and, in time, decreases the opportunity for individual **\*849** judge's biases to shape discovery outcomes. Reported decisions develop clear rules, where rules are possible, and narrow the range of judicial discretion in other areas simply by providing numerous cases finding that the trial court did or did not abuse its discretion. Such case law can be particularly helpful in a jurisdiction that has recently amended its discovery rules. Over time, the existence of discovery case law may even clarify the rules sufficiently so as to decrease the number of disputes in the trial court.

*Review of Discovery Orders* at 1080 (footnotes omitted). Appellate opinions properly applying mandamus produce,

then, both more consistency and more accuracy in trial court decisions. *See id.* at 1077. [3]

The role of this court is particularly important in answering novel or significant questions of discovery law. *See Mandamus of Disclosure Orders* at 376 ("[P]re-trial appellate review of [important discovery] questions could lend critical guidance to the development of Texas discovery practice."). Rather than avoiding its responsibility, this court should utilize mandamus review to reduce the abuse of judicial power when "a unique question of discovery" law is presented. David West, Note, *The Use of Mandamus to Review Discovery Orders in Texas: An Extraordinary Remedy,* 1 Rev.Litigation 325, 327 (1981) (hereinafter *The Use of Mandamus* ).

Most trial court mistakes denying discovery result from the need to make repeated, quick decisions based upon limited information. Recognizing this circumstance, trial judges sometimes actually encourage litigants to raise disputed rulings affecting truly vital matters for appellate examination through mandamus by automatically staying their orders. Refusal of prompt appellate review not only denies a party its rights but may also deprive a trial court of desired guidance.

Today's opinion appropriately recognizes that "this Court will not grant mandamus relief unless we determine that the error is of such importance to the jurisprudence of the state as to require correction." At 839 n. 7. But under the standard announced, questions of importance concerning judicially-approved concealment of facts will never be considered. The significance to the state's jurisprudence of a ruling should certainly not be controlled by whether the order granted or denied discovery.

## III.

With mandamus now severely limited, many important issues will not be reviewed. *See generally Review of Discovery Orders* at 1056; *The Use of Mandamus* at 337 & n. 94. Abuses of judicial power will go forever uncorrected when the party disallowed discovery, realizing the difficulty of proving a case with less than full information and the uphill task of maintaining a successful appeal, is either forced to settle or forgoes a costly and extended appeal following defeat on the entire case. Nor will improper rulings ever be reviewed where one denied discovery, although severely handicapped, nonetheless prevails at trial.

Where appeals do occur, remedies will be rare even for egregious pretrial rulings. To succeed in this endeavor, one must show that

> the error complained of amounted to such a denial of the rights of appellant as **\*850** was reasonably calculated to cause and probably did cause rendition of an improper judgment in the case, or was such as probably prevented the appellant from making a proper presentation of the case to the appellate court.

Tex.R.App.P. 81(b). This standard is universally regarded as a "more difficult hurdle" than abuse of discretion. Helen A. Cassidy, *The Instant Freeze–Dried Guide to Mandamus Procedure in Texas Courts,* 31 S.Tex.L.Rev. 509, 512 (1990). As another commentator has aptly concluded,

> only an unusual discovery order would be dispositive enough to show the harmful error that most jurisdictions require for appellate reversal. Many appellants, therefore, would not even raise the discovery points on appeal.

*Review of Discovery Orders* at 1056; *see also Mandamus of Disclosure Orders* at 376 n. 40 (observing that, because of the harmless error rule, many discovery rulings are not pursued on appeal). In denying mandamus today, the majority closes and locks the appellate courthouse door to any meaningful consideration of numerous significant matters.

## IV.

Only with the tragic recent change in course by this court's majority has such denial of access become acceptable. Previously both this court and the courts of appeals had employed their writ power as necessary to correct the abusive refusal of discovery. Among those cases providing the foundation for appropriate mandamus review is *Barker v. Dunham,* 551 S.W.2d 41 (Tex.1977, orig. proceeding), in which the trial court had overruled a motion to complete an expert witness's deposition and to compel production of his work papers. We interceded, stating that: "It is settled that the writ of mandamus may issue in a discovery proceeding to correct a clear abuse of discretion by a trial judge." *Id.* at 42.

Similarly, in *Allen v. Humphreys,* 559 S.W.2d 798 (Tex.1977, orig. proceeding), the trial court refused to order discovery of tests, surveys and complaints by similarly affected persons. This court found an abuse of discretion and granted the writ, despite the argument that the plaintiff had "an adequate remedy via the normal appellate process." *Id.* at 801. It is difficult to perceive, in light of this argument and the court's subsequent grant of mandamus relief, how the majority can now claim that "we [had] not focused" on the requirement of an inadequate remedy by appeal in *Allen* and on, admittedly, a "few [other] occasions." At 840–841.

Following these two opinions, this court has not hesitated to consider and correct the wrongful denial of discovery. By issuing mandamus to rectify an erroneous trial court ruling refusing discovery in *Jampole v. Touchy,* 673 S.W.2d 569 (Tex.1984, orig. proceeding), this court recognized that appeal is not an adequate remedy:

> [R]equiring a party to try his lawsuit, debilitated by the denial of proper discovery, only to have that lawsuit rendered a certain nullity on appeal, falls well short of a remedy by appeal that is "equally convenient, beneficial, and effective as mandamus."

*Id.* at 576 (quoting *Crane v. Tunks,* 160 Tex. 182, 190, 328 S.W.2d 434, 439 (1959) (citation omitted)); *see also Cleveland v. Ward,* 116 Tex. 1, 14, 285 S.W. 1063, 1068 (Tex.1926).

A trial court's unwillingness to order the production of accident scene photographs was overturned by mandamus in *Terry v. Lawrence,* 700 S.W.2d 912 (Tex.1985, orig. proceeding). In *Lindsey v. O'Neill,* 689 S.W.2d 400, 402 (Tex.1985, orig. proceeding) (per curiam), the court overturned by mandamus an order limiting the scope of a deposition and quashing the accompanying document request. A blanket order protecting hospital records was similarly vacated by mandamus in *Barnes v. Whittington,* 751 S.W.2d 493 (Tex.1988, orig. proceeding). In *Lunsford v. Morris,* 746 S.W.2d 471 (Tex.1988, orig. proceeding), this court again granted mandamus to remedy a trial court's erroneous disallowance **\*851** of relevant discovery. *See also Loftin v. Martin,* 776 S.W.2d 145 (Tex.1989, orig. proceeding) (correcting by mandamus wrongful denial of discovery); *Turbodyne Corp. v. Heard,* 720 S.W.2d 802 (Tex.1986, orig. proceeding) (per curiam) (mandamus directing trial court to rescind order denying discovery of documents from insurer in subrogation action); *Ginsberg v. Fifth Court of Appeals,* 686 S.W.2d 105 (Tex.1985, orig.

proceeding) (erroneous bar of deposition by court of appeals cured by mandamus). [4]

It is only after fifteen years of repeated judicial reliance upon *Barker* and *Allen* in the issuance of numerous opinions that we learn these precedents of our court are not good law. This is all the more strange in that we had explicitly refused to overrule them. When that very request was urged in *Jampole, 673 S.W.2d at 576,* our answer was unmistakable: "We decline to do so." But the majority's new answer is simple: "Line them up against the wall." What does it matter that a dozen or more Texas Supreme Court cases and countless decisions of the courts of appeals are to the contrary? They can be disposed of in a mass execution of precedent. [5] Today's firing squad announces that it is only answering the command of Jim Sales and two law students who separately criticized the court during the period 1977–79. At 840–841. It thereby rationalizes constructing so distorted a standard on the corpses of so many prior authorities.

One of the most significant casualties is *Jampole v. Touchy,* which has formed the centerpiece for discovery in litigation over defective products and toxic substances for almost a decade. The majority, in a massive understatement, "disapproves" *Jampole* "to the extent [it implies] that a remedy by appeal is inadequate merely because it might involve more delay or cost than mandamus." At 842. Although leaving untouched for now this court's prior writing on the proper scope of discovery, the majority has in fact overruled that landmark precedent in its entirety. Despite a gross abuse of discretion in denying critical discovery in *Jampole,* the majority's only correction by mandamus would be to require inclusion of the disputed materials in **\*852** the record, to await a deferred and meaningless appellate review.

## V.

Instead of affording the relief that prior rulings demand, the majority announces, after considerable mental gymnastics, that "at least three [discovery situations] come to mind" where mandamus is justified, at 843; then it strangely proceeds to describe six. The first three instances where remedy by appeal is inadequate stem from a trial court's wrongful allowance of discovery. First, mandamus will issue if "disclosure of privileged information ... will materially affect the rights of the aggrieved party." At 843. This requisite is easily fulfilled with discovery objections that include an assertion of privilege, the violation of which necessarily impinges on the objecting party's rights.

Second, mandamus will issue when a trial court orders the disclosure of "trade secrets without adequate protections to maintain the confidentiality of the information." At 843 (citing, without discussion, *Automatic Drilling Machs., Inc. v. Miller,* 515 S.W.2d 256 (Tex.1974, orig. proceeding)). Posing numerous problems, this hastily-drawn exception has no relevance to the instant case and was concocted by the majority without any briefing or argument by counsel. One privilege is thereby unjustifiably elevated above all others. Moreover, the writing implies an absolute protection of trade secrets from discovery when in fact this privilege is most definitely qualified, as recognized by *Automatic Drilling,* 515 S.W.2d at 259, [6] the rule itself, Tex.R.Civ.Evid. 507 (trade secrets not protected when nondisclosure conceals fraud or works injustice), and even Mr. Sales, whose writing purportedly warranted today's brash action. [7] Nor does this exception consider the availability in some cases of the interlocutory appeal mechanism provided in Tex.R.Civ.P. 76a(8) to address the adequacy of a protective order. *See Eli Lilly & Co. v. Marshall,* Order Granting Leave to File Petition for Writ of Mandamus (Doggett, J., dissenting), 829 S.W.2d 156 (Tex.1991).

The third situation requiring mandamus is an "order [that] compels the production of patently irrelevant or duplicative documents, such that it clearly constitutes harassment or imposes a burden on the producing party far out of proportion to any benefit that may obtain to the requesting party." At 843. This "catch-all" exception indeed makes the extraordinary writ of mandamus an ordinary one. In almost any complex litigation, the claim of burden is essentially a form objection to discovery. It is difficult to perceive a dispute in which the party seeking to obstruct the process could not and, after today's decision, will not claim harassment or imposition of an undue burden. *See, e.g., Sears, Roebuck & Co. v. Ramirez,* 824 S.W.2d 558 (Tex.1992) (per curiam) (granting mandamus to preclude disclosure of corporate tax returns on the basis of undue burden and unnecessary expense, not privilege). [8]

A fourth exception, based on **\*853** *Transamerican Natural Gas Corp. v. Powell,* 811 S.W.2d 913 (Tex.1991, orig. proceeding),* is described when the trial court imposes "discovery sanctions ... precluding a decision on the merits of a party's claims ... unless the sanctions are imposed simultaneously with the rendition of a final, appealable

judgment." At 843 (emphasis deleted). The majority falsely suggests that today's standard creates a symmetry with *Transamerican.* Unlike *Transamerican,* which treated the striking of a petition in the same manner as the entry of a default judgment, this ruling creates a double standard. Unlike *Transamerican,* which involved a readily-perceptible wrong such as an order of dismissal, a determination of whether hidden documents "go to the heart of a party's case," at 843, involves significant uncertainties.

More importantly, *Transamerican* was issued at a time when the announced policy of this court was to deter abuses of discretion without regard to whether discovery was granted or denied. A wide spectrum of sanction orders arising from discovery rulings are immediately appealable. *See Braden v. Downey,* 811 S.W.2d 922 (Tex.1991, orig. proceeding). Superimposing *Transamerican* and *Braden* on today's double standard sends a clear message to the rare trial court that would impose significant penalties on those who obstruct discovery with deceit and delay—be careful. There is no real danger of immediate and genuine appellate examination of an order denying discovery, but there is a constant threat of appellate review of an order granting discovery or imposing meaningful sanctions on obstructionists. Once again the majority provides an incentive for concealment.

The remaining two situations address the wrongful denial of discovery, and constitute a narrow path in the woods compared to the expressway for resisting discovery constructed in the previous four exceptions. Mandamus is possible when

> the missing discovery cannot be made part of the appellate record, or the trial court after proper request refuses to make it part of the record, and the reviewing court is unable to evaluate the effect of the trial court's error on the record before it.

At 843–844. The quick fix of including materials in the appellate record is both ingenious and ingenuous. It has the immediate "benefit" of excluding a great number of errors in the discovery area from mandamus review. As the majority in fact recognizes, "this situation should only rarely arise." At 844.[9] And if it ever does, the majority guarantees that no relief will be forthcoming, by directing that the reviewing court

carefully consider all relevant circumstances, such as the claims and defenses asserted, the type of discovery sought, what it is intended to prove, and the presence or lack of other discovery, to determine whether mandamus is appropriate.

At 844. Within these constraints, there will always be a readily available excuse to deny both discovery and mandamus.

In most cases the materials can be boxed up, file-stamped, and sent to the appellate court. How this will accomplish anything more than cluttering the judicial chambers is quite another matter. No clue is given as to how to resolve the obvious difficulties inherent in appellate determination, without any effective argument and analysis by counsel, of whether each item would have affected the result. Moreover, this approach improperly requires courts of appeals to act as juries while denying to the true fact-finder evidence that may be highly **\*854** relevant to the proceeding. This distrust of juries—of ordinary people resolving factual disputes—is increasingly reflected in the majority's decisions.[10]

The only hope for review of a trial court's order denying discovery is upon proof that a claim has been "vitiated or severely compromised by the trial court's discovery error." At 843. It must be shown "that the trial would be a waste of judicial resources," at 843, and that "a denial of discovery [goes] to the heart of a party's case." At 843. It is far from clear whether these encompass one or three different standards. What is clear is that few cases, if any, will satisfy whatever standard is applied.

The majority offers no example of a case in which a party has ever met such a heavy burden. Apparently an applicant for mandamus in this court must confess that, without the discovery sought, the trial court should and must direct a contrary verdict. Any semblance of a chance at prevailing prevents a determination that the trial would be a "waste of judicial resources" or that the discovery denied goes "to the heart of a party's case." While this situation may theoretically arise in the future, it will be most unlikely. Nor is there any explanation of how a party can be expected to show such a probability without having any of the materials in question. We have previously recognized the hardship inherent in showing need for documents when their contents are unknown. *State v. Lowry,* 802 S.W.2d 669, 673 (Tex.1991) ("It is difficult for the [relators] to make a more particularized showing of need for these documents, the contents of which are unknown to them.").

Application of today's font of mandamus law to the Walkers' situation is most revealing. The majority summarily concludes that the trial court's misapplication of the law to deprive them of relevant evidence "does [not] vitiate or severely compromise the Walkers' ability to present a viable claim." At 844. Most ironically, today's announcement imposes one type of double standard on top of another alleged double standard. The Walkers claim they have uncovered a double standard at a taxpayer-financed institution that encourages faculty to defend those accused of medical malpractice while discouraging professional advice on behalf of the alleged victim. It is the merits of this revelation that the majority so eagerly seals away from both the Walkers and the public.

Fully aware of the impact of expert credibility on the outcome of much medical malpractice litigation, the majority denies the Walkers the very information that could perhaps demonstrate the bias of a key witness. An official blessing is thus provided for trial court action that may have a material, adverse effect on their ability to present a viable case. Having now learned that the denial of impeachment evidence is never susceptible to mandamus, it remains to be seen what other critical information will next be similarly viewed as unimportant to this majority.

While the nature of the double standard approved by today's writing requires that this dissent focus on wrongful denials, I recognize that the wrong can be every bit as real from improper grants of discovery. As a practical matter there is probably less danger that a trial judge will capriciously ignore properly established objections and privileges to accord too much information instead of too little. Nevertheless, I favor the use of mandamus to control abuse without regard to how it occurs or whom is helped. What I deplore is the discrimination which the majority officially substitutes for even-handedness. Scholars viewing **\*855** the so-called "*Walker* mandamus standard" should recognize that it is not a standard but an excuse for ignoring wrongdoing.

After today's decision, discovery disputes will no longer be resolved on a level playing field. I believe that mandamus should be available to correct any trial court abuse concerning a subject that is important to the jurisprudence of the state and which substantially affects rights of an aggrieved party. If this requisite is satisfied, relief should be accorded without regard to whether the trial court has granted or denied discovery.

## VI.

In supporting today's opinion, Justice Gonzalez insists that we must stem what he claims is an alarming increase in the number of mandamus filings. At 844–846 (Gonzalez, J., concurring). The view that "the sky is falling" is best reflected in the gruesome statistics and conclusions of his dissenting opinion in *Joachim v. Chambers,* 815 S.W.2d 234, 241 (Tex.1991). *See also Jampole,* 673 S.W.2d at 578 (Barrow, J., dissenting); *cf.* C.L. Ray & M.R. Yogi McKelvey, *The Mandamus Explosion,* 28 S.Tex.L.Rev. 413, 413–14 (1987).

Blaming an ever-increasing caseload for the Texas courts on the advent of the discovery mandamus is wholly insupportable. These petitions most often present emergency situations requiring expedited review and, consequently, are frequently viewed as a thorn in the side of appellate courts. *See Review of Discovery Orders* at 1059 n. 99. But I cannot agree that justice should be denied or delayed solely to accommodate appellate judges.

Recent studies have debunked the myth of the mandamus explosion. The *Joachim* dissent, to which Justice Gonzalez once again points with pride today, is based upon an analysis that fails to segregate filings arising from discovery disputes. A more detailed study of Supreme Court experience during a period of more than ten years correctly concluded that:

> [I]nterlocutory review of discovery orders ... has [had] a positive effect.... The increase [in appellate caseloads] has been an extremely small and manageable one....

. . . . .

> The numbers, then, suggest that while the availability of interlocutory review of discovery orders added cases to the appellate docket, interlocutory review has not added a large or burdensome number of cases.

*Review of Discovery Orders* at 1047, 1059.

The fact is that most petitions are denied, with fewer than 3% granted by us during fiscal year 1991. Most of these were handled expeditiously, with over half resolved within one month of filing. Moreover, Justice Gonzalez completely ignored the fact that mandamus requests in this court actually decreased over the last three years. There were 202 of these in fiscal 1991, down from 257 and 258, respectively, in fiscal 1989 and 1990. Although the court's overall workload is

expanding, the contribution of mandamus filings is certainly not uncontrollable. [11] "In deciding whether courts should permit interlocutory **\*856** review in specific cases, judges and commentators tend to emphasize the needs of court administration over the needs of the litigants." *Id.* at 1049. While cutting off the right to mandamus review when discovery is denied may reduce the appellate workload, the result will be a significant decline in the quality of justice. The inconvenience caused by the unexpected arrival of a petition that often demands immediate action is the price paid "to assure that ... trial proceedings are fair and equitable to *all* concerned parties.... '[W]e must not sacrifice justice upon the altar of expediency.' " *Mandamus Review of Disclosure Orders* at 422 (quoting David W. Holman & Byron C. Keeling, *Disclosure of Witnesses in Texas: The Evolution and Application of Rules 166b(6) and 215(5) of the Texas Rules of Civil Procedure,* 42 Baylor L.Rev. 405, 458 (1990)) (emphasis added).

## VII.

The majority announces here not a standard, but a pseudo-standard. In reality, the rule is little more than "how can we help those whom we want to help?" The only true precedent for this is *Terrazas v. Ramirez,* 829 S.W.2d 712 (Tex.1991), where *R*epublican *r*elators in *r*edistricting were accorded relief in the Supreme Court never sought in any other forum. This "triple R exception to mandamus," *id.* at 760–61 (Mauzy, J., dissenting), only presages the continued pursuit of this goal.

If doubts remain as to the one-sidedness of the standard announced today, its application to currently pending cases should resolve them. *See, e.g., Remington Arms Co. v. Canales,* No. D–1867, 35 Tex.S.Ct.J. 245 (Dec. 13, 1991) (trial court order which found documents relating to firearm safety relevant and required their production stayed despite no timely response or objection being made); *Eli Lilly & Co. v. Marshall,* No. D–1827, 35 Tex.S.Ct.J. 168, 354 (Dec. 3, 1991 and Jan. 23, 1992) (stays of trial court order directing production of information relating to the drug Prozac); *see id.* at 189 (Order Granting Leave to File Petition for Writ of Mandamus) (Doggett, J., dissenting); *Valley Baptist Medical Center v. Bennett,* No. D–1193, 34 Tex.S.Ct.J. 668 (June 18, 1991) (stay issued to protect hospital from disclosure of materials relating to policy of informing patients of risk of treatment), and 35 Tex.S.Ct.J. 452 (Feb. 12, 1992) (motion for leave to file granted). One interested in verifying the true meaning of the majority's carefully chosen words will do well to observe how the court actually disposes of each of these matters.

## VIII. CONCLUSION

In an apparent attempt to cope with a false "mandamus explosion," today's opinion has offered us an explosion of another type—a reverberating detonation of this court's prior rulings. True the majority has considerable experience in disregarding precedent as merely a lifeless thing of the past. *See Edgewood III,* 826 S.W.2d at 516, 517 (Doggett, J., dissenting); *Terrazas,* 829 S.W.2d at 739 (Mauzy, J., dissenting); *Stewart Title Guaranty Co. v. Sterling,* 822 S.W.2d 1, 12 (Tex.1991) (Doggett, J., dissenting). But a dozen or more Texas Supreme Court authorities and even more rulings from the courts of appeals cut down at one time is not a modest accomplishment. Precedent, no matter how voluminous or how well-established, will clearly not restrain this majority from accomplishing its preconceived social policy objectives.

Through both deed and now word, the majority invites a true explosion in mandamus filings. What does an attorney whose client faces the possibility of a judgment for significant damages have to lose from accepting the beneficence of a majority of this court ever willing to serve as protector of the privileged? Will a deposition site other than that ordered by the trial court **\*857** be more costly and inconvenient to the claimant? Get a stay from the Texas Supreme Court, even if your petition is still pending in the court of appeals. *See Continental Can Co. v. Wittig,* No. D–2015, 35 Tex.S.Ct.J. 355, 1992 WL 17415 (Jan. 29, 1992) (stay of trial court order directing engineering employee of products liability defendant to be deposed in Houston rather than Chicago even though mandamus petition was pending in court of appeals). Did the trial court resolve a conflict in deposition schedules in a manner unacceptable to an insurance company? Don't worry, the Texas Supreme Court will stay proceedings even without bothering to get a response from the affected judge. *See Cigna Corp. v. Spears,* No. D–2069, 35 Tex.S.Ct.J. 463 (Feb. 19, 1992). Any attorney whose client desires to make more difficult access to information that will jeopardize its credibility, suggest its liability or defeat its defenses would be foolish to accept a trial court discovery order. A majority of the Texas Supreme Court is ready and willing to interfere for the asking.

The ripple effect created by today's refusal to accord mandamus review to pretrial discovery orders will swell to tidal-wave proportion, and sweep before it any hope of fair and consistent application of our Texas discovery rules. In many cases it will leave buried in the sand any possibility of trials directed by the full and truthful revelation of the underlying facts. Juries will be forced to resolve critical disputes based not on truths but rather upon whatever half-truths can be discovered. Left in the wreckage on the beach will be the tattered remains of the many prior decisions of this court and others that viewed litigation as a search for truth in which fair and prompt appellate review of an order denying discovery was vital.

MAUZY, J., joins in this dissenting opinion.

GAMMAGE, Justice, dissenting.

I dissent. Today's decision departs from previous instances where this court has provided mandamus relief to correct a wrongful denial of discovery, and labors too hard to conclude that appeal is an adequate remedy for a party who is denied adequate discovery.

I would hold that mandamus is available to correct a trial court error which negatively and materially affects the right of aggrieved parties to adequately present their cases, whether the particular party is seeking discovery or resisting it. *See Iley v. Hughes,* 158 Tex. 362, 368, 311 S.W.2d 648, 652 (1958); *see also* Elizabeth G. Thornburg, *Interlocutory Review of Discovery Orders: An Idea Whose Time Has Come,* 44 SW.L.J. 1045 (1990). In the case before us, the trial court's denial of discovery has a material and adverse effect on the Walkers' ability to present their case. The information they seek could impugn the credibility of key expert witnesses at trial. Because their medical malpractice claim, like all such claims, will likely stand or fall on the credibility of the expert witnesses, I would hold that the Walkers are entitled to the information they seek, and that relief by appeal is inadequate.

Discovery is the "linchpin of the search for truth," and "[a]ffording parties full discovery promotes the fair resolution of disputes by the judiciary." *State v. Lowry,* 802 S.W.2d 669, 671 (Tex.1991). Today the court removes and disposes of that "linchpin" and abandons enforcement of fair and adequate discovery. Because I believe that mandamus relief should be readily available when a court allows *either* too much *or* too little discovery, I dissent.

Footnotes

1    St. Paul contends that the Walkers' request for mandamus relief is barred by laches since the Walkers delayed almost two years before seeking to compel production. Because we find that the Walkers have failed to establish the requirements for mandamus relief, we do not reach this issue.

2    The court also sustained Aetna's motion to quash, holding that the discovery requested was improper under the investigation exemption, the attorney-client privilege, and the work-product privilege. The Walkers do not complain to us about this ruling.

3    Even if no evidence had been presented, the Walkers would have had the burden of filing an affidavit so stating. *See Barnes v. Whittington,* 751 S.W.2d 493, 495 (Tex.1988) ("The undisputed fact that no testimony was adduced at any of the hearings, as set forth in the affidavit of relator's counsel, satisfies the relator's burden under Rule 121.").

4    The records sought in *Russell* included, among others:

        (2) All appointment books maintained by [the expert physician] during 1969;

        (3) All statements, listings, ledgers, or other books showing the accounts receivable of [the expert physician] during 1969;

        (4) All deposit slips or tickets showing deposits into bank accounts of [the expert physician] during 1969;

        (5) All statements, listings, ledgers, journals, or other books showing receipt of payments, either in cash, by check or by any other means [by the expert physician] during 1969;

        (6) All statements of account or bills for services rendered [by the expert physician] during 1969;

        (7) All accounting ledgers, journals or other books of account of [the expert physician] maintained during 1969; and

        (8) All financial statements showing income and expenses of [the expert physician] during 1969.

    452 S.W.2d at 435.

5    Evidence of bias is not admissible if the witness "unequivocally admits such bias or interest" at trial. Tex.R.Civ.Evid. 613(b). To date, however, Dr. Gilstrap has not admitted any bias, but rather has flatly denied it. In this situation, such evidence should be discoverable.

6    We do not decide whether the documents were properly discoverable, only that the trial court erred in denying discovery based solely on *Russell.* If the Walkers sought the documents solely to attack the credibility of Dr. Gilstrap by showing that his deposition testimony was untrue, for instance, the information would probably not be reasonably calculated to lead to the discovery of admissible

evidence. *See* Tex.R.Civ.Evid. 608(b). ("Specific instances of the conduct of a witness [other than criminal convictions], for the purpose of attacking ... his credibility, may not be ... proved by extrinsic evidence.").

7   Additionally, this Court will not grant mandamus relief unless we determine that the error is of such importance to the jurisprudence of the state as to require correction. *Cf.* Tex.Gov't Code § 22.001(a)(6); Tex.R.App.P. 140(b). This issue, however, is properly resolved in deciding whether to grant leave to file the petition, not in its disposition.

8   *See, e.g., TransAmerican Natural Gas Corp. v. Powell,* 811 S.W.2d 913, 919 (Tex.1991) (imposition of discovery sanctions); *Schultz v. Fifth Judicial District Court of Appeals,* 810 S.W.2d 738, 739 n. 4 (Tex.1991) (refusal to enforce turnover order by contempt); *Joachim v. Chambers,* 815 S.W.2d 234, 240 (Tex.1991) (refusal to bar judicial officer from testifying as expert witness); *Hooks v. Fourth Court of Appeals,* 808 S.W.2d 56, 59–60 (Tex.1991) (refusal to grant nonsuit); *Bell Helicopter Textron, Inc., v. Walker,* 787 S.W.2d 954, 955 (Tex.1990) (refusal to dismiss for lack of subject-matter jurisdiction); *Champion Int'l Corp. v. Twelfth Court of Appeals,* 762 S.W.2d 898, 899 (Tex.1988) (grant of new trial); *Stringer v. Eleventh Court of Appeals,* 720 S.W.2d 801, 801–02 (Tex.1986) (imposition of discovery sanction); *Johnson v. Fourth Court of Appeals,* 700 S.W.2d 916, 917 (Tex.1985) (grant of new trial); *Abor v. Black,* 695 S.W.2d 564, 566 (Tex.1985) (denial of plea in abatement); *State v. Walker,* 679 S.W.2d 484, 485 (Tex.1984) (refusal to reinstate temporary injunction); *Pat Walker & Co. v. Johnson,* 623 S.W.2d 306, 309 (Tex.1981) (refusal to extend time for filing statement of facts); *State Bar of Texas v. Heard,* 603 S.W.2d 829, 833 (Tex.1980) (refusal to suspend attorney); *Pope v. Ferguson,* 445 S.W.2d 950, 953 (Tex.1969) (refusal to dismiss criminal case pending against relator), *cert. denied,* 397 U.S. 997, 90 S.Ct. 1138, 25 L.Ed.2d 405 (1970); *Crane v. Tunks,* 160 Tex. 182, 190, 328 S.W.2d 434, 439 (1959) (discovery order); *Iley v. Hughes,* 158 Tex. 362, 367–68, 311 S.W.2d 648, 652 (1958) (bifurcation of trial); *Harrell v. Thompson,* 140 Tex. 1, 1, 165 S.W.2d 81, 81 (1942) (restriction of oil and gas production by Railroad Commission); *Ben C. Jones & Co. v. Wheeler,* 121 Tex. 128, 130, 45 S.W.2d 957, 958 (1932) (refusal to enter judgment nunc pro tunc); *Cleveland v. Ward,* 116 Tex. 1, 14, 285 S.W. 1063, 1068 (1926) (refusal to enter judgment); *Aycock v. Clark,* 94 Tex. 375, 376–77, 60 S.W. 665, 666 (1901) (refusal to enter injunction); *Screwmen's Benevolent Ass'n v. Benson,* 76 Tex. 552, 555, 13 S.W. 379, 380 (1890) (expulsion of member from charitable corporation).

9   We recently held that a mandamus action was never required to preserve error on appeal. *Pope v. Stephenson,* 787 S.W.2d 953 (Tex.1990). We explained: "The decision not to pursue the extraordinary remedy of mandamus does not prejudice or waive a party's right to complain on appeal." *Id.* at 954.

10  Courts use a similar approach in determining whether a witness has properly invoked the Fifth Amendment privilege against self-incrimination. It is often impossible for a witness to prove that an answer might incriminate him without actually answering and thereby forfeiting the privilege. Therefore, rather than requiring actual proof of the privilege, courts sustain the privilege if it is "evident from the implications of the question, in the setting in which it is asked, that a responsive answer [might be incriminating]." *Hoffman v. United States,* 341 U.S. 479, 487, 71 S.Ct. 814, 818, 95 L.Ed. 1118 (1951).

1   If the records have relevance apart from their potential for impeachment, however, *Russell* does not bar discovery. *See Ex Parte Shepperd,* 513 S.W.2d 813, 816 (Tex.1974).

1   Billie Holiday, *God Bless the Child* (Okeh Records 1941) (words and music by Arthur Herzog, Jr. & Billie Holiday).

2   These entities rarely need information to prevail:

> Even when an institutional litigant appears as a plaintiff suing an individual defendant as, for example, when a corporation sues an individual on a debt, the institutional litigant tends to already have the information needed to prove its case.

> *Review of Discovery Orders* at 1070 n. 162. They are also less likely to require information from an opponent to establish affirmative defenses. *Id.* at 1070.

3   With no appellate opinions setting forth appropriate limitations upon trial court discretion, "litigants may receive widely divergent rulings from different judges, even in the same geographical location." *Id.* at 1077. Proper use of mandamus discourages forum shopping to obtain a trial judge more likely to provide a more favorable ruling and allows for greater consistency and accountability:

> [Such] review ... even[s] out inconsistencies in trial court rulings, and ... allows trial judges to operate with a more accurate understanding of the meaning of the discovery rules.... If the appellate court is consistent, it can fix disparities and inequities produced by the trial courts and promote consistency among the trial level decisionmakers.

> *Id.* at 1047, 1077 (footnotes omitted).

4   Intermediate appellate courts have also recognized the importance of mandamus to avoid trial court abuse in improperly limiting or denying discovery. *See, e.g., Kentucky Fried Chicken Nat'l Mgmt. Co. v. Tennant,* 782 S.W.2d 318 (Tex.App.—Houston [1st Dist.] 1989, orig. proceeding) (writ granted when discovery of plaintiff's psychiatric records denied); *Foster v. Heard,* 757 S.W.2d 464 (Tex.App.—Houston [1st Dist.] 1988, orig. proceeding) (mandamus issued against trial court's denial of discovery of post-accident investigation report); *Super Syndicate, Ltd. v. Salazar,* 762 S.W.2d 749 (Tex.App.—Houston [14th Dist.] 1988, orig. proceeding) (granting mandamus against trial court's denial of discovery of claims investigator's files); *Goodspeed v. Street,* 747 S.W.2d 526 (Tex.App.—Fort Worth 1988, orig. proceeding) (trial court's denial of discovery of hospital records based on privilege without presentation of evidence overturned); *Estate of Gilbert v. Black,* 722 S.W.2d 548, 551 (Tex.App.—Austin 1987, orig. proceeding)

(denial of discovery of insurer's internal communications overturned on mandamus, despite argument that "mandamus is proper only [for] improperly ordered discovery of privileged material, not when the trial court has denied discovery."); *Essex Crane Rental Corp. v. Kitzman,* 723 S.W.2d 241 (Tex.App.—Houston [1st Dist.] 1986, orig. proceeding) (writ granted to correct trial court's order quashing deposition); *Velasco v. Haberman,* 700 S.W.2d 729, 730 (Tex.App.—San Antonio 1985, orig. proceeding) (mandamus appropriate "not only where the trial court order improperly grants discovery, but the writ may also issue where the trial court improperly limits or denies discovery."); *Aztec Life lns. Co. v. Dellana,* 667 S.W.2d 911 (Tex.App.—Austin 1984, orig. proceeding) (mandamus issued against trial court for denying discovery of claims files).

The majority identifies by name five cases in conflict with today's writing, declaring that: "We disapprove of *Barker* and *Allen,* and any other authorities," at 842, and "[we] disapprove of *Cleveland, Crane, Jampole,* and any other authorities," at 842, to the extent they conflict with the new *Walker* standard. Subsumed within the "other" designation are a great number of additional cases from this court and the courts of appeals that would grant to the Walkers relief when the trial court has clearly abused its discretion in denying discovery. The court's willingness to sweepingly erase whole unidentified categories of recent precedent is exemplified by their signing of a blank check: "any other authorities," meaning all other authorities, are now endangered.

The few cases citing *Automatic Drilling* do not expand its holding to that suggested by the court today. *See Jampole,* 673 S.W.2d at 574–75 ("We hold that discovery cannot be denied because of an asserted proprietary interest in the requested documents when a protective order would sufficiently preserve that interest."); *Firestone Photographs, Inc. v. Lamaster,* 567 S.W.2d 273, 278 (Tex.Civ.App.—Texarkana 1978, no writ) ("[T]he claim of trade secrets ... does not necessarily defeat the right of discovery.").

James B. Sales, *Pretrial Discovery in Texas Under the Amended Rules: Analysis and Commentary,* 27 S.Tex.L.Rev. 305, 345–46 (1986), stating that:

> Trade secrets ... are not, per se, exempt from discovery. The trial court is obligated to weigh the need for discovery against the interests on secrecy.... The need to protect the confidentiality of documents does not constitute an absolute bar to discovery....

Although also citing *General Motors Corp. v. Lawrence,* 651 S.W.2d 732 (Tex.1983, orig. proceeding), as allowing mandamus relief from an allegedly burdensome trial court discovery order, the majority fails to note the very expansive discovery permitted in that case. The efforts of General Motors to limit discovery to results from tests performed on the particular type of truck and the particular type of impact involved in the subject incident were rejected, and it was directed to supply all impact test results for all types of trucks manufactured over a 23–year period.

If the trial court "refuses to make [the discovery] part of the record," At 843, presumably the only relief accorded under today's standard would be issuance of a writ directing inclusion of these materials.

*See Caller Times Publishing Co. v. Triad Communications,* 826 S.W.2d 576, 597–608 (Tex.1992) (Doggett, J., dissenting) (addressing court's refusal to allow evidence of predatory intent); *see also Greater Houston Transp. Co. v. Phillips,* 801 S.W.2d 523, 527 (Tex.1990) (Doggett, J., dissenting); *Crim Truck & Tractor Co. v. Navistar Int'l Transp. Co.,* 823 S.W.2d 591, 596 & n. 1 (Tex.1992) (Mauzy, J., dissenting); *Reagan v. Vaughn,* 804 S.W.2d 463, 488 (Tex.1990) (Doggett, J., concurring and dissenting).

Supreme Court Filings

| Year | Mandamus Discovery Orders | All Mandamus Filings | Total Mandamus and Applications for Writ | Discovery as Percentage of Total |
|------|------|------|------|------|
| 1979 | 24 | 129 | 933 | 2.6% |
| 1981 | 17 | 98 | 943 | 1.8% |
| 1989 | 51 | 257 | 1078 | 4.7% |
| 1991 | 64 | 202 | 1257 | 5.1% |

*Interlocutory Review of Discovery Orders* at 1058–59; the 1989 and 1991 figures are derived from my review of court filings.

346 S.W.3d 258
Court of Appeals of Texas,
Dallas.

E. Steve WATSON, Appellant,

v.

The HOMEOWNERS ASSOCIATION
OF HERITAGE RANCH, INC., Appellee.

No. 05–10–00364–CV.    |    July 28, 2011.

**Synopsis**

**Background:** Nonprofit homeowners association member brought action against homeowners association seeking a writ of mandamus to permit him to inspect the books and records of the association. The association filed a general denial and raised the affirmative defenses that the suit was not ripe or was moot because it never denied member the right to examine and copy its books and records. The 416th District Court, Collin County, Chris Oldner, J., entered summary judgment in favor of association. Member appealed.

**[Holding:]** The Court of Appeals, Moseley, J., held that homeowners association did not refuse to permit member to examine the books and records at a reasonable time.

Affirmed.

West Headnotes (3)

**[1]      Mandamus**
         Conduct of hearing or trial
      **Mandamus**
         Appeal and Error

An original proceeding for a writ of mandamus initiated in the trial court is a civil action subject to trial and appeal on substantive law issues and the rules of procedure as any other civil suit.

Cases that cite this headnote

**[2]      Mandamus**
         Nature of acts to be commanded

**Mandamus**
      Necessity of demand

**Mandamus**
      Refusal or default

There are three requisites to a common law action for a writ of mandamus: (1) a legal duty to perform a non-discretionary act; (2) a demand for performance of the act; (3) and a refusal to perform.

Cases that cite this headnote

**[3]      Common Interest Communities**
         Association records

**Mandamus**
      Corporations and associations subject to mandamus

Homeowners association nonprofit did not refuse to permit member to examine the books and records at a reasonable time, and, therefore, member was not entitled to mandamus relief compelling association to permit him to examine records, notwithstanding member's allegations that the association engaged in improper accounting practices, failed to document transactions, and kept false and misleading financial records; member was permitted to examine and copy the association's records for a total of approximately 22 hours. V.T.C.A., Business Organizations Code § 22.351.

Cases that cite this headnote

**Attorneys and Law Firms**

**\*259** E. Steve Watson, Attorney at Law, Allen, TX, pro se.

Robert L. Harris, Shannon, Gracey, Ratliff & Miller, LLP, Dallas, TX, for Appellee.

Before Justices MORRIS, MOSELEY, and MYERS.

**OPINION**

Opinion By Justice MOSELEY.

E. Steve Watson sued The Homeowners Association of Heritage Ranch, Inc. (the HOA) seeking a writ of mandamus to permit him to inspect the books and records of the HOA. The HOA filed a general denial and raised the affirmative defenses that Watson's suit was not ripe or was moot because the HOA never denied him the right to examine and copy the HOA's books and records. Eventually the trial court granted the HOA's motion for summary judgment. Watson appeals, arguing in a single issue that genuine issues of material fact were raised regarding his claims and the HOA's affirmative defenses. We affirm the trial court's judgment.

Watson is a member of the HOA, which is a non-profit corporation. Former article 1396–2.23 gives members of a non-profit corporation the right, on a proper written demand, to examine and copy records as follows:

> B. A member of a corporation, on written demand stating the purpose of the demand, has the right to examine and copy, in person or by agent, accountant, or attorney, at any reasonable time, for any proper purpose, the books and records of the corporation relevant to that purpose, at the expense of the member.

Act of May 24, 1993, 73d Leg., R.S., ch. 733, § 12, 1993 Tex. Gen. Laws 2873, 2879 (expired Jan. 1, 2010) (current version at TEX. BUS. ORGS.CODE ANN. § 22.351 (West 2010)). The HOA's bylaws authorize the board of directors to establish reasonable rules regarding inspection of its records by members, including the notice to be given, the hours and days of the week when inspection may be made, and payment of the cost of reproducing requested copies of the documents.

Watson alleged he made a written demand to inspect the records of the HOA on May 20, 2009 to determine if the financial records of the HOA were properly and accurately kept and whether true results of the HOA's financial operations were communicated to the members. He alleged he was permitted to examine and copy some records, but that the HOA later refused to make additional records available. In an e-mail dated September 9, 2009, Watson requested additional documents regarding the relationship between the HOA and Western Golf Properties (WGP), the manager of the golf course located on the subdivision. On September 18, 2009, Watson made a formal written demand to review the additional documents, stating the same purpose as in his May 20, 2009 demand. He stated that he would file suit to enforce his rights if the additional documents were not made available to him by September 30, 2009. Watson alleged the HOA advised him on September 30, 2009 that it would review his request at the board meeting in October, "but gave no assurance that Plaintiff would be permitted continued access to such records for purposes of examination and/or **\*260** copying." Watson filed this suit on October 1, 2009.

The HOA moved for summary judgment, asserting that the HOA had not refused Watson's written demands to examine and copy its books and records, that Watson's assertions that the HOA would not permit him to examine the books and records in the future were not ripe, and that Watson's prior written demands were moot because he had been permitted to examine and copy the books and records both before suit was filed and again on November 16 and 17 and December 21, 2009. Watson's response and his affidavit argue he was given limited access to some documents for approximately two days before he filed suit. After he filed the suit, he was denied access until November 16, 2009 and again until December 22, 2009, when he was allowed to examine records for a period of less than two days. The trial court granted the HOA's motion for summary judgment without specifying the grounds on which it relied.

**[1]** **[2]** We review a trial court's summary judgment de novo. *See Provident Life & Accident Ins. Co. v. Knott,* 128 S.W.3d 211, 215 (Tex.2003). We apply the well-established standards for reviewing summary judgments. *See Nixon v. Mr. Property Management Co.,* 690 S.W.2d 546, 548–49 (Tex.1985); *see also* TEX.R. CIV. P. 166a. An original proceeding for a writ of mandamus initiated in the trial court is a civil action subject to trial and appeal on substantive law issues and the rules of procedure as any other civil suit. *Anderson v. City of Seven Points,* 806 S.W.2d 791, 795 n. 1 (Tex.1991). There are three requisites to a common law action for a writ of mandamus: a legal duty to perform a non-discretionary act, a demand for performance of the act, and a refusal to perform. *Dallas Fort Worth Int'l Airport Bd. v. Cox,* 261 S.W.3d 378, 382 (Tex.App.-Dallas 2008, no pet.).

**[3]** Watson's request for mandamus is based on the HOA's alleged refusal to perform its legal duty under article 1396–2.23 to permit him to inspect its books and records. To invoke the right to examine and copy records under that statute, the member of the non-profit corporation must make a written demand stating a proper purpose. He may then examine and copy, at any reasonable time, the books and records relevant to the proper purpose at his expense. *See* Act of May 24, 1993,

73d Leg., R.S., ch. 733, § 12, 1993 Tex. Gen. Laws 2873, 2879 (expired Jan. 1, 2010).

To establish entitlement to the writ of mandamus, Watson was required to show (1) the HOA had a legal duty under article 1396–2.23, (2) he made a written demand stating a proper purpose, and (3) the HOA refused to permit him to examine the books and records at a reasonable time. *See Cox, 261 S.W.3d at 382.* The HOA does not claim that Watson's stated purpose was improper.

The summary judgment evidence shows Watson made the May 20, 2009 and September 18, 2009 written demands described above. The summary judgment record indicates the HOA gave Watson access to the HOA's books and records in response to the May 20, 2009 written demand. [1]

The HOA's September 30, 2009 letter stated that the board had discussed Watson's September 18 demand and "agreed that there is not a problem in you examining **\*261** the records you requested." The letter also stated the board decided it needed to establish a policy for payment of the costs associated with the making the records available and copying them and would do so at its October meeting. The letter indicated Watson would be allowed to review the charges and proceed with his request at that time.

The HOA's president testified in his affidavit that, after Watson filed suit, he again examined the HOA's books and records for approximately twenty-two hours on November 16 and 17 and December 21, 2009. [2] The president also testified the HOA would make its books and records available to Watson in the future after proper notice of a proper purpose and at a reasonable time at Watson's expense.

Watson's response and affidavit state that he was denied access to the records at various times, but admit that he was given access on November 16, 2009 and on December 22, 2009. He does not dispute that he was permitted to examine and copy the HOA's records for a total of approximately twenty-two hours in November and December.

Watson's summary judgment response is replete with allegations of improper accounting practices, failures to document transactions, and false and misleading financial records of the HOA. These assertions, however, are not material to whether the HOA refused to permit him to examine the books and records at a reasonable time. [3]

We conclude the summary judgment record establishes that the HOA did not deny Watson's written demands to examine and copy the relevant books and records. Accordingly, the trial court did not err by granting the HOA's motion for summary judgment. We overrule Watson's sole issue.

We affirm the trial court's judgment.

Footnotes

[1] Watson reviewed the 2007–2009 balance sheets, 2007–2009 profit & loss statements, 2007–2009 trial balance of the general ledger associated with the golf course and restaurant, and other documents including the reserve analysis and audited financial statements from 2003 through 2008.

[2] Watson examined and copied monthly statements, balance sheets, profit and loss statements, cash flow statements, account and reserve reconciliations, annual audited statements, invoices, checks, the general ledger, contracts with WGP, other financial records, and membership lists during the November and December 2009 inspection dates.

[3] Watson also complains about the sufficiency of the HOA's responses to discovery in the litigation, but the record does not indicate the trial court was ever asked to rule on these complaints. Whether the HOA properly responded to the discovery requests in this case does not bear on whether it complied with its statutory duty under article 1396–2.23. Thus, Watson's complaints about discovery do not raise a genuine issue of material fact in response to the motion for summary judgment.

**End of Document** © 2015 Thomson Reuters. No claim to original U.S. Government Works.

940 S.W.2d 359
Court of Appeals of Texas,
Dallas.

Angela M. WOOD, M.D., et al., Appellants,
v.
JAMES R. MORIARTY, P.C., d/b/a Moriarty &
Associates, Kathy L. Buchanan, Dallas Observer,
Toni P., et al., and Eva Renea A., et al., Appellees.

No. 05–95–01727–CV.   |   Feb. 19, 1997.

Psychiatrists brought libel and slander action against attorney who represented patients in lawsuit against psychiatrists. The 101st Judicial District Court, Dallas County, Jay Patterson, J., denied psychiatrists' motion to restrict use of or access to discovery records consisting of financial and office records. Psychiatrists appealed. The Court of Appeals, Lagarde, J., held that: (1) it lacked jurisdiction over appeal insofar as it concerned denial of relief under rule permitting court to limit scope of discovery; (2) sufficient evidence supported finding that discovery documents were "court records"; and (3) trial court did not abuse its discretion in denying motion.

Affirmed.

West Headnotes (12)

**[1]    Records**
 Court records

Party seeking to seal court records must prove required elements by preponderance of evidence. Vernon's Ann.Texas Rules Civ.Proc., Rule 76a.

1 Cases that cite this headnote

**[2]    Records**
 Court records

Trial court may not presume particular document or group of documents are court records, for purposes of motion to seal, when party raises issue of whether discovery documents are court records; rather court must make a factual determination of whether specific document or

category of documents constitutes court records. Vernon's Ann.Texas Rules Civ.Proc., Rule 76a.

Cases that cite this headnote

**[3]    Records**
 Court records

Court of Appeals reviews trial court's ruling on motion to seal court records under abuse of discretion standard. Vernon's Ann.Texas Rules Civ.Proc., Rule 76a.

2 Cases that cite this headnote

**[4]    Records**
 Court records

In determining if trial court abused its discretion in ruling on motion to seal documents, test is whether trial court acted without reference to guiding rules or principles provided by rule governing sealing of documents or if trial court acted in arbitrary or unreasonable manner. Vernon's Ann.Texas Rules Civ.Proc., Rule 76a.

5 Cases that cite this headnote

**[5]    Appeal and Error**
 Abuse of discretion

When reviewing matters committed to trial court's discretion, Court of Appeals may not substitute its judgment for that of trial court.

1 Cases that cite this headnote

**[6]    Appeal and Error**
 Province of trial court
**Appeal and Error**
 Province of trial court

In a nonjury trial or hearing, trial judge is sole judge of witnesses' credibility and weight given their testimony.

1 Cases that cite this headnote

**[7]    Records**
 Court records

Court of Appeals had jurisdiction over defendants' claim that trial court erred in denying their motion to restrict use of and access to discovery documents under rule permitting court to seal court records. Vernon's Ann.Texas Rules Civ.Proc., Rule 76a.

Cases that cite this headnote

**[8]     Appeal and Error**
     Relating to witnesses, depositions, affidavits or discovery

Court of Appeals lacked jurisdiction over defendants' appeal insofar as it concerned denial of relief under rule permitting court to limit scope of discovery. Vernon's Ann.Texas Rules Civ.Proc., Rule 166b, subd. 5, par. c.

Cases that cite this headnote

**[9]     Records**
     Court records

Trial court ruled, in granting plea in intervention, that all unfiled discovery constituted "court records," and thus court did not abuse its discretion in ruling on motion to seal discovery documents by failing to determine whether discovery documents sought to be sealed were court records. Vernon's Ann.Texas Rules Civ.Proc., Rule 76a.

Cases that cite this headnote

**[10]     Appeal and Error**
     Failure to make bill of exceptions, case, or statement of facts

In absence of a statement of facts, Court of Appeals must presume that sufficient evidence was introduced in trial court to support trial court's decision. Rules App.Proc., Rule 50(d).

1 Cases that cite this headnote

**[11]     Records**
     Court records

In the absence of statement of facts, Court of Appeals presumed that sufficient evidence supported trial court's finding that discovery

documents were "court records" in court's ruling denying libel plaintiffs' motion to restrict use or access to those documents. Vernon's Ann.Texas Rules Civ.Proc., Rule 76a; Rules App.Proc., Rule 50(d).

Cases that cite this headnote

**[12]     Records**
     Court records

Trial court did not abuse its discretion in denying psychiatrists' motion to restrict use of and access to discovery records, consisting of financial and office records, in their libel and slander action against attorney who was representing patients in lawsuit against psychiatrists, where psychiatrists presented no evidence that lack of restrictions on use of discovery would harm their defense in patients' action or that any existing orders in patients' action would prevent patients from obtaining those requested documents. Vernon's Ann.Texas Rules Civ.Proc., Rule 76a.

1 Cases that cite this headnote

**Attorneys and Law Firms**

**\*360** William A. Smith, J. Douglas Uloth, Smith & Uloth, P.C., Dallas, for Appellants.

Thomas J. Williams, Haynes & Boone, L.L.P., Fort Worth, Ronald L. Palmer, C. Craig Tadlock, Baker & Botts, L.L.P., Dallas, James R. Moriarty, The Law Offices of James R. Moriarty & Associates, Houston, for Appellees.

Before LAGARDE, MALONEY and MORRIS, JJ.

**OPINION**

LAGARDE, Justice.

Angela M. Wood, M.D., et al. appeal the trial court's order denying their motion to restrict access to discovery pursuant to rule 76a. *See* TEX.R. CIV. P. 76a. Appellants bring four points of error contending that the trial court abused its discretion in denying appellants' motion to restrict discovery (i) in failing to determine whether the discovery documents

were court records, (ii) in failing to analyze or apply correct legal principles, and (iii) because no evidence or insufficient evidence supports the trial court's ruling. We overrule the points and affirm the trial court's order.

## FACTUAL BACKGROUND

Appellants are ten psychiatrists and their professional corporations operating as a partnership, Dallas Psychiatric Associates. From 1987 to 1991, these doctors practiced at Brookhaven Psychiatric Pavilion, which was owned by National Medical Enterprises. James Moriarty is an attorney who placed allegedly libelous advertisements in newspapers and on radio stating that appellants had received kickbacks, had overcharged patients, had charged patients for services not performed, and had physically and mentally abused patients. Moriarty represents about six hundred plaintiffs in a lawsuit against appellants filed in Montgomery County. After Moriarty filed the Montgomery County suit, appellants brought this suit against him and Kathy Buchanan alleging libel and slander. Appellants asserted as damages, *inter alia,* loss of income and patients. During discovery, Moriarty requested that appellants turn over certain personal and business financial records. Appellants filed a motion asking the trial court to limit the scope of discovery under rule of civil procedure 166b or to restrict public access to the records under rule 76a. The Dallas Observer, Toni **\*361** P., et al., and Eva Renea A., et al., [1] intervened in the suit for purposes of the motion to seal under rule 76a(4). Appellants did not tender the documents to the trial court for in camera review. Following a hearing, the trial court denied appellants' request to seal. Pursuant to rule 76a(8), appellants brought this appeal from the trial court's order denying the rule 76a motion. *See* TEX.R. CIV. P. 76a(8).

## RULE 76A

 **[1]**    Rule 76a of the rules of civil procedure provides that "court records ... are presumed to be open to the general public...." TEX.R. CIV. P. 76a(1). "Court records" are defined in the rule as, among other things, "discovery, not filed of record, concerning matters that have a probable adverse effect upon the general public health or safety." TEX.R. CIV. P. 76a(2)(c). Rule 76a provides:

[C]ourt records, as defined in this rule, are presumed to be open to the general public and may be sealed only upon a showing of all of the following:

(a) a specific, serious and substantial interest which clearly outweighs:

(1) this presumption of openness;

(2) any probable adverse effect that sealing will have upon the general public health or safety;

(b) no less restrictive means than sealing records will adequately and effectively protect the specific interest asserted.

TEX.R. CIV. P. 76a(1). The party seeking to seal the court records must prove the elements of rule 76a(1) by a preponderance of the evidence. *Upjohn Co. v. Freeman,* 906 S.W.2d 92, 96 (Tex.App.—Dallas 1995, no writ); *Eli Lilly & Co. v. Biffle,* 868 S.W.2d 806, 809 (Tex.App.—Dallas 1993, no writ).

 **[2]**    A trial court may not presume a particular document or group of documents constitutes court records if a party in a rule 76a motion raises the issue of whether the discovery in question constitutes court records as defined in the rule. *Upjohn,* 906 S.W.2d at 95–96; *Eli Lilly,* 868 S.W.2d at 808. When the issue is raised, the trial court must make a factual determination of whether a specific document or category of documents constitutes court records. *Upjohn,* 906 S.W.2d at 96; *Eli Lilly,* 868 S.W.2d at 808.

 **[3]**    **[4]**    We review the trial court's ruling on the rule 76a motion under an abuse of discretion standard. *Upjohn,* 906 S.W.2d at 95; *Eli Lilly,* 868 S.W.2d at 809. The test for an abuse of discretion is not whether the facts present a proper case for the trial court's action. Rather, the test is whether the trial court acted without reference to any guiding rules or principles, or acted in an arbitrary or unreasonable manner. *Downer v. Aquamarine Operators, Inc.,* 701 S.W.2d 238, 241–42 (Tex.1985), *cert. denied,* 476 U.S. 1159, 106 S.Ct. 2279, 90 L.Ed.2d 721 (1986); *Upjohn,* 906 S.W.2d at 95. Rule 76a provides the guiding rules and principles for sealing court records. *Upjohn,* 906 S.W.2d at 95; *Dunshie v. General Motors Corp.,* 822 S.W.2d 345, 347 (Tex.App.—Beaumont 1992, no writ). An abuse of discretion does not exist when the trial court bases its decision on conflicting evidence. *Davis v. Huey,* 571 S.W.2d 859, 862 (Tex.1978); *Zmotony v. Phillips,* 529 S.W.2d 760, 762 (Tex.1975); *Upjohn,* 906 S.W.2d at 95.

**[5]** **[6]** When we review matters committed to the trial court's discretion, we may not substitute our judgment for that of the trial court. *Upjohn,* 906 S.W.2d at 95. Even if we would decide the issue differently, we may not disturb the trial court's decision unless it is arbitrary and unreasonable. *Id.* In a nonjury trial or hearing, the trial judge is the sole judge of the witnesses' credibility and the weight given their testimony. *Id.; Tate v. Commodore County Mut. Ins. Co.,* 767 S.W.2d 219, 224 (Tex.App.—Dallas 1989, writ denied).

## JURISDICTION

**[7]** In their first "reply point," appellees assert that this Court lacks jurisdiction over the appeal because appellants contend in their first point of error that the trial court did not determine that the discovery documents **\*362** were court records. If the documents are not court records, then rule 76a is not applicable. *See Dunshie,* 822 S.W.2d at 348; *see also* TEX.R. CIV. P. 76a(8). Appellants' argument under the point is that the trial court appeared to presume that the records were court records without making a factual determination. Courts of appeals do have jurisdiction to review this complaint. *See Upjohn,* 906 S.W.2d at 96; *Eli Lilly,* 868 S.W.2d at 808. We conclude that we have jurisdiction over the appeal. We overrule appellees' first reply point.[2]

**[8]** All of appellants' points of error assert that the trial court erred in denying their motion to restrict use of and access to the discovery documents pursuant to rules 76a and 166b(5)(c) of the Texas Rules of Civil Procedure. This Court has jurisdiction over the appeal insofar as it concerns the denial of relief under rule 76a. This Court has no jurisdiction over the appeal insofar as it concerns the denial of relief under rule 166b. *See Dunshie,* 822 S.W.2d at 348. Accordingly, we dismiss appellants' points of error to the extent they do not involve denial of relief under rule 76a.

## COURT RECORDS

**[9]** In their first point of error, appellants contend that the trial court abused its discretion in failing to determine that the documents sought to be sealed were court records. The record shows that the trial court did determine that the documents were court records. In the order granting the Dallas Observer's plea in intervention, the trial court ruled, "All documents filed with the clerk of this Court in this action and all unfiled

discovery constitute 'court records' as that term is defined and interpreted for purposes of application of Tex.R. Civ. P. 76a."[3] Therefore, we overrule appellants' first point of error.

In their second point of error,[4] appellants contend that no evidence or insufficient evidence supports the trial court's order denying appellants' motion to restrict use of and access to discovery. Under this point, appellants argue that no evidence or insufficient evidence supports the trial court's finding that the discovery documents are court records. The order containing the finding that the discovery documents are court records states that the decision was based on the pleadings, the evidence submitted, and the argument of counsel. The briefs refer to a statement of facts from the hearing on the motion to seal, but no statement of facts has been filed in this case.[5] The briefs note that certain exhibits, which are not included in the record before this Court, were submitted to the trial court and admitted into evidence.

**[10]** Appellants had the responsibility to ensure that the statement of facts was filed. TEX.R.APP. P. 53(k); *Smith v. Grace,* 919 S.W.2d 673, 676 (Tex.App.—Dallas 1996, writ denied), *petition for cert. filed,* 65 U.S.L.W. 3489 (U.S. Jan. 2, 1997) (No. 96–1057); *see also* TEX.R.APP. P. 50(d). The requirement of a statement of facts applies to issues that require reference to the evidence. **\*363** *Smith,* 919 S.W.2d at 677. In the absence of a statement of facts, we must presume that sufficient evidence was introduced in the trial court to support the trial court's decision. *Id.; Northeast Wholesale Lumber, Inc. v. Leader Lumber, Inc.,* 785 S.W.2d 402, 405 (Tex.App.—Dallas 1989, no writ).

**[11]** Appellees state that the trial court admitted defendants' exhibits one through three at the hearing. Appellees state these exhibits were certified copies of criminal judgments against National Medical Enterprises and Peter Alexis. The other evidence considered by the trial judge was contained in affidavits filed with the district clerk. The affidavits are before this Court in the transcript and supplemental transcript. The judgments introduced at the hearing, however, do not appear to be part of the record before this Court. Because the parties allege that the trial court received evidence at the hearing not before this Court in the transcript, review of the sufficiency of the evidence in this case requires review of the statement of facts. Appellants failed in their duty to file the statement of facts in this case. Accordingly, we must presume that some evidence and sufficient evidence supports the trial court's finding that the documents were court records. We overrule appellants' second point of error.

## ABUSE OF DISCRETION

In their third point of error, appellants contend that the trial court abused its discretion in denying their motion to restrict use of and access to discovery documents. [6]

The records requested consist of financial and office records including: records of compensation from appellants' associated hospitals and national medical organizations; records of compensation from referrals; stock options from the associated hospitals and national medical organizations; billing records; federal income tax returns for 1993 and 1994; financial statements; accounting documents; and records showing appellants' income from 1993 through the present. Appellants assert that they have a specific, serious, and substantial interest in these records which outweighs the presumption of openness and any probable adverse effect that sealing will have upon the general public health and safety. Appellants assert that no less restrictive means than sealing these records will protect their interest in these records. *See* TEX.R. CIV. P. 76a(1).

 **[12]** Appellants assert a privacy interest in the financial records. Appellants rely on *Fox v. Anonymous,* 869 S.W.2d 499 (Tex.App.—San Antonio 1993, writ denied). In *Fox,* the minor plaintiff and his guardian ad litem filed a "friendly" suit in district court for the approval, entry, and enforcement of a settlement agreement of the minor's tort claims resulting from being sexually assaulted while a patient in a mental health facility. *Id.* at 501. The plaintiff moved to have the records sealed so that his identity and the terms of the settlement agreement would not be disclosed. *Id.* at 502. The plaintiff introduced evidence showing that he would be irreparably harmed by the disclosure of his identity and the terms of the settlement agreement. *Id.* The trial court granted the plaintiff's motion and ordered the records sealed. On appeal, the San Antonio Court of Appeals found that sufficient evidence existed that the plaintiff had a specific, serious, and substantial interest in concealing his identity and the terms of the settlement agreement because of his severe emotional problems and the risks associated with his rehabilitation and treatment. *Id.* at 506. The plaintiff met the other requirements of rule 76a(1). *Id.* at 505–06. The court of appeals affirmed the sealing order to the extent that it concealed the plaintiff's identity and the terms of the settlement agreement. *Id.* at 507.

*Fox* is an appeal of an order *granting* a sealing order; this case involves review of an order *denying* a sealing order. The standards **\*364** for reviewing the denial of a sealing order differ from those for reviewing the granting of a sealing order. [7] Therefore, *Fox* does not apply to this case.

Appellants also note that the court in *Fox* stated that an unapproved version of rule 76a placed financial information on the same level of protection as a sexual assault victim's identity. Appellants assert that the trial court should have ordered the financial records sealed in this case just as the court in *Fox* ordered sealed the plaintiff's identification and the terms of the settlement agreement. However, in *Fox,* the court held that the trial court did not err in sealing the records because the plaintiff proved the existence of a specific, serious, and substantial interest by showing that the lack of restrictions on access to the plaintiff's identity and the terms of the settlement agreement would cause him irreparable harm. *Id.* at 507. In this case, appellants proved that the records were private, but they presented no evidence showing that the lack of restrictions on access to the financial information would cause them irreparable harm. Thus, *Fox* does not support appellants' position.

Appellants also assert for the first time that disclosure of the financial records would harm their spouses and children by disclosing their social security numbers. Nothing in the record shows that any of the appellants are married or have children. Thus, this argument lacks merit.

Appellants assert that because appellee Moriarty is counsel for plaintiffs in the suit against appellants in *Evangeline R., et al. v. National Medical Enterprises, et al.* pending in Montgomery County, Moriarty would be likely to use information discovered in his capacity as a party in this case in his representation of plaintiffs in *Evangeline R.* in their suit against appellants. Appellants argue that the lack of restrictions on the use of the material discovered in this lawsuit against appellants in the other lawsuit would be improper and cause appellants irreparable harm. Appellants present no argument or authorities explaining why the use of the information in the Montgomery County suit would be improper. Nor do they explain how the use of the evidence in the Montgomery County suit would cause them irreparable harm. If the evidence is relevant to the Montgomery County suit, then, presumably, the same information is subject to discovery in that suit. *See* TEX.R. CIV. P. 166b(2)(a) ("Parties may obtain discovery regarding any matter which is relevant to the subject matter in the pending

action...."). Appellants have not shown that any existing orders limiting discovery in the Montgomery County suit would prevent appellees from obtaining this information during the discovery procedures in the Montgomery County suit or that the lack of restrictions on the use of discovery in this case would harm them in their defense of the Montgomery County suit. Thus, even though appellants asserted in their motion that they would be irreparably harmed by the lack of restrictions on the use of the documents, they presented no evidence in support of this assertion.

Appellants' failure to make any showing that the lack of restrictions on the use of or access to the documents would harm them supports the trial court's finding that:

> the public interest and right to know the contents of Plaintiffs' discovery responses in this lawsuit outweigh Plaintiffs' interest in the privacy of such records. Plaintiffs have not shown a specific, serious, and substantial interest which clearly outweighs the presumption of openness of court records and the probable adverse effect that sealing will have upon the general public health and safety.

Accordingly, we conclude that the trial court did not abuse its discretion in denying appellants' motion to restrict use of and access to discovery documents. We overrule appellants' third point of error.

**\*365** In their fourth point of error,[8] appellants contend that the trial court erred in failing to analyze or apply the correct legal principles in denying appellants' motion to restrict use of and access to discovery. Appellants' argument under this point appears to be an attempt to incorporate their arguments from the first two points of error. Because we have overruled those points of error, we overrule appellants' fourth point of error.

We affirm the trial court's order denying appellants' motion to seal.

## Footnotes

1     Toni P., et al. and Eva Renea A., et al. are 105 individuals who were appellants' patients and have suits pending against appellants in Dallas and Montgomery counties.

2     In their argument under this reply point, appellees cited *Tollack v. Allianz of America Corp.,* No. 05–91–01943–CV, 1993 WL 321458 (Tex.App.—Dallas, Aug.16, 1993, writ denied) (not designated for publication). This Court ordered that the opinion not be published. Rule 90(i) of the rules of appellate procedure provides, "Unpublished opinions *shall not* be cited as authority by counsel or by a court." TEX.R.APP. P. 90(i) (emphasis added). Appellees' citation to *Tollack* as authority in support of their argument is in clear violation of this rule. Appellees and their counsel are cautioned not to violate this rule in the future.

3     Appellants do not challenge this ruling as overbroad. Accordingly, we do not address this issue. We do not consider and we express no opinion on the propriety of the order.

4     On page iv of appellants' brief, this point of error is listed as the fourth point of error.

5     Before bringing this appeal, appellants filed a motion for leave to file a writ of mandamus. That motion was summarily denied. The statement of facts from the hearing on the motion to seal was delivered to the clerk of this Court as an exhibit to the petition for writ of mandamus presented with the motion for leave to file. *See* TEX.R.APP. P. 121(a)(3), (4). No party to this appeal attempted to make that statement of facts part of the record of this appeal or requested that we take judicial notice of the statement of facts. Accordingly, we do not address the issue of whether the statement of facts is properly part of the records of this Court following the denial of the motion for leave to file the petition for writ of mandamus.

6     This is the point of error as stated on page 17 of appellants' brief immediately preceding the argument on the point of error. On page iv of their brief, appellants state the third point of error as: "The trial court abused its discretion in failing to make a factual determination on the motion to restrict use of and access to discovery pursuant to Texas Rules of Civil Procedure 76a and 166b(5) (c)." Appellants do not argue the point as stated on page iv. Accordingly, we address the point of error as stated on page 17.

7     Rule 76a permits a trial court to seal court records only when the movant makes the showing required by rule 76a. However, rule 76a does not require the trial court to seal the record if the movant makes the 76a(1) showing. *See* TEX.R. CIV. P. 76a(1) ("court records ... are presumed to be open ... and *may* be sealed *only* upon a showing of the [requirements of rule 76a(1)(a) & (b) ]" (emphasis added)).

8     On page iv of appellants' brief, this point of error is listed as the second point of error.

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

Vernon's Texas Statutes and Codes Annotated
  Business Organizations Code (Refs & Annos)
    Title 6. Associations (Refs & Annos)
      Chapter 252. Unincorporated Nonprofit Associations (Refs & Annos)

V.T.C.A., Business Organizations Code § 252.010

§ 252.010. Books and Records

Effective: January 1, 2006
Currentness

(a) A nonprofit association shall keep correct and complete books and records of account for at least three years after the end of each fiscal year and shall make the books and records available on request to members of the association for inspection and copying.

(b) The attorney general may inspect, examine, and make copies of the books, records, and other documents the attorney general considers necessary and may investigate the association to determine if a violation of any law of this state has occurred.

**Credits**
Acts 2003, 78th Leg., ch. 182, § 1, eff. Jan. 1, 2006.

V. T. C. A., Business Organizations Code § 252.010, TX BUS ORG § 252.010
Current through the end of the 2013 Third Called Session of the 83rd Legislature

**End of Document**                    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

> Vernon's Texas Statutes and Codes Annotated
>   Business Organizations Code (Refs & Annos)
>     Title 2. Corporations (Refs & Annos)
>       Chapter 22. Nonprofit Corporations
>         Subchapter H. Records and Reports

V.T.C.A., Business Organizations Code § 22.351

§ 22.351. Member's Right to Inspect Books and Records

Effective: January 1, 2006
Currentness

A member of a corporation, on written demand stating the purpose of the demand, is entitled to examine and copy at the member's expense, in person or by agent, accountant, or attorney, at any reasonable time and for a proper purpose, the books and records of the corporation relevant to that purpose.

**Credits**

Acts 2003, 78th Leg., ch. 182, § 1, eff. Jan. 1, 2006.

Notes of Decisions (1)

V. T. C. A., Business Organizations Code § 22.351, TX BUS ORG § 22.351
Current through the end of the 2013 Third Called Session of the 83rd Legislature

---

**End of Document** 

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

Vernon's Texas Statutes and Codes Annotated
  Civil Statutes (Refs & Annos)
    Title 32. Corporations
      Chapter Nine. Non-Profit, Cooperative, Religious and Charitable (Refs & Annos)
        1. Texas Non-Profit Corporation Act (Refs & Annos)

This section has been updated. Click here for the updated version.

Vernon's Ann.Texas Civ.St. Art. 1396-2.23

Art. 1396-2.23. Books and Records

Effective: [See Text Amendments] to December 31, 2009

<This article expires effective Jan. 1, 2010 pursuant to Vernon's Ann.Civ.St. art. 1396-11.02.>

A. Each corporation shall keep correct and complete books and records of account and shall keep minutes of the proceedings of its members, board of directors, and committees having any authority of the board of directors and shall keep at its registered office or principal office in this State a record of the names and addresses of its members entitled to vote.

B. A member of a corporation, on written demand stating the purpose of the demand, has the right to examine and copy, in person or by agent, accountant, or attorney, at any reasonable time, for any proper purpose, the books and records of the corporation relevant to that purpose, at the expense of the member.

**Credits**
Acts 1959, 56th Leg., p. 286, ch. 162, art. 2.23. Amended by Acts 1993, 73rd Leg., ch. 733, § 12, eff. Jan. 1, 1994.

Titles 1 to 8 [part] appear in this volume

Vernon's Ann. Texas Civ. St. Art. 1396-2.23, TX CIV ST Art. 1396-2.23
Current through the end of the 2013 Third Called Session of the 83rd Legislature

**End of Document** © 2015 Thomson Reuters. No claim to original U.S. Government Works.

Vernon's Texas Statutes and Codes Annotated
  Property Code (Refs & Annos)
    Title 7. Condominiums
      Chapter 82. Uniform Condominium Act (Refs & Annos)
        Subchapter C. Condominium Management

V.T.C.A., Property Code § 82.114

§ 82.114. Association Records

Currentness

(a) The association shall keep:

(1) detailed financial records that comply with generally accepted accounting principles and that are sufficiently detailed to enable the association to prepare a resale certificate under Section 82.157;

(2) the plans and specifications used to construct the condominium except for buildings originally constructed before January 1, 1994;

(3) the condominium information statement prepared under Section 82.152 and any amendments;

(4) the name and mailing address of each unit owner;

(5) voting records, proxies, and correspondence relating to amendments to the declaration; and

(6) minutes of meetings of the association and board.

(b) All financial and other records of the association shall be reasonably available at its registered office or its principal office in this state for examination by a unit owner and the owner's agents. An attorney's files and records relating to the association are not records of the association and are not subject to inspection by unit owners or production in a legal proceeding.

(c) The association shall, as a common expense, annually obtain an independent audit of the records. Copies of the audit must be made available to the unit owners. An audit required by this subsection shall be performed by a certified public accountant if required by the bylaws or a vote of the board of directors or a majority vote of the members of the association voting at a meeting of the association.

(d) A declarant shall furnish copies to the association of the information required by Subsection (a) on the date the first unit is sold.

(e) Not later than the 30th day after the date of acquiring an interest in a unit, the unit owner shall provide the association with:

(1) the unit owner's mailing address, telephone number, and driver's license number, if any;

(2) the name and address of the holder of any lien against the unit, and any loan number;

(3) the name and telephone number of any person occupying the unit other than the unit owner; and

(4) the name, address, and telephone number of any person managing the unit as agent of the unit owner.

(f) A unit owner shall notify the association not later than the 30th day after the date the owner has notice of a change in any information required by Subsection (e), and shall provide the information on request by the association from time to time.

**Credits**
Added by Acts 1993, 73rd Leg., ch. 244, § 1, eff. Jan. 1, 1994.

V. T. C. A., Property Code § 82.114, TX PROPERTY § 82.114
Current through the end of the 2013 Third Called Session of the 83rd Legislature

**End of Document** © 2015 Thomson Reuters. No claim to original U.S. Government Works.

Vernon's Texas Rules Annotated
    Texas Rules of Appellate Procedure
        Section Two. Appeals from Trial Court Judgments and Orders (Refs & Annos)
            Rule 42. Dismissal (Refs & Annos)

TX Rules App.Proc., Rule 42.3

42.3. Involuntary Dismissal in Civil Cases

Currentness

Under the following circumstances, on any party's motion--or on its own initiative after giving ten days' notice to all parties--the appellate court may dismiss the appeal or affirm the appealed judgment or order. Dismissal or affirmance may occur if the appeal is subject to dismissal:

(a) for want of jurisdiction;

(b) for want of prosecution; or

(c) because the appellant has failed to comply with a requirement of these rules, a court order, or a notice from the clerk requiring a response or other action within a specified time.

**Credits**
Eff. Sept. 1, 1997.

Notes of Decisions (26)

Rules App. Proc., Rule 42.3, TX R APP Rule 42.3
Current with amendments received through August 15, 2014

**End of Document**                                    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

Vernon's Texas Rules Annotated
  Texas Rules of Civil Procedure
    Part II. Rules of Practice in District and County Courts
      Section 9. Evidence and Discovery (Refs & Annos)
        B. Discovery
          Rule 190. Discovery Limitations (Refs & Annos)

TX Rules of Civil Procedure, Rule 190.5

190.5. Modification of Discovery Control Plan

Currentness

The court may modify a discovery control plan at any time and must do so when the interest of justice requires. Unless a suit is governed by the expedited actions process in Rule 169, the court must allow additional discovery:

(a) related to new, amended or supplemental pleadings, or new information disclosed in a discovery response or in an amended or supplemental response, if:

(1) the pleadings or responses were made after the deadline for completion of discovery or so nearly before that deadline that an adverse party does not have an adequate opportunity to conduct discovery related to the new matters, and

(2) the adverse party would be unfairly prejudiced without such additional discovery;

(b) regarding matters that have changed materially after the discovery cutoff if trial is set or postponed so that the trial date is more than three months after the discovery period ends.

**Credits**

Aug. 5, 1998 and Nov. 9, 1998, eff. Jan. 1, 1999. Amended by order of Feb. 12, 2013, eff. March 1, 2013.

**Editors' Notes**

**COMMENT--2013**

Rule 190 is amended to implement section 22.004(h) of the Texas Government Code, which calls for rules to promote the prompt, efficient, and cost-effective resolution of civil actions when the amount in controversy does not exceed $100,000. Rule 190.2 now applies to expedited actions, as defined by Rule 169. Rule 190.2 continues to apply to divorces not involving children in which the value of the marital estate is not more than $50,000, which are otherwise exempt from the expedited actions process. Amended Rule 190.2(b) ends the discovery period 180 days after the date the first discovery request is served; imposes a fifteen limit maximum on interrogatories, requests for production, and requests for admission; and allows for additional disclosures. Although expedited actions are not subject to mandatory additional discovery under amended Rule 190.5, the court may still allow additional discovery if the conditions of Rule 190.5(a) are met.

Vernon's Ann. Texas Rules Civ. Proc., Rule 190.5, TX R RCP Rule 190.5
Current with amendments received through 3/15/2015

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

Vernon's Texas Rules Annotated
  Texas Rules of Civil Procedure
    Part II. Rules of Practice in District and County Courts
      Section 9. Evidence and Discovery (Refs & Annos)
        B. Discovery
          Rule 191. Modifying Discovery Procedures and Limitations; Conference Requirement; Signing
          Disclosures, Discovery Requests, Responses, and Objections; Filing Requirements

TX Rules of Civil Procedure, Rule 191.1

191.1. Modification of Procedures

Currentness

Except where specifically prohibited, the procedures and limitations set forth in the rules pertaining to discovery may be modified in any suit by the agreement of the parties or by court order for good cause. An agreement of the parties is enforceable if it complies with Rule 11 or, as it affects an oral deposition, if it is made a part of the record of the deposition.

**Credits**
Aug. 5, 1998 and Nov. 9, 1998, eff. Jan. 1, 1999.

Notes of Decisions (8)

Vernon's Ann. Texas Rules Civ. Proc., Rule 191.1, TX R RCP Rule 191.1
Current with amendments received through 3/15/2015

---

**End of Document**    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

Vernon's Texas Rules Annotated
  Texas Rules of Civil Procedure
    Part II. Rules of Practice in District and County Courts
      Section 9. Evidence and Discovery (Refs & Annos)
        B. Discovery
          Rule 191. Modifying Discovery Procedures and Limitations; Conference Requirement; Signing
          Disclosures, Discovery Requests, Responses, and Objections; Filing Requirements

TX Rules of Civil Procedure, Rule 191.3

191.3. Signing of Disclosures, Discovery Requests, Notices, Responses, and Objections

Currentness

(a) *Signature Required.* Every disclosure, discovery request, notice, response, and objection must be signed:

(1) by an attorney, if the party is represented by an attorney, and must show the attorney's State Bar of Texas identification number, address, telephone number, and fax number, if any; or

(2) by the party, if the party is not represented by an attorney, and must show the party's address, telephone number, and fax number, if any.

(b) *Effect of Signature on Disclosure.* The signature of an attorney or party on a disclosure constitutes a certification that to the best of the signer's knowledge, information, and belief, formed after a reasonable inquiry, the disclosure is complete and correct as of the time it is made.

(c) *Effect of Signature on Discovery Request, Notice, Response, or Objection.* The signature of an attorney or party on a discovery request, notice, response, or objection constitutes a certification that to the best of the signer's knowledge, information, and belief, formed after a reasonable inquiry, the request, notice, response, or objection:

(1) is consistent with the rules of civil procedure and these discovery rules and warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law;

(2) has a good faith factual basis;

(3) is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation; and

(4) is not unreasonable or unduly burdensome or expensive, given the needs of the case, the discovery already had in the case, the amount in controversy, and the importance of the issues at stake in the litigation.

(d) *Effect of Failure to Sign.* If a request, notice, response, or objection is not signed, it must be stricken unless it is signed promptly after the omission is called to the attention of the party making the request, notice, response, or objection. A party is not required to take any action with respect to a request or notice that is not signed.

(e) *Sanctions.* If the certification is false without substantial justification, the court may, upon motion or its own initiative, impose on the person who made the certification, or the party on whose behalf the request, notice, response, or objection was made, or both, an appropriate sanction as for a frivolous pleading or motion under Chapter 10 of the Civil Practice and Remedies Code.

**Credits**

Aug. 5, 1998 and Nov. 9, 1998, eff. Jan. 1, 1999.

Vernon's Ann. Texas Rules Civ. Proc., Rule 191.3, TX R RCP Rule 191.3

Current with amendments received through 3/15/2015

**End of Document**                                            © 2015 Thomson Reuters. No claim to original U.S. Government Works.

Vernon's Texas Rules Annotated
   Texas Rules of Civil Procedure
      Part II. Rules of Practice in District and County Courts
         Section 9. Evidence and Discovery (Refs & Annos)
            B. Discovery
               Rule 191. Modifying Discovery Procedures and Limitations; Conference Requirement; Signing
               Disclosures, Discovery Requests, Responses, and Objections; Filing Requirements

TX Rules of Civil Procedure, Rule 191.3

191.3. Signing of Disclosures, Discovery Requests, Notices, Responses, and Objections

Currentness

(a) *Signature Required.* Every disclosure, discovery request, notice, response, and objection must be signed:

(1) by an attorney, if the party is represented by an attorney, and must show the attorney's State Bar of Texas identification number, address, telephone number, and fax number, if any; or

(2) by the party, if the party is not represented by an attorney, and must show the party's address, telephone number, and fax number, if any.

(b) *Effect of Signature on Disclosure.* The signature of an attorney or party on a disclosure constitutes a certification that to the best of the signer's knowledge, information, and belief, formed after a reasonable inquiry, the disclosure is complete and correct as of the time it is made.

(c) *Effect of Signature on Discovery Request, Notice, Response, or Objection.* The signature of an attorney or party on a discovery request, notice, response, or objection constitutes a certification that to the best of the signer's knowledge, information, and belief, formed after a reasonable inquiry, the request, notice, response, or objection:

(1) is consistent with the rules of civil procedure and these discovery rules and warranted by existing law or a good faith argument for the extension, modification, or reversal of existing law;

(2) has a good faith factual basis;

(3) is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation; and

(4) is not unreasonable or unduly burdensome or expensive, given the needs of the case, the discovery already had in the case, the amount in controversy, and the importance of the issues at stake in the litigation.

(d) *Effect of Failure to Sign.* If a request, notice, response, or objection is not signed, it must be stricken unless it is signed promptly after the omission is called to the attention of the party making the request, notice, response, or objection. A party is not required to take any action with respect to a request or notice that is not signed.

(e) *Sanctions.* If the certification is false without substantial justification, the court may, upon motion or its own initiative, impose on the person who made the certification, or the party on whose behalf the request, notice, response, or objection was made, or both, an appropriate sanction as for a frivolous pleading or motion under Chapter 10 of the Civil Practice and Remedies Code.

 © 2015 Thomson Reuters. No claim to original U.S. Government Works.

**Credits**

Aug. 5, 1998 and Nov. 9, 1998, eff. Jan. 1, 1999.

Vernon's Ann. Texas Rules Civ. Proc., Rule 191.3, TX R RCP Rule 191.3

Current with amendments received through 3/15/2015

**End of Document**
© 2015 Thomson Reuters. No claim to original U.S. Government Works.

Vernon's Texas Rules Annotated
   Texas Rules of Civil Procedure
      Part II. Rules of Practice in District and County Courts
         Section 9. Evidence and Discovery (Refs & Annos)
            B. Discovery
               Rule 192. Permissible Discovery: Forms and Scope; Work Product; Protective Orders; Definitions (Refs & Annos)

TX Rules of Civil Procedure, Rule 192.4

192.4. Limitations on Scope of Discovery

Currentness

The discovery methods permitted by these rules should be limited by the court if it determines, on motion or on its own initiative and on reasonable notice, that:

(a) the discovery sought is unreasonably cumulative or duplicative, or is obtainable from some other source that is more convenient, less burdensome, or less expensive; or

(b) the burden or expense of the proposed discovery outweighs its likely benefit, taking into account the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the litigation, and the importance of the proposed discovery in resolving the issues.

**Credits**
Aug. 5, 1998 and Nov. 9, 1998, eff. Jan. 1, 1999.

Notes of Decisions (37)

Vernon's Ann. Texas Rules Civ. Proc., Rule 192.4, TX R RCP Rule 192.4
Current with amendments received through 3/15/2015

**End of Document**                                    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

---

> Vernon's Texas Rules Annotated
>   Texas Rules of Civil Procedure
>     Part II. Rules of Practice in District and County Courts
>       Section 9. Evidence and Discovery (Refs & Annos)
>         B. Discovery
>           Rule 192. Permissible Discovery: Forms and Scope; Work Product; Protective Orders; Definitions (Refs & Annos)

TX Rules of Civil Procedure, Rule 192.6

192.6. Protective Orders

Currentness

(a) *Motion.* A person from whom discovery is sought, and any other person affected by the discovery request, may move within the time permitted for response to the discovery request for an order protecting that person from the discovery sought. A person should not move for protection when an objection to written discovery or an assertion of privilege is appropriate, but a motion does not waive the objection or assertion of privilege. If a person seeks protection regarding the time or place of discovery, the person must state a reasonable time and place for discovery with which the person will comply. A person must comply with a request to the extent protection is not sought unless it is unreasonable under the circumstances to do so before obtaining a ruling on the motion.

(b) *Order.* To protect the movant from undue burden, unnecessary expense, harassment, annoyance, or invasion of personal, constitutional, or property rights, the court may make any order in the interest of justice and may--among other things--order that:

  (1) the requested discovery not be sought in whole or in part;

  (2) the extent or subject matter of discovery be limited;

  (3) the discovery not be undertaken at the time or place specified;

  (4) the discovery be undertaken only by such method or upon such terms and conditions or at the time and place directed by the court;

  (5) the results of discovery be sealed or otherwise protected, subject to the provisions of Rule 76a.

**Credits**
Aug. 5, 1998 and Nov. 9, 1998, eff. Jan. 1, 1999.

Notes of Decisions (28)

Vernon's Ann. Texas Rules Civ. Proc., Rule 192.6, TX R RCP Rule 192.6
Current with amendments received through 3/15/2015

---

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

 © 2015 Thomson Reuters. No claim to original U.S. Government Works.

---

> Vernon's Texas Rules Annotated
>   Texas Rules of Civil Procedure
>     Part II. Rules of Practice in District and County Courts
>       Section 9. Evidence and Discovery (Refs & Annos)
>         B. Discovery
>           Rule 192. Permissible Discovery: Forms and Scope; Work Product; Protective Orders; Definitions (Refs & Annos)

TX Rules of Civil Procedure, Rule 192.6

192.6. Protective Orders

Currentness

(a) *Motion.* A person from whom discovery is sought, and any other person affected by the discovery request, may move within the time permitted for response to the discovery request for an order protecting that person from the discovery sought. A person should not move for protection when an objection to written discovery or an assertion of privilege is appropriate, but a motion does not waive the objection or assertion of privilege. If a person seeks protection regarding the time or place of discovery, the person must state a reasonable time and place for discovery with which the person will comply. A person must comply with a request to the extent protection is not sought unless it is unreasonable under the circumstances to do so before obtaining a ruling on the motion.

(b) *Order.* To protect the movant from undue burden, unnecessary expense, harassment, annoyance, or invasion of personal, constitutional, or property rights, the court may make any order in the interest of justice and may--among other things--order that:

(1) the requested discovery not be sought in whole or in part;

(2) the extent or subject matter of discovery be limited;

(3) the discovery not be undertaken at the time or place specified;

(4) the discovery be undertaken only by such method or upon such terms and conditions or at the time and place directed by the court;

(5) the results of discovery be sealed or otherwise protected, subject to the provisions of Rule 76a.

**Credits**
Aug. 5, 1998 and Nov. 9, 1998, eff. Jan. 1, 1999.

Notes of Decisions (28)

Vernon's Ann. Texas Rules Civ. Proc., Rule 192.6, TX R RCP Rule 192.6
Current with amendments received through 3/15/2015

---

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

---

---

> Vernon's Texas Rules Annotated
>   Texas Rules of Civil Procedure
>     Part II. Rules of Practice in District and County Courts
>       Section 9. Evidence and Discovery (Refs & Annos)
>         B. Discovery
>           Rule 192. Permissible Discovery: Forms and Scope; Work Product; Protective Orders; Definitions (Refs & Annos)

TX Rules of Civil Procedure, Rule 192.6

192.6. Protective Orders

Currentness

(a) *Motion.* A person from whom discovery is sought, and any other person affected by the discovery request, may move within the time permitted for response to the discovery request for an order protecting that person from the discovery sought. A person should not move for protection when an objection to written discovery or an assertion of privilege is appropriate, but a motion does not waive the objection or assertion of privilege. If a person seeks protection regarding the time or place of discovery, the person must state a reasonable time and place for discovery with which the person will comply. A person must comply with a request to the extent protection is not sought unless it is unreasonable under the circumstances to do so before obtaining a ruling on the motion.

(b) *Order.* To protect the movant from undue burden, unnecessary expense, harassment, annoyance, or invasion of personal, constitutional, or property rights, the court may make any order in the interest of justice and may--among other things--order that:

(1) the requested discovery not be sought in whole or in part;

(2) the extent or subject matter of discovery be limited;

(3) the discovery not be undertaken at the time or place specified;

(4) the discovery be undertaken only by such method or upon such terms and conditions or at the time and place directed by the court;

(5) the results of discovery be sealed or otherwise protected, subject to the provisions of Rule 76a.

**Credits**
Aug. 5, 1998 and Nov. 9, 1998, eff. Jan. 1, 1999.

Notes of Decisions (28)

Vernon's Ann. Texas Rules Civ. Proc., Rule 192.6, TX R RCP Rule 192.6
Current with amendments received through 3/15/2015

---

**End of Document**

© 2015 Thomson Reuters. No claim to original U.S. Government Works.

Vernon's Texas Rules Annotated
  Texas Rules of Civil Procedure
    Part II. Rules of Practice in District and County Courts
      Section 9. Evidence and Discovery (Refs & Annos)
        B. Discovery
          Rule 215. Abuse of Discovery; Sanctions (Refs & Annos)

TX Rules of Civil Procedure, Rule 215.3

215.3. Abuse of Discovery Process in Seeking, Making, or Resisting Discovery

Currentness

If the court finds a party is abusing the discovery process in seeking, making or resisting discovery or if the court finds that any interrogatory or request for inspection or production is unreasonably frivolous, oppressive, or harassing, or that a response or answer is unreasonably frivolous or made for purposes of delay, then the court in which the action is pending may, after notice and hearing, impose any appropriate sanction authorized by paragraphs (1), (2), (3), (4), (5), and (8) of Rule 215.2(b). Such order of sanction shall be subject to review on appeal from the final judgment.

**Credits**
Oct. 29, 1940, eff. Sept. 1, 1941. Amended by orders of Aug. 5, 1998, and Nov. 9, 1998, eff. Jan. 1, 1999.

Notes of Decisions (74)

Vernon's Ann. Texas Rules Civ. Proc., Rule 215.3, TX R RCP Rule 215.3
Current with amendments received through 3/15/2015

---

    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

---

Vernon's Texas Rules Annotated
  Texas Rules of Civil Procedure
    Part II. Rules of Practice in District and County Courts
      Section 11. Trial of Causes
        H. Judgments

TX Rules of Civil Procedure, Rule 301

Rule 301. Judgments

Currentness

The judgment of the court shall conform to the pleadings, the nature of the case proved and the verdict, if any, and shall be so framed as to give the party all the relief to which he may be entitled either in law or equity. Provided, that upon motion and reasonable notice the court may render judgment non obstante veredicto if a directed verdict would have been proper, and provided further that the court may, upon like motion and notice, disregard any jury finding on a question that has no support in the evidence. Only one final judgment shall be rendered in any cause except where it is otherwise specially provided by law. Judgment may, in a proper case, be given for or against one or more of several plaintiffs, and for or against one or more of several defendants or intervenors.

**Credits**

Oct. 29, 1940, eff. Sept. 1, 1941. Amended by order of July 15, 1987, eff. Jan. 1, 1988.

**Editors' Notes**

**OPINIONS OF SUBCOMMITTEE ON INTERPRETATION OF RULES**
  **Applicability of rule**

This rule was not properly cited as authority in the opinion in the case of Starr et al. v. Ferguson, 166 S.W.2d 131, for the reason that the case was tried before the new rules became effective and the Supreme Court has since stricken the reference from the opinion. 6 Texas B.J. 77 (1943); 8 Texas B.J. 33 (1945).

Notes of Decisions (2972)

Vernon's Ann. Texas Rules Civ. Proc., Rule 301, TX R RCP Rule 301
Current with amendments received through August 15, 2014

    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

 © 2015 Thomson Reuters. No claim to original U.S. Government Works.

Vernon's Texas Rules Annotated
  Texas Rules of Civil Procedure
    Part II. Rules of Practice in District and County Courts
      Section 11. Trial of Causes
        J. New Trials

TX Rules of Civil Procedure, Rule 329b

Rule 329b. Time for Filing Motions

Currentness

The following rules shall be applicable to motions for new trial and motions to modify, correct, or reform judgments (other than motions to correct the record under Rule 316) in all district and county courts:

(a) A motion for new trial, if filed, shall be filed prior to or within thirty days after the judgment or other order complained of is signed.

(b) One or more amended motions for new trial may be filed without leave of court before any preceding motion for new trial filed by the movant is overruled and within thirty days after the judgment or other order complained of is signed.

(c) In the event an original or amended motion for new trial or a motion to modify, correct or reform a judgment is not determined by written order signed within seventy-five days after the judgment was signed, it shall be considered overruled by operation of law on expiration of that period.

(d) The trial court, regardless of whether an appeal has been perfected, has plenary power to grant a new trial or to vacate, modify, correct, or reform the judgment within thirty days after the judgment is signed.

(e) If a motion for new trial is timely filed by any party, the trial court, regardless of whether an appeal has been perfected, has plenary power to grant a new trial or to vacate, modify, correct, or reform the judgment until thirty days after all such timely-filed motions are overruled, either by a written and signed order or by operation of law, whichever occurs first.

(f) On expiration of the time within which the trial court has plenary power, a judgment cannot be set aside by the trial court except by bill of review for sufficient cause, filed within the time allowed by law; provided that the court may at any time correct a clerical error in the record of a judgment and render judgment nunc pro tunc under Rule 316, and may also sign an order declaring a previous judgment or order to be void because signed after the court's plenary power had expired.

(g) A motion to modify, correct, or reform a judgment (as distinguished from motion to correct the record of a judgment under Rule 316), if filed, shall be filed and determined within the time prescribed by this rule for a motion for new trial and shall extend the trial court's plenary power and the time for perfecting an appeal in the same manner as a motion for new trial. Each such motion shall be in writing and signed by the party or his attorney and shall specify the respects in which the judgment should be modified, corrected, or reformed. The overruling of such a motion shall not preclude the filing of a motion for new trial, nor shall the overruling of a motion for new trial preclude the filing of a motion to modify, correct, or reform.

(h) If a judgment is modified, corrected or reformed in any respect, the time for appeal shall run from the time the modified, corrected, or reformed judgment is signed, but if a correction is made pursuant to Rule 316 after expiration of the period of plenary power provided by this rule, no complaint shall be heard on appeal that could have been presented in an appeal from the original judgment.

**Credits**

July 20, 1954, eff. Jan. 1, 1955. Amended by orders of July 26, 1960, eff. Jan. 1, 1961; July 20, 1966, eff. Jan. 1, 1967; Oct. 3, 1972, eff. Feb. 1, 1973; July 11, 1977, eff. Jan. 1, 1978; June 10, 1980, eff. Jan. 1, 1981; Dec. 5, 1983, eff. April 1, 1984; July 15, 1987, eff. Jan. 1, 1988.

**Editors' Notes**

**COMMENT--1988**

Amended to conform with repeal of Rule 317.

**GENERAL COMMENTARY--1966**

**Outmoded court terms**

Old style inflexible terms of court with intervening vacation periods had, prior to 1955, been outmoded in the district courts for some time. This had resulted from a number of causes, including the press of ever-increasing judicial business and crowded court dockets, particularly in the more populous counties, and recognition of the fact that traditional terms of court impeded the administration of justice by unnecessary delays and waste of time for the courts, the litigants and the attorneys. In courts where rigid terms for holding court existed, the expiration of a term usually meant that trials and judicial proceedings in progress came to an end, and that uncompleted trials and proceedings had to be begun anew at a subsequent term. Motions for new trial had to be filed and considered, if at all, at the term at which the case was tried; and on expiration of the term pending motions were overruled automatically by operation of law, and if there was not enough time before the end of the term, the judgment was final without motion for new trial; after the term had expired, the court had no control over judgments rendered during the term, and thereafter it could not revise or set aside its judgments. [1] The underlying principle was that a court is without power to function except during term time. During vacation, according to the traditional view, a court could engage only in corrective and incidental proceedings, perform administrative functions and issue writs in extraordinary or ancillary proceedings such as injunctions, mandamus, sequestration, garnishment and supersedeas as expressly authorized by statute. Under this system, uncontested litigation and settlements could not be disposed of during vacation, the court being without power to exercise judicial authority. Also, if terms of court were of several months duration, judgments rendered during the early part of a term are a long time in becoming final since trial courts customarily retained jurisdiction to revise or to set aside their judgments until the end of the term.

**Relaxation of district court terms**

The elimination of the rigid term concept as to district courts was brought about in a variety of ways by a series of legislative enactments and rule changes extending over a period of many years. First, beginning with the authorization given by the Constitution of 1876 [2] to regulate terms of district courts the Legislature began to establish so called "continuous terms" for district courts in the more populous counties, and this trend continued, with impetus by the amendment of the Constitution of 1949, so that by 1952 the terms of most district courts had been made continuous.

The effect of these enactments was to require the district courts to which they applied to be in continuous session throughout the year without any intervening vacation periods between terms, simply by providing for the beginning of a new term immediately upon termination of the previous one. Then, from 1905 on district judges were given the authority to avoid the inflexibility of conventional statutory terms by calling special terms for the purpose of disposing of pending cases. [3] Likewise, after 1909 district courts had the authority to extend their statutory terms as to pending cases where the trial was not completed before the end of the term, including disposition of the motion for new trial, as well as conclusion of the trial on the merits; [4] and also, by consent of the parties, to try civil cases without a jury in vacation and enter final judgments therein. [5]

**The Special Practice Act; Continuous Term Courts**

In 1923 the Legislature passed the Special Practice Act, [6] which was first applicable in counties having two or more civil district courts, and later by the 1939 amendment, in counties having five or more civil or criminal district courts. This Act was the forerunner of Rule 330 and present practice under Rules 329a and 329b. Among other things the Special Practice Act provided that a motion for new trial filed during one term of court could be heard and acted on at the next, and that a case or other matter on trial or in process of hearing when the term of court expired, could be proceeded with at the next term. It expressly stated that no motion for new trial or other motion or plea would be considered waived or overruled because not passed on at the term at which it was filed, and that such matter could be acted on at the succeeding term or at any time fixed by the judge or to which it may have been postponed by agreement. Motions for new trial were required to be presented within 30 days and determined within 45 days unless decision was postponed by agreement. Motions for new trial were required to be filed within 10 days after judgment, and judgments were made final after the expiration of 30 days from rendition or overruling of motion for new trial "as if the terms of court has expired". These familiar provisions are readily recognized as the source of the procedural rules above mentioned. Thus, under the Special Practice Act the end of the term was not fraught with all of the age-old problems previously referred to, the ripening of completed cases into final judgment was placed on a reasonable basis, and litigation which was in progress would automatically carry over into the next term, including the filing and disposition of motions for new trial, without the necessity for extending the term under existing statutes.

In 1942 when the Rules of Civil Procedure became effective, there were 203 counties in the State in which district courts did not have continuous terms. [7] The Rules were intended to broaden the application of the Special Practice Act, and Rule 330 states that it applies in all district courts in counties where such courts have "successive terms throughout the year, without more than two days intervening". By 1952, as a result of successive legislative enactments converting more district courts into continuous term courts, district by district, the Special Practice Act applied in approximately eighty-five percent of the counties. [8]

**The 1955 amendments**

The 1955 revision of Rules 320 and 330 and the adoption of new Rules 329-a and 329-b, effective January 1, sought to achieve uniformity of practice in all district courts with respect to motions for new trial. Except as modified by the new rules, Rules 320 and 330 did not contain any new matter; there was no change of substance in the matter that was retained in those rules. The portions that were eliminated were covered by the newly adopted Rules 329-a and 329-b.

**Rule 329a**

Rule 329-a as promulgated applied only to County Courts, including County Courts at Law. The former practice with respect to the filing and disposition of motions for new trial in those courts was unchanged.

**Rule 329b**

Under Rule 329-b the provisions of the former Special Practice Act were made applicable to all District Courts, including those with non-continuous terms. The confusing variation with respect to the time for filing and determining original and amended motions for new trial in District Courts having continuous terms and those whose terms were limited by law, in such manner that there was an appreciable interval of time between terms, was abolished. With some modification, the former provisions of sub-division (j) of Rule 330 were made applicable to all District Courts. An original motion for new trial may be filed within ten days after the judgment or other order complained of is rendered. [Subd. 1.] The 1961 amendment permits more than one postponement but none beyond 90 days after the original or amended motion for new trial is filed; and by the concluding sentence of Section 4, also added by the amendment, a postponed motion or amended motion is overruled by operation of law on expiration of 90 days after it was filed or after the date to which it was postponed, whichever occurs first.

**Amendment**

With leave of court, the original motion for new trial may be amended within twenty days and only one amended motion for new trial will be permitted. [Subd. 2.]

**Continuous term courts**

The former practice of hearing motions for new trial at a succeeding term in District Courts having continuous terms is continued. [Subd. 6.] It is not necessary to secure an order extending a term of court for the purpose of hearing and determining a motion for new trial in courts which do not have continuous terms because provision is made for automatic extensions.

**Presentation**

One change of significance was made with respect to the presenting and determining of original and amended motions for new trial. Under Rule 330, as previously worded, such motion had to be presented within thirty days after it was filed. A number of District Judges throughout the State found that this arbitrary time limitation in some cases worked a hardship on the Court, which might be engaged in an extended trial for several days prior to the expiration of such time. In order to provide some flexibility, the District Judges were given discretion to permit the presenting of a motion for new trial within an additional period of fifteen days. [Subd. 4.] It should be specifically noted that the granting of this discretion did not extend the time for the determination of an original or an amended motion for new trial beyond the period of forty-five days after its filing. Hence it will be seen that the new provision gave the Court discretion to permit the presenting and to hear the motion within a period of an additional fifteen days and no more.

**Postponement of hearing on motion**

As was formerly the practice under Rule 330, the determination of the motion could be had after the forty-five day period only by written agreement of the parties postponing the decision to "a later date". [Subd. 3.]

Under the rule as amended in 1961, the agreement must specify the day to which decision is postponed, which may not be more than 90 days after filing.

The 1961 amendment was intended to eliminate postponements to "a date convenient to the court" and similar indefinite agreements. See Holland v. Foley Bros. Dry Goods Co., Inc., 324 S.W.2d 430, writ ref.

**District courts with non-continuous terms**

In subd. 7, it was provided that as to judgments rendered in non-continuous term courts within 30 days of the end of the term, there is an automatic extension of the term so as to permit filing and disposition of motions and amended motions for new trial within the time periods prescribed for continuous term courts, and that such judgments become final at the end of 30 days from date of rendition or order overruling motion for new trial. Finally, Article 1919 was amended, effective January 1, 1956, to provide that the terms of *all* district courts shall be continuous "notwithstanding the provision of any law". [9] This amendment rendered obsolete Section 7 of Rule 329b having application in district courts without continuous terms since the terms of all district courts were now made continuous. The net effect of these changes is that all civil actions in district courts in all counties are governed by the provisions of the Special Practice Act as now written into Rules 329b and 330, and that terms of court no longer have any real significance in the disposition of litigation in the district courts. The 1961 amendments deleted subd. 7 as it was originally promulgated, and inserted a new subd. 7 extending the application of subd. 6 to county courts with non-continuous terms.

**County court terms and their problems**

In county courts, the progression toward doing away with terms of court did not parallel developments in the district courts. This resulted in part from the Constitutional provision giving both the Legislature and the commissioners' courts control of county court terms. [10] Under this provision the authority of the commissioners' courts is in some respects recognized as superior to that of the Legislature and not subject to legislative restriction. [11] Unlike district courts, county courts have not had the authority to extend their terms [12] nor to call special terms; in fact, legislation authorizing the county judge to call special terms is unconstitutional. [13] While under the Constitution continuous terms for the disposition of civil business may be established in the county court by authorization of the commissioners' court, [14] this has been accomplished in some but not in most of the counties. In short, except in probate matters, [15] county courts have always had inflexible terms of court with the result that unfinished business did not carry over beyond the end of the term or to the next term. Motions for new trial always had to be filed, if time permitted, by the end of the term, and if not considered and disposed of by the court during the term such motions were overruled by operation of law. [16] Judgments became final at the end of the term.

In county courts at law [17] the same concepts as to terms of court have prevailed as in the regular county courts, and the motion for new trial practice has been identical. In some of the county courts at law, continuous terms of court have been provided by the legislative enactments creating them, [18] but as in the case of county courts there are no provisions for extension of terms as to uncompleted trials and hearings, or for unfinished matters carrying over into the next term.

**Special practice in county courts**

The 1961 amendments of Rules 329a and 329b effective January 1, 1961, have made the district court practice with respect to pending and unfinished matters and motions for new trial applicable in county courts in so far as it was possible to do so. These rules in referring to county courts include both the constitutional county courts and county courts at law. Under Rule 329a as now amended unfinished trials and all matters which are in process of hearing when the term ends "may be proceeded with at the next or any subsequent term", and no pleas or motions will be waived or overruled automatically if not considered by the end of the term. Under Rule 329b original and amended motions for new trial in the county court are to be filed and disposed of within the same time periods as have application in the district court. The same extensions and other conditions for presentation and determination only. County court judgments become final 30 days after judgment or order overruling the motion for new trial, and during this 30 day period the county court retains control over its judgments, as in the district court. [Subd. 5.] The same rules apply in county courts which have, as well as those which do not have continuous terms, except that in noncontinuous term courts time periods ending during vacation are extended to the fifth day of the next term. Rule 329a, Subd. 7.

Evidently the last mentioned provision is in recognition of the fact that such courts without continuous terms are without power to act judicially in vacation.

Notes of Decisions (2132)

Footnotes

1      See, for example, Rule 320 as originally promulgated, regulating motions for new trial in district courts without continuous terms, and Rule 329a prior to the 1960 amendment, pertaining to motion for new trial in county courts. On this subject generally see McKean v. Ziller, 9 Tex. 58; Eddleman v. McGlaherty, 1889, 74 Tex. 280, 11 E.W. 1100; Aetna Ins. Co. v. Dancer, Com.App.1919, 215 S.W. 962; Green v. Green, Com.App.1927, 288 S.W. 406; British General Ins. Co. v. Ripy, 1937, 130 Tex. 101, 106 S.W.2d 1047; Drane v. Humble Oil & Ref. Co., Waco 1928, 4 S.W.2d 241, writ ref.

2      Article V, Section 7. "The Legislature shall have power by general act to authorize the holding of special terms, when necessary and to provide for the holding of more than two terms of the court in any county for the dispatch of business; * * *." This was amended in 1891 to permit such terms by "general or special laws". The wording was changed in 1949 to authorize the Legislature, by general or special law, "to make such provisions concerning terms or sessions of each court as it may deem necessary."

3      Articles 1920 and 200-a, Sec. 6, Vernon's Ann.Civil Statutes.

4      Article 1923; Stephenson v. Nichols, Com.App.1926, 286 S.W. 197; Curl v. Jeppesen, San Ant.1953, 253 S.W.2d 73.

5      Article 1915, Vernon's Ann.Civ. Statutes.

6      Article 2092, Vernon's Anno.Civ.Statutes.

7      James P. Alexander, "Continuous Terms", 5 Texas B.J. 43 (1942).

8      A. E. Collier, "The Special Practice Act in Texas", 6 Southwestern L.J. 193 (1952).

9      Article 1919, Vernon's Anno.Civ.St. "All district courts * * * whenever and however created shall hold at least two (2) terms per year in each county where they sit. Notwithstanding the provision of any law, the terms of all district courts * * * shall be continuous and shall begin on the day now or hereafter fixed by law and shall continue until the day fixed by law for the beginning of the next succeeding term."

10      Article V, Sec. 29. "The county court shall hold at least four terms for both civil and criminal business annually, as may be provided by the Legislature, or by the Commissioners' Court of the county under authority of law, and such other terms each year as may be fixed by the Commissioners' Court; * * *"

11      Hughes v. Doyle, 1898, 91 Tex. 421, 44 S.W. 64; Moore v. Mettauer, Beaumont 1936, 91 S.W.2d 841, writ dis.; Farrow v. Star Ins. Co. of America, Waco 1925, 273 S.W. 318; Henn v. City of Amarillo, 1928, 157 Tex. 129, 301 S.W. 71.

12      Citizens State Bank v. Miller, Waco 1938, 115 S.W.2d 1183; Denton County v. Lowry, Ft. Worth 1942, 156 S.W.2d 546.

13      Ex parte Reeves, 1907, 100 Tex. 617, 103 S.W. 478; Citizens State Bank v. Miller, Note 12 supra; Stewart v. Kemp, 54 Tex. 248.

14      See McDonald, Texas Civil Practice, Section 1.36, pp. 108-110.

15      Constitution, Article V, Section 29. "* * * said court shall be open at all times for probate business."

16      See Note 1, supra.

17      County courts at law are created by the Legislature by virtue of Article 1, Section 5 of the Constitution which permits "such other courts as may be provided by law." W. L. Sterrett v. Morgan, Dallas 1956, 294 S.W.2d 201; and see State v. Gillette's Estate, Com.App.1928, 5 S.W.2d 131; Harris County v. Stewart, 1897, 91 Tex. 133, 41 S.W. 650.

18      See Article 1970, Vernon's Anno.Civ.Statutes, and provisions for particular courts thereunder.

Vernon's Ann. Texas Rules Civ. Proc., Rule 329b, TX R RCP Rule 329b

Current with amendments received through August 15, 2014

---

**End of Document** <span style="float:right">© 2015 Thomson Reuters. No claim to original U.S. Government Works.</span>

Sign In    My Account    SUBSCRIBE: Home Delivery   Digital                     Real Estate   Rentals   Cars   Today's Paper   Going Out Guide   Find&Save

PostTV | **Politics** | Opinions | Local | Sports | National | World | Business | Tech | Lifestyle | Entertainment | Jobs | More


SLIM YOUR WALLET
*Without turning your world upside down*   bellroy

Full Archive

# John Roberts, umpire.

Posted by Chris Cillizza

In <u>John Roberts' opening statement in his 2005 confirmation hearing before the Senate Judiciary Committee</u>, he uttered the following famous/infamous lines:

> "Judges are like umpires. Umpires don't make the rules; they apply them. The role of an umpire and a judge is critical. They make sure everybody plays by the rules. But it is a limited role. Nobody ever went to a ball game to see the umpire... I will remember that it's my job to call balls and strikes and not to pitch or bat."



US Supreme Court Chief Justice John G. Roberts participates in the court's official photo session in this October 8, 2010 file photo at the Supreme Court in Washington, DC. AFP PHOTO / TIM SLOAN/FILES

As the Supreme Court — with Roberts serving as Chief Justice — moved to the ideological right on, most notably, campaign finance reform with its Citizens United ruling, Democrats pointed to that initial "umpire" statement with an eyeroll. (Citzens United allowed corporations and labor unions to make unlimited donations in support of express advocacy of candidates.)

Today, in serving as the swing vote in 5-4 ruling that largely upheld President Obama's health care law and, in so doing, handing the incumbent a major political boost, Roberts made good on his pledge to referee the game not play it.

The reaction to Roberts role as the pivot point in the most-anticipated (and high stakes) Court decision since Bush v. Gore in 2000 turned traditional partisan patterns on their head.

Liberals praised Roberts for his judgment that while forcing people to buy insurance was unconstitutional under the Commerce Clause, it held up under Congress' right to tax people for not buying into the insurance system.

Republicans fumed. "This is obviously an extremely disappointing ruling, particularly with Roberts so amazingly rewriting the law in order to uphold it," said Louisiana Republican Sen. David Vitter.

Added Dean Clancy, vice president of health care policy for FreedomWorks, a tea party aligned group: "The justification to uphold the individual mandate while simultaneously admitting it is unconstitutional under the Commerce Clause is baffling," said Dean Clancy.

Spin aside, it's seems clear that Roberts had his eye on legacies — both his own and that of the Court — when he threw his lot in with the majority opinion.

As we have noted in the past, the Court is at its lowest ebb in more than two decades in terms of how it is viewed by the public at large. A bare majority — 52 percent — regarded the Court in a favorable light in a <u>recent Pew poll</u>, a significant tumble from the 80 percent favorable rating the Court scored as recently as 1994.

Along with — or perhaps precipitated by — the Court's diminished regard among the American public, has been an increasing willingness by the President to directly criticize or challenge the nation's highest court.

In his 2010 State of the Union Speech — and with many of the Justices in attendance — Obama bashed the Citizens United ruling as having "reversed a century of law to open the floodgates for special interests — including foreign companies — to spend without limit in our elections."


*Is Congress about to threaten hospital care?*
ACT NOW
PAID FOR AND AUTHORIZED BY THE COALITION TO PROTECT AMERICA'S HEALTH CARE
AMERICA'S HEALTH CARE

## Latest Tweets


With clock ticking, Republicans feuding over DHS funding, immigration action wapo.st/1wfi9TD
WaPoSean


NEW: @JebBush needs to find way to connect with conservatives who haven't joined rush to back him. By @costareports wapo.st/1zKp4KG
edatpost


A searchable index of Clinton Foundation donors. wapo.st/1AvLALg
TheFix

More tweets from The Fix

## Post Newsletters & Alerts

Sign-up for e-mail newsletters and alerts and get the

Then, in the immediate aftermath of oral arguments this spring on the health care law, Obama offered something of a warning to the Court, arguing that an overturning of Affordable Care Act would be both "unprecedented" and "extraordinary".



**View Photo Gallery:** The Supreme Court upheld President Obama's health-care law on Thursday. Here are other instances when the high court has dipped into political fights.

While Roberts — and the rest of the Court — steadfastly maintain that they pay no attention to the back and forth in the political world regarding what their role is (and should be) in the national debate, it's impossible to believe that someone as intelligent as the Chief Justice would be unaware of how an overturning of Obama's health care law would be perceived by liberal partisans.

That's not, of course, to suggest that Roberts' motivation was political rather than legal. But it is to suggest that what Roberts did — whether intentionally or not — in ruling that Obamacare is, in fact, constitutional, is to remind people of two things: 1) Trying to cover the Supreme Court through the same partisan lens we cover campaigns and congressional politics is inherently flawed and 2) He meant what he said during his confirmation hearing almost seven years ago.

Given that, it's worth revisiting a less mentioned passage from Robert's opening statement way back in 2005. He said (in part):

> "Judges have to have the humility to recognize that they operate within a system of precedent, shaped by other judges equally striving to live up to the judicial oath. And judges have to have the modesty to be open in the decisional process to the considered views of their colleagues on the bench."

Roberts made good on that statement today. And, in so doing, may well have changed what history will write about him — and the Court.

Read more on PostPolitics:

Roberts votes for Obama, who didn't vote for him

Roberts joins liberal wing, says mandate is permissible

Live updates: Reactions to Supreme Court ruling

Obama victorious today, as GOP looks to November

Tags                                                      Older >

**Former White House press secretary Jay Carney going to**

news you need delivered directly to your inbox.

☐ Behind the Government Showdown

☐ Afternoon Fix

☐ Wonkbook

☐ Federal Insider

☐ Morning Fix

☐ Politics News & Analysis

☐ Politics News Alerts

Subscribe

See all Washington Post Newsletters

**No room for "princes" in Pope Francis' Vatican**

**How to declutter your office, your home, and your mind**

**Dozens of mysterious new craters discovered in Siberia**

Find us on Facebook



Washington Post Politics

Like

254,627 people like Washington Post Politics.

Facebook social plugin

**Featured Advertiser Links**

Looking to buy a home? Visit TWP Real Estate section for the latest open houses.

Wireless Solves Parking Nightmare

**Featured Advertiser Links**

**Sponsored Links**

American Express Hotels
Book Your Next Hotel Stay & You Can Earn Membership Rewards® Points.
americanexpress.com/Travel

Try Equifax
Take control of your credit with Equifax Complete™ Premier
www.equifax.com

TaxSlayer
Max your refund with TaxSlayer.
https://www.taxslayer.com

Buy a link here